United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| LOS GATOS MERCANTILE, INC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> E.I. DUPONT DE NEMOURS AND COMPANY, et al., <br><br> Defendants. | Case No.  13-cv-01180-BLF <br><br> **ORDER GRANTING MOTION TO DISMISS IN PART, WITH LEAVE TO AMEND** <br><br> [Re:  ECF 70] |

Plaintiffs bring this indirect purchaser class action against four manufacturers of titanium dioxide, asserting claims under state and federal antitrust laws, state consumer protection statutes, and state common laws.  Defendants move to dismiss for lack of Article III standing, lack of antitrust standing, and failure to state a claim upon which relief may be granted.  The Court has considered the briefing and the oral argument presented at the hearing on July 10, 2014.  For the reasons discussed below, the motion is GRANTED IN PART, with leave to amend.

## I.    BACKGROUND

Defendants E.I. DuPont de Nemours and Company ("DuPont"), Huntsman International, LLC ("Huntsman"), Kronos Worldwide, Inc. ("Kronos"), and Millennium Inorganic Chemicals, Inc. ("Millennium") manufacture and sell titanium dioxide, a chemical that is used as an ingredient in numerous products including paint, paper, plastic, inks, pharmaceutical coatings, toothpaste, sunscreen, cosmetics, food, rubber, and ceramic.  Titanium dioxide is unique in that it "traps and reflects light better than almost any known substance."   First Am'd Compl. ¶ 49.  There are no competitive substitutes for titanium dioxide in consumer products.

In 2010, direct purchasers of titanium dioxide filed a putative class action against DuPont,

1   Huntsman, Kronos, and Millennium in the District of Maryland, alleging a price-fixing conspiracy

2   in violation of antitrust  and consumer protection laws.  *See* Case No. 1:10-cv-00318.  Following

3   significant motion practice, that case was set for a four-week jury trial to commence in September

4   2013.  The parties settled on the eve of trial, and on December 13, 2013 the court approved the

5   class action settlement and entered judgment.

6       While the direct purchaser action was pending, the present indirect purchaser action was

7   filed by seven paint retailers:  Los Gatos Mercantile, Inc. dba Los Gatos Ace Hardware; Fred

8   Swaim, Inc. dba Quality Auto Parts; Ace Hardware of South Walton, Inc.; Lexington Home

9   Center, LLC; R.F. Cole, Inc. dba Brewers Paint Center; Cusimano Carstar Collision, Inc.; and The

10  Carpetshoppe, Inc.  Plaintiffs subsequently filed the operative first amended complaint ("FAC")

11  adding two individual plaintiffs, Morgan Tanner and William Aviles.

12      The FAC alleges the following facts:  Defendants and their co-conspirators engaged in

13  collusive pricing to dominate and control the titanium dioxide market in the United States.

14  Titanium dioxide is particularly susceptible to collusive pricing because demand is inelastic and

15  the titanium dioxide industry has high barriers to entry.  Defendants and their co-conspirators took

16  advantage of those circumstances by discussing pricing when they met at various trade association

17  functions and then engaging in lock-step price increases.  The coordinated price increases occurred

18  from 2002 through 2008 despite flat demand and excess supply.

19      The overcharges for titanium dioxide were passed through each level of distribution

20  between Defendants and Plaintiffs, who purchased "paint and other products containing Titanium

21  Dioxide manufactured by one or more of the Defendants."  FAC ¶¶ 15-21.  Titanium dioxide can

22  be physically traced through the chain of distribution, as can the overcharges.  *Id.* ¶ 143.

23  Defendants concealed their collusive activities by releasing public statements indicating that price

24  increases were the result of competitive factors.  Plaintiffs were not on inquiry notice of the price-

25  fixing conspiracy until after July 2010, when direct purchasers such as Sherwin-Williams publicly

26  announced that they were passing on titanium dioxide price increases to indirect purchasers.

27      Based upon these allegations, Plaintiffs assert claims on behalf of several putative classes

28  that purchased "products" containing "in some form" titanium dioxide manufactured by one or

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    more of the Defendants or co-conspirators.  FAC ¶¶ 35-38.  The class period is defined as "the

2    period from and including January 1, 2002 through such time as the anticompetitive effects of

3    Defendants' conduct ceased."  *Id.* ¶ 6.  The proposed classes include a  Nationwide Class seeking

4    injunctive and equitable relief; a Merchant Class comprising business entities doing business in

5    "Merchant States" that bought products containing titanium dioxide for resale; a Consumer Class

6    comprising individuals living in "Consumer States" who bought products containing titanium

7    dioxide for personal use and not for resale; and a Commercial End User Class comprising

8    individuals living in "Commercial End User States" who bought products containing titanium

9    dioxide for personal use and not for resale.  *Id.* ¶¶ 35-38.

10         The operative FAC asserts claims for:  (1) damages under antitrust laws of twenty-five

11   states; (2) damages under consumer protection laws of thirteen states; (3) disgorgement under

12   unjust enrichment laws of thirty-two states; and (4) injunctive and equitable relief under the

13   Sherman Act, 15 U.S.C. § 1.  Defendants seek dismissal of all claims for lack of Article III

14   standing, lack of antitrust standing, and failure to state a claim upon which relief may be granted.

15   **II.    DISCUSSION**

16         **A.    Article III Standing (All Claims)**

17              **1.    Legal Standard**

18         A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1)[1] raises a

19   challenge to the Court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Article III . . .

20   gives the federal courts jurisdiction over only cases and controversies."  *Public Lands for the*

21   *People, Inc. v. United States Dep't of Agric.*, 697 F.3d 1192, 1195 (9th Cir. 2012) (internal

22   quotation marks and citation omitted).  "The oft-cited *Lujan v. Defenders of Wildlife* case states

23   the three requirements for Article III standing:  (1) an injury in fact that (2) is fairly traceable to

24   the challenged conduct and (3) has some likelihood of redressability."  *Id.* at 1195-96 (citing *Lujan*

25   *v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  If these requirements are not satisfied, the

26

27   _____
     [1] Defendants' motion is brought under "Rule 12" generally.  The Court construes Defendants'
     Article III challenge to be a motion under Federal Rule of Civil Procedure 12(b)(1), which is the

28   appropriate vehicle for such a challenge.  *See Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d
     1115, 1122 (9th Cir. 2010).

1    action should be dismissed for lack of subject matter jurisdiction.  *See Steel Co. v. Citizens for a*

2    *Better Env't*, 523 U.S. 83, 109-10 (1998).

3                    **2.    Analysis**

4            Defendants contend that Plaintiffs lack Article III standing to assert claims under the laws

5    of states in which no Plaintiff resides or has purchased products.[2]  Although Plaintiffs sue under

6    the laws of thirty-two states, Plaintiffs are residents of only seven:  Arkansas, California, Florida,

7    Mississippi, New York, South Carolina, and Tennessee.  Plaintiffs argue that because they clearly

8    have Article III standing to pursue claims under the laws of some states, questions regarding the

9    ultimate scope of the class action should be addressed at class certification and not at the pleading

10   stage.  Plaintiffs assert that once a named plaintiff has established Article III standing as to some

11   claims, class certification is "logically antecedent" to resolution of Article III concerns with

12   respect to other claims.

13           Surprisingly, there is no controlling case law on this issue.  The Ninth Circuit has indicated

14   that in at least some circumstances, Article III issues properly are considered before class

15   certification.  In *Easter v. Am. West Fin.*, 381 F.3d 948 (9th Cir. 2004), borrowers filed a class

16   action in state court against mortgage loan originators, assignees, and others, alleging violations of

17   Washington state laws in connection with certain mortgage loans.  The loans in question were sold

18   to various investment trusts ("trust defendants") that pooled the loans together, securitized the

19   loans into trusts, and sold interests in the trusts to investors.  *Id.* at 954.  The Ninth Circuit held

20   that the borrowers lacked Article III standing to sue trust defendants who did not hold a named

21   plaintiff's note, observing that "[t]o satisfy the traceability requirement, a class action plaintiff

22   must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class

23   of other possible litigants.'"  *Id.* at 961 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  As

24

25   [2] At the hearing, Defendants' counsel also made the much broader argument that Plaintiffs cannot
26   satisfy the traceability requirement – and thus lack Article III standing – with respect to *any* claim.
     When questioned by the Court, defense counsel acknowledged that the broader argument had not
27   been fleshed out in the briefs.  As discussed below, this order dismisses the bulk of Plaintiffs'
     claims with leave to amend.  Because amendment could affect its viability, and because it has not
28   been briefed adequately, Defendants' broader Article III argument is not addressed in this order.
     Defendants may reassert the argument in a future motion, if appropriate.

United States District Court
Northern District of California

1    relevant here, the court concluded that "[t]he district court correctly addressed the issue of

2    standing before it addressed the issue of class certification."  *Id.* at 962.

3            The trend in the Northern District of California is to consider Article III issues at the

4    pleading stage in antitrust cases and to dismiss claims asserted under the laws of states in which no

5    plaintiff resides or has purchased products.  For example, *In re Ditropan XL Antitrust Litig.*, 529

6    F. Supp. 2d 1098 (N.D. Cal. 2007) addressed indirect purchaser claims asserted against a drug

7    manufacturer.  Concluding that "at least one named plaintiff must have standing with respect to

8    each claim the class representatives seek to bring," the district court dismissed all claims based

9    upon the laws of states in which no named plaintiff resided.  *Id.* at 1107.  The court expressly

10   rejected the plaintiffs' argument that determination of standing was premature prior to class

11   certification.  *Id.*

12           Most courts in this district have followed *Ditropan's* lead.  *See, e.g., In re Optical Disk

13   Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2011 WL 3894376, at *13 (N.D. Cal. Aug. 3, 2011)

14   ("Defendants have adequately shown that dismissal of state law claims is appropriate with respect

15   to those jurisdictions in which none of the named class representatives reside, notwithstanding

16   plaintiffs' arguments that it would not contravene standing requirements to allow those claims to

17   proceed."); *Pecover v. Electronics Arts Inc.*, 633 F. Supp. 2d 976, 984-85 (N.D. Cal. 2009)

18   (dismissing claims under laws of states in which named plaintiffs did not purchase products); *In re

19   Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1309 (N.D. Cal. 2008) (dismissing

20   claims asserted under laws of forty states in which no named plaintiff resided); *In re Graphics

21   Processing Units Antitrust Litig. ("GPU I")*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007)

22   ("no named plaintiff has standing to bring antitrust claims in those states [where no plaintiff

23   resides], and defendants' motion to dismiss those claims will be GRANTED"); *but cf. In re

24   Actimmune Mktg. Litig.*,[3] 614 F. Supp. 2d 1037, 1053-54 (N.D. Cal. 2009) ("the court agrees with

25   plaintiffs that the class-certification issue is logically antecedent to Article III standing, where the

26   standing concerns would not exist but for the class-action certification") (internal quotation marks

27

28   _____
     [3] *Actimmune* was a civil RICO action, not an antitrust action.

United States District Court
Northern District of California

1    and citation omitted).

2        Courts outside the district likewise have dismissed claims asserted under the laws of states

3    in which no named plaintiff resides or has purchased products.  *See, e.g., In re Niaspan Antitrust*

4    *Litig.*, --- F.Supp.2d ----, 2014 WL 4403848, at *16 (E.D. Pa. Sept. 5, 2014) ("Because standing

5    must be resolved on a claim-by-claim basis, the Court agrees with defendants that the named

6    plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or

7    in which they suffered no injury."); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 658

8    (E.D. Mich. 2011) (same).

9        However, a number of district courts have reached contrary holdings.  For example, *In re*

10   *Hydroxycut Mktg. and Sales Practices Litig.*, 801 F. Supp. 2d 993 (S.D. Cal. 2011) addressed class

11   claims asserted by consumers of a weight loss supplement under various state consumer protection

12   and unfair trade practices laws.  Opining that "[t]he constitutional issue of standing should not be

13   conflated with Rule 23 class action requirements," the court held that the relevant question was

14   "not whether Named Plaintiffs have standing to sue Defendants – they most certainly do – but

15   whether their injuries are sufficiently similar to those of the purported Class to justify the

16   prosecution of a nationwide class action."  *Id.* at 1005 (internal quotation marks and citation

17   omitted).  The court denied the defendants' motion to dismiss claims brought under the laws of

18   states in which the named plaintiffs did not reside.  *Id.*

19       Several other courts have articulated similar rationales.  *See, e.g., In re Processed Egg*

20   *Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 886-87 (E.D. Penn. 2012) (holding that it was

21   irrelevant for Article III purposes whether the named plaintiffs were within the zone of persons

22   protected by the state statutes at issue, that is, whether they had statutory standing); *In re Bayer*

23   *Corp. Combination Aspirin Prods. Mktg. and Sales Practices Litig.*, 701 F. Supp. 2d 356, 377

24   (E.D.N.Y. 2010) ("Whether the named plaintiffs have standing to bring suit under each of the state

25   laws alleged is immaterial because they are not bringing those claims on their own behalf, but are

26   only seeking to represent other, similarly situated consumers in those states.") (internal quotation

27   marks and citation omitted); *Jepson v. Ticor Title Ins. Co.*, No. C06-1723-JCC, 2007 WL

28   2060856, at *1-2 (W.D. Wash. May 1, 2007) (holding that class certification is "logically

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    antecedent" to Article III concerns when the named plaintiff has alleged injury flowing from the

2    defendant's conduct and the only issue is whether the named plaintiff should be permitted to

3    represent "a class of those similarly injured by this Defendant under analogous laws in other

4    states").

5         After careful consideration, this Court joins the majority of courts in the Northern District

6    in concluding that dismissal is appropriate with respect to claims asserted under the laws of states

7    in which no Plaintiff resides or has purchased products.[4]  This approach best comports with the

8    Court's understanding of Article III requirements, summed up concisely by *Moore*:  "If a

9    complaint includes multiple claims, at least one named class representative must have Article III

10   standing to raise each claim."  5 J. Moore *et al.*, *Moore's Federal Practice* § 26.63[1][b] at 23-304

11   (3rd Ed. 2014).  "[I]t is not enough that a named plaintiff can establish a case or controversy

12   between himself and the defendant by virtue of having standing as to just one of many claims he

13   wishes to assert."  *Grivvin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987).  "Rather, each claim

14   must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one

15   named plaintiff has suffered the injury that gives rise to that claim."  *Id; see also Hawkins v.*

16   *Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001) ("A named plaintiff cannot represent a

17   class alleging constitutional claims that the named plaintiff does not have standing to raise. . . .  It

18   is not enough that the class members share other claims in common.").

19        Accordingly, Defendants' motion is GRANTED with leave to amend as to claims asserted

20   under the law of states other than Arkansas, California, Florida, Mississippi, New York, South

21   Carolina, and Tennessee.[5]

22

23   _____

24   [4] Plaintiffs argue that many states' antitrust and consumer protection laws do not require in-state
     residency or in-state purchase.  To the extent that Plaintiffs are asserting that they have statutory
     standing under those laws, the FAC does not make that allegation clear and does not identify the
25   states in question.

26   [5] At the hearing, Plaintiffs' counsel asserted that granting Defendants' motion on this basis will
     have little effect as a practical matter, since Plaintiffs will locate putative class members in each
27   state and move to add them as parties.  Counsel argued that it would be more efficient simply to
     permit the claims to go forward under the laws of all states now and thus avoid future piecemeal
28   litigation.  The Court does not disagree; however, it is constrained by the jurisdictional limits
     imposed by Article III.

United States District Court
Northern District of California

**B.     Antitrust Standing (Claims 1 and 4)**

**1.     Legal Standard**

With respect to antitrust claims brought under federal statute, the presiding court must determine "whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983). "The label 'antitrust standing' has traditionally been applied to some of the elements of this inquiry." *Id.* "Under AGC, courts consider (1) the nature of plaintiffs' injuries and whether plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (citing *AGC*, 459 U.S. at 536–39).

A challenge to antitrust standing properly is brought under Federal Rule of Civil Procedure 12(b)(6). *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) (analyzing *AGC* factors in the context of a Rule 12(b)(6) motion); *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (characterizing "antitrust standing" as a pleading requirement for a Sherman Act § 1 claim). A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**2.     *AGC*'s Application to State Law Claims and Sherman Act § 1 Claim**

Defendants contend that the *AGC* factors apply to Plaintiffs' state law antitrust claims as well as their Sherman Act § 1 claim. There is no dispute that the Sherman Act § 1 claim is subject to an *AGC* analysis. However, because damages are not available under a § 1 claim, the fourth factor (risk of duplicative recovery) and fifth factor (complexity in apportioning damages) do not apply. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. MDL 2109, 09 C

1    7666, 2012 WL 39766, at *9 (N.D. Ill. Jan. 9, 2012).  At the hearing, Defendants' counsel agreed

2    that with respect to the Sherman Act § 1 claim, the appropriate test is "*AGC* lite."

3         However, the parties disagree whether *AGC* applies to Plaintiffs' state law antitrust claims.

4    Plaintiffs contend that it does not, arguing that such application would effectively abrogate the

5    remedies authorized by the relevant states' repealer statutes.[6]  Defendants argue that the states in

6    question have adopted *AGC*, as evidenced by state court decisions or statutory provisions

7    harmonizing state and federal antitrust laws.

8         Plaintiffs assert claims under the antitrust laws of twenty-five states but they are residents

9    of just four:  California, Mississippi, New York, and Tennessee.  Because Plaintiffs lack Article III

10   standing to pursue claims under the laws of states in which no Plaintiff resides or purchased

11   products, the Court's *AGC* analysis is limited to the antitrust laws of those four states.

12        Federal courts have adopted different criteria for determining whether the *AGC* factors

13   apply to a particular state's antitrust statute.  In *Knevelbaard*, the Ninth Circuit simply announced

14   that California's Cartwright Act is subject to the *AGC* factors.  *Knevelbaard*, 232 F.3d at 987.  At

15   least one district court also has applied *AGC* to Cartwright Act claims, relying on *Knevelbaard*.

16   *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig. ("DRAM I")*, 516 F. Supp.

17   2d 1072, 1088 (N.D. Cal. 2007).  *DRAM I* also held that AGC applies to the antitrust statutes of

18   thirteen other states based upon state court decisions applying federal law and/or statutory

19   harmonization provisions indicating that federal law applies.  *Id.* at 1093-95.

20        A narrower approach was articulated in the decision *In re Graphics Processing Units*

21   *Antitrust Litig. ("GPU II")*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007).  In *GPU II*, the court

22   determined that application of the *AGC* factors is appropriate when a state's highest court has

23   expressly endorsed *AGC*; may or may not be appropriate when *AGC* has been endorsed only by an

24   intermediate appellate court; and is not appropriate when the only basis for applying *AGC* is a

25

26   ───────────────

27   [6] In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court limited the ability of
     indirect purchasers to recover damages under the Sherman and Clayton Acts.  "[I]n response to
     *Illinois Brick*, some states passed 'repealer' statutes expressly allowing indirect purchasers to
28   recover money damages for antitrust violations under state law."  *Flat Panel*, 586 F. Supp. 2d at
     1120.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    harmonization provision in the state antitrust statute.  *Id.* at 1097.  Unlike *DRAM I*, which applied

2    *AGC* to California's Cartwright Act, *GPU II* concluded that *AGC* may or may not apply to the

3    Cartwright Act.  *Id.*

4         *Flat Panel* adopted yet a narrower approach, holding that "it is inappropriate to broadly

5    apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear

6    directive from those states' legislatures or highest courts."  *Flat Panel*, 586 F. Supp. 2d at 1123.

7         This Court concludes that it is appropriate to apply the *AGC* factors to a repealer statute if

8    the state legislature or a state court decision clearly indicates that federal law should be followed

9    in construing the statute.  A decision of the state's highest court is controlling, and a lower state

10   court is in a better position than this Court to predict its highest court's approach.[7]  However, the

11   Court is not persuaded that *AGC* should be applied to a repealer statute based solely upon a

12   general harmonization provision therein.

13        Turning to the states at issue here, at least one intermediate appellate court has applied

14   *AGC* to California's Cartwright Act.  *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814

15   (1995).  The Ninth Circuit has done so as well, as discussed above.  *See Knevelbaard*, 232 F.3d at

16   987.  At least one state court decision has applied *AGC* to New York's antitrust statute.  *See Ho v.

17   Visa U.S.A. Inc.*, No. 112316/00, 2004 WL 1118534, at *2-3 (N.Y. Sup. Ct. Apr. 21, 2004), *aff'd*

18   16 A.D. 3d 256 (N.Y. App. Div. 2005).  Accordingly, this Court concludes that application of the

19   *AGC* factors is appropriate with respect to claims asserted under California and New York

20   antitrust law.

21        There do not appear to be any state court decisions applying *AGC* to the antitrust statutes

22   of Mississippi, *see DRAM I*, 516 F. Supp. 2d at 1095, or Tennessee.[8]  Accordingly, this Court

---

[7] Whether *AGC* applies to a state's antitrust statute is a question of state law.  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151 (9th Cir. 2009).  "In analyzing questions of state law, federal courts are bound by the decisions of the state's highest court" and "must follow the state intermediate appellate court decision" absent convincing evidence that the state's highest court likely would not follow it.  *Id.* (internal quotation marks and citation omitted).

[8] Defendants rely upon *Tenn. Med. Ass'n v. Blue Cross Blue Shield of Tenn., Inc.*, 229 S.W. 3d 304, 311 (Tenn. Ct. App. 2007), for the proposition that *AGC* should be applied to the antitrust claim brought under Tennessee law.  The cited case involved a medical association's action against a health maintenance organization under Tennessee's Consumer Protection Act.  The

1   declines to apply *AGC* to the claims arising under the antitrust laws of those states.

2   **3.      Antitrust Standing under *AGC***

3       Applying the *AGC* factors to the Sherman Act § 1 claim and the claims brought under the

4   antitrust laws of California and New York, the Court concludes that Plaintiffs have failed to plead

5   facts establishing antitrust standing.

6   **a.      First Factor**

7       With respect to the first factor – the nature of the plaintiffs' injuries and whether the

8   plaintiffs were participants in the relevant markets – courts have adopted different approaches to

9   the definition of the relevant market.  In *DRAM I*, the plaintiffs alleged that the defendants fixed

10  prices for dynamic random access memory ("DRAM"), a type of semiconductor chip used in

11  computers and other consumer electronics.  *See DRAM I*, 516 F. Supp. 2d at 1082.  Plaintiffs

12  brought an indirect purchaser lawsuit alleging that they paid artificially high prices for electronic

13  goods that incorporated DRAM.  The court found that "plaintiffs who are purchasing products in

14  which DRAM is a component, rather than DRAM itself, are participating in a secondary market

15  that is incidental to the primary price-fixed market (i.e., the market for DRAM modules

16  themselves)."  *Id.* at 1091.  Following amendment of the complaint to allege that the DRAM and

17  computer markets were "inextricably linked," the court dismissed the plaintiffs' state antitrust

18  claims on the ground that the new allegation was insufficient to establish that the plaintiffs were

19  participating in the same market as the allegedly restrained DRAM market.  *See In re Dynamic*

20  *Random Access Memory (DRAM) Antitrust Litig. ("DRAM II")*, 536 F. Supp. 2d 1129, 1140-41

21  (N.D. Cal. 2008).

22      However, *Flat Panel* reached a different result on similar facts.  In that case, the indirect

23  purchaser plaintiffs alleged price-fixing with respect to LCD panels, and claimed that they paid

24  artificially high prices for products such as computer monitors, laptop computers, and televisions

25  that incorporated LCD panels.  *See Flat Panel*, 586 F. Supp. 2d at 1114.  The plaintiffs made the

27  decision cited *AGC* in the context of a discussion of common law principles of proximate cause.
    The Court is not persuaded that the decision suggests that Tennessee's highest court would apply
28  *AGC* to state law antitrust claims.

United States District Court
Northern District of California

1    same "inextricably linked" allegation that was rejected in *DRAM II*.  The court in *Flat Panel* found

2    the allegation to be sufficient for pleading purposes, holding that it was not clear as a factual

3    matter whether the plaintiffs and defendants were participating in the same market or in

4    analytically distinct markets but that the issue should be resolved on a more developed record.

5    *Flat Panel,* 586 F. Supp. 2d at 1123.  The court also observed that "even if plaintiffs are not

6    participants in the relevant market, they have also alleged that TFT-LCD panels are identifiable,

7    discrete physical objects that do not change form or become an indistinguishable part of the TVs,

8    computer monitors, laptops, or other products in which they are contained, and [t]hus LCD panels

9    follow a traceable physical chain from the defendants to the OEMs to the purchasers of the

10   finished products incorporating LCD panels."  *Id.* (internal quotation marks and citation omitted)

11   (alteration in the original).  The court suggested that these allegations were sufficient to satisfy the

12   first factor of *AGC*.  *Id.*; *accord, GPU II*, 540 F. Supp. 2d at 1098 (finding that first factor "slightly

13   favor[ed] standing" because graphics processing units – GPUs – were separate components of a

14   computer and that costs attributable to GPUs were traceable through the chain of distribution).

15          In the present case, Plaintiffs have defined the relevant market to include *every product in*

16   *the United States that contains titanium dioxide*.  A market that includes such a broad array of

17   products cannot be considered the same market as the allegedly restrained market for titanium

18   dioxide itself.  As noted above, that would be the end of the analysis under *DRAM I* and *DRAM II*.

19   Even if the Court were to apply the reasoning of *Flat Panel* and *GPU II*, Plaintiffs have failed to

20   allege facts showing that the market for *every* product containing titanium dioxide – even in mere

21   trace amounts – is "inextricably linked" to the titanium dioxide market.  Moreover, both *Flat*

22   *Panel* and *GPU II* turned in part upon allegations that the allegedly price-fixed products – LCD

23   panels and GPUs, respectively – could be physically traced through the distribution chain *because*

24   they were identifiable, discrete components that did not become indistinguishable parts of the

25   finished consumer end product.  In the present case, however, the allegedly price-fixed product is

26   a chemical ingredient that does become an indistinguishable part of the finished consumer product.

27   Thus although Plaintiffs allege that they will be able to physically trace titanium dioxide

28   manufactured by Defendants through the distribution chain, that allegation is implausible given

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    the breadth of the defined market and the manner in which titanium dioxide is incorporated into

2    finished consumer products.[9]

3              In a similar case involving alleged price-fixing of an ingredient, the court concluded that

4    purchasers of products containing potash, a combination of mineral and chemical salts, "failed to

5    show they are participants in the relevant market, and, as a result, have not satisfied the antitrust

6    injury requirement."  *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 940 (N.D. Ill. 2009),

7    *vacated and remanded on other grounds by Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th

8    Cir. 2011), *aff'd Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).  This Court need

9    not decide at this time whether tracing ever would be possible with respect to a chemical

10   ingredient such as titanium dioxide; it is clear that Plaintiffs have not alleged the necessary facts

11   here.

12                              **b.       Second and Third Factors**

13             With respect to the second and third *AGC* factors – the directness of the alleged injury and

14   the speculative nature of the alleged harm – Plaintiffs allege the following facts:  Defendants

15   conspired to and did fix the price of titanium dioxide at artificially high levels throughout the

16   United States; as a result, direct purchasers paid unfairly high prices for titanium dioxide; those

17   overcharges were passed through each level of distribution as titanium dioxide was incorporated

18   into consumer products; and Plaintiffs and class members paid supracompetitive prices for

19   products containing titanium dioxide during the class period.  FAC ¶¶ 141-142.  Plaintiffs assert

20   that a regression analysis may be used to determine the impact of the increase in the price of

21   titanium dioxide on products containing titanium dioxide while controlling for other factors that

22   impact the price of those products.  FAC ¶ 146.

23

24   ―――――――――――――――
     [9] While it accepts as true all factual allegations in the FAC, the Court need not accept "allegations
25   that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re
     Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and
26   citations omitted).  Plaintiffs' allegations that "Titanium Dioxide comprises a significant portion
     of the cost of products containing the chemical," that "Titanium Dioxide follows a traceable
27   physical chain of distribution from Defendants to Plaintiffs" and that "any costs attributable to
     Titanium Dioxide can be traced through the chain of distribution to Indirect Purchaser Plaintiffs"
28   are conclusory.  FAC ¶ 143.  Given their implausibility in light of the breadth of products at issue,
     the Court does not accept those tracing allegations as true.

United States District Court
Northern District of California

1    These allegations are insufficient given the absence of any facts indicating how the alleged

2    overcharges for titanium dioxide could be traced through the hundreds or perhaps thousands of

3    distribution chains implicated by the breadth of Plaintiffs' market definition.  Moreover, with

4    respect to consumer products far down the distribution chain and products that do not contain

5    significant amounts of titanium dioxide, the alleged injury appears to be too remote.  When asked

6    about the breadth of the market definition at the hearing, Plaintiffs' counsel acknowledged that the

7    market would have to be narrowed at some point.  However, counsel suggested that the Court

8    focus solely on the allegations regarding paint in analyzing the motion to dismiss, and he argued

9    that with respect to paint traceability has been fairly alleged for antitrust standing.  The problem

10   with that argument is that the FAC clearly is not limited to paint, and the Court must evaluate the

11   FAC as it is presently framed.

            c.        **Fourth and Fifth Factors**

13   The fourth and fifth factors – a risk of duplicative recovery and the complexity in

14   apportioning damages – are not implicated with respect to the Sherman Act § 1 claim.  With

15   respect to the state law claims, Plaintiffs have not explained adequately how they intend to avoid

16   duplicative recovery given that the putative classes include every level of the distribution chain.

17   Moreover, in light of the fact that the defined market runs the spectrum between products

18   containing significant amounts of titanium dioxide to products containing only trace amounts, the

19   Court fails to see how apportionment of damages could be anything other than complex.

20   Plaintiffs may be able to cure these defects by alleging a more limited market of products

21   containing titanium dioxide; showing how that market (whatever it is) is "inextricably linked" to

22   the primary, restrained market; and alleging facts demonstrating that titanium dioxide can be

23   traced through the distribution chain.  However, because of the way that Plaintiffs' claims

24   currently are framed, the motion to dismiss for lack of antitrust standing is GRANTED with leave

25   to amend as to the Sherman Act § 1 claim and the claims asserted under California and New York

26   state antitrust law.  The motion to dismiss for lack of antitrust standing is DENIED with respect to

27   the claims asserted under Mississippi and Tennessee state antitrust law, as *AGC* does not apply to

28

14

those claims.[10]

### C.   Consumer Protection Statutes (Claim 2)

Plaintiffs allege that Defendants' conduct gives rise to liability under consumer protection statutes of thirteen states.  Plaintiffs reside in only five of those states:  Arkansas, California, Florida, New York, and South Carolina.[11]

#### 1.   Arkansas

It is unclear whether price-fixing claims may be asserted under the Arkansas Deceptive Trades Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101 *et seq.*  "[T]he ADTPA protects consumers from unfair ways of doing business."  *Indep. Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 887 (E.D. Ark. 2008).  At least one Arkansas court has held that price-fixing is actionable under the ADTPA as an "unconscionable, false or a deceptive act."  *Burton v. Micron Tech., Inc.*, No. CV 2004-226-1, at 2 (Ark. Cir. Ct. 1st Div. Nov. 6, 2009) (provided at Pl.'s Exh. G).  District courts have split on the issue.  *DRAM I* held that price fixing claims are permitted under the ADTPA, *see DRAM I*, 516 F. Supp. 2d at 1108-09, while *Flat Panel* and *GPU I* held that they are not, *see Flat Panel*, 586 F. Supp. 2d at 1125; *GPU I*, 527 F. Supp. 2d at 1029-30.  In *Flat Panel*, the court's ruling turned upon the plaintiffs' failure to cite any Arkansas authority construing the ADTPA to encompass price-fixing claims; the court was "unwilling to expansively interpret the statute" absent such authority.  *Flat Panel*, 586 F. Supp. 2d at 1125.  In *GPU I*, the court simply

---

[10] With respect to Mississippi, Defendants assert an additional argument that Plaintiffs' claims are barred because they do not allege a sufficient nexus between the alleged anticompetitive conduct and intrastate commerce.  That argument was rejected in *GPU II* on facts similar to those pled in this case.  *See GPU II*, 540 F. Supp. 2d at 1099 ("Plaintiffs have alleged that defendants' conspiracy substantially affected commerce in each of those states, injured residents in those states, that defendants promoted and sold GPUs and graphics cards in each of those states, and that defendants harmed competition in those states . . . .  plaintiffs have alleged that defendants' conspiracy affected commerce within these states.").  This Court likewise concludes that Plaintiffs have alleged facts sufficient to plead an effect on intrastate commerce.

[11] Defendants assert multiple arguments in support of their motion to dismiss the claims brought under state consumer protection laws.  All of the consumer protection claims addressed herein fail because, as presently framed, the complaint does not allege facts sufficient to show that the alleged unfair or deceptive price-fixing actually caused Plaintiffs injury.  In light of that basic pleading failure, the Court need not address the myriad of other arguments asserted by Defendants. If Plaintiffs cure the defects noted in this order, Defendants may reassert those arguments in a future motion, if appropriate.

United States District Court
Northern District of California

1    concluded that price-fixing "is not the kind of conduct prohibited" under the statute.  *GPU I*, 527

2    F. Supp. 2d at 1030.

3         Even assuming that a price-fixing claim may be asserted under the ADTPA, "Arkansas law

4    recognizes the remoteness doctrine" such that a consumer claim is subject to dismissal if there is

5    no direct link between the alleged misconduct and the claimed damages.  *Indep. Cnty.*, 534 F.

6    Supp. 2d at 888-89.  As discussed above in connection with antitrust standing, Plaintiffs have not

7    alleged facts showing that there is a direct connection between the alleged price-fixing of titanium

8    dioxide and any damages suffered as a result of Plaintiffs' purchase of products containing

9    titanium dioxide.  Accordingly, the motion to dismiss is GRANTED with leave to amend as to the

10   claim brought under the ADTPA.

                    **2.       California**

12        California's Unfair Competition Law ("UCL") provides a vehicle for recovery against a

13   defendant engaged in an "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. &

14   Prof. Code § 17200.  "The broad scope of the statute encompasses both anticompetitive business

15   practices and practices injurious to consumers."  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363,

16   374 (2001).  However, "[i]f the same conduct is alleged to be both an antitrust violation and an

17   'unfair' business act or practice for the same reason – because it unreasonably restrains

18   competition and harms consumers – the determination that the conduct is not an unreasonable

19   restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."  *Id.*

20   Because Plaintiffs have failed to state a claim for an antitrust violation, they have failed to state a

21   claim under the UCL based upon the alleged anticompetitive conduct.  *See LiveUniverse, Inc. v.*

22   *MySpace, Inc.*, 304 Fed. Appx. 554, 558 (9th Cir. 2008) ("Because LiveUniverse fails to state a

23   claim under the Sherman Act, it also fails to state a claim under § 17200.").  Accordingly, the

24   motion to dismiss is GRANTED with leave to amend as to the claim brought under § 17200.

                    **3.       Florida**

26        The Florida Deceptive and Unfair Trade Practices Act ("DTPA") prohibits "[u]nfair

27   methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices

28   in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  "[T]he Florida DTPA clearly

United States District Court
Northern District of California

16

1    expresses the legislative policy to authorize consumers (that is, indirect purchasers) to bring

2    actions under the Florida DTPA for price-fixing conduct." *Mack v. Bristol-Myers Squibb Co.*, 673

3    So. 2d 100, 109 (Fla. App. 1 Dist. 1996). However, as discussed above, Plaintiffs have not alleged

4    facts sufficient to show that they suffered any injury as a result of the alleged price fixing.

5    Accordingly, the motion to dismiss is GRANTED with leave to amend as to the claim brought

6    under the Florida DTPA.

7                  **4.  New York**

8        New York's consumer protection law provides that "[d]eceptive acts or practices in the

9    conduct of any business, trade or commerce or in the furnishing of any service in this state are

10    hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). "In order to state a claim under section

11    349, plaintiffs must allege first, that the challenged act or practice was consumer-oriented; second,

12    that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of

13    the deceptive act." *DRAM II*, 536 F. Supp. 2d at 1143 (internal quotation marks and citation

14    omitted). Defendants argue that Plaintiffs' claims do not meet the "consumer-oriented"

15    requirement because Plaintiffs allege price-fixing agreements between companies, and not conduct

16    aimed specifically at New York consumers. That argument was expressly rejected in *DRAM II*.

17    However, even if the Court were to adopt *DRAM II*'s holding on that point, Plaintiffs have failed

18    to allege facts showing that they suffered injury as a result of the alleged price-fixing.

19    Accordingly, the motion to dismiss is GRANTED with leave to amend as to the claim brought

20    under New York's consumer protection law.

21                  **5.  South Carolina**

22        The South Carolina consumer protection law provides that: "Any person who suffers any

23    ascertainable loss of money or property, real or personal, as a result of the use or employment by

24    another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20

25    may bring an action individually, but not in a representative capacity, to recover actual damages."

26    S.C. Code § 39-5-140(a). Despite the express language limiting suits to individual actions, at least

27    some district courts have held that consumer class actions may be brought under this statute in

28    federal court. *See, e.g., In re Hydroxycut Mktg. and Sales Practices Litig.*, 299 F.R.D. 648, 652

1   (S.D. Cal. 2014) (holding that statutory provisions prohibiting class actions for unfair or deceptive

2   practices are procedural rather than substantive, and that the viability of class actions under the

3   statute is governed by Federal Rule of Civil Procedure 23).  However, even assuming that a class

4   action is viable under South Carolina's consumer protection law, the claim fails to allege that

5   Plaintiffs suffered an ascertainable loss "as a result" of Defendants' alleged unfair price-fixing

6   practices.  Accordingly, the motion to dismiss is GRANTED with leave to amend as to the claim

7   brought under South Carolina's consumer protection law.

8          **D.     Unjust Enrichment (Claim 3)**

9          Plaintiffs assert unjust enrichment claims under the laws of "all states" alleged in Claims 1

10  and 2.  No further specificity is provided in the FAC; it does not identify the relevant laws of the

11  thirty-two states in question or attempt to set forth facts showing that claims lie under each of

12  those laws.  The Court informed counsel at the hearing that those allegations are inadequate and

13  that Plaintiffs must identify and plead the elements of unjust enrichment for each state.

14  Accordingly, the motion is GRANTED with leave to amend as to Claim 3.

15         **E.     Statute of Limitations (Claims 1 and 2)**

16         Defendants contend that certain of Plaintiffs' state law antitrust and consumer protection

17  claims are time-barred under applicable limitations periods.  At the hearing, the Court expressed

18  reservations regarding the timeliness of Plaintiffs' claims and their allegations of delayed

19  discovery.  Plaintiffs' counsel indicated that Plaintiffs wish to amend their delayed discovery

20  allegations to set forth additional facts and a different discovery date.  Plaintiffs are given leave to

21  do so.

22  **III.   ORDER**

23         For the foregoing reasons, IT IS HEREBY ORDERED that:

24         (1)     Defendants' motion to dismiss for lack of Article III standing is GRANTED with

25                 leave to amend as to all claims asserted under the laws of states in which no named

26                 Plaintiff resides or purchased products;

27         (2)     Defendants' motion to dismiss for lack of antitrust standing under *AGC* is

28                 GRANTED with leave to amend as the claims asserted under the Sherman Act § 1

United States District Court
Northern District of California

18

and the antitrust laws of California and New York, and is DENIED as to the claims asserted under the antitrust laws of Mississippi and Tennessee;

(3)   Defendants' motion to dismiss state law consumer protection claims is GRANTED with leave to amend as to the claims asserted under the laws of Arkansas, California, Florida, New York, and South Carolina;

(4)   Defendants' motion to dismiss Plaintiffs' state law unjust enrichment claims is GRANTED with leave to amend;

(5)   Plaintiffs are granted leave to amend their allegations with respect to statute of limitations and delayed discovery;

(6)   Leave to amend is limited to curing the pleading defects noted herein – Plaintiffs shall not add new claims without leave of the Court; and

(7)   Any amended complaint shall be filed on or before October 13, 2014.

Dated:  September 22, 2014

BETH LABSON FREEMAN
United States District Judge

19