1   Ben F. Pierce Gore (SBN 128515)
    PRATT & ASSOCIATES
2   1871 The Alameda, Suite 425
    San Jose, California 95126
3   Telephone: (408) 369-0800
    Facsimile:  (408) 369-0752
4   pgore@prattattorneys.com

5   *Attorney for Plaintiffs and the Putative Class*

6   Additional counsel listed on signature page

7              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
8                **SAN FRANCISCO DIVISION**

9   LOS GATOS MERCANTILE, INC. D/B/A
    LOS GATOS ACE HARDWARE; ACE
10  HARDWARE OF SOUTH WALTON, INC.;
    ABBOTT PAINT AND CARPET, INC.;
11  LEXINGTON HOME CENTER, LLC;
    PROCTOR'S BUILDING MATERIALS,
12  INC. D/B/A PROCTORS DO IT BEST
    BLDG MTRL; GREENE'S HARDWARE &
13  SUPPLY COMPANY, INC.; R.F. COLE,        No. 5:13-cv-01180-BLF
    INC. D/B/A BREWERS PAINT CENTER;
14  COLUMBARE, INC., D/B/A EVERYDAY'S       **SECOND AMENDED**
    TRUE VALUE; JAN HARRISON; LEE          **CLASS ACTION COMPLAINT**
15  RANALLI; MORGAN TANNER;
    SPENCER HATHAWAY; TODD TURLEY;
16  DEBBIE HALE; KELI ANNO; DEANNA
    DEVENEY; CHRISTOPHER KUON-TSEN
17  LEE; JIM BUCKINGHAM; TANDA
    SAXTON; JOHN WOZNIAK; JEROME
18  SHERMAN; BEVERLY JENKINS; DAVID
    PETERSEN; TOM STEVER; BRIAN
19  BAWOL; RANSOME FOOSE; and STACY
    FRANKLIN;
20
                    Plaintiffs,
21
    v.
22
    E.I. DUPONT DE NEMOURS AND
23  COMPANY; HUNTSMAN
    INTERNATIONAL, LLC; KRONOS
24

1 | WORLDWIDE, INC.; NATIONAL
TITANIUM DIOXIDE COMPANY
2 | LIMITED d/b/a CRISTAL; and
MILLENNIUM INORGANIC
3 | CHEMICALS, INC.;

4 |        Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## TABLE OF CONTENTS

2    I.      INTRODUCTION ..................................................................................... 1

3    II.     JURISDICTION AND VENUE ............................................................... 4

4    III.    PARTIES ................................................................................................. 6

5            A.      PLAINTIFFS ................................................................................. 6

6            B.      DEFENDANTS ............................................................................ 15

7    IV.     AGENTS AND CO-CONSPIRATORS ................................................ 17

     V.      CLASS ACTION ALLEGATIONS ....................................................... 20
8
     VI.     TRADE AND COMMERCE.................................................................. 23
9
     VII.    FACTUAL ALLEGATIONS .................................................................. 23
10
             A.      BACKGROUND REGARDING TITANIUM DIOXIDE ................... 23
11
             B.      THE TITANIUM DIOXIDE INDUSTRY. ...................................... 25
12
             C.      DEFENDANTS' UNLAWFUL TITANIUM DIOXIDE PRICE FIXING CONSPIRACY......... 29
13
                     1.      Industry Conditions Prior to 2002.......................... 33
14
                     2.      A Paradigm Shift in Industry Behavior................... 34
15
                     a.   2002 Price Increases ..................................... 37
16
                     b.   2003 Price Increases ..................................... 39
17
                     c.   2004 Price Increases ..................................... 40
18
                     d.   2005 Price Increases ..................................... 42
19
                     e.   2006 Price Increases ..................................... 44
20
                     f.   2007 Price Increases ..................................... 44
21
                     g.   2008 Price Increases ..................................... 46
22
                     h.   2009 Price Increases ..................................... 50
23
                     i.   2010 Price Increases ..................................... 52

     VIII.   PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY ....................... 56
24

IX.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF
      LIMITATIONS ........................................................................................ 61

      A.    THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS
            DID NOT AND COULD NOT DISCOVER THE CLAIMS. ............................................. 61

      B.    FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS. ............... 63

X.    CLAIMS FOR RELIEF ......................................................................... 71

      FIRST CLAIM FOR RELIEF ...................................................................... 71

      SECOND CLAIM FOR RELIEF ................................................................. 87

      THIRD CLAIM FOR RELIEF .................................................................. 101

      FOURTH CLAIM FOR RELIEF ............................................................... 112

PRAYER FOR RELIEF ..................................................................................... 114

JURY DEMAND ............................................................................................... 116

Come now Plaintiffs Los Gatos Mercantile, Inc. d/b/a Los Gatos Ace Hardware; Ace Hardware of South Walton, Inc.; Abbott Paint and Carpet, Inc.; Lexington Home Center, LLC; Proctor's Building Materials, Inc. d/b/a Proctors Do it Best Bldg Mtrl; Greene's Hardware & Supply Company, Inc.; R.F. Cole, Inc. d/b/a Brewers Paint Center; The Carpet Shoppe, Inc.; and Columbare, Inc., d/b/a Everyday's True Value; (collectively "Merchants") and Jan Harrison; Lee Ranalli; Morgan Tanner; Spencer Hathaway; Todd Turley; Debbie Hale; Keli Anno; Deanna Deveney; Christopher Kuon-Tsen Lee; Jim Buckingham; Tanda Saxton; John Wozniak; Jerome Sherman; Beverly Jenkins; David Petersen; Tom Stever; Ransome Foose; Brian Bawol; and Stacy Franklin (collectively "Consumers") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, and for their Second Amended Class Action Complaint, state as follows:

## I.      INTRODUCTION

1.      This class action lawsuit alleges price fixing in Titanium Dioxide, a principal ingredient in Architectural Coatings.[1]  Many Architectural Coatings are commonly known as house paint.  Although Titanium Dioxide is an ingredient in many products, the only product at issue in this case is Architectural Coatings.

2.      Plaintiffs are indirect purchasers of Titanium Dioxide who purchased Titanium Dioxide in Architectural Coatings.   Defendants E.I. DuPont De Nemours and Company ("DuPont"); Huntsman International, LLC ("Huntsman"); Kronos Worldwide, Inc. ("Kronos");

---

[1] ASTM International defines "Architectural Coatings" as follows:  "Organic coatings intended for on-site application to interior or exterior surfaces of residential, commercial, institutional, or industrial buildings, in contrast to industrial coatings. They are protective and decorative finishes applied at ambient temperatures."  *See* http://www.astm.org/DIGITAL_LIBRARY/ MNL/PAGES/MNL12240M.htm (last visited Oct. 14, 2014). "Most are designated for specific uses such as roof coatings, wall paints, or deck finishes."  *Id.*

National Titanium Dioxide Company Limited d/b/a Cristal ("Cristal"); and Millennium Inorganic Chemicals, Inc. ("Millennium") (collectively "Defendants") and their co-conspirators are the dominant suppliers of Titanium Dioxide in the United States.  Defendants dominate the United States marketplace for this product, a dry chemical powder, which is used in coatings such as paint, cosmetics, plastics, and paper industries.  All or virtually all sales of Titanium Dioxide in the United States for production of Architectural Coatings during the Class Period (defined below) were made by Defendants.  Defendants earn billions in revenues from these Titanium Dioxide sales.

3.  On September 13, 2004, Bob Lee, Chief Executive Officer and Deputy General Counsel and Director of Corporate Development for Millennium, met with Tom Keenan, the President of Huntsman, and Mahomed Maiter, its Vice President, in Baltimore, Maryland.  The next day, Millennium's Gary Cianfichi sent an e-mail to colleagues, stating "now that we have competition on board for the Oct 1 price increase announcement, please relook at your agents['] commissions."  Based on this and other evidence detailed below, Plaintiffs allege that Defendants and other unnamed co-conspirators intentionally conspired and agreed to manipulate, fix, raise, maintain, and stabilize prices at which Titanium Dioxide is sold in the United States.  The alleged conspiracy was hatched and implemented in the United States and elsewhere for the purpose of collusively restraining competition, resulting in the unconscionable, unfair, and deceptive overcharging of Plaintiffs.

4.  Defendants' unlawful conspiracy was initiated, developed, maintained, and facilitated by a course of anticompetitive conduct, including information exchanges, verbal and tacit agreements, price signaling, secret meetings, and communications between Defendants for the purpose of artificially inflating the price of Titanium Dioxide and allocating shares of the

United States market.   In secret discussions and elsewhere, Defendants exchanged commercially sensitive and proprietary information relating to the sales, production, supply, inventory, marketing, and pricing of Titanium Dioxide, as well as the raw materials necessary to manufacture Titanium Dioxide itself.   In order to perpetuate this unlawful conspiracy, Defendants and their co-conspirators engaged in fraudulent and deceptive anticompetitive behavior to hide and conceal their behavior from Plaintiffs and others.

5.      As a result of Defendants' fraudulent, deceptive, unconscionable, unfair, and anticompetitive behavior, the United States marketplace for Titanium Dioxide was controlled and manipulated while prices for Titanium Dioxide were artificially inflated.   Because Plaintiffs paid a price for Titanium Dioxide Architectural Coatings that was higher than what would be paid in a competitive marketplace, each suffered economic damages as a result of Defendants' wrongdoing.

6.      Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of residents of jurisdictions which proscribe the Defendants' unlawful conduct, as described in this Second Amended Class Action Complaint.   These jurisdictions include Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oregon, South Carolina, Tennessee, and Wisconsin.

7.      Plaintiffs bring this lawsuit individually, and on behalf of all persons and business entities who, during the period from and including January 1, 2002 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period"), indirectly purchased Architectural Coatings containing Titanium Dioxide in the United States

1    indirectly from one or more of the named Defendants, their agents, and/or co-conspirators.

2    Plaintiffs seek recovery of actual and/or compensatory damages and to enjoin Defendants and

3    their co-conspirators from engaging in their unlawful and anticompetitive behavior.

4    **II.    JURISDICTION AND VENUE**

5          8.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26)

6    to secure equitable and injunctive relief against Defendants for violating Section 1 of the

7    Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages

8    pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain

9    restitution, recover damages, and secure other relief against Defendants for violation of those

10   state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under

11   federal and state law.

12         9.      This Court has jurisdiction over the subject matter of this action pursuant to

13   Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),

14   and 28 U.S.C. §§ 1332(d) and 1367 in that: (i) this is a class action in which the matter or

15   controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which

16   some members of the proposed Classes are citizens of a state different from the Defendants;

17   and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal

18   claims under Article III of the United States Constitution.

19         10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15

20   U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events

21   giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected

22   interstate trade and commerce discussed below has been carried out in this District, and

23   Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are

24   found or transact business in this District.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)

11.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Titanium Dioxide throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.   Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

12.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

13.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

14.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.   Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Titanium Dioxide, which conspiracy unreasonably restrained trade and adversely affected the market for Titanium Dioxide.

15.    Defendants' conspiracy and wrongdoing described herein adversely affected Plaintiffs in the United States.

**III.    PARTIES**

   **A.    Plaintiffs**

16.    Plaintiff Los Gatos Mercantile, Inc. d/b/a Los Gatos Ace Hardware ("Los Gatos") is a California corporation with its principal place of business in Los Gatos, California. Plaintiff Los Gatos is an Ace Hardware store and paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to Ace-brand and Benjamin Moore paints, containing Titanium Dioxide manufactured by one or more of the Defendants.   Plaintiff Los Gatos purchased and received the afore-mentioned Architectural Coatings in California.   Plaintiff Los Gatos has also displayed, sold, and advertised its Architectural Coatings in California during the Class Period.  Plaintiff Los Gatos has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

17.    Plaintiff Ace Hardware of South Walton, Inc. ("South Walton") is a Florida corporation with its principal place of business in Miramar Beach, Florida.  Plaintiff South Walton is an Ace Hardware store and paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to Ace-brand paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff South Walton purchased and received the afore-mentioned Architectural Coatings in Florida. Plaintiff Los Gatos has also displayed, sold, and advertised its Architectural Coatings in Florida during the Class Period.  Plaintiff South Walton has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

18.      Plaintiff Abbott Paint and Carpet, Inc. ("Abbott") is a Minnesota corporation with its principal place of business in St. Paul, Minnesota.  Plaintiff Abbott is a paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to Benjamin Moore, Cabot, and Muralo paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Abbott purchased and received the afore-mentioned Architectural Coatings in California.  Plaintiff Abbott has also displayed, sold, and advertised its Architectural Coatings in Minnesota during the Class Period.  Plaintiff Abbott has suffered overcharge loss due to unjustified increases in the price of products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

19.      Plaintiff Lexington Home Center, LLC ("Lexington") is a Mississippi corporation with its principal place of business in Lexington, Mississippi.  Plaintiff Lexington is a paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to Do It Best-brand paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Lexington purchased and received the afore-mentioned Architectural Coatings in Mississippi.   Plaintiff Lexington has also displayed, sold, and advertised its Architectural Coatings in Mississippi during the Class Period.  Plaintiff Lexington has suffered overcharge loss due to unjustified increases in the price of products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

20.      Plaintiff Proctor's Building Materials, Inc. d/b/a Proctors Do It Best Bldg Mtrl ("Proctors") is a Missouri corporation with its principal place of business in Tipton, Missouri.  Plaintiff Proctors is a paint retailer which, during the Class Period, regularly purchased for

resale Architectural Coatings, including but not limited to Do It Best-brand paints, containing Titanium Dioxide manufactured by one or more of the Defendants.   Plaintiff Proctors purchased and received the afore-mentioned Architectural Coatings in Missouri.   Plaintiff Proctor has also displayed, sold, and advertised its Architectural Coatings in Missouri during the Class Period.  Plaintiff Proctors has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

21.     Plaintiff Greene's Hardware & Supply Company, Inc. ("Greene's") is a North Carolina corporation with its principal place of business in Robbins, North Carolina.  Plaintiff Greene's is a paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to Do It Best-brand paints, containing Titanium Dioxide manufactured by one or more of the Defendants.   Plaintiff Greene's purchased and received the afore-mentioned Architectural Coatings in North Carolina. Plaintiff Greene's has also displayed, sold, and advertised its Architectural Coatings in North Carolina during the Class Period.   Plaintiff Greene's has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

22.     Plaintiff R.F. Cole, Inc. d/b/a Brewers Paint Center ("Brewers") is a South Carolina corporation with its principal place of business in Charleston, South Carolina. Plaintiff Brewers is a paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to Benjamin Moore and Sherwin-Williams paints, containing Titanium Dioxide manufactured by one or more of the Defendants. Plaintiff Brewers purchased and received the afore-mentioned Architectural Coatings in South

Carolina.  Plaintiff Brewers has also displayed, sold, and advertised its Architectural Coatings in South Carolina during the Class Period.  Plaintiff Brewers has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

23.     Plaintiff The Carpet Shoppe, Inc. ("Carpet Shoppe") is a Tennessee corporation with its principal place of business in Dickson, Tennessee.  Plaintiff Carpet Shoppe is a paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to PPG Industries paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Carpet Shoppe purchased and received the afore-mentioned Architectural Coatings in Tennessee.  Plaintiff Carpet Shoppe has also displayed, sold, and advertised its Architectural Coatings in Tennessee during the Class Period.  Plaintiff Carpet Shoppe has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Second Amended Class Action Complaint.

24.     Plaintiff Columbare, Inc. d/b/a Everyday's True Value ("Columbare") is a New York corporation with its principal place of business in Jamestown, New York.  Plaintiff Columbare is a paint retailer which, during the Class Period, regularly purchased for resale Architectural Coatings, including but not limited to True Value-brand paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Columbare purchased and received the afore-mentioned Architectural Coatings in New York.  Plaintiff Proctor has also displayed, sold, and advertised its Architectural Coatings in New York during the Class Period.  Plaintiff Columbare has suffered overcharge loss due to unjustified increases

1    in the price of these products, as a result of the conspiracy described in this Second Amended

2    Class Action Complaint.

3          25.    Plaintiff Stockman Development Inc. d/b/a Stockman Farm Supply

4    ("Stockman") is a Wisconsin corporation with its principal place of business in Wilson,

5    Wisconsin.  Plaintiff Stockman is a paint retailer which, during the Class Period, regularly

6    purchased for resale Architectural Coatings containing Titanium Dioxide manufactured by one

7    or more of the Defendants.  Plaintiff Stockman purchased and received the afore-mentioned

8    Architectural Coatings in Wisconsin.  Plaintiff Stockman has also displayed, sold, and

9    advertised its Architectural Coatings in Wisconsin during the Class Period.  Plaintiff Stockman

10   has suffered overcharge loss due to unjustified increases in the price of these products, as a

11   result of the conspiracy described in this Second Amended Class Action Complaint.

12         26.    Plaintiff Jan Harrison ("California") is a California resident who, during the

13   Class Period, regularly purchased for personal use paint and/or other Architectural Coatings,

14   including but not limited to Sherwin Williams paints, containing Titanium Dioxide

15   manufactured by one or more of the Defendants.  Plaintiff Harrison has suffered overcharge

16   loss due to unjustified increases in the price of these products, as a result of the conspiracy

17   described in this Complaint.

18         27.    Plaintiff Lee Ranalli ("Ranalli") is an Arizona resident who, during the Class

19   Period, regularly purchased for personal use paint and/or other Architectural Coatings

20   containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Ranalli

21   has suffered overcharge loss due to unjustified increases in the price of these products, as a

22   result of the conspiracy described in this Complaint.

23

24

28.     Plaintiff Morgan Tanner ("Tanner") is an Arkansas resident who, during the Class Period, regularly purchased for personal use paint and/or other Architectural Coatings, including but not limited to PPG Industries paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Tanner has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

29.     Plaintiff Spencer Hathaway ("Hathaway") is a District of Columbia resident who, during the Class Period, regularly purchased for personal use paint and/or other Architectural Coatings, including but not limited to interior paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Hathaway has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

30.     Plaintiff Todd Turley ("Turley") is a Florida resident who, during the Class Period, regularly purchased for personal use paint and/or other Architectural Coatings, including but not limited to Rust-Oleum and Glidden paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Turley has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

31.     Plaintiff Debbie Hale ("Hale") is an Iowa resident who, during the Class Period, regularly purchased for personal use paint and/or other Architectural Coatings, including but not limited to Behr, Valspar, and Sherwin Williams paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff Hale has suffered overcharge loss

1  due to unjustified increases in the price of these products, as a result of the conspiracy

2  described in this Complaint.

3       32.   Plaintiff Keli Anno ("Anno") is a Kansas resident who, during the Class Period,

4  regularly purchased for personal use paint and/or other Architectural Coatings, including but

5  not limited to PPG Industries and Behr paints, containing Titanium Dioxide manufactured by

6  one or more of the Defendants. Plaintiff Anno has suffered overcharge loss due to unjustified

7  increases in the price of these products, as a result of the conspiracy described in this

8  Complaint.

9       33.   Plaintiff Deanna Deveney ("Deveney") is a Massachusetts resident who, during

10  the Class Period, regularly purchased for personal use paint and/or other Architectural

11  Coatings, including but not limited to Behr paints, containing Titanium Dioxide manufactured

12  by one or more of the Defendants.  Plaintiff Deveney has suffered overcharge loss due to

13  unjustified increases in the price of these products, as a result of the conspiracy described in

14  this Complaint.

15       34.   Plaintiff Christopher Kuon-Tsen Lee ("Lee") is a Michigan resident who, during

16  the Class Period, regularly purchased for personal use paint and/or other Architectural

17  Coatings, including but not limited to Sherwin Williams and Behr paints, containing Titanium

18  Dioxide manufactured by one or more of the Defendants.  Plaintiff Lee has suffered overcharge

19  loss due to unjustified increases in the price of these products, as a result of the conspiracy

20  described in this Complaint.

21       35.   Plaintiff Jim Buckingham ("Buckingham") is a Minnesota resident who, during

22  the Class Period, regularly purchased for personal use paint and/or other Architectural Coatings

23  containing Titanium Dioxide manufactured by one or more of the Defendants.  Plaintiff

24

1   Buckingham has suffered overcharge loss due to unjustified increases in the price of these
2   products, as a result of the conspiracy described in this Complaint.

3       36.     Plaintiff Tanda Saxton ("Saxton") is a Mississippi resident who, during the
4   Class Period, regularly purchased for personal use paint and/or other Architectural Coatings,
5   including but not limited to interior paints, containing Titanium Dioxide manufactured by one
6   or more of the Defendants.  Plaintiff Saxton has suffered overcharge loss due to unjustified
7   increases in the price of these products, as a result of the conspiracy described in this
8   Complaint.

9       37.     Plaintiff John Wozniak ("Wozniak") is a Missouri resident who, during the
10  Class Period, regularly purchased for personal use paint and/or other Architectural Coatings,
11  including but not limited to Behr paints, containing Titanium Dioxide manufactured by one or
12  more of the Defendants.  Plaintiff Wozniak has suffered overcharge loss due to unjustified
13  increases in the price of these products, as a result of the conspiracy described in this
14  Complaint.

15      38.     Plaintiff Jerome Sherman ("Sherman") is a Nebraska resident who, during the
16  Class Period, regularly purchased for personal use paint and/or other Architectural Coatings
17  containing Titanium Dioxide manufactured by one or more of the Defendants.   Plaintiff
18  Sherman has suffered overcharge loss due to unjustified increases in the price of these
19  products, as a result of the conspiracy described in this Complaint.

20      39.     Plaintiff Beverly Jenkins ("Jenkins") is a New Hampshire resident who, during
21  the Class Period, regularly purchased for personal use paint and/or other Architectural
22  Coatings, including but not limited to Behr paints, containing Titanium Dioxide manufactured
23  by one or more of the Defendants. Plaintiff Jenkins has suffered overcharge loss due to
24

1  unjustified increases in the price of these products, as a result of the conspiracy described in

2  this Complaint.

3      40.    Plaintiff Tom Stever ("Stever") is a New Mexico resident who, during the Class

4  Period, regularly purchased for personal use paint and/or other Architectural Coatings,

5  including but not limited to Dunn-Edwards paints, containing Titanium Dioxide manufactured

6  by one or more of the Defendants.  Plaintiff Stever has suffered overcharge loss due to

7  unjustified increases in the price of these products, as a result of the conspiracy described in

8  this Complaint.

9      41.    Plaintiff David Petersen ("Petersen") is a New York resident who, during the

10  Class Period, regularly purchased for personal use paint and/or other Architectural Coatings,

11  including but not limited to Benjamin Moore paints, containing Titanium Dioxide

12  manufactured by one or more of the Defendants.  Plaintiff Petersen has suffered overcharge

13  loss due to unjustified increases in the price of these products, as a result of the conspiracy

14  described in this Complaint.

15      42.    Plaintiff Ransome Foose ("Foose") is a North Carolina resident who, during the

16  Class Period, regularly purchased for personal use paint and/or other Architectural Coatings,

17  including but not limited to Cabot paints, containing Titanium Dioxide manufactured by one or

18  more of the Defendants.  Plaintiff Foose has suffered overcharge loss due to unjustified

19  increases in the price of these products, as a result of the conspiracy described in this

20  Complaint.

21      43.    Plaintiff Brian Bawol ("Bawol") is an Oregon resident who, during the Class

22  Period, regularly purchased for personal use paint and/or other Architectural Coatings,

23  including but not limited to Miller paints, containing Titanium Dioxide manufactured by one or

24

more of the Defendants. Plaintiff Bawol has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

44. Plaintiff Stacy Franklin ("Franklin") is a Tennessee resident who, during the Class Period, regularly purchased for personal use paints, including but not limited to PPG Industries and Sherwin Williams paints, containing Titanium Dioxide manufactured by one or more of the Defendants. Plaintiff Franklin has suffered overcharge loss due to unjustified increases in the price of these paints, as a result of the conspiracy described in this Complaint.

**B.    Defendants**

45. Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. During the Class Period, DuPont manufactured and sold Titanium Dioxide, which was indirectly purchased in the United States and elsewhere through DuPont or through DuPont's predecessors, affiliates and/or subsidiaries. DuPont is the largest producer and supplier of Titanium Dioxide in the world, and it owns and controls approximately half of the Titanium Dioxide production capacity in North America. DuPont has U.S. manufacturing plants in Delaware, Florida, Mississippi and Tennessee. DuPont receives billions of dollars in revenues from the production and sale of Titanium Dioxide used in various products marketed and sold throughout the United States directly and through the Internet. These products were purchased by the Indirect Purchasers within all fifty (50) states.

46. Defendant Huntsman is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. During the relevant times alleged herein, Huntsman manufactured and sold Titanium Dioxide in the United States, which was indirectly purchased in the United States, through Huntsman or through Huntsman's predecessors, affiliates, and/or subsidiaries, including Tioxide Americas, Inc., an indirect subsidiary of Huntsman and a direct

1    subsidiary of Tioxide Group (a UK company), which is wholly-owned by Huntsman.

2    Huntsman is the fourth largest Titanium Dioxide global producer and has annual sales in the

3    billions of dollars.

4        47.    Defendant Kronos (formerly known as Kronos, Inc.) is a Delaware corporation

5    with its principal executive offices in Dallas, Texas and its principal North American sales,

6    marketing, and technical offices in Cranbury, New Jersey.  Kronos and Huntsman (through a

7    subsidiary, Huntsman Holding, LLC) jointly operate (50/50) a Titanium Dioxide

8    manufacturing venture, Louisiana Pigment Company, L.P. (LPC), in Lake Charles, Louisiana.

9    During the relevant time periods alleged herein, Kronos manufactured and sold Titanium

10   Dioxide, which was indirectly purchased in the United States through Kronos or through its

11   predecessors, affiliates and/or subsidiaries.  Kronos is the fifth largest global producer of

12   Titanium Dioxide and has net sales over a billion dollars.

13       48.    Defendant Cristal is a privately held Saudi Arabian Corporation with its

14   principal place of business in Jeddah within the Kingdom of Saudi Arabia.  During the relevant

15   time periods alleged herein, Cristal manufactured and sold Titanium Dioxide, which was

16   indirectly purchased in the United States, directly or through predecessors, affiliates, and/or

17   subsidiaries, including Defendant Millennium.

18       49.    Defendant Millennium is a Delaware corporation with its principal place of

19   business in Hunt Valley, Maryland.  During the relevant time periods alleged herein,

20   Millennium manufactured and sold Titanium Dioxide, which was indirectly purchased in the

21   United States.  Prior to its acquisition by Cristal in 2007, Millennium comprised the Titanium

22   Dioxide business of Lyondell Chemical Company.  During the relevant times alleged herein,

23   Millennium operated plants in Ashtabula, Ohio and Baltimore, Maryland.

24

50.     Millennium is the wholly owned U.S. subsidiary of Cristal.   Cristal and Millennium together form the world's second largest Titanium Dioxide producer, with combined annual sales of approximately $1.6 billion.   At all relevant times, Millennium has acted as the U.S. agent and/or alter ego for Cristal.   Cristal has exerted considerable control over the activities and operations of Millennium such that the two entities are essentially one. Facts demonstrating the substantial control that Cristal has exercised over Millennium include, but are not limited to: (1) Cristal's direct and controlling ownership interest in Millennium, (2) Millennium's role as the primary U.S. importer and distributor of Cristal's products, (3) Cristal's exercise of control over Millennium's marketing, purchasing, pricing, management, and/or operating policies, (4) Cristal's role in approving Millennium's significant business decisions, and (5) the overlapping functions and operations of Cristal and Millennium. Cristal knew, or should have known, that its conduct through Millennium in Maryland would have an impact in the United States.   According to Cristal's website, Cristal and Millennium share the same Maryland operational headquarters, commercial offices, research center, and plant, as well as two shared plants in Ohio.  *See* http://www.cristal.com/about-us/Pages/site-locations.aspx (last visited Oct. 14, 2014). Based on this relationship, Cristal could not do business in the United States absent its wholly owned subsidiary Millennium.

**IV.     AGENTS AND CO-CONSPIRATORS**

51.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Second Amended Class Action Complaint.

52.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of some of which are presently unknown to Plaintiffs, have participated as coconspirators with Defendants in the

offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

53.     Alleged co-conspirator Lyondell Chemical Company ("Lyondell") is a Delaware corporation with its principal place of business in Houston, Texas.   During the relevant time periods alleged herein, Lyondell manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including a wholly-owned subsidiary that is the predecessor of Defendant Millennium.   Lyondell acquired its Titanium Dioxide business as part of its acquisition of Millennium Chemicals, Inc. in 2004.   In 2005, Lyondell was the second-largest global producer of Titanium Dioxide and earned over a billion dollars in revenue.   Lyondell sold its Titanium Dioxide business (the predecessor of Millennium) to Cristal in 2007.   In January 2009, Lyondell and numerous affiliates filed voluntary bankruptcy petitions to restructure under Chapter 11 of the Bankruptcy Code.

54.     Alleged co-conspirator Tronox Inc. ("Tronox") is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma.   During the relevant time periods alleged herein, Tronox manufactured and sold Titanium Dioxide to indirect purchasers in the United States through itself or through its predecessors, affiliates and/or subsidiaries.   Tronox is the world's third largest producer of Titanium Dioxide.   In 2006, Tronox earned hundreds of millions of dollars in net sales of Titanium Dioxide in the United States.   It owns plants in Hamilton, Mississippi and Savannah, Georgia.   Prior to becoming a publicly traded company in November 2005, Tronox was a wholly owned subsidiary of Kerr-McGee Corporation and was acquired by Anadarko Petroleum Corporation in 2006.   In January 2009, Tronox and

1    certain of its subsidiaries filed voluntary petitions to restructure under Chapter 11 of the United

2    States Bankruptcy Code.

3          55.     Alleged co-conspirator International Business Management Associates, Inc.

4    ("IBMA") is a Delaware corporation, and its principal place of business is believed to be in

5    Plainsboro, New Jersey.   Alleged co-conspirator James R. Fisher is the President and Chief

6    Executive Officer of IBMA and has held this role at all relevant times.   IBMA is Mr. Fisher's

7    alter ego.   Mr. Fisher has been a consultant to the Titanium Dioxide industry for many years,

8    including before and during the relevant time periods alleged herein.   Prior to working as a

9    consultant to the industry, he was employed by Defendant Kronos.   Mr. Fisher was a main

10   actor and perpetuator of the sharing of nonpublic, commercially sensitive information

11   concerning Titanium Dioxide between and among Defendants and their co-conspirators. He

12   has also been an agent and co-conspirator of one or more Defendants.

13         56.     Whenever in this Second Amended Class Action Complaint reference is made

14   to any act, deed, or transaction of any corporation or limited liability entity, the allegation

15   means that the corporation or limited liability entity engaged in the act, deed, or transaction by

16   or through its officers, directors, agents, employees, or representatives while they were actively

17   engaged in the management, direction, control, or transaction of the corporation's or limited

18   liability entity's business or affairs.

19         57.     Defendants are liable for unlawful acts performed in furtherance of the alleged

20   anticompetitive price-fixing conspiracy by companies acquired through mergers and

21   acquisitions.

22

23

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                                    Page 19 of 117

## V.   CLASS ACTION ALLEGATIONS

58.   Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following defined class (the "Nationwide Class"):

> All persons and business entities who purchased Architectural Coatings containing, in some form, Titanium Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates during the Class Period.

59.   Merchants bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Merchant Class"):

> All business entities doing business in the Merchant States[2] that purchased Architectural Coatings for resale containing, in some form, Titanium Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, during the Class Period.

60.   Consumers bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Consumer Class"):

> All natural persons who resided in the Consumer States[3] and purchased Architectural Coatings for personal use and not for resale containing, in some form, Titanium Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, during the Class Period.

---

[2] The Merchant States are the following states listed in the First and Second Claims for Relief: California, Florida, Minnesota, Mississippi, Missouri, New York, North Carolina, South Carolina, Tennessee, and Wisconsin.

[3] The Consumer States are the following states listed in the First and Second Claims for Relief: Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oregon, and Tennessee.

61.     The Merchant Class and Consumer Class are referred to herein as the "Damages Classes."   The Nationwide Class and the Damages Classes are referred to herein as the "Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, any judicial officer presiding over this matter and his or her staff, and persons who purchased Titanium Dioxide directly.

62.     Plaintiffs believe the approximate size of the Classes to be extremely numerous and so geographically dispersed throughout the United States that joinder of all class members is impracticable.

63.     Plaintiffs' state law claims are typical of the claims of the Classes and arise from the same anticompetitive conspiracy and unlawful conduct engaged in by Defendants and co-conspirators as alleged herein.  The relief sought by the Plaintiffs is common to the Classes.

64.     Numerous questions of fact or law arise from Defendants' and their co-conspirators' anticompetitive conduct that are common to the Classes, including but not limited to:

(a)     Whether Defendants and their co-conspirators combined or conspired to manipulate, raise, maintain, or stabilize prices of Titanium Dioxide sold in the United States;

(b)     Whether Defendants and their co-conspirators shared nonpublic, proprietary information, allocated markets and customers, restricted the supply and output of Titanium Dioxide sold in the United States and/or committed unfair or anticompetitive conduct in furtherance of the alleged price-fixing conspiracy;

(c)     Whether Defendants and their co-conspirators engaged in unfair, false, deceptive or unconscionable behavior;

(d)     Whether Defendants and their co-conspirators conduct resulted in Titanium Dioxide's being sold at an artificially high and noncompetitive prices;

(e)     Whether Defendants and their co-conspirators were unjustly enriched by the sale of Titanium Dioxide at artificially high and non-competitive levels;

(f)     Whether Plaintiffs and Class were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; and

(g)     Whether Plaintiffs and the Nationwide Class are entitled to nationwide injunctive relief.

65.     The questions of fact or law common to the Class are overarching and predominate as a threshold matter over any individual questions affecting members of the Classes.

66.     Plaintiffs will only seek one recovery from Defendants and will not make duplicative claims for damages.

67.     Plaintiffs will fairly and adequately represent the interests of the Class and have no interest that conflicts with or is antagonistic to the Class.  Plaintiffs have retained counsel who are competent and experienced in antitrust law, class actions, and complex litigation.  At or before class certification, Plaintiffs' counsel will either seek an order from the Court appointing separate counsel for the Merchant and Consumer Classes or otherwise obviate any possible conflict between the two levels of the indirect purchasers.

68.     Defendants have acted in ways that cause similar injury to the Classes as a whole, thereby making final injunctive relief appropriate with respect to the Classes.

69.     A class action is procedurally superior to any alternatives for adjudicating the claims of Plaintiffs and members of the Classes.  The claims of the members of the Classes can be consolidated into one lawsuit to decide the predominating issue of liability.  Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple lawsuits over the same common issues of fact and liability and the risk of inconsistent decisions establishing varying standards of conduct for Defendants.  Maintenance of the lawsuit as a class action will promote judicial economy, efficiency, and fairness to all parties involved.

## VI.     TRADE AND COMMERCE

70.     During the relevant time periods alleged in this Second Amended Class Action Complaint, the Defendants and co-conspirators engaged in anticompetitive and unlawful conduct and control of the Titanium Dioxide market affecting trade and commerce throughout the fifty (50) states, including this judicial district.

## VII.    FACTUAL ALLEGATIONS

### A.     Background Regarding Titanium Dioxide

71.     Titanium Dioxide is a dry chemical powder that is primarily used as a white pigment.  It is the world's most widely used pigment for whiteness, brightness, and masking of colors in paints and coatings purchased by Plaintiffs and members of the Classes.  Titanium Dioxide is consumed in 170 countries and is one of the most important inorganic chemicals used in the production of goods.  Titanium Dioxide is considered very valuable in markets such as the United States, and its use in consumer goods increases the quality of life for consumers.

72.     Titanium Dioxide traps and reflects light better than almost any known substance.  The majority (approximately 55 percent) of Titanium Dioxide is consumed in the

United States in the paint and coatings industries.  In 2008, Architectural Coatings accounted for approximately 41 percent of all Titanium Dioxide consumption in the United States.  It is nonflammable and nontoxic and has replaced lead compounds in residential paints.  Although the primary function of Titanium Dioxide is to whiten or brighten paint, paper, and plastic, the chemical is also used in synthetic fiber production and to make inks, pharmaceutical coatings, toothpaste, sunscreen, cosmetics, food, rubber, ceramic, and other products.

73.     There are no viable white pigment competitive substitutes for Titanium Dioxide in consumer products.  Because Titanium Dioxide's masking or opacifying ability is very unique, there is no technical substitute for the product.  Titanium Dioxide also has great resistance to other chemicals and ultraviolet degradation and has very good heat stability. There are no competitive white pigment substitutes.  Even though Titanium Dioxide's artificially inflated and supra-competitive prices are manipulated and unconscionably high, competitors have difficulty entering into and competing in the consumer goods market.  Thus, Indirect Purchasers have no alternative but to pay the unfairly fixed and maintained prices set by Defendants.

74.     Titanium is the ninth most abundant element in the Earth's crust.  It is typically found along with iron in a mineral oxide called ilmenite and also in a less common ore called rutile.  The majority of titanium production is used to make Titanium Dioxide.  The Titanium Dioxide manufactured for commercial use is derived from the mining of ilmenite and rutile. Manufacturers typically sell Titanium Dioxide in powder form after mining it and separating it from titanium ore.

75.     Titanium Dioxide is manufactured using two different processes, sulphate and chloride, which create two crystal forms, rutile and anatase.  The sulphate process uses

concentrated sulfuric acid to extract Titanium Dioxide from ilmenite or titanium slag.  The chloride process uses petroleum coke to convert rutile to titanium tetrachloride, which is then converted into Titanium Dioxide through contact with superheated oxygen or air.

76.     Most Titanium Dioxide plants utilize the chloride manufacturing process because, among other advantages, it generates less waste.  Defendants and their co-conspirators operate most of the chloride process plants in the world.  Although both the sulphate and chloride processes create the rutile crystal form of Titanium Dioxide, only the sulphate process produces the anatase form, which is less durable than rutile.  Anatase is preferred in food, drug and cosmetic products.  The rutile form of Titanium Dioxide fulfills more than 80 percent of the world's requirements for Titanium Dioxide.  After Tronox's predecessor, Kerr-McGee, closed its sulphate process plant in 2004, only the chloride process has been used to produce Titanium Dioxide in the United States.

77.     Titanium Dioxide is a homogeneous commodity chemical that is sold in rutile and anatase grades worldwide.  Titanium Dioxide grades feature degrees of brightness and whiteness, and most are made by adjusting the size of the Titanium Dioxide particles.  Most grades are sold in fine powder form, but a few are sold in other forms, including ultrafine powder, water slurry (aqueous solutions), and a coarse, nonpigmentary form (such as for use in glass and ceramic manufacturing).

**B.     The Titanium Dioxide Industry.**

78.     Grades of Titanium Dioxide supplied by one producer are readily substituted for grades of Titanium Dioxide supplied by other producers.  Accordingly, buyers make purchase decisions based largely, if not entirely, on price, which made it easier for Defendants and their co-conspirators to reach agreement on prices and to monitor each other's compliance with the agreements.

79.    All Defendants make and sell rutile grades of Titanium Dioxide, which comprise more than 80 percent of Titanium Dioxide sales, and which are sold primarily to United States customers in the paint, coatings, and plastic industries.  All Defendants except for DuPont make and sell anatase grades.  The rutile crystalline form of Titanium Dioxide has a higher refractive index and is more durable than anatase.  Generally speaking, rutile grades are preferred for outdoor uses by customers in the coatings and plastics industries (the largest end-use applications for Titanium Dioxide), whereas anatase grades are preferred by customers in the food, drug, and cosmetic industries.  Both rutile and anatase grades are sold to fine paper and paperboard customers in the paper industry for use as a filler and in coatings. Approximately 90 to 95 percent of Titanium Dioxide annual sales are made to customers in the coatings, plastics, and paper industries, and all Defendants sell grades of Titanium Dioxide to customers in these industries.

80.    During the relevant times alleged herein, Defendants and their co-conspirators dominated and controlled the Titanium Dioxide market in the United States.  Defendants and their co-conspirators control 100 percent of the United States' Titanium Dioxide capacity and 65.5 percent of all imports.[4]  Thus, Defendants account for approximately 92 percent of all United States consumption of Titanium Dioxide.  The remaining eight percent is unsuitable for and not used in the production of Architectural Coatings.  Because of this market domination, Defendants and their co-conspirators are able to engage in unfair and anticompetitive behavior, overcharging consumers of paints, cosmetics, and plastics in the United States.

---

[4] The largest non-defendant source of Titanium Dioxide in the United States is from China. However, Chinese imports of Titanium Dioxide are not used in the production of Architectural Coatings because of the low quality of the Chinese product.  In fact, Chinese manufacturers actually imports rutile-based Titanium Dioxide from the United States and other countries to be used in paint because of the low quality of the domestic Titanium Dioxide.

81.     The Titanium Dioxide industry has high barriers to entry.  For example, a new "greenfield" one-hundred kilotons-per-year plant has been estimated to cost approximately $450 to $500 million and require a three to five year lead time to build.  Defendants also have cost advantages and proprietary technologies that effectively deter new entrants.  Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and maintain the high concentration of the Titanium Dioxide industry.

82.     Titanium Dioxide producers, including Defendants, face similar costs.  Because Defendants face similar costs, their pricing preferences tend to be aligned.  This alignment and unity of interest make it much easier for them to agree to and defend an agreement on price increases, thus manipulating the Titanium Dioxide market capacity and control of supply.  The manipulation of the production and supply further creates the opportunity for an unlawful uniform conspiracy to artificially inflate the price charged for Titanium Dioxide, which is passed on to purchasers of products containing Titanium Dioxide such as paint, cosmetics, and plastics.

83.     In and around 2005, allegedly to reduce the costs of importing Titanium Dioxide manufactured abroad into North America, Huntsman purportedly reduced its sales (and, presumably, its market share) in North America.  Nevertheless, Defendants' domestic and global market shares remained relatively stable during the relevant times alleged herein.  For example, even though DuPont's Titanium Dioxide plant in DeLisle, Mississippi was shut down by Hurricane Katrina in August 2005 and did not even begin a phased-in production until January 2006, DuPont's resulting market share decline in 2005 was recovered in 2006, even in the midst of price increases and increasing demand for Titanium Dioxide in the United States.  Indeed, sales volumes in DuPont's Coatings and Color Technologies segment (of which

1    Titanium Dioxide sales are a part) declined only 3 percent from 2004 to 2005, while sales

2    revenues were up 3 percent.

3         84.    Because Titanium Dioxide is an essential (non-substitutable) element in the

4    production of consumer goods, demand for the product is inelastic:  *i.e.*, the loss in sales

5    volume from a Titanium Dioxide price increase is small relative to the magnitude of the price

6    increase itself.

7         85.    The Titanium Dioxide industry in the United States presents strong

8    characteristics favoring creation of an unlawful pricing cartel.  The industry is highly

9    concentrated with the vast majority of the world's capacity concentrated in the few Defendants

10   and involves the sale of a homogenous commodity product, for which there is inelastic

11   demand.  Couple this inelastic demand with the industry's high barriers to entry, and the

12   concomitant opportunity to collude, cooperate, and conspire regarding the pricing for Titanium

13   Dioxide supply and output is particularly favorable.  This is especially true given that the vast

14   majority of the world's capacity for production of Titanium Dioxide is concentrated in these

15   few Defendants.  During the Class Period, "the overall market share remained relatively stable,

16   with DuPont's share hovering around 30 percent, Huntsman's around 10 percent, Kronos's

17   between 16 and 20 percent, and Millennium's around 20 percent."  Indeed, the Defendants

18   have exploited this opportunity, adversely affecting Plaintiffs and members of the Classes.

19        86.    Titanium Dioxide market characteristics that indicate collusive behavior include

20   very similar, quickly followed, and obviously coordinated price increase announcements, the

21   existence of joint venture agreements among cartel members and static or declining demand,

22   which encourages those in collusion to coordinate supply restraint and/or  reduction and

23   prevent downward price competition. Moreover, many of these factors make it easier for each

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                                    Page 28 of 117

Defendant to monitor one another's compliance with an agreement to artificially inflate or stabilize prices, putting each at a higher risk of retaliatory action and enforcement from those who choose not to disrupt the unlawful agreement and restraint of trade.

87.     Industries like the Titanium Dioxide industry, with few sellers facing similar costs, low substitutability, competition primarily based on price, and high barriers to entry are particularly susceptible to price collusion.  Succinctly stated, the Titanium Dioxide industry bore in 2002 all of the characteristics of a price-fixing cartel waiting to happen.  This set the stage for an unlawful conspiracy to manipulate, fix, maintain, and stabilize the price of Titanium Dioxide which began to impact industry pricing in January 2002.

## C.     Defendants' Unlawful Titanium Dioxide Price Fixing Conspiracy

88.     Defendants' joint ventures, transactions, trade association activity, use of common consultants, deals, and agreements afforded them opportunities to discuss pricing, capacity, cost, customer, and other nonpublic, commercially sensitive issues, which they utilized.  Defendants engaged in coordinated pricing activity as early as January 2002 and thereafter in furtherance of their unlawful, ongoing conspiracy.  In the absence of such an overriding price raising and/or price stabilization agreement and understanding among Defendants, it would have been contrary to the independent economic self-interest of each Defendant to allow its competitors access to information about each other's pricing, supply, capacity, utilization, and output..

89.     Defendants and their affiliates produce and sell raw materials to each other.  For example, Defendants Kronos, Millennium, and their affiliates sell raw materials, such as ilmenite ore, to other Titanium Dioxide producers.  In 2007, Millennium purchased Titanium Dioxide from DuPont for eighty-eight cents per pound, while the lowest price paid by any other purchaser at that time was nine cents higher.  Defendants also engage in other business

1  transactions with each other, including sales of Titanium Dioxide between Defendants (as

2  opposed to selling the product to customers of another Defendant or co-conspirator).

3      90.    Defendants Huntsman and Kronos' joint Titanium Dioxide manufacturing

4  venture, LPC, facilitated the conspiracy by giving the two competitors opportunities to collude.

5  For example, Huntsman agreed to reduce inventory in 2002 following the release of a monthly

6  report by LPC indicating that it reduced production as a result of the partners' wishes due to

7  high stocks.   Kronos's and DuPont's cross-license patents to make certain Titanium Dioxide

8  grades are also examples of opportunities to collude and conspire.

9      91.

10

11

12

13

14      92.    The mutually beneficial nature of the business relations between Defendants

15  provided not only the opportunity to conspire, but also a financial incentive to do so.  The more

16  that Defendants came to deal with and rely on each other, the more incented they were to

17  maintain market stability, to agree on and support price increases, and to avoid competing on

18  price for the business of each other's customers.  Defendants' meetings and communications,

19  which occurred during the relevant times alleged herein and are detailed below, fostered

20  cooperation, eliminated competition, and permitted the unlawful price-fixing conspiracy.

21      93.    Defendants' conspiracy to overcharge Plaintiffs and members of the Classes

22  was monitored and policed by communications not only among Defendants themselves, but

23  also between Defendants and industry consultants, customers, and others', as well as through

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)

public sources like *Chemical Week*, the *Chemical Market Reporter* (now ICIS), and Defendants' websites.  For example, in advance of the effective date of a price increase, Defendants routinely sent price increase announcement letters to customers being served by other producers, conditioning the market to accept a price increase by the effective date.  This conduct maximized the transparency in the market of Defendants' collective willingness to increase prices and discouraged price competition or "cheating" on the price increase.  After having reached an unlawful agreement or understanding as alleged herein, Defendants used consultants, customers, and others as conduits to confirm intended pricing and other actions with each other.

94.   During the Class Period, when Defendants met and spoke with each other, they were always in the process of trying to increase Titanium Dioxide prices.  Indeed, the facts reveal that Defendants and coconspirators regularly and routinely met and spoke with each other *before* price increase announcements; *during* the period of time after an industry increase had been announced but before it became effective, and *after* the effective dates of price increases, when Defendants and co-conspirators were in the process of implementing the increases for all of their customer accounts.

95.   Like their other business meetings, trade association functions provided Defendants with the opportunity to discuss prices and support for price increases, as well as capacity and cost issues. Defendants engaged in such private discussions with each other at dinner meetings before and during trade association and other business meetings.  For example, Defendants are all members of the American Chemistry Council's Titanium Dioxide Panel. Although the timing and frequency of the meetings of the Panel are not fixed, annual American Chemistry Council meetings are held in June at the Greenbrier in White Sulfur Springs, West

1   Virginia, and these were attended by Defendants' top executives. Defendants are also

2   members of the Titanium Dioxide Stewardship Council, which was formed as a U.S. industry

3   trade group ostensibly focusing on safety, health, and environmental issues. Defendants also

4   met and spoke with each other at bi-annual (odd year) IntertechPira Titanium Dioxide

5   conferences and at bi-annual (even year) meetings and exhibitions of the Industrial Minerals

6   International Congress, annual meetings of the U.S.-based National Paint and Coatings

7   Association, and other associations related to their industry and customers. Finally,

8   Defendants are all members of the Titanium Dioxide Manufacturers Association (TDMA),

9   which conducts annual and other meetings and is associated with the European Chemical

10  Industry Council (CEFIC). Eighty-eight percent of price increase announcements by

11  Defendants came within thirty days of their attendance at TDMA General Council meetings.

12       96.    Defendants' contacts also fostered industry discipline in maintaining and

13  effectively allocating customer positions and market shares. The numerous meetings and

14  contacts (both bi-lateral and multi-lateral) between Defendants and co-conspirators typically

15  coincided with simultaneous industry price increase announcements.

16       97.    In addition to prices, costs, and customers, Defendants also discussed capacity

17  issues. Their discussions helped them reach consensus on the need to restrain Titanium

18  Dioxide capacity expansion, which restraint they knew would help stabilize prices and support

19  price increases despite industry overcapacity. Defendants monitored each other's capacity

20  plans, including plant closures, "debottleneckings," and "brownfield" capacity expansion

21  through the improvement of production efficiencies at existing facilities.

22       98.    Defendants were generally aware of each other's inventory levels and operating

23  rates. Defendants understood that industry expansion needed to occur in a "disciplined" way,

24

1    i.e., in a manner that sought to eliminate—or at least minimize—the potentially negative

2    pricing impact of capacity expansion.  At times during the Class Period, Defendants wanted the

3    industry to appear to be "tight" on product (regardless of whether demand was weak or strong),

4    so that industry overcapacity did not cause prices to decline like it did in the mid-1990s.

5         99.    Defendants' discussions about capacity issues had their intended effect.  None

6    of the capacity increase announcements made during the Class Period, including increases

7    planned by DuPont to cover the industry's annual growth, decreased prices.  For example,

8    within weeks after DuPont's announcement of its intent to build an enormous plant in China,

9    Defendants announced price increases in North America and worldwide.  These price increases

10   were a success.

11        **1.    Industry Conditions Prior to 2002**

12        100.    During the 1990s, on account of factors including vigorous price competition,

13   global overcapacity, and customer consolidation, Titanium Dioxide prices trended downward,

14   with the profitability of Titanium Dioxide manufacturers reaching an all-time low in 1996.

15   Bayer and Rhone-Poulenc left the industry, selling their Titanium Dioxide businesses to Kerr-

16   McGee (Tronox's predecessor) and Millennium, respectively.

17        101.    The Titanium Dioxide business of Imperial Chemical Industries also went up

18   for sale, and it was eventually sold to Huntsman ▮▮▮▮▮▮▮▮▮▮▮  Although industry

19   consolidation and other factors helped industry prices and margins improve by the year 2000

20   from their 1996 lows, poor economic conditions (e.g., those following the events of September

21   11, 2001), declining demand, and increased global customer purchasing power severely eroded

22   prices in 2001.

23        102.    Demand in 2001 decreased to the point that Defendant Millennium idled one of

24   its U.S. plants effective September 1, 2001, informing customers that they would not be

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                                Page 33 of 117

1   impacted because other plants could still supply them.  By the end of 2001, average U.S. prices

2   of Titanium Dioxide purportedly had reached their lowest level in current dollars since 1991.

3   103.

4

5

6

7

8

9

10

11

12

13   104.

14

15

16

17

18

19            **2.      *A Paradigm Shift in Industry Behavior***

20        105.    As a result of abysmal industry conditions in 2001, Defendants were motivated

21   to reach, and did reach, an agreement or understanding to act together to increase prices and

22   improve margins in the industry.  Millennium, for example, created a presentation entitled

23   "Strategic Planning Presentation" that included a slide titled "TiO2 Industry Trends" for the

24

September 2001 meeting of TDMA.  One such "Trend" was "[p]ossibly more discipline on pricing and capacity."

106.    Prior to 2002, DuPont was not a member of TDMA.  That was corrected at the TDMA General Committee meeting on January 24, 2002, in Saariselka, Finland when TDMA's existing members ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The GSP would involve monthly reporting by its members of the previous month's sales production, and inventory figures and consolidation by CEFIC of that information into a report e-mailed back to TDMA members. Finally, TDMA's members agreed to a one-time exchange of historical data for the years 2000 through 2002. ████████████████████████████████████████████████████████████████████████

107.    Millennium's David Vercollone encouraged creation of the GSP, writing to his Millennium colleagues on April 17, 2002 that the program was  "an important effort for us to get the industry to make more informed decisions" and "the best opportunity we have in structuring industry data for all our collective needs."   Vercollone's uses of the terms "we," "our," and "collective" suggest benefits to all Defendants and their co-conspirators rather than simply Millennium.

108.    James Fisher, a well known consultant in the Titanium Dioxide industry and the President and Chief Executive Officer of International Business Management Associates, Inc., also "recommended that pigment producers "more carefully monitor trends in end-use sectors and trends in demand for end-use products" in an editorial he wrote for a pigment industry

1  newsletter called "TiO2 Worldwide Update" during this time frame. Fisher also advised all

2  Defendants that it was "critical for producers to have accurate information about their success

3  in the market as well as knowing share positions of their competitors for sales as well as for

4  inventory levels." Fisher would act as a conduit for Defendants throughout their conspiracy.

5      109. The details of these information exchanges were finalized and agreed upon at

6  TDMA's September 2002 meeting and became operational in October 2002. Defendants and

7  their co-conspirators treated the information as being highly confidential and instructed any

8  person that was given access not share it with any other parties, including other employees of

9  their companies.

10     110. Once DuPont joined TDMA and members began contributing to the Global

11  Statistics Program, Defendants' and their co-conspirators' behavior in the market immediately

12  changed. Beginning in or around early 2002, increases were announced and implemented

13  despite flat demand, decreasing raw material costs, and excess capacity in the industry.

14  Defendants' cooperative conduct and achieving of consensus not to resist price increases

15  caused customers to pay higher prices for Titanium Dioxide during the Class Period than they

16  would have paid in a competitive market.

17     111. Defendant DuPont, the world's largest supplier of Titanium Dioxide, which had

18  the largest U.S. and world Titanium Dioxide market share, usually led industry price increases

19  during the Class Period. Defendants routinely matched the amount and typically the effective

20  date of each other's price increase announcements during the Class Period. Defendants also

21  usually justified price increases on the same grounds, whether in written announcements or in

22  discussions with customers.

23

24

112.    It is logical to assume that prior to these price increases, Defendants communicated with each other directly (bi-laterally and/or multi-laterally) and indirectly (such as through industry analysts, consultants, or others) and reached an understanding or agreement to support increases in industry prices.  Defendants' price-fixing agreement or understanding was reached in secret, so Plaintiffs do not presently know the precise circumstances surrounding its formation.  However, the facts indicate that this understanding or agreement was maintained and fostered throughout the Class Period by means of other communications, which led to numerous additional price increases and relatively stable customer positions and market shares.  Defendants' communications were conducted surreptitiously.

### a.   2002 Price Increases

113.    On January 7, 2002, Dave Young of DuPont emailed his colleagues regarding alternative price increase announcement strategies.  He wrote that an announcement on "January 24, effective February 15" – as opposed to  the alternative  of "February 4, effective March 1" – "could give our competitors a change [sic] to announce 'differently' on March 1." DuPont was admitted to TDMA only a few weeks later.

114.    Less than a week after TDMA's January 2002 meeting in Finland and in spite of flat demand, decreasing raw material costs, and excess capacity in the industry, Defendants and their co-conspirators announced similar price increases worldwide, including a $0.05 per pound increase in the United States, to be effective March 1, 2002.   This immediately preceded the seasonal demand peak period of April to June and the annual Industrial Minerals International Congress Exhibition held in Paris, France in April 2002.  At the time this exhibition was held in Paris, Defendants were still in the process of increasing prices to their customers globally, in part because the largest customers typically buy Titanium Dioxide under contracts that contain price protection clauses, which defer the effective date of an increase

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)

until several months after the increase announcement.   The first known increases of the Titanium Dioxide cartel were successful.

115.    After Defendants' announcements of the early 2002 price increases, but several weeks before their effective date of March 1, 2002, a chemical and oil industry news service published an article on February 11, 2002 entitled "Ti02 Producers Seek Large Price Increases As Profitability Hovers Near Break-Even Point."   The article noted that support for the worldwide increases "appears unanimous" and it predicted further increases if demand recovered in the next few months.   The article quoted an industry analyst, James Fisher of IBMA, as stating, "Every producer is hurting. They all need to get prices up."   The article continued, "Producers concede that buyers may question the increases because of last year's falloff in demand, but they stress that the increases are necessary to rebuild margins."   The article also quoted high-level executives from Defendants DuPont (Ian Edwards, Global Marketing Director for Titanium Dioxide), Millennium (Bruce Zwicker, Vice President of the Global Coatings Business), and Huntsman (Stuart Heyes, Vice President of NAFTA Sales), commenting on industry prices, margins, consumption, and demand.

116.    In May 2002, Joe Maas of Kronos stated in an e-mail to Fisher "that he had heard Huntsman announced a price increase of '150$/mt???!!!'"   "It sounds weird to me," wrote Maas, "[c]an you confirm anything from your lofty position??"

117.    On June 7, 2002, several days before DuPont's June 11, 2002 price increase announcement Connie Hubbard, DuPont's Competitive Intelligence Manager, spoke with Fisher.   A week later, she made a note in DuPont's "Competitive Intelligence" database that Fisher had called her to confirm that Huntsman had announced a "$150/T increase" in North America.   Hubbard wrote that "[a]s this call came before the DuPont announcement, [she] told

[Fisher] that [she] had not seen any press release or announcement on Huntsman (or DuPont) and asked him his source."

118.    In July 2002, shortly after the communications between Hubbard and Fisher, Defendants announced price increases worldwide again.    DuPont led the charge with a price increase of $0.06, to be effective on July 1, 2002. Millennium and Kronos followed suit three days later, Huntsman announced an identical price increase two weeks later, and Tronox joined in effective August 1, 2002.  A few months later, in and around September 2002, a U.S. price increase of $0.04 per pound for other grades sold to the paper industry was announced.

### b.  2003 Price Increases

119.    Defendants also increased prices in 2003 despite a decline in global demand and 85 percent industry capacity utilization.  Kronos, DuPont, and Huntsman led a $0.06 per pound price increase announcement in January 2003, which Tronox followed two weeks later.  Then DuPont led a second $0.06 per pound increase in September 2003, which the remaining Defendants followed within 20 days.  In all, the North American annual average price per ton of Titanium Dioxide (including cost of goods, insurance, and freight) increased by 4 percent from 2002 to 2003, going from $1,753 to $1,830, .

120.    In the midst of the January and February 2003 price increase announcements, a Titanium Dioxide conference was held in Miami, Florida.  It was attended by Defendants and their co-conspirators, who, it is believed and alleged, discussed and came to price agreements at or around the same time.  DuPont's Global Business Director (Ian Edwards, who gave the keynote address), as well as a former Vice President of Defendant Millennium (Bruce Zwicker), who told conference attendees to expect further price increases.  Mr. Edwards's speech, entitled "TiO2 - Graceful Maturation of Spirited Rejuvenation" included slides that stated, among other things, "Cost is a beautiful thing to have as an advantage - but is of limited

benefit if it's all given away."  Mr. Edwards later told another DuPont executive that his goal was "to stress the need for the TiO2 industry to get its financial house in order" and that "verbally at the conference [he] was more direct."  His speech coincided with the February 2003 price increase announcements described above.

121.    On July 31, 2003, Gary Cianfichi of Millennium sent an e-mail to his colleagues John Hall and Rick Rowe to report that Millennium had decided to "stop our US TiO2 statistics reporting to the [Department of Commerce]" in order "not to telegraph a possible US TiO2 inventory buildup by us and others."   More tellingly though, Mr. Cianfichi ended the e-mail, "PS – John – also note that Bob asked me to talk to Fisher to ask him to do a little job for us – ascertain relative TiO2 inventory levels for some of our key competitors. A little task but I'll speak to Jim this week on this."

### c.   2004 Price Increases

122.    Defendants announced price increases four times in 2004, though DuPont was not always the leader (as it was in 2002 and 2003).  There was a U.S. price increase of $0.05 per pound for all grades effective March 15, 2004; a U.S. increase of $0.04 per pound for all grades effective June 15, 2004 (Millennium, DuPont, Tronox, Huntsman) or July 1, 2004 (Kronos); a price increase of $0.03 to $0.07 per pound, depending on grade, effective October 1, 2004; and a $0.06 per pound increase for all grades effective January 1, 2005.  Overall, the North American annual average price per ton of Titanium Dioxide increased by 5 percent (from $1,830 to $1,921) from 2003 to 2004.

123.    Again, Defendants and their co-conspirators had ample opportunities to conspire and agree to the increases.   At an Industrial Minerals International Congress conference in Barcelona, Spain held in the last few days of March 2004, a Senior Vice President of Huntsman gave a presentation about Titanium Dioxide industry prices and price

dynamics.  It was a timely speech because Defendants were in the process of increasing prices, described above, to customers, and Defendants and their co-conspirators in attendance at the conference were able to discuss and come to price agreements at or around the same time.

124.   On August 25, 2004, Millennium's European sales director Tim Edwards sent an email to Gary Cianfichi instructing that the October 1 announcement date was "a bit early" and that an announcement on November 1 would give "others [a] chance to get on their horses."

125.   Millennium's Chief Executive Officer Bob Lee, Millennium's Deputy General Counsel and Director of Corporate Development, Huntsman's President Tom Keenan, and Huntsman Vice President Mahomed Maiter met in Baltimore, Maryland on September 13, 2004.  The next day, Millennium's Cianfichi sent an e-mail to colleagues, stating "**now that we have competition on board for the Oct 1 price increase announcement**, please relook at your agents['] commissions."

126.   In addition, Defendants were able to monitor each other's conduct both in the United States and worldwide beginning in May 2004  through  their support of, and data contributions to, TZ Minerals International's (TZMI) *TiO2 Review*, a publication that, during the relevant time period alleged herein, provided Defendants with detailed production, pricing, capacity, raw material, and other information and statistics.  The July 2004 issue of this publication included an article on industry price dynamics written by Robert Louw, Senior Vice President of Huntsman.  (Upon leaving Huntsman, Mr. Louw joined TZ Minerals International as its senior global pigment advisor in or around April 2005.)  That article provided that the "decision to reduce c**apacity by both Huntsman and Millennium will**

**possibly impact on future price levels."  Indeed**, it did, as the industry announced price increases shortly thereafter to be effective in October 2004.

### d.  2005 Price Increases

127.   In an article dated February 28, 2005, after the 2004 Fourth Quarter price increases, an industry analyst was reported to say that he "expects 75-85 percent of the increase to get implemented by the end of [the first quarter of 2005]" and that he "expects benchmark pricing in the U.S. to be around $1 per pound once the increase goes through." That prediction proved correct as Defendants and their co-conspirators increased prices four times in 2005.  DuPont announced a $0.05 per pound increase for all grades effective April 1, 2005, which was in addition to the $0.06 increase that it had announced in December 2004. There were also U.S. price increases of $0.04 per pound for all grades, effective July 1, 2005 and for $0.06 per pound, effective October 1, 2005.  Notably, DuPont's September 2005 announcement (effective in October) was followed by Tronox within a mere seven hours and Kronos within eight hours.  Defendant Millennium's Jim Clover sent an e-mail that evening to Gary Cianfichi and others at Millennium, commenting that their competitors' announcements were "too much fun to ignore."  Millennium and Huntsman announced price increases the next day.  In sum, the North American annual average price per ton of Titanium Dioxide increased by 13 percent (from $1,921 to $2,169) from 2004 to 2005 alone.

128.   As in past years, Defendants and their co-conspirators attended a conference in 2005, where they were able to meet and discuss price increases that would be announced within a few weeks. In March 2005, a Titanium Dioxide conference was held in Cannes, France.  It was attended by Defendants, including Vice Presidents from Lyondell and DuPont (Sam Severance), who gave keynote presentations.  Fisher later wrote, in an expert report for unrelated litigation, that pigment producers at the conference "discussed the need to take

advantage of tight market conditions to improve pricing." He further stated that Defendant

Millennium's John Hall "noted in his presentation that the industry should avoid responding to

increased demand with 'over-investment in capacity' as had happened in the past," suggesting

Defendants and their co-conspirators shared pricing information with Fisher as well as each

other.

129.    As described below, Defendants had previously increased prices, effective in

January 2005. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ and

also announced worldwide price increases within weeks of this conference in March 2005 that

became effective April 1, 2005. Indeed, around this time, Defendants were announcing price

increases every quarter.

130.    At an investor conference in September 2005, Lyondell, which owned

Millennium and had an estimated 19 percent of North American capacity at the time, made a

presentation noting that there were minimal announced Titanium Dioxide industry capacity

additions. The same presentation included a chart that showed annual industry operating rates

and overcapacity. According to the chart, the industry operating rate averaged approximately

87 percent in the 2002 to 2005 period, a time when Defendants were announcing price

increases nearly every quarter.

131.    After Hurricane Katrina shut down DuPont's DeLisle Plant, Tronox's Vice

President of Investor Relations Robert Gibney wrote an e-mail to his colleagues advising "that

DuPont would not be 'aggressively pursuing their lost share and will be diligent in bringing the

volume back to the market.'" In addition, financial firm JP Morgan reported that the head of

DuPont's coating division stated that DuPont would "bring DeLisle up gradually and NOT flood the market with product."

132.    Even when industry leader DuPont announced in November 2005 that it had an agreement with Chinese officials to build a massive 200,000 metric-ton-per-year Titanium Dioxide plant in China, Defendants were still able to increase prices, both in 2005 and in subsequent years, and even at times when demand and consumption were declining in the face of poor economic conditions (*e.g.*, as in 2007-2008).  An industry analyst was quoted as saying in November 2005 that DuPont's new capacity would have no problem being absorbed by the market when it eventually came online because pigments would remain "tight" in the future.

### e.   2006 Price Increases

133.    Defendants again increased prices in 2006.  For example, Defendants and their co-conspirators announced a $0.05 per pound increase for all grades in North America, effective January 1, 2006.  This increase was in addition to the October 1, 2005 increase.  An Industrial Minerals International Congress Exhibition was held in San Francisco, California from March 26-29, 2006.  Defendants, who likely attended the Exhibition, were in the process of trying to increase prices at this time.  Indeed, there was a U.S. price increase of $0.04 per pound for all grades effective June 15, 2006 (DuPont) and July 1, 2006 (Millennium, Tronox, and Kronos).  Even though global industry capacity increased from approximately 4 million tons to 5.3 million tons from 2005 to 2006 and industry operating rates were approximately 87 percent in 2006, the North American annual average price per ton of Titanium Dioxide increased from approximately $2,169 to $2,273 from 2005 to 2006, an increase of 5 percent.

### f.   2007 Price Increases

134.    Defendants sought price increases for all grades worldwide in 2007, despite weak demand for Titanium Dioxide in some regions due to declining economic conditions and

1    overcapacity in the market.  In the U.S., Defendants and their co-conspirators announced a

2    $0.05 per pound increase effective July 1, 2007 and a $0.06 per pound increase effective

3    October 15, 2007 (or October 17, 2007 in the case of Huntsman).  The increases were for all

4    grades.  The announcements followed a February 2007 Intertech Titanium Dioxide conference

5    in Fort Lauderdale, Florida where it is believed and alleged that Defendants in attendance,

6    including Vice Presidents from Lyondell and DuPont, were able to meet and discuss said price

7    increases.

8         135.    On July 9, 2007, Defendant Millennium's Michael Card e-mailed his colleagues

9    complaining that "Millennium's market share was 20 percent in the year to date, while the

10   company's historical share was 21 percent" and asserting that "[w]e should have this extra

11   share—customers have been and want to buy this from us.  Competitors will let us have this."

12   However, Millennium's Jim Clover made a handwritten notation reading, "Don't steal Dup

13   tonnes" in November 2007.

14        136.    Connie Hubbard of DuPont again spoke with Fisher in the summer of 2007 and

15   drafted an entry in DuPont's Competitive Intelligence database noting that Fisher told her,

16   regarding "pricing," that he was "[v]ery confident that Tronox, Kronos, and Huntsman will

17   follow."

18        137.    In December 2007, Millennium's John Hall e-mailed his colleague Jim Clover

19   and others at Millennium regarding the need to "improve price."   Hall responded that

20   Millennium should "[b]e disciplined, keep [its] volume, do not take others." Hall explained at a

21   later deposition that he meant "do not take others" and was referring to the volume of titanium

22   dioxide sales of Millennium's competitors.

23

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                                Page 45 of 117

### g.   2008 Price Increases

138.   2008 was a banner year for Defendants and their co-conspirators.   They announced price increases worldwide for all grades in 2008 on several occasions and also implemented "energy surcharges" for the first time.

139.   On January 7, 2008, DuPont first announced a $0.06 per pound price increase for all grades sold in North America, effective January 15, 2008, stating that the increase was in addition to the $0.06 per pound increase previously announced that was effective October 15, 2007.  On the same day, an article published in an industry publication quoted a Titanium Dioxide industry analyst and consultant as stating that Titanium Dioxide prices and margins were expected to increase in 2008.

140.   Tronox's CEO was quoted in the same article as stating: "Although supply and demand fundamentals support increased prices, since 2004 the Ti02 industry has been largely unsuccessful in its efforts to offset rising costs of various inputs, from energy to process chemicals, through increased prices."  This statement was false and misleading because industry "supply and demand fundamentals" rarely, if ever, explained and supported increased prices during the 2004-2007 time period and because Defendants were at times able to offset increased costs during this period and improve their margins.   There was also overcapacity in the industry and flat or weak demand at times during this period, yet, in an uneconomic move, prices were still increased.  This statement "was also false and misleading in that it justified increased prices as being based solely on 'supply and demand fundamentals,'" which did not justify an increase, rather than on Defendants' carefully coordinated and sustained campaign to increase industry prices worldwide.

141.   An Industrial Minerals International Congress Exhibition was held in Athens, Greece from March 30 - April 2, 2008.  Defendants, who were in the process of increasing

1  prices at this time, were registered to attend and are believed and alleged to have attended.

2  Shortly thereafter on May 23, 2008, Defendant Kronos announced a $0.05 per pound increase

3  for all grades sold in North America to be effective June 15, 2008, as well as a $0.03 per pound

4  "energy related surcharge" effective June 9, that would be added to all North American

5  invoices for the sale of all Titanium Dioxide products.   Kronos stated that the surcharge

6  "represents further implementation of previously announced North American price increases."

7  This was the first time that an "energy surcharge" was announced in the industry.

8          142.    On Monday, June 2, 2008, DuPont announced that it would increase prices for

9  all grades in all regions, telling customers that they "can expect the rapid implementation of

10  previously announced price increases, additional increases and, in some areas, energy-related

11  surcharges."  That same day, DuPont announced a North American price increase of $0.05 per

12  pound, effective June 15, 2008, for all grades, stating that this increase was in addition to the

13  two $0.06 per pound increases in late 2007 and early 2008, which were still "in the process of

14  being implemented."  On June 3, 2008, DuPont announced an "energy cost related surcharge"

15  of $0.04 per pound, effective July 1, 2008, for grades of Titanium Dioxide sold in North

16  America to the paper and board industry.  DuPont cited the dramatically increased cost of

17  crude oil as an example of an energy cost increase that necessitated the surcharge.

18          143.    On June 3, 2008, Tronox announced global price increases, stating in its press

19  release that "prices for all TRONOX® titanium dioxide (Ti02) grades sold worldwide will

20  increase by up to 8 percent by July 1."  On the same day, June 3, 2008, the Vice President and

21  General Manager of DuPont Titanium Technologies was quoted in a PRNewswire article as

22  saying "We expect to increase the global pricing structure by as much as 8 percent in coming

23  weeks."  On June 4, 2008, Millennium and Tronox announced a $0.05 per pound price increase

24

in North America for all grades.   Tronox's increase was effective June 15, 2008 and Millennium's increase was effective July 1, 2008.

144.   Also on June 4, 2008, Huntsman announced "energy related surcharges," including a surcharge of $75 per metric ton for "all sales of imported product into North America."  On June 6, 2008, Huntsman announced price increases throughout the world, and on June 9, 2008, Huntsman matched the other Defendants in announcing a North American price increase of $0.05 per pound effective July 1, 2008.

145.   On June 12, 2008, Millennium announced that it would apply "raw material surcharges" to Titanium Dioxide grades sold into the North American paper market of either $0.04 per pound (for Tiona RCS-P grades) or $0.09 per pound (for sulfate anatase grades).

146.   On June 23, 2008, only three weeks after its June 2, 2008 price increase, DuPont announced another price increase, this time for $0.06 per pound for all grades sold in North America, effective July 1, 2008.  This increase was in addition to all previous increases and the paper industry surcharge announced earlier in June.

147.   On June 25, 2008, both Kronos and Tronox matched DuPont's $0.06 per pound increase for all grades sold in North America, effective July 1, 2008.   The Tronox announcement stated that the "increase is in addition to the price increases announced in October 2007, January 2008 and on June 4, 2008, and is the next step toward partially offsetting the extraordinary increases in freight, energy, and other input costs that the Ti02 industry has absorbed over the last two years."   Kronos also announced another $0.03 per pound energy surcharge to be added to all North American invoices, effective July 15, 2008, which would be in addition to the surcharge that became effective on June 9, 2008.

148.    On June 27, 2008, Defendant Huntsman matched DuPont's second increase ($0.06 per pound for all grades in North America effective July 1) and also announced another energy surcharge ($0.03 per pound in North America effective August 1).  These increases were in addition to all previously announced price increases as well as the June 4, 2008 surcharge.

149.    On June 30, 2008, Defendant Millennium joined DuPont and the other Defendants and their co-conspirators, announcing a $0.06 per pound price increase for all grades sold in North America, effective July 1, 2008, which was in addition to its previously announced price increases in North America.

150.    On August 1, 2008, Defendant DuPont announced another energy surcharge, this time for $0.06 per pound on all sales of the Titanium Dioxide grades that it sold to the North American paper and board industry, specifically its Ti-Pure® RPS Vantage® grades. Unconscionably, Millennium and Tronox matched DuPont's surcharge increase.

151.    On August 19, 2008, Huntsman announced a $0.05 per pound increase on ten Titanium Dioxide grades sold in North America, effective September 1, 2008, or as contracts allowed.

152.    On September 2, 2008, DuPont announced a North American price increase, effective that same day, of $0.08 per pound for all Ti-Pure® Titanium Dioxide grades.  Kronos and Tronox matched this increase the next day on September 3, 2008.  Millennium joined it on September 4, 2008, and Huntsman joined it on September 5, 2008.  The Huntsman increase announcement did not clarify whether this increase (which was for all grades) was in addition to the $0.05 per pound price increase for ten grades that it had announced several weeks earlier on August 19, 2008.

153.   The September 2008 price increases were misleadingly justified by DuPont, Millennium, and Huntsman because of cost increases, even though oil prices had fallen far below the record highs that they had reached earlier in the year.   Defendants' 2007-2008 price increases and energy surcharges also occurred in spite of declining demand in the United States for Titanium Dioxide due to recessionary economic conditions, including declining demand in the paint and construction industries.   Titanium Dioxide demand generally had decreased almost 20 percent from 2000-2008 and more than 25 percent from 2004-2008.

154.   In short, over the course of approximately 14 weeks, from late May 2008 to early September 2008, Defendants and their co-conspirators uniformly announced three separate Titanium Dioxide price increases and at least two energy surcharges, in spite of declining demand.   The prices of ilmenite and rutile titanium ore, key raw materials for making Titanium Dioxide, also decreased from 2007-2008, further showing a disconnect between the 2008 price increases and their purported justification.

155.   On December 4, 2008, Defendant Kronos's Joe Maas -e-mailed his colleagues about Kronos's November 2008 sales, complaining that the company's sales volume "was the lowest November volume since 1998 and the worst sales volume month since December 2003!" However, Maas went on to write that the "good news" was that Kronos's "average price worldwide increase[d] by 17 US$/MT and we have now realized since May a total average price increase of 205 US$/MT."   Maas concluded, "It appears that we and our competitors are prepared to reduce production rather than chase phantom volume."

### h.  2009 Price Increases

156.   In March 2009, Richard C. Olson, vice president and general manager of Defendant DuPont's Titanium Technologies gave the key note address at IntertechPera's Titanium Dioxide 2009 conference.   According to DuPont's website, Mr. Olson "said during

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)

the economic downturn the titanium dioxide industry must operate more cautiously, keeping inventory at levels only sufficient to satisfy customer requirements, scrutinizing all capital expenditures and avoiding investment in new capacity without some certainty of a reasonable return."  Representatives from Millennium also presented at this conference, and it is believed and alleged that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time.

157.    Following IntertechPera's 2009 conference, Defendant DuPont announced a price increase on May 15, Millennium announced on May 20, Kronos announced on July 10, Huntsman announced on July 15, and Tronox announced on July 17, with each party's increase to take effect on August 1, 2009.  Defendants DuPont, Millennium, and Huntsman each increased their prices by $0.02 per pound while Defendant Kronos and co-conspirator Tronox increased their prices by $0.03 per pound.

158.    TZMI hosted another minerals conference in October 2009.  David Robb, then Managing Director of Iluka Resources (an Australian mineral company), stated in his opening address, "Industry participants who seek temporary advantage or cash flow through lowering prices in the face of weak demand are confining themselves and their industry to a long and painful recovery process.  Of course, we recognize that individual companies will act in what they believe is their own interest, but often that just produces short term gain and long term pain."  It is believed and alleged that DuPont and Millennium were both in attendance and that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time.

159.    On December 2, 2009, Kronos's Maas e-mailed a file entitled "R&D Org Chart" to Fisher on December 2, 2009 and warned Fisher, "[P]lease do not copy it verbatum

1   [sic] and screw up a few facts so it does not look like too much inside info."   Defendants

2   Kronos and Millennium and co-conspirator Tronox simultaneously announced a price increase

3   of $0.06 per pound one week later, effective January 1, 2010.  Huntsman followed suit with an

4   immediate $0.06 per pound increase on January 14, 2010.

5                                    **i.   2010 Price Increases**

6           160.    Defendants and their co-conspirators followed up on the January 2010 price

7   increase with a second $0.05 per pound increase, effective April 1, 2010.  DuPont led this

8   increase on February 24, and Kronos, Huntsman, Tronox, and Millennium followed on March

9   3, 9, 10, and 12 respectively.

10          161.    The 20th Industrial Minerals International Congress & Exhibition was held later

11  in March 2010.  It is believed and alleged that DuPont and Millennium were in attendance and

12  that Defendants and their co-conspirators were able to meet and discuss price increases at or

13  around the same time.   One month after the conference convened, Defendants and their

14  conspirators announced a third 2010 price increase of $0.08 per pound, effective June 1, 2010.

15  DuPont again led the charge on April 30, and Millennium, Kronos, Huntsman, and Tronox

16  followed on May 3, 5, 6 and 17 respectively.

17          162.    TMZI held its Annual Asia in Focus Congress in Hong Kong from **November** 3

18  to 5, 2010.  A DuPont representative spoke at the conference, and it is believed and alleged that

19  Defendants and co-conspirators in attendance were able to meet and discuss price increases at

20  or around the same time.   One week later, Huntsman announced an $0.08 per pound increase.

21  Kronos, Millennium, Tronox, and DuPont followed with $0.10 per pound price increase

22  announcements on November 15, 24, and 30 and December 3, respectively.

23          163.    During the Class Period, price increase announcements for sales in the United

24  States or North America were typically in cents per pound for all grades of Titanium Dioxide

sold to all customers for all end-use applications, effective on a particular date. Prices in the

United States tended to set a benchmark for prices in other regions worldwide. Price increases

in one region were used by Defendants to justify price increases in other regions. Indeed,

industry price increases often occurred worldwide in that regional price increases were

announced simultaneously or within a month or two of each other. For example, North

American price increases typically occurred within a month or two of announcements of price

increases in Europe, Asia and other regions. Some of the coordinated price increase

announcements of the Defendants and their co-conspirators during the Class Period are listed

by effective date in the following table:

**Examples of Certain U.S. Titanium Dioxide
Industry Price Increase Announcements by
Effective Date in Cent Per Pound**

| Effective Date | DuPont | Millennium | Kronos | Tronox | Huntsman |
|---|---|---|---|---|---|
| | | | | | |
| 03/2002 | $0.05 | $0.05 | $0.03 | $0.05 | $0.05 |
| 07/2002 | $0.06 | $0.06 | $0.03 | | |
| 08/2002 | | | | $0.06 | |
| 10/2002 | $0.04 | $0.04 | | | |
| 02/2003 | $0.06 | $0.06 | | $0.06 | |
| 10/2003 | $0.06 | $0.06 | $0.03 | $0.06 | |
| 03/2004 | $0.05 | $0.05 | $0.05 | | |
| 04/2004 | | | | | $0.05 |
| 06/2004 | $0.04 | $0.04 | | $0.04 | $0.04 |
| 07/2004 | | | $0.04 | | |
| 10/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 01/2005 | $0.06 | $0.06 | $0.06 | | |
| 04/2005 | $0.05 | $0.07 | $0.05 | $0.05 | |
| 07/2005 | $0.04 | $0.04 | $0.04 | $0.04 | |
| 10/2005 | $0.06 | $0.06 | $0.06 | | $0.06 |
| 01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 06/2006 | $0.04 | | | | |
| 07/2006 | | $0.04 | $0.04 | $0.04 | |
| 08/2006 | | | | | $0.04 |
| 10/2006 | $0.04 | | | | |
| 07/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |

| | | | | | |
|---|---|---|---|---|---|
| 10/2007 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 11/2007 | | $0.06 | | | |
| 01/2008 | | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/2008 | $0.05 | | $0.05 | $0.05 | |
| 07/2008 | $0.06 | $0.05 | $0.06 | $0.06 | $0.05 |
| 08/2008 | | | | | $0.06 |
| 09/2008 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 01/2009 | $0.04 | | | | |
| 06/2009 | | | $0.04 | | |
| 08/2009 | $0.02 | $0.02, $0.03 | $0.03 | $0.02 | $0.02, $0.03 |
| 10/2009 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 01/2010 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 04/2010 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 06/2010 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 09/2010 | | $0.08 | | $0.08 | $0.08 |
| 10/2010 | $0.08 | | $0.08 | $0.08 | |
| 01/2011 | $0.10 | $0.10 | $0.10 | $0.10 | $0.08 |
| 04/2011 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| 06/2011 | $0.10 | $0.10 | | $0.10 | $0.20 |
| 07/2011 | $0.25 | $0.25 | $0.35 | $0.25 | $0.15 |
| 08/2011 | $0.10 | | $0.10 | | |
| 09/2011 | $0.32 | $0.10 | $0.10 | $0.10 | $0.10 |
| 10/2011 | | | $0.25 | | |
| 11/2011 | $0.15 | $0.15 | | $0.15 | $0.15 |

Sources: Defendants' press releases; 2002-2008 *Chemical Market Reporter*, *Chemical Week*, and other industry news articles.

164.   All these acts indicate that Defendants were acting pursuant to, and confirming by their acts, an agreement or understanding to fix, raise, maintain, and stabilize Titanium Dioxide prices during the Class Period.  Pursuant to the alleged conspiracy, Defendants and their co-conspirators engaged in deceptive behavior including secret discussions about industry pricing, capacity, costs, and customers, and conspired and agreed to support industry price increase announcements.  It is clear that Defendants had achieved a consensus that if they attempted to take significant business or market share from one another on the basis of price (*e.g.*, by "attacking" or trying to "steal" another Defendant's customer with a low-price offer),

they risked retaliation from that producer and the potential peril of their own customer accounts, not only in the United States but also around the world, and that they acted to reinforce that consensus.  For example, Defendant Huntsman was careful not to appear to compete aggressively for the business of a DuPont customer, lest its own customer accounts then be subject to retaliation from DuPont.  Plaintiffs allege that such conduct was not limited to Huntsman but was also practiced by the other Defendants, pursuant to and consistent with an understanding or agreement among DuPont, Millennium, Kronos, Huntsman, and their co-conspirators to keep customer positions and industry prices stable.  Price increase announcements were routinely supported in the industry during the Class Period, and this consistent conduct in light of Defendants' considerable contacts with each other also gives further support to the allegation that an anticompetitive understanding or agreement existed among Defendants during the Class Period.

165.    The conspiracy among Defendants was successful in increasing prices during the Class Period even when industry overcapacity and weak demand existed.  For example, in November 2007, Defendant Millennium announced that it was closing a Titanium Dioxide plant in France, in part due to industry overcapacity.   As discussed above, Defendants announced worldwide price increases in 2007 and in 2008.  Unlike in the 1990s, when market forces caused industry overcapacity to generate lower prices and poor industry margins, Defendants' conspiracy managed to prevent overcapacity from appreciably impacting prices during the Class Period.

166.    Defendants' price increases during the Class Period had their intended effect, and the alleged conspiracy has been profitable for Defendants.  For example, the average annual price per ton of Titanium Dioxide in North America increased from approximately

1   $1,753 in 2002 to $2,273 in 2006, an increase of 30 percent.   Defendants Huntsman and

2   Kronos dramatically increased their operating income and margins between 2002 and 2003.

3   Even after discounting the $142 million in insurance proceeds that Defendant DuPont received

4   for damages to its Mississippi plant from Hurricane Katrina in 2005, DuPont's operating

5   income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide

6   business) increased approximately 45 percent from 2002 to 2007.   In addition, in 2008 and in

7   spite of declining demand for Titanium Dioxide and recessionary economic conditions in the

8   United States and elsewhere, the global Titanium Dioxide industry earned over $1 billion in

9   pre-tax operating income.   Industry leader and Defendant DuPont achieved approximately half

10   of that amount.

11   **VIII.   PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY**

12   167.   Defendants' combination and conspiracy has had the following effects, among

13   others:

14   (a)   Price competition in the sale of Titanium Dioxide by Defendants and their co-

15   conspirators has been restrained, suppressed, and eliminated throughout the United States;

16   (b)   Prices for Titanium Dioxide sold by Defendants and their co-conspirators have

17   been unfairly raised, fixed, maintained, and stabilized at artificially high and

18   noncompetitive levels throughout the United States; and

19   (c)   Defendants charged purchasers of Titanium Dioxide artificially inflated, fixed,

20   and stabilized prices for such Titanium Dioxide;

21   (d)   Architectural Coatings manufacturers  paid an unfairly high price for Titanium

22   Dioxide, which they passed on to Plaintiffs and the Classes;

23   (e)   Defendants' overcharges passed through each level of distribution as they

24   traveled to Plaintiffs and the Classes;

(f)      All persons and entities purchasing Architectural Coatings containing Titanium

Dioxide paid Defendants' artificially inflated prices, during the Class Period, as a result of

the Defendants' conspiracy and have been deprived of free and open competition.

168.    During the Class Period, Plaintiffs and the members of the Classes paid

supracompetitive prices for Architectural Coatings containing Titanium Dioxide as a result of

Defendants' conspiracy.

169.    The market for Titanium Dioxide and the market for Architectural Coatings are

inextricably linked and intertwined.    Architectural Coatings manufacturers consume

approximately 41 percent of all Titanium Dioxide.    Moreover, there are no viable white

pigment competitive substitutes for Titanium Dioxide in the Architectural Coatings industry.

170.    Titanium Dioxide follows a traceable physical chain of distribution from

Defendants to Plaintiffs and the members of the Classes.    It goes through a single

transformation when manufacturers incorporate it into their Architectural Coatings and is a

substantial part of those products.  Architectural Coatings manufacturers know what percentage

of their products is comprised of Titanium Dioxide, and they disclose that percentage on their

Material Safety Data Sheets.  For example, 17 percent (by weight) of Sherwin-William's

SUPERPAINT® Interior Flat Latex Wall Paint is composed of Titanium Dioxide.  *See*

http://www.sherwin-williams.com /document/MSDS/en/035777036921/ (last visited Oct. 14,

2014).

171.    The chain of distribution from Defendants to Plaintiffs is short.    Titanium

Dioxide is sold directly to manufacturers of paint such as Sherwin-Williams, who then

incorporate it into and sell Architectural Coatings either directly to Consumers through

company-owned stores or indirectly through retailers such as Merchants.  In the first instance,

Consumers are the first-level indirect purchasers, and in the second instance, Merchants are the first-level and Consumers the second-level indirect purchasers.[5]

172.     Just as Titanium Dioxide can be physically traced through the supply chain, so can its price be traced to show that changes in the prices paid by direct purchasers of Titanium Dioxide affect prices paid by indirect purchasers of products containing Titanium Dioxide. Titanium Dioxide is the costliest component of Architectural Coatings such that the retail price of the product is determined in substantial part by the cost of the Titanium Dioxide.  Because of the significance of Titanium Dioxide as an input, Architectural Coatings producers are not able to absorb fluctuations in the cost of Titanium Dioxide.    As a result, increases in the price of Titanium Dioxide cause increases in the prices of Architectural Coatings containing Titanium Dioxide during the Class Period.

173.     Raw materials like Titanium Dioxide account for 7 to 13 percent of the cost of Architectural Coating production, and in July 2010, it was reported that paint costs would go up by as much as 5 percent over the rest of that year due to the reduced supply and increased price of Titanium Dioxide.  In November 2011, the cost of paint continued to rise.  "Chief executives from US paint and coatings manufacturers Sherwin-Williams and PPG Industries . . . reported frustration about price hikes coming from their customers.  The companies [we]re passing on their own price increases in response to continuous rising costs of titanium dioxide."

---

[5] Architectural Coatings are sometimes sold to Merchants through distributors, meaning that Merchants become second-level indirect purchasers and Consumers become third-level indirect purchasers.  This is the furthest removed that Plaintiffs will become in the Titanium Dioxide distribution chain.

174.    Analysts reported in 2011 that "TiO$_2$ pigment accounts for 24-25% of the total raw cost to make architectural paint," and Sherwin-Williams' CEO stated that Titanium Dioxide "makes up most of [its] raw material costs."  Further, Kronos CEO Steve Watson admitted, while on an earnings call in November 2011, that its customers pass along the higher Titanium Dioxide prices, and he advised investors, "There is no question that an extra $1 for a gallon of paint is not going to destroy demand . . . . I feel our customer base understands and would prefer a higher price than a lack of availability."  That same year, Sherwin-Williams announced an eight- to nine-percent increase in prices for Architectural Coatings.  *See* http://www.icis.com/resources/news/2011/11/14/9507731/inorganics-us-paint-companies-frustrated-by-continuous-tio2-price-hikes/ (last visited Oct. 14, 2014).

175.    The inflated prices of Titanium Dioxide in Architectural Coatings resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by manufacturers.  Those overcharges have unjustly enriched Defendants.

176.    The purpose of the conspiratorial conduct of the Defendants and their coconspirators was to raise, fix, rig, or stabilize the price of Titanium Dioxide and, as a direct and foreseeable result, the price of Architectural Coatings containing Titanium Dioxide.

177.    Kronos admits that Titanium Dioxide price increases led to "an extra $1 for a gallon of paint."  Even without such direct evidence, economists have also developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis – called a regression analysis – is commonly used in the real

world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Titanium Dioxide on prices for Architectural Coatings containing the chemical even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Titanium Dioxide affects changes in the price of Architectural Coatings containing Titanium Dioxide. In such models, the price of Titanium Dioxide would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Titanium Dioxide impact the price of Architectural Coatings containing Titanium Dioxide while controlling for the impact of other price-determining factors.

178. The precise amount of the overcharge affecting the price of Architectural Coatings containing Titanium Dioxide can be measured and quantified. Commonly used and well accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified. Plaintiffs will present a damages model at class certification that will eliminate the possibility of duplicative recovery.

179. By reason of Defendants' illegal, unfair, and anticompetitive conduct, Plaintiffs and the members of the Classes have sustained injury to their businesses and/or property, having paid higher prices for Architectural Coatings containing Titanium Dioxide than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. Specifically, and by way of example, Plaintiffs and the members of the Classes have suffered during the Class Period overcharge loss due to unjustified increases in the price of paint containing Titanium

1   Dioxide, as a result of the conspiracy described in this Second Amended Class Action

2   Complaint.

3      180.    Plaintiffs and the members of the Classes have suffered an antitrust injury of the

4   type that the various state antitrust laws invoked by this Second Amended Class Action

5   Complaint were meant to punish and prevent, and Plaintiffs' and Class Members' damages are

6   measurable.

7      181.    Plaintiffs have standing, and have suffered damage, in the states where they

8   reside and/or operate, compensable by indirect purchaser laws, and they and members of the

9   Classes they seek to represent have sustained significant damage and injury as a result of

10  Defendants' conspiracy and unlawful and unfair trade practices.

11  **IX.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

12

13     **A.    The Statute of Limitations Did Not Begin To Run Because Plaintiffs Did Not And Could Not Discover The Claims.**

14     182.    Plaintiffs repeat and reallege the allegations set forth above.

15     183.    Under controlling precedent, Plaintiffs and members of the Class, the applicable

16  statutes of limitations did not begin to run against Plaintiffs until shortly after August 28, 2012

17  when a class of direct purchasers of Titanium Dioxide was certified by Judge Richard D.

18  Bennett in a separate but related lawsuit brought in the District of Maryland ("Direct Purchaser

19  Litigation").  *See In Re: Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, Memorandum

20  Opinion ("Class Cert. Opinion") D.E. 337 Aug. 28, 2012).

21     184.    Judge Bennett's order conferred judicial legitimacy for the first time on the

22  allegations made against Defendants in that case, accepting as credible nearly all of the

23  findings by direct purchasers' economics expert, Dr. Russell Lamb.  He "f[ound] credible Dr.

24  Lamb's conclusions that the Defendants implemented multiple nearly simultaneous price

increases throughout the class period, and those price increases can be used to prove coordinated pricing." Class Cert. Opinion at 21. In addition, the court accepted "as established" the "general conclusions that the market for TiO2 is a highly concentrated one," and it "credit[ed] Dr. Lamb's conclusion that $TiO_2$ is a commodity-like product and that competition among produces is based primarily on price." Class Cert. Opinion at 23, 25. Finally, Judge Bennett accepted Dr. Lamb's findings of declining demand and excess capacity after describing his determination "that prices for $TiO_2$ did not fall as economic theory predicts." Class Cert. Opinion at 26.

185. Judge Bennett also found credible Dr. Lamb's findings regarding how Defendants' anticompetitive conduct had common impact on and damaged the direct purchasers, holding that "Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry." Class Cert. Opinion at 33. Dr. Lamb's analysis concluded "that, as a result of the cartel, prices for TiO2 were more than seven percent higher during the Class." Class Cert. Opinion at 32-33. This informed Plaintiffs for the first time that Architectural Coatings manufacturers in the United States were damaged, as a whole, by Defendants' anticompetitive conduct.

186. Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the very earliest, August 28, 2012, when Judge Bennett entered his class certification order. Until that time, Plaintiffs did not have access to Dr. Lamb's report or the evidence he relied on, nor did they have any way to determine the legitimacy of the direct purchasers' allegations against Defendants.

187.    Plaintiffs and the members of the Classes had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Second Amended Class Action Complaint until the entry of Judge Bennett's class certification opinion.

188.    Prior to the August 2012 certification of a direct purchaser class, facts were not available to Plaintiffs and the members of the Classes that revealed sufficient information to suggest that Plaintiffs had a claim against the Defendants.  Plaintiffs and the members of the Classes did not have facts or information concerning Defendants' dealings with each other or with direct purchasers of Titanium Dioxide, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged in this Second Amended Class Action Complaint.

189.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Second Amended Class Action Complaint.

**B.    Fraudulent Concealment Tolled the Statute of Limitations.**

190.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted in this Second Amended Class Action Complaint by Plaintiffs and the Classes.  Plaintiffs and members of the Classes did not know, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy and unlawful combination alleged herein until, at the earliest, the August 28, 2012 entry of Judge Bennett's class certification opinion.

191.    Because Defendants' agreements, understandings, and conspiracies were kept secret and not known to Plaintiffs before Judge Bennett's August 2012 class certification ruling, Plaintiffs and members of the Classes were unaware before that time of Defendants'

1   unlawful conduct, and they did not know before then that they were paying supracompetitive

2   prices throughout the United States for Architectural Coatings containing Titanium Dioxide

3   during the Class Period.

4       192.    The affirmative acts of the Defendants alleged in this Second Amended Class

5   Action Complaint, including acts in furtherance of the conspiracy, were wrongfully concealed

6   and carried out in a manner that precluded detection.

7       193.    By its very nature, Defendants' and their co-conspirators' alleged price-fixing

8   conspiracy was inherently self-concealing.  Defendants met and communicated in secret and

9   agreed to keep the facts about their collusive conduct from being discovered by any member of

10  the public or by the Architectural Coatings manufacturers and other direct purchasers with

11  whom they did business.  Plaintiffs thus had neither actual nor constructive knowledge of the

12  facts constituting their claims for relief despite diligence in trying to discover the pertinent

13  facts.

14      194.    Plaintiffs and members of the Classes did not discover, and could not have

15  discovered through the exercise of reasonable diligence, that Defendants and their co-

16  conspirators were violating the antitrust laws at an earlier date because of the deceptive

17  practices and techniques of secrecy employed by the Defendants and their co-conspirators to

18  avoid detection of, and fraudulently conceal, their conduct.

19      195.    The conspiracy as herein alleged was fraudulently concealed by Defendants by

20  various means and methods.    Defendants and their co-conspirators are alleged to have

21  affirmatively concealed their conspiracy by meeting secretly to discuss Titanium Dioxide

22  prices, customers and markets; by agreeing among themselves at meetings and in

23  communications not to discuss publicly, or otherwise reveal, the nature and substance of the

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                        Page 64 of 117

acts and communications in furtherance of their illegal scheme; by deceptively giving false and pretextual reasons for price increases, and by describing Titanium Dioxide pricing falsely as being the result of competitive factors rather than collusion; and by wrongfully and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection.  If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators.

196.    As alleged above, in 2002 after years of declining prices, the price of Titanium Dioxide began to increase.  The price increases and "surcharges" implemented by Defendants and their co-conspirators during the Class Period tended to be based on a need to improve margins, justify future investment, offset increased  costs and/or meet allegedly increased demand at a time of tight supply.  The justifications offered by Defendants and their co-conspirators for their price increases were false, pretextual and/or misleading and operated to conceal the conspiracy.  In fact, price increases were the result of collusive conduct among the Defendants and their co-conspirators, which was undisclosed at the time of the increases.  To the extent there was any truth in the explanations offered by Defendants for their numerous price increases during the Class Period, the explanations were nevertheless misleading because of Defendants' conspiracy, which was kept secret from the public.

197.    For example, in early 2002 when industry prices had hit bottom and Titanium Dioxide producers were desperate to increase prices, they offered a variety of justifications for price increases.  Huntsman's Vice President of NAFTA sales was quoted in an article as saying that "recent pricing has been insufficient to justify investments in major new capacity, which

1  will be needed by 2003 to 2004, leading to a tight market at that time." But this was false and

2  misleading because new capacity was in fact not needed. Huntsman and other producers, who

3  successfully increased prices in 2002-2005, actually shut down some capacity during the 2003-

4  2004 period.

5      198.   Indeed, a lack of new capacity was used at times to justify price

6  increases during the Class Period, even though Defendants and their co-conspirators often had

7  more than enough capacity (and inventory) on hand to supply global markets. For example,

8  Huntsman and Millennium decreased capacity at certain plants in 2004, and shortly after the

9  October 2007 price increase, Defendant Millennium closed a plant in France citing "the

10  overcapacity of titanium dioxide in the world market," among other reasons.

11      199.   Often during the Class Period, Defendants justified the need for price increases

12  due to poor or otherwise "unacceptable" industry margins even though the Titanium Dioxide

13  business of DuPont and other Defendants earned hundreds of millions of dollars in profits

14  annually. For example, in August 2007, DuPont informed customers (even customers who

15  were being supplied by other Defendants) that price increases were justified in part because

16  industry profitability had declined, even though DuPont's operating income for its Coatings &

17  Color Technologies segment (which includes its Titanium Dioxide business) increased

18  approximately 45 percent from 2002 to 2007. Also, in 2008, a year in which the paint and

19  plastics industries (which account for approximately 80 percent of Titanium Dioxide

20  consumption) were beleaguered by recession, DuPont, the industry leader, earned over $500

21  million in pre-tax operating income from global Titanium Dioxide sales.

22      200.   In addition, when DuPont led an industry price increase in September 2008, its

23  price increase announcement contained various justifications for the increase from its Global

24

Business Director, Ian Edwards.  The justifications included not only the existence of higher raw material, energy and transportation costs (which plagued a vast number of industries in 2008), but also the purported fact that "Demand for Ti02 remains strong."  This was false and misleading, as demand for Titanium Dioxide was declining in 2008, particularly given recessionary economic conditions in the paint, construction, paper and plastic industries.  In fact, demand for Titanium Dioxide had been declining for years.  For example, the market volume of Titanium Dioxide sold in the U.S. declined over 25 percent between 2004 and 2007.

201.    Although Defendants' price increase announcements during the Class Period often did not contain justifications for price increases (such justifications were typically given to customers orally), the announcements nevertheless constituted implicit statements that the price increases in question were legitimate and were the result of competitive market forces.  Customers also were often told that price increases were needed because raw material costs were increasing and industry margins were being adversely impacted.

202.    For example, after Defendants announced price increases to be effective on October 1, 2004, an article published in Paint and Coatings Industry magazine on October 1, 2004 stated: "DuPont said the price increases are the result of rising raw-material costs, economic expansions that are driving 'very strong global Ti02 demand,' high capacity rates, and 'reinvestment economics for capital funding to support industry growth.'"  Similar statements were issued by other suppliers.

203.    Huntsman said the price hikes "reflect both strong global market demand and the significant impact of raw material, energy and freight cost increases."  These statements were false and misleading because (1) capacity was not "high"—the industry operating rate averaged approximately 87 percent in the 2002-2004 period and (2) ore costs,

1    which are a substantial part of the raw material costs of manufacturing Titanium Dioxide, were

2    either decreasing (ilmenite ore) or stable (rutile ore) during the 2002-2004 period.

3          204.    Defendant's also actively hid the existence of the GSP from the public:

4          (a)    Millennium's Cianfichi stressed that the GSP was confidential and advised that

5    any references made to the public regarding market details should be described as

6    "[Millennium] estimates and never as CEFIC data"

7          (b)    Kronos's Basson reminded colleagues that "[a]ny TDMA statistics that are

8    shared with you or any specifics which you may share with your co-workers, should

9    UNDER NO CIRCUMSTANCES BE DIVULGED TO ANY THIRD PARTIES"

10         205.    Other examples of Defendants' fraudulent concealment include the following:

(d)     In a telephone conversation with a financial consulting firm, Jim Fisher explained that the 60 "published production capacities" of the pigment producers are "far below the real ones," and that DuPont, Millennium, and Kerr-McGee had a total of "350,000 tons of unused capacity."

206.    Defendants' customers, including Plaintiffs and members of the Classes, were thus conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time.  Plaintiffs and members of the Classes were lulled into believing that price increases were the normal result of competitive market forces rather than the product of collusive, unlawful efforts.  Indeed, as alleged herein, Defendants and their co-conspirators made statements in the media in support of price increases that were presumed to be true and were designed to convince members of the Classes to pay purportedly legitimate price increases. Plaintiffs are informed and believe, and thereon allege, that Defendants' reasons for the price increases of Titanium Dioxide during the Class Period were materially false and/or misleading and were made, at least in part, in order to conceal Defendants' anticompetitive scheme as alleged in this Second Amended Class Action Complaint.

207.    Judge Bennett found an adequate basis to defeat Defendants' motion for summary judgment based on the statute of limitations in the Direct Purchaser Litigation, citing evidence "suggesting that the Defendants attempted to minimize the appearance of collusion" and "indicating that the Defendants gave inaccurate information to customers in order to justify their price increase."  Direct Purchaser Litigation, Memorandum Opinion at 59-60 (D.E. 498 Aug. 14, 2013).

208.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

209.     Because Defendants' agreements, understandings, and conspiracies were both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy or of any factors or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.  Plaintiffs were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices throughout the United States for Architectural Coatings containing Titanium Dioxide during the Class Period.

210.     For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until August 28, 2012.

## X.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Violation of State Antitrust Statutes
#### (On Behalf of Plaintiffs and the Damages Classes)

211.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

212.     From as early as January 2002 until at least the filing of this Second Amended Class Action Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Titanium Dioxide in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below

213.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at

1 artificially supracompetetive levels the price for Titanium Dioxide and to allocate customers

2 for Titanium Dioxide in the United States.

3     214.   In formulating and effectuating this conspiracy, Defendants and their co-

4 conspirators performed acts in furtherance of the combination and conspiracy, including:

5     (a)   Participating in meetings and conversations among themselves in the United

6 States and elsewhere during which they agreed to price Titanium Dioxide at certain levels,

7 and otherwise fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs

8 and members of the Classes with respect to Titanium Dioxide sold in the United States;

9     (b)   Allocating customers and markets for Titanium Dioxide in the United States in

10 furtherance of their agreements; and

11     (c)   Participating in meetings and conversations among themselves in the United

12 States and elsewhere to implement, adhere to, and police the unlawful agreements they

13 reached.

14     215.   Defendants and their co-conspirators engaged in the actions described above for

15 the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize

16 prices and the allocate customers with respect to Titanium Dioxide.

17     216.   Defendants' anticompetitive acts described above were knowing, willful, and

18 constitute violations or flagrant violations of the following state antitrust statutes.

19     217.   Defendants have entered into an unlawful agreement in restraint of trade in

20 violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

21     (a)   Defendants' combinations or conspiracies had the following effects:  (1)

22 Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

23 Arizona; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                   Page 72 of 117

artificially high levels throughout Arizona; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Consumers and members of the Consumer Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

218.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Titanium Dioxide at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action

among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Titanium Dioxide.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Titanium Dioxide; and (2) Allocating among themselves the production of Titanium Dioxide.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California:  (1) Price competition in the sale of Titanium Dioxide has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Architectural Coatings containing Titanium Dioxide from entities who purchased the chemical from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property in that they paid more for Architectural Coatings containing Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Classes seek treble damages and their cost of suit, including a reasonable

attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

219.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Consumers and members of the Consumer Class, who resided in the District of Columbia and/or purchased Architectural Coatings containing Titanium Dioxide in the District of Columbia, were deprived of free and open competition, in the District of Columbia; and (4) Consumers and members of the Consumer Class, who resided in the District of Columbia and/or purchased Architectural Coatings containing Titanium Dioxide in the District of Columbia, paid supracompetitive, artificially inflated prices in the District of Columbia for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly,

Consumers and members of the Consumer Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-45601, *et seq.*

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Consumers and members of the Consumer Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

221.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

Kansas; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Consumers and members of the Consumer Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

222.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*   Accordingly, Consumers and members of the Consumer Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Classes were deprived of free and open competition; and (4) Plaintiffs and members of the Classes paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

1    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

2    of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and

3    members of the Classes seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

4    224.    Defendants **h**ave entered into an unlawful agreement in restraint of trade in

5    violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

6    (a)    Defendants' combinations or conspiracies had the following effects:    (1)

7    Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

8    Mississippi; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

9    artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Classes

10   who resided in Mississippi and/or purchased Architectural Coatings containing Titanium

11   Dioxide in Mississippi were deprived of free and open competition in Mississippi; and (4)

12   Plaintiffs and members of the Classes who resided in Mississippi and/or purchased

13   Architectural Coatings containing Titanium Dioxide in Mississippi paid supracompetitive,

14   artificially inflated prices in Mississippi for Architectural Coatings containing Titanium

15   Dioxide.

16   (b)    During the Class Period, Defendants' illegal conduct substantially affected

17   Mississippi commerce.

18   (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

19   members of the Classes have been injured in their business and property and are threatened

20   with further injury.

21   (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

22   of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs

23

24

and members of the Classes seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:    (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*    Accordingly, Consumers and members of the Consumer Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*  Accordingly, Consumers and members of the Consumer Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

227.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and

members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Consumers and members of the Consumer Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New York; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Classes who resided in New York and/or purchased Architectural Coatings containing Titanium Dioxide in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Classes who resided in New York paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide when they purchased, in New York, Architectural Coatings containing Titanium Dioxide or purchased, in New York, Architectural Coatings containing Titanium Dioxide that were

otherwise of lower quality than would have been absent the conspirators' illegal acts, or were unable to purchase Architectural Coatings containing Titanium Dioxide that they would have otherwise purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Classes seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

229.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Classes who resided in North Carolina and/or purchased Architectural Coatings containing Titanium Dioxide were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Classes who resided in North Carolina and/or purchased Architectural   Coatings   containing   Titanium   Dioxide   in   North   Carolina   paid

supracompetitive, artificially inflated prices in North Carolina for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly, Plaintiffs and members of the Classes seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

230.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*   Accordingly, Consumers and members of the Consumer Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Classes who resided in Tennessee and/or purchased Architectural Coatings containing Titanium Dioxide in Tennessee were deprived of free and open competition in Tennessee; and (4) Plaintiffs and members of the Classes who resided in Tennessee and/or purchased Architectural Coatings containing Titanium Dioxide in Tennessee paid supracompetitive, artificially inflated prices in Tennessee for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

1    (c)    By reason of the foregoing, Defendants have entered into agreements in restraint

2    of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs

3    and members of the Classes seek all relief available under Tennessee Code Ann. §§ 47-25-

4    101, *et seq.*

5    232.    Defendants have entered into an unlawful agreement in restraint of trade in

6    violation of the Wisconsin Statutes §§ 133.01, *et seq.*

7    (a)    Defendants' combinations or conspiracies had the following effects:   (1)

8    Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

9    Wisconsin; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

10   artificially high levels throughout Wisconsin; (3) Merchants and members of the Merchant

11   Class were deprived of free and open competition; and (4) Merchants and members of the

12   Merchant Class paid supracompetitive, artificially inflated prices for Architectural Coatings

13   containing Titanium Dioxide.

14   (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

15   Wisconsin commerce.

16   (c)    As a direct and proximate result of Defendants' unlawful conduct, Merchants

17   and members of the Merchant Class have been injured in their business and property and

18   are threatened with further injury.

19   (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

20   of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Merchants and

21   members of the Merchant Class seek all relief available under Wisconsin Stat. §§ 133.01, *et*

22   *seq.*

23

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                              Page 86 of 117

233.    Plaintiffs and members of the Classes in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Classes have paid more for Architectural Coatings containing Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

234.    In addition, Defendants have profited significantly from the aforesaid conspiracy.  Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and members of the Classes.

235.    Accordingly, Plaintiffs and the members of the Classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**SECOND CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(On Behalf of Plaintiffs and the Damages Classes)**

236.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Second Amended Class Action Complaint.

237.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

238.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Architectural Coatings containing Titanium Dioxide were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Consumers and members of the Consumer Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Consumers and members of the Consumer Class seek all relief available under that statute.

239.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)   During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)   During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers.

(c)   This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Second Amended Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)   The Defendants' conduct as alleged in this Second Amended Class Action Complaint violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above;

(e)   Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California

Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)      Defendants' acts or practices are unfair to purchasers of Architectural Coatings containing Titanium Dioxide in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)      Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout California; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Classes who resided in California and/or purchased Architectural Coatings containing Titanium Dioxide in California were deprived of free and open competition in California; and (4) Plaintiffs and members of the Classes who resided in California and/or purchased Architectural Coatings containing Titanium Dioxide in California paid supracompetitive, artificially inflated prices in California for Architectural Coatings containing Titanium Dioxide.

(h)      Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)      Plaintiffs and members of the Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j)      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(k)      The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause

Plaintiffs and the members of the Classes to pay supracompetitive and artificially inflated prices for Architectural Coatings containing Titanium Dioxide. Plaintiffs and the members of the Classes suffered injury in fact and lost money or property as a result of such unfair competition.

(l)      The conduct of Defendants as alleged in this Second Amended Class Action Complaint violates Section 17200 of the California Business and Professions Code.

(m)      As alleged in this Second Amended Class Action Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Classes are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

240.      Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Titanium Dioxide was sold, distributed, or obtained in the District of Columbia.

(b)      The foregoing conduct constituted "unlawful trade practices" within the meaning of D.C. Code § 28-3904.

(c)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(e)     As a direct and proximate result of Defendants' conduct, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Consumers and members of the Consumer Class seek all relief available under that statute.

241.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Florida; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Classes were deprived of free

and open competition; and (4) Plaintiffs and members of the Classes paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unlawful, unfair, or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Classes seek all relief available under that statute.

242.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Titanium Dioxide was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Consumers and members of the Consumer Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2, 11.

(c)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2)

Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2,11 and, accordingly, Consumers and members of the Consumer Class seek all relief available under that statute.

243.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

(a)     Defendants engaged in the conduct described in this Second Amended Class Action Complaint in connection with the sale of Architectural Coatings containing Titanium Dioxide in a market that includes Missouri.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers.

(c)     Defendants agreed to, and in fact did, fix, control, and/or maintain at artificial and non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or

1    obtained in Missouri, which conduct constituted unfair practices in that it was unlawful

2    under federal and state law, violated public policy, was unethical, oppressive, and

3    unscrupulous, and caused substantial injury to Plaintiffs and members of the Classes.

4         (d)    Defendants concealed, suppressed, and omitted to disclose material facts to

5    Plaintiffs and members of the Classes concerning Defendants' unlawful activities and

6    artificially inflated prices for Titanium Dioxide. The concealed, suppressed, and omitted

7    facts would have been important to Plaintiffs and members of the Classes as they related to

8    the cost of Architectural Coatings containing Titanium Dioxide.

9         (e)    Defendants' unlawful conduct had the following effects: (1) Titanium Dioxide

10    price competition was restrained, suppressed, and eliminated throughout Missouri; (2)

11    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high

12    levels throughout Missouri; (3) Plaintiffs and members of the Classes were deprived of free

13    and open competition; and (4) Plaintiffs and members of the Classes paid supracompetitive,

14    artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

15         (f)    The foregoing acts and practices constituted unlawful practices in violation of

16    the Missouri Merchandising Practices Act.

17         (g)    As a direct and proximate result of the above-described unlawful practices,

18    Plaintiffs and members of the Classes suffered ascertainable loss of money or property.

19         (h)    Accordingly, Plaintiffs and members of the Classes seek all relief available

20    under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020,

21    which prohibits "the act, use or employment by any person of any deception, fraud, false

22    pretense, false promise, misrepresentation, unfair practice or the concealment, suppression,

23    or omission of any material fact in connection with the sale or advertisement of any

24

merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

244.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at a non-competitive and artificially inflated levels, the price at which Titanium Dioxide was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Consumers and members of the Consumer Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices" in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, and as set forth in N.M.S.A. § 57-12-2E, resulted in a gross disparity between the value received by Consumers and members of the Consumer Class and the prices paid by them for Architectural Coatings containing Titanium Dioxide.

(c)    Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Consumers and members of the Consumer Class were deprived of free and open competition; and (4) Consumers and members of the Consumer Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(d)    During the Class Period, Defendants' illegal conduct substantially affected Now Mexico commerce and consumers.

(e)      As a direct and proximate result of the unlawful conduct of the Defendants, Consumers and members of the Consumer Class have been injured in their business and property and are threatened with further injury.

(f)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Consumers and members of the Consumer Class seek all relief available under that statute.

245.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the members of the Classes.

(b)      Defendants deceptively led purchasers, such as Plaintiffs and members of the Classes, to believe that the Architectural Coatings containing Titanium Dioxide they had purchased had been sold at a legal, competitive price, when they had in fact been sold at a collusively obtained and inflated price, that passed on to them the artificially inflated price of Titanium Dioxide.

(c)      The conduct of the Defendants described in this Second Amended Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

1    (d)    Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide

2    price competition was restrained, suppressed, and eliminated throughout New York; (2)

3    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high

4    levels throughout New York; (3) Plaintiffs and members of the Classes who reside in

5    and/or made purchases of Architectural Coatings containing Titanium Dioxide in New

6    York were deprived of free and open competition and subject to Defendants' deceptive

7    practices in New York; and (4) Plaintiffs and members of the Classes who reside in and/or

8    made purchases of Architectural Coatings containing Titanium Dioxide in New York paid

9    supracompetitive, artificially inflated prices in New York for Architectural Coatings

10   containing Titanium Dioxide, and were subjected to Defendants' deceptive practice in New

11   York.

12    (e)    During the Class Period, Defendants' illegal conduct substantially affected New

13   York commerce and consumers.

14    (f)    During the Class Period, each of the Defendants named in this Second Amended

15   Class Action Complaint directly, or indirectly and through affiliates they dominated and

16   controlled, manufactured, sold, and/or distributed Titanium Dioxide in New York.

17    (g)    Plaintiffs and members of the Classes seek all relief available pursuant to N.Y.

18   Gen. Bus. Law § 349(h).

19   246.    Defendants have engaged in unfair competition or unfair, unconscionable, or

20   deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

21    (a)    Defendants agreed to, and did in fat, act in restraint of trade or commerce by

22   affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels,

23

24

the price at which Titanium Dioxide was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Classes.

(b)     The conduct of the Defendants described in this Second Amended Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers in North Carolina or Architectural Coatings containing Titanium Dioxide:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Classes who reside in North Carolina and/or purchased Architectural Coatings containing Titanium Dioxide in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Classes who resided in North Carolina and/or purchased Architectural Coatings containing Titanium Dioxide in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for Architectural Coatings containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(e)     During the Class Period, each of the Defendants named in this Second Amended Class Action Complaint, directly, or indirectly and through affiliated they dominated and controlled, manufactured, sold, and/or distributed Titanium Dioxide in North Carolina.

(f)     Plaintiffs and members of the Classes seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Classes seek all relief available under that statute.

247.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Merchants and members of the Merchant Class were deprived of free and open competition; and (4) Merchants and members of the Merchant Class paid supracompetitive, artificially inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Merchants and members of the Merchant Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 29-5-10, *et seq.*, and, accordingly, Merchants and members of the Merchant Class seek all relief available under that statute.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Damages Classes)**

248.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

249.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Arkansas by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)   Consumers and members of the Consumer Class have conferred a benefit on Defendants.

(b)   It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

(c)   Defendants received something of value – Defendants' ill-gotten profits from illegally inflated prices of Titanium Dioxide – to which they were not entitled and which they must restore.

(d)   Defendants engaged in conduct and acts, with the requisite intent, and under the circumstances, to make their receipt of profits from unlawfully inflated prices for Titanium Dioxide compensable, as equity and good conscience dictate they may not retain. Defendants are at fault for their gains.

250.   As a result of their unlawful conduct described above, Defendants have and will continued to be unjustly enriched in violation of the common law of Arizona by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)   Defendants have been enriched from their unlawful acts.

(b)      It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of Consumer Class for Architectural Coatings containing Titanium Dioxide.

(c)      Consumers and members of the Consumer Class have been impoverished as a result of Defendants' conspiracy.

(d)       There is a connection between the Defendants' enrichment and the impoverishment of the Consumers and members of the Consumer Class because both were fundamentally caused by Defendants' wrongful and unlawful acts and the benefit flowed from Consumers and members of the Consumer Class to Defendants.

(e)      There is no justification for the Defendants' enrichment and the impoverishment of the Consumers and members of the Consumer Class.

251.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of California by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)      Plaintiffs and members of Classes have conferred a benefit on Defendants.

(b)      It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Classes for Architectural Coatings containing Titanium Dioxide.

252.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of the District of Columbia by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Consumer Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

253.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Florida by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and members of Classes have conferred a benefit on Defendants.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Classes for Architectural Coatings containing Titanium Dioxide.

(c)     Defendants had knowledge of the benefit conferred by Plaintiffs and members of the Classes through their payment of unlawfully inflated prices for products containing Titanium Dioxide.

(d)     Defendants voluntarily accepted and retained the benefit conferred by Plaintiffs and members of the Classes through their payment of unlawfully inflated prices for Architectural Coatings containing Titanium Dioxide

(e)     The circumstances are such that it would be inequitable for the Defendants to retain their ill-gotten profits as a result of unlawfully inflated prices for Architectural Coatings containing Titanium Dioxide.

254.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Iowa by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)   Defendants were cognizant of and appreciated the benefit conferred on them by Consumers and members of the Consumer Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)   Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Consumer Class.

(c)   It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

255.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Kansas by the receipt of, t a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)   Defendants were cognizant of and appreciated the benefit conferred on them by Consumers and members of the Consumer Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)   Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Consumer Class.

(c)   It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

256.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Massachusetts by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants have benefitted from their unlawful acts at the expense of Consumers and members of the Consumer Class.

(b)    Consumers and members of the Consumer Class were not compensated for the benefit they conferred on Defendants.

(c)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

257.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Michigan by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants have benefitted from their unlawful acts at the expense of Consumers and members of the Consumer Class.

(b)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

258.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Minnesota by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and the members of the Classes conferred a benefit on the Defendants through their payment of unlawfully inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)     Defendants were cognizant of and appreciated the benefit conferred on them by Plaintiffs and the members of the Classes through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(c)     Defendants have benefitted from their unlawful acts by accepting and retaining the benefit conferred by Plaintiffs and the members of the Classes.

(d)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Classes for Architectural Coatings containing Titanium Dioxide without payment to the Plaintiffs and the members of the Classes.

259.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Mississippi by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and the members of the Classes have conferred a benefit upon Defendants as a result of mistakes of fact concerning the pricing of Titanium.

(b)     Defendants have benefitted from their unlawful acts by accepting and retaining the benefit conferred by Plaintiffs and the members of the Classes.

(c)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Classes for Architectural Coatings containing Titanium Dioxide.

260.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Missouri by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants were cognizant of and appreciated the benefit conferred on them by Plaintiffs and the members of the Classes through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)    Defendants were enriched at the expense of the Plaintiffs and the members of the Classes.

(c)    Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Classes.

(d)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Classes for Architectural Coatings containing Titanium Dioxide.

261.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Nebraska by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Consumer Class.

(b)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

262.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of New Hampshire by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Consumer Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

263.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of New Mexico by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have knowingly benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Consumer Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

264.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of New York by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted and been enriched from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Classes.

1     (b)     It would be inequitable for Defendants to be permitted to retain any of the ill-

2     gotten gains resulting from the overpayment made by Plaintiffs or the members of the

3     Classes for Architectural Coatings containing Titanium Dioxide.

4     (c)     Defendants' ill-gotten gains were at the expense of Plaintiffs and members of

5     the Classes through their payment of unlawfully inflated prices for Architectural Coatings

6     containing Titanium Dioxide.

7     (d)     It is against equity and good conscience to permit Defendants to retain their ill-

8     gotten profits.

9     265.    As a result of their unlawful conduct described above, Defendants have and will

10    continue to be unjustly enriched in violation of the common law of North Carolina by the

11    receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

12    (a)     Plaintiffs and the members of the Classes have conferred a measurable benefit

13    on the Defendants in the form of paying unlawfully inflated prices for Architectural

14    Coatings containing Titanium Dioxide.

15    (b)     Defendants, with conscious knowledge, have benefitted from their unlawful acts

16    by accepting the benefit conferred by Plaintiffs and the members of the Classes.

17    (c)     It would be inequitable for Defendants to be permitted to retain any of the ill-

18    gotten gains resulting from the overpayment made by Plaintiffs or the members of the

19    Classes for Architectural Coatings containing Titanium Dioxide.

20    (d)     Plaintiffs and the members of the Classes did not confer the benefit of ill-gotten

21    profits on Defendants gratuitously or officiously, but rather as a result of, and through,

22    Defendants' unlawful conspiracy.

23

24

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                          Page 109 of 117

266.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Oregon by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)   Defendants have benefitted from their unlawful by accepting the benefit conferred by Consumers and members of the Consumer Class.

(b)   It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Consumer Class for Architectural Coatings containing Titanium Dioxide.

267.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of South Carolina by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)   Merchants and members of the Merchants Class conferred a non-gratuitous benefit on Defendants through payment of unlawfully inflated prices for Architectural Coatings containing Titanium Dioxide.

(b)   Defendants have realized value and benefitted from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Merchants and members of the Merchant Class for Architectural Coatings containing Titanium Dioxide.

(c)   Defendants were cognizant of the benefit they received through unlawfully inflated prices for Titanium Dioxide from the Merchants and members of the Merchant Class.

268.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Tennessee by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants were cognizant of, appreciated, and desired the benefit conferred on them by Plaintiffs and the members of the Classes through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)    Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Classes.

(c)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Classes for Architectural Coatings containing Titanium Dioxide.

269.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Wisconsin by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants were cognizant of and appreciated the benefit conferred on them by Merchants and members of the Merchant Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)    Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Merchants and members of the Merchant Class.

(c)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Merchants and members of the Merchant Class for Architectural Coatings containing Titanium Dioxide.

270.    Plaintiffs and the members of the classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Classes may make claims on a pro rata basis.

271.    Pursuit of any remedies against the entities from which Plaintiffs and members of the Classes purchased products containing Titanium Dioxide subject to Defendants' conspiracy would have been futile, given that those entities did not take part in Defendants' conspiracy.

## FOURTH CLAIM FOR RELIEF
### Injunctive and Equitable Relief
### (On Behalf of Plaintiffs and the Nationwide Class)

272.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

273.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

274.    At least as early as January 2002, and continuing until at least the filing of this Second Amended Class Action Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Titanium Dioxide, thereby creating anticompetitive effects.

275.     The anticompetitive acts were intentionally directed at the United States market for Titanium Dioxide and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Titanium Dioxide throughout the United States.

276.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Titanium Dioxide.

277.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Titanium Dioxide have been harmed by being forced to pay inflated, supracompetitive prices for Titanium Dioxide.

278.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Titanium Dioxide has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for Titanium Dioxide sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c)     Prices for Architectural Coatings purchased by Plaintiffs and the members of the Nationwide Class containing Titanium Dioxide manufactured by Defendants and their coconspirators were inflated; and

(d)     Plaintiffs and members of the Nationwide Class who purchased Architectural Coatings containing Titanium Dioxide indirectly from Defendants have been deprived of the benefits of free and open competition.

279.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Titanium Dioxide than they would have paid and will pay in the absence of the conspiracy.

280.     Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Titanium Dioxide.

281.     Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Titanium Dioxide.

282.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

283.     There being no injunction in force preventing repetition of Defendants' conspiratorial conduct, Plaintiffs will face possible future antitrust injury unless this Court enjoins the conduct and all improper information exchanges that facilitated it.  Thus, Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing them from repeating the violations alleged herein.

**PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that

1  reasonable notice of this action, as provided by Rule 23(a)(2) of the Federal Rules of Civil

2  Procedure, be given to each and every member of the Class;

3         B.     The unlawful conduct, contract, conspiracy, or combination alleged in this

4  Second Amended Class Action Complaint be adjudged and decreed:

5         (a)    An unlawful combination, trust, agreement, understanding, and/or concert of

6      action in violation of the state antitrust and unfair competition and consumer protection

7      laws as set forth in this Second Amended Class Action Complaint; and

8         (b)    Acts of unjust enrichment by Defendants as set forth in this Second Amended

9      Class Action Complaint.

10         C.     Plaintiffs and members of the Classes recover damages, to the maximum extent

11  allowed under applicable laws, and that a joint and several judgment in favor of Plaintiffs and

12  the members of the Classes be entered against Defendants in an amount to be trebled to the

13  extent such laws permit;

14         D.     Plaintiffs and the members of the Classes recover damages, to the maximum

15  extent allowed by applicable laws, in the form of restitution and/or disgorgement of profits

16  unlawfully gained from them;

17         E.     Defendants, their affiliates, successors, transferees, assignees, and other officers,

18  directors, partners, agents, and employees thereof, and all other persons acting or claiming to

19  act on their behalf or in concert with them, be permanently enjoined and restrained from in any

20  manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination

21  alleged herein, or from entering into any other contract, conspiracy, or combination having a

22  similar purpose or effect, and from adopting or following any practice, plan, program, or

23  device having a similar purpose or effect;

24

1    F.    Plaintiffs and the members of the Classes are awarded restitution, including

2    disgorgement of profits Defendants obtained as a result of their acts of unfair competition and

3    acts of unjust enrichment;

4    G.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment

5    interest as provided by law, and that such interest be awarded at the highest legal rate from and

6    after the date of service of this Second Amended Class Action Complaint;

7    H.    Plaintiffs and the members of the Classes recover their costs of suit, including

8    reasonable attorneys' fees, as provided by law; and

9    I.    Plaintiffs and members of the Classes have such other and further relief as the

10    case may require and the Court may deem just and proper.

11                                    **JURY DEMAND**

12    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

13    Procedure, of all issues so triable.

14    Dated: October 14, 2014                    Respectfully submitted,

15                                                PRATT & ASSOCIATES

16                                                */s/ Ben F. Pierce Gore*
                                                 Ben F. Pierce Gore (SBN 128515)
17                                                1871 The Alameda, Suite 425
                                                 San Jose, California 95126
18                                                Telephone:   (408) 369-0800
                                                 Facsimile:   (408) 369-0752
19                                                pgore@prattattorneys.com

20
      Don Barrett (admitted *pro hac vice*)      Jonathan W. Cuneo (admitted *pro hac vice*)
21    Barrett Law Group, P.A.                    Joel Davidow (*pro hac vice* to be filed)
      P.O. Box 927                               Katherine Van Dyck (admitted *pro hac vice*)
22    404 Court Square                           Victoria Romanenko (admitted *pro hac vice*)
      Lexington, MS 39095                        Cuneo Gilbert & LaDuca LLP
23    Telephone: (662) 834-2488                  507 C Street, N.E.
      dbarrett@barrettlawgroup.com               Washington, DC 20002
24                                                Telephone:    (202) 789-3960

1  Charles F. Barrett  (admitted *pro hac vice*)         Facsimile:      (202) 789-1813
   Charles Barrett, P.C.                                 jonc@cuneolaw.com
2  6518 Highway 100, Suite 210                           joel@cuneolaw.com
   Nashville, TN 37205                                   kvandyck@cuneolaw.com
3  Telephone:   (615) 515-3393                           vicky@cuneolaw.com
   Facsimile:    (615) 515-3395
4  Email: charles@cfbfirm.com

5  Thomas P. Thrash (admitted *pro hac vice*)            Dewitt Lovelace
   Marcus N. Bozeman                                     Lovelace & Associates, P.A.
6  Thrash Law Firm, P.A.                                 12870 US Hwy 98 West, Ste. 200
   1101 Garland Street                                   Miramar Beach, FL 32550
7  Little Rock, AR 72201                                 Telephone: (850) 837-6020
   Telephone: (501) 374-1058                             dml@lovelacelaw.com
8  tomthrash@sbcglobal.net
   bozemanmarcus@sbcglobal.net
9
   Shawn M. Raiter                                       Phillip Duncan
10 Larson • King, LLP                                    Richard Quintus
   2800 Wells Fargo Place                                Duncan Firm, P.A.
11 30 East Seventh Street                                900 S. Shackleford, Suite 725
   St. Paul, MN 55101                                    Little Rock, AR 72211
12 Telephone: (651) 312-6500                             Telephone: (501) 228-7600
   sraiter@larsonking.com                                phillip@duncanfirm.com
13                                                       richard@duncanfirm.com

   Gerard V. Mantese
14 Mantese Honigman Rossman &
   Williamson, P.C.
15 1361 E. Big Beaver Road
   Troy, Michigan 48083
16 Telephone:    (248) 457-9200
   Facsimile:    (248) 457-9201
17 gmantese@manteselaw.com                               *Attorneys for Plaintiffs and the Putative*
                                                         *Class*
18

19

20

21

22

23

24