1

2

3

4

**UNITED STATES STRICT OURT**

5

**NORTHERN DISTRICT OF CALIFORNIA**

6

**SAN JOSE DIVISION**

7

8

LOS GATOS MERCANTILE, INC, et al.,

Plaintiffs,

9

v.

10

E.I. DUPONT DE NEMOURS AND
COMPANY, et al.,

11

Defendants.

12

Case No.  13-cv-01180-BLF

**ORDER (1) GRANTING DEFENDANT CRISTAL ARABIA'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION; (2) FINDING MOOT DEFENDANT CRISTAL ARABIA'S MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS; (3) DENYING PLAINTIFFS' REQUEST FOR LEAVE TO TAKE JURISDICTIONAL DISCOVERY; (4)  GRANTING DOMESTIC DEFENDANTS' MOTION TO DISMISS FOR LACK OF ARTICLE III STANDING, WITH LEAVE TO AMEND; (5) GRANTING IN PART AND DENYING IN PART DOMESTIC DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, WITH LEAVE TO AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART; AND (6) DENYING DOMESTIC DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS**

[Re:  ECF 120, 124]

13

14

15

16

17

18

19

20

21

22

23

24

Plaintiffs bring this indirect purchaser class action against manufacturers of titanium

25

dioxide, asserting that Defendants conspired to and did fix the price of titanium dioxide sold in the

26

United States in violation of state and federal antitrust laws, state consumer protection laws, and

27

state common laws.  Initially, Plaintiffs sued four United States companies:  E.I. DuPont De

28

Nemours and Company ("Dupont"), Huntsman International, LLC ("Huntsman"), Kronos

*United States District Court*
*Northern District of California*

Worldwide, Inc. ("Kronos"), and Millennium Inorganic Chemicals, Inc. ("Millennium") (collectively, "Domestic Defendants"). Plaintiffs' operative second amended complaint ("SAC") adds as a fifth defendant National Titanium Dioxide Company, Ltd., dba Cristal, a privately held Saudi Arabian corporation ("Cristal Arabia").[1]

Cristal Arabia moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and under Rule 12(b)(5) for insufficient service of process. Domestic Defendants move to dismiss under Rule 12(b)(1) for lack of Article III standing and under Rule 12(b)(6) for failure to state a claim.[2] Domestic Defendants also move to strike Plaintiffs' class allegations under Rule 12(f). Plaintiffs oppose those motions and request leave to take jurisdictional discovery in the event that the Court is inclined to grant Cristal Arabia's motion to dismiss for lack of personal jurisdiction.

The Court has considered the briefing and the oral arguments presented at the hearing on May 7, 2015. For the reasons discussed below, the Court GRANTS Cristal Arabia's motion to dismiss for lack of personal jurisdiction; TERMINATES AS MOOT Cristal Arabia's motion to dismiss for insufficient service of process; DENIES Plaintiffs' request to take jurisdictional discovery; GRANTS Domestic Defendants' motion to dismiss for lack of Article III standing, with leave to amend; GRANTS IN PART AND DENIES IN PART Domestic Defendants' motion to dismiss for failure to state a claim, with leave to amend in part and without leave to amend in part; and DENIES Domestic Defendants' motion to strike class allegations.

---

[1] Several years into the alleged conspiracy period, Cristal Arabia acquired Millennium, which now is known as Cristal USA, Inc. To avoid confusion, this order refers to the parent Cristal company as "Cristal Arabia" and to the subsidiary Cristal company as "Millennium."

[2] Domestic Defendants do not specify the rules under which they seek dismissal of Plaintiffs' claims. As it did with respect to their prior motion to dismiss the first amended complaint, the Court construes Domestic Defendants' Article III challenge to be a motion under Rule 12(b)(1), and their challenge to the sufficiency of Plaintiffs' statutory antitrust standing and factual allegations to be a motion under Rule 12(b)(6). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("Though lack of statutory standing requires dismissal for failure to state a claim, lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."). Any future motion brought in this case shall cite to the specific rule or statute under which relief is sought.

United States District Court
Northern District of California

## I.  BACKGROUND

Domestic Defendants and Cristal Arabia manufacture and sell titanium dioxide, "a dry chemical powder that is primarily used as a white pigment."  SAC ¶¶ 45-49, 71, ECF 117. Titanium dioxide "is the world's most widely used pigment for whiteness, brightness, and masking of colors in paints and coatings."  *Id.* ¶ 71.  According to Plaintiffs, "Titanium Dioxide traps and reflects light better than almost any known substance," and "[t]here are no viable white pigment competitive substitutes for Titanium Dioxide."  *Id.* ¶¶ 72-73.

Plaintiffs are indirect purchasers of titanium dioxide.  Specifically, Plaintiffs have purchased "Architectural Coatings," a term that encompasses house paint, deck finishes, and other "[o]rganic coatings intended for on-site application to interior or exterior surfaces of residential, commercial, institutional, or industrial buildings."  SAC ¶ 1 and n.1.  "In 2008, Architectural Coatings accounted for approximately 41 percent of all Titanium Dioxide consumption in the United States."  *Id.* ¶ 72.

Plaintiffs allege that from 2002 through 2011, Domestic Defendants, Cristal Arabia, and third-party co-conspirators dominated and controlled the titanium dioxide market in the United States; conspired to fix the price of titanium dioxide in the United States; and did fix the price of titanium dioxide in the United States.  SAC ¶¶ 80, 88-99,110-164.  As a result of that conspiracy, Plaintiffs allege, the price of titanium dioxide has been "unfairly raised, fixed, maintained, and stabilized at artificially high noncompetitive levels throughout the United States"; "Architectural Coating manufacturers paid an unfairly high price for Titanium Dioxide"; and "Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs."  *Id.* ¶ 167. Plaintiffs seek to represent nationwide and statewide classes of persons and entities who purchased Architectural Coatings for resale ("Merchant Class") or for personal use ("Consumer Class").  *Id.* ¶¶ 58-60.  Plaintiffs propose a class period defined as "the period from and including January 1, 2002 through such time as the anticompetitive effects of the Defendants' conduct ceased."  SAC ¶ 7.

The present indirect purchaser action was filed on the coattails of a 2010 direct purchaser action against the same defendants in the District of Maryland.  *See Haley Paint Co. v. E.I.*

United States District Court
Northern District of California

*Dupont De Nemours and Co.*, Case No. 1:10-cv-00318. Following significant motion practice, which among other things resulted in the dismissal of Cristal Arabia for lack of personal jurisdiction, the Maryland case was set for a four-week jury trial to commence in September 2013. *See* Memorandum Opinion Granting Preliminary Approval of Class Action Settlement at 2, ECF 534 in Case No. 1:10-cv-00318. The parties settled on the eve of trial, and on December 13, 2013 the Maryland court granted final approval of the class action settlement and entered judgment. *See* Order of Final Approval and Judgment, ECF 555 in Case No. 1:10-cv-00318. Toward the end of the Maryland litigation, on March 15, 2013, Plaintiffs filed the present action in this Court alleging indirect purchaser claims. *See* Compl., ECF 1.

On September 22, 2014, this Court issued an order granting in part and denying in part Domestic Defendants' motion to dismiss the first amended complaint, which asserted four claims: (1) violation of state antitrust statutes; (2) violation of state consumer protection statutes; (3) unjust enrichment; and (4) injunctive and equitable relief under § 16 of the Clayton Act, 15 U.S.C. § 26, for violating § 1 of the Sherman Act, 15 U.S.C. § 1. *See* Order Granting Motion to Dismiss in Part, With Leave to Amend, ECF 105. The Court dismissed the bulk of those claims for lack of Article III standing, lack of antitrust standing, and failure to allege sufficient facts. The Court granted leave to amend all dismissed claims.

Plaintiffs thereafter filed the operative SAC, which asserts the same four claims, bolstered by new allegations, and adds Cristal Arabia as a defendant. The current motions followed.

## II.  CRISTAL ARABIA'S MOTION

Cristal Arabia is a privately held Saudi Arabian corporation with its principal place of business in Jeddah, within the Kingdom of Saudi Arabia. SAC ¶ 48. Cristal Arabia seeks dismissal for lack of personal jurisdiction and insufficient service of process. Because sufficiency of service is irrelevant if Cristal Arabia is not subject to this Court's jurisdiction, the Court takes up the question of personal jurisdiction first, although Cristal Arabia's motion addresses the issues of personal jurisdiction and service in the reverse order.

### A.  Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) authorizes a defendant to seek dismissal of an

United States District Court
Northern District of California

4

action for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When a defendant challenges a court's personal jurisdiction over it, the plaintiff bears the burden of establishing that jurisdiction is proper. *Ranza v. Nike, Inc.*, --- F.3d ----, No. 13-35251, 2015 WL 4282986, at *3 (9th Cir. July 16, 2015). The plaintiff may meet that burden by submitting affidavits and discovery materials. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ranza*, 2015 WL 4282986, at *3 (internal quotation marks and citation omitted). "[T]he plaintiff cannot simply rest on the bare allegations of its complaint." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation marks and citation omitted). However, uncontroverted allegations in the complaint are accepted as true, and factual disputes created by conflicting affidavits are resolved in the plaintiff's favor. *Id.*

A federal district court may exercise personal jurisdiction over a defendant only if a rule or statute potentially confers jurisdiction and the exercise of jurisdiction comports with constitutional due process. *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177, 1180 (9th Cir. 2004); *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989). For a non-resident defendant, due process requires that the defendant has "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).

The SAC does not allege a statutory basis for personal jurisdiction over Cristal Arabia. However, in their opposition to Cristal Arabia's motion, Plaintiffs asserts personal jurisdiction under Section 12 of the Clayton Act, 15 U.S.C. § 22. *See* Pls.' Opp. at 20, ECF 141. Section 12, the long-arm statute for federal antitrust suits, provides for nationwide and worldwide service of process. 15 U.S.C. § 22; *see also Action Embroidery*, 368 F.3d at 1177; *Go-Video*, 885 F.2d at 1413. "[W]hen a statute authorizes nationwide service of process, national contacts analysis is appropriate." *Go-Video*, 885 F.2d at 1416. "In such cases, due process demands a showing of minimum contacts with the United States with respect to foreign defendants before a court can

United States District Court
Northern District of California

assert personal jurisdiction." *Id.* (internal quotation marks, citation, and brackets omitted). Thus, "[w]hen a federal antitrust claim is alleged, personal jurisdiction may be based upon the defendant's aggregate contacts with the United States" and not just contacts with the forum state. *Cnty. of Stanislaus v. Pac. Gas & Elec. Co.*, No. CV-F-93-5866-OWW, 1995 WL 819149, at *3 (E.D. Cal. Dec. 18, 1995) (citing *Go-Video*, 885 F.2d at 1414-15).

"The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction." *Ranza*, 2015 WL 4282986, at *4. "General jurisdiction exists when the defendant's contacts "are so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (internal quotation marks and citation omitted). A nonresident that is subject to the court's general jurisdiction may be sued for claims "arising from dealings entirely distinct" from the forum-related activities. *Id.* (internal quotation marks and citation omitted) (emphasis omitted). In contrast, specific jurisdiction exists when the defendant's contacts with the forum state are more limited but the plaintiff's claims arise out of or relate to those contacts. *Id.* at 754. General jurisdiction is referred to as "all-purpose" jurisdiction whereas specific jurisdiction is referred to as "case-specific" or "case-linked" jurisdiction. *Ranza*, 2015 WL 4282986, at *4 n.2 (citations omitted).

Plaintiffs contend that the contacts of Cristal Arabia's United States subsidiary, Millennium, may be imputed to Cristal Arabia under theories of agency or alter ego, and that those contacts are sufficient to give rise to personal jurisdiction over Cristal Arabia. Alternatively, Plaintiffs contend that Cristal Arabia's own contacts with the United States are sufficient to give rise to personal jurisdiction. Plaintiffs assert the existence of both general and specific jurisdiction in this case.

### 1.    Agency/Alter Ego

"The existence of a parent-subsidiary relationship is insufficient, on its own, to justify imputing one entity's contacts with a forum state to another for the purpose of establishing personal jurisdiction." *Ranza*, 2015 WL 4282986, at *6 (citing *Unocal*, 248 F.3d at 925-26); *see also Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th

United States District Court
Northern District of California

Cir. 2003).  However, the corporate veil may "be pierced to exercise personal jurisdiction over a foreign defendant in certain limited circumstances."  *Ranza*, 2015 WL 4282986, at *6.  "Before the Supreme Court's *Daimler* decision, this circuit permitted a plaintiff to pierce the corporate veil for jurisdictional purposes and attribute a local entity's contacts to its out-of-state affiliate under one of two separate tests:  the 'agency' test and the 'alter ego' test."  *Id.* at *7; *see also Harris Rutsky*, 328 F.3d at 1134 ("a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent").[3]

"The agency test required a plaintiff to show the subsidiary performed services that were sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services."  *Ranza*, 2015 WL 4282986, at *7 (internal quotation marks, citation, and brackets omitted).  The Ninth Circuit, which articulated the agency test in *Unocal*, recently recognized that "[t]he Supreme Court invalidated this test" in *Daimler*.  *Ranza*, 2015 WL 4282986, at *7.  In *Daimler*, the Supreme Court concluded that the Ninth Circuit's agency test "stacks the deck" toward finding jurisdiction because "[a]nything a corporation does through an independent contractor, subsidiary, or distributor presumably is something that the corporation would do by other means if the independent contractor, subsidiary, or distributor did not exist."  *Daimler*, 134 S. Ct. at 759 (internal quotation marks and citation omitted).

Both *Daimler*'s rejection of the Ninth Circuit's agency test and *Ranza*'s recognition of the Supreme Court's invalidation of that test arose in the general jurisdiction context.  The Supreme

---

[3] The parties cite California and Maryland state law on piercing the corporate veil to establish personal jurisdiction.  The law of both states is substantially similar to that articulated by the Ninth Circuit in *Ranza*, *see Hickory Travel Sys., Inc. v. Tui Ag*, 213 F.R.D. 547, 553 n.2 (N.D. Cal. 2003) (California "uses agency/alter ego analysis to determine whether a court may exercise jurisdiction over a defendant."); *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993) (discussing Maryland's test for piercing the corporate veil for jurisdictional purposes), although Maryland law may be more restrictive, *see Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, No. 1:10-cv-00318, 2012 WL 1145027, at *3 (D. Md. April 3, 2012) ("Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil.").  Thus application of California or Maryland law would not alter the Court's analysis significantly and would not result in a different determination on the issue of personal jurisdiction.

Court signaled in *Daimler* that some type of agency analysis still might be relevant in the specific jurisdiction context. *See Daimler*, 134 S. Ct. at 759 n.13 ("Agency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction."). However, the rationale set forth in *Daimler* – that the Ninth Circuit's agency test inappropriately "stacks the deck" – would seem to undermine application of the *Unocal* agency test even in specific jurisdiction cases. Even assuming that the *Unocal* agency test remains viable in the specific jurisdiction context, the *Unocal* decision makes clear that "the question to ask is not whether the American subsidiaries can formally accept orders for their parent, but rather whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." *Unocal*, 248 F.3d at 928-29 (internal quotation marks, citation, and brackets omitted) (emphasis added). Similarly, the Ninth Circuit's alter ego test, which was left intact by *Daimler*, "is designed to determine whether the parent and subsidiary are 'not really separate entities,' such that one entity's contacts with the forum state can be fairly attributed to the other." *Ranza*, 2015 WL 4282986, at *7 (citing *Unocal*, 248 F.3d at 926)). "An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations." *Unocal*, 248 F.3d at 926.

The SAC's allegations regarding the alter ego and/or agency relationship between Cristal Arabia and Millennium are contained in a single paragraph, set forth in full as follows:

> Millennium is the wholly owned U.S. subsidiary of Cristal. Cristal and Millennium together form the world's second largest Titanium Dioxide producer, with combined annual sales of approximately $1.6 billion. At all relevant times, Millennium has acted as the U.S. agent and/or alter ego for Cristal. Cristal has exerted considerable control over the activities and operations of Millennium such that the two entities are essentially one. Facts demonstrating the substantial control that Cristal has exercised over Millennium include, but are not limited to: (1) Cristal's direct and controlling ownership interest in Millennium, (2) Millennium's role as the primary U.S. importer and distributor of Cristal's products, (3) Cristal's exercise of control over Millennium's marketing, purchasing, pricing, management, and/or operating policies, (4) Cristal's role in approving Millennium's significant business decisions, and (5) the overlapping functions and operations of Cristal and Millennium. Cristal knew, or should have known, that its conduct through Millennium in Maryland would have an impact in the United States. According to Cristal's website, Cristal and Millennium share the same Maryland operational headquarters, commercial offices, research center, and plant, as well as two shared plants in Ohio. See http://www.cristal.com/about-us/Pages/site-locations.aspx (last visited Oct. 14, 2014). Based on this relationship, Cristal could not do business in the United States absent its wholly owned subsidiary Millennium.

SAC ¶ 50.

8

Even if all facts contained within this paragraph are credited, those allegations are insufficient to demonstrate that Millennium is Cristal Arabia's alter ego or agent. The allegation that Cristal Arabia has a controlling ownership interest in Millennium does not advance the ball, as the mere fact of a parent-subsidiary relationship is insufficient to attribute the contacts of Millennium to Cristal Arabia for jurisdictional purposes. *See Unocal*, 49 F.3d at 925. The allegations regarding Cristal Arabia's "role in approving Millennium's significant business decisions" and "the overlapping functions and operations" of the two companies are too vague to establish an alter ego or agency relationship. The allegations that Millennium "has acted as the U.S. agent and/or alter ego" for Cristal Arabia are conclusory and unsupported by adequate facts.

The most specific allegation in the paragraph, regarding the sharing of operational headquarters and other facilities, is not supported by the cited website. The website provides information about the global manufacturing and sales of an entity referred to as "Cristal" but it does not provide any specific information regarding the sharing of facilities between Cristal Arabia and Millennium. As the parties are well aware, Judge Richard D. Bennett, who presided over the related direct purchaser action in the District of Maryland, previously called out the impropriety of relying upon statements by *Cristal Global*, which Judge Bennett characterized as "the marketing arm by which all Cristal entities communicate with the public," to establish *Cristal Arabia's* control of Millennium. *Haley Paint Co. v. E.I. Dupont De Nemours and Co.*, 775 F. Supp. 2d 790, 794 (2011). After considering most of the same evidence that has been presented to this Court, Judge Bennett dismissed Cristal Arabia from the direct purchaser action for lack of personal jurisdiction, concluding that the plaintiffs' evidence conflated Cristal Global with Cristal Arabia and/or constituted mere "corporate puffery regarding the synergies present between Cristal Global's many members." *Id.* at 799.

Judge Bennett subsequently denied the direct purchaser plaintiffs' motion to vacate the dismissal of Cristal Arabia. The motion before Judge Bennett was based upon new evidence, specifically, an "Authorized Approval Matrix" purporting to show that Cristal Arabia executives must approve the most significant contracts entered into by Millennium. *See Haley Paint Co. v. E.I. Dupont De Nemours & Co*., No. 1:10-cv-00318, 2012 WL 1145027, at *4 (D. Md. April 3,

2012).  Noting that the document "also reflects the fact that Millennium has significant autonomy in its day-to-day operations, and does not need Cristal's approval for the majority of sales contracts it enters into or capital projects it undertakes," Judge Bennett concluded that the evidence did not rise to the level required to pierce the corporate veil.  *Id.*

Given Judge Bennett's comments, the Court finds it surprising that Plaintiffs in this case would rely upon allegations and evidence that blur the line between Cristal Global and Cristal Arabia.  However, as is discussed below, Plaintiffs consistently blur that line in their arguments presented to this Court and in doing so they undermine their personal jurisdiction arguments with respect to Cristal Arabia.

Plaintiffs' assertion of personal jurisdiction further is undermined by Cristal Arabia's submission of the declaration of Samuel H. Livingston, a Millennium Vice President, which is attached as an exhibit to Cristal Arabia's motion to dismiss.  *See* Livingston Decl., ECF 124-1. Mr. Livingston states that Millennium was formed in 1996; is a Delaware corporation with its own articles of incorporation and by-laws; maintains its own corporate records, bank accounts, payroll, and financial plans, independent of Cristal Arabia; files its own federal, state and local taxes; funds its own utility bills and other expenses; and is responsible for its own debts.  Livingston Decl. ¶¶ 4, 6-7.  Cristal Arabia purchased Millennium in 2007 as a fully functioning entity.  *Id.* ¶ 3.  Millennium is an indirect subsidiary of Cristal Arabia – there are multiple levels of incorporated entities between Millennium and Cristal Arabia.  *Id.* ¶ 5.  Millennium leases its own headquarters in Hunt Valley, Maryland; leases a research center in Glen Bernie, Maryland; and owns two titanium dioxide plants in Ashtabula, Ohio.  *Id.* ¶¶ 10-11.  Cristal Arabia does not have any ownership interest in those plants other than its indirect ownership of Millennium.  *Id.* ¶ 10. Millennium has its own employees, who report to senior management of Millennium, and its own board of directors.  *Id.* ¶¶ 8, 12.  All current board members are Millennium employees and none are Cristal Arabia board members or Cristal Arabia employees.  *Id.* ¶ 12.  The Millennium board of directors meets separately from the Cristal Arabia board of directors.  *Id.*

Plaintiffs must come forward with evidence sufficient to establish a prima facie case of alter ego or agency, not an easy task here given the backdrop of the SAC's inadequate allegations,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Judge Bennett's prior rulings, and Mr. Livingston's declaration.  Plaintiffs attempt to meet their

2    burden with precisely the type of evidence rejected by Judge Bennett, for example, reports, news

3    articles, press releases, and public filings that do not distinguish between Cristal Arabia and

4    Cristal Global, and statements that best are described as corporate puffery.  *See* Decl. of Katherine

5    Van Dyck and Exhs. B-M, ECF 138.[4]

6         Plaintiffs also cite deposition testimony referring to the activities of Cristal Global as

7    though they were those of Cristal Arabia.  For example, Plaintiffs assert that Samuel Alexander, a

8    Cristal Arabia officer, "testified that Cristal's operational headquarters are in Maryland."  *See* Pls.'

9    Opp. at 5-6, ECF 141.  Mr. Alexander actually testified that he was deployed to Millennium's

10   Hunt Valley, Maryland, headquarters from July 2009 through January 2011 "to run the global

11   operations team," and that *Cristal Global's* operational headquarters are in Hunt Valley,

12   Maryland.  Alexander Dep. 75:18-76:7, ECF 142-1.  Mr. Alexander's testimony establishes that

13   Cristal Arabia and Cristal Global are *not* synonymous, as he stated that "Cristal Global is a non-

14   registered company that's a group name for" twelve different Cristal entities.  *See id.* 22:1-9.

15        Plaintiffs argue that Cristal Arabia's control over Millennium's operations is evidenced by

16   Cristal Arabia's "meeting with customers and approving pricing decisions, contracts, and various

17   business expenses."  Pls.' Opp. at 7, ECF 141.  With respect to meeting with customers, Mr.

18   Alexander testified that Cristal Arabia's president, Jamal Nahas, travels to the United States

19   approximately twice a year with his large family and that because "[h]e grew up in marketing," it

20

21   _____
     [4] Plaintiffs request that the Court take judicial notice of the documents attached to Ms. Van Dyck's
22   declaration, including a declaration of John Hall filed in the Maryland direct purchaser action;
     copies of a publication issued by Cristal Global called the *Cristal Globe*; printouts of Cristal
23   Global's website from June 2008; a news article from 2007; press releases from 2008; and the
     purchase agreement under which Cristal Arabia acquired Millennium.  A district court may take
24   judicial notice of "a fact that is not subject to reasonable dispute because it:  (1) is generally
     known within the trial court's territorial jurisdiction; or (2) can be accurately and readily
25   determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).
     Some of the documents attached to Ms. Van Dyck's declaration do not fit within this definition,
26   for example, Mr. Hall's declaration and the Millennium purchase agreement.  However, when
     considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court
27   may consider evidence submitted by the parties.  *See Unocal*, 248 F.3d at 922; *Data Disc, Inc. v.
     Systems Tech. Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  Thus although judicial notice
28   is not the appropriate vehicle for considering these documents, the Court has considered them in
     connection with Cristal Arabia's Rule 12(b)(2) motion.

1    "was always his penchant to want to visit his customers."  Alexander Dep. 63:3-64:17, ECF 142-1.

2    Mr. Alexander testified that Dr. Talal al-Shair ("Dr. Talal"), who is Cristal Arabia's chief

3    executive officer and Cristal Global's chairman, has a house in Maine and meets with customers

4    when he is in the United States.  *Id.* 65:2-11, 75:18-24.  However, Mr. Alexander could not

5    provide any specifics about Dr. Talal meeting with customers.  *Id.*  Dr. Talal visits the Hunt Valley

6    offices "one day every couple of years."  Richard Rowe Dep. 138:4-8, ECF 142-4.  This evidence

7    suggests only the most sporadic participation in customer meetings by Cristal Arabia's top

8    management; it does not evidence the type of control required for a finding of agency or alter ego.

9         With respect to control of pricing, contracts, and expenditures, the Court notes that much

10   of the evidence proffered by Plaintiffs refers to pricing controls and other actions by "Cristal

11   Global" rather than Cristal Arabia.  *See, e.g.*, Second Decl. of Katherine Van Dyck, Exhs. 11-15.

12   However, even if the Court were to accept the proffered documents as evidence that Cristal Arabia

13   set the titanium dioxide price increases for all Cristal entities, and required approval for certain

14   contracts and business expenses, that evidence does not suggest that Millennium "functions as

15   merely the incorporated department of its parent," *see Unocal*, 248 F.3d at 928 (internal quotation

16   marks and citation omitted), or that Millennium and Cristal Arabia are "not really separate

17   entities," *see Ranza*, 2015 WL 4282986, at *7 (internal quotation marks and citation omitted).

18        Courts in this circuit have declined to find alter ego or agency based upon evidence as

19   strong or stronger than that presented here.  *See, e.g., Kramer Motors, Inc. v. British Leyland, Ltd.*,

20   628 F.2d 1175, 1177 (9th Cir. 1980) (no alter ego or agency where parent placed its own directors

21   on subsidiary's board, guaranteed loans for subsidiary, reviewed and approved subsidiary's major

22   decisions, and had involvement in subsidiary's pricing); *Hickory Travel Systems, Inc.*, 213 F.R.D.

23   547, 554 (N.D. Cal. 2003) (no alter ego or agency where parent referred to wholly owned

24   subsidiaries as "divisions," reported their earnings in annual statements, boasted of corporate

25   integration, and made decisions about restructuring subsidiaries' businesses).  As discussed above,

26   Judge Bennett found a nearly identical body of evidence to be insufficient to justify piercing the

27   corporate veil.  This Court likewise concludes that, even viewing the record as a whole and giving

28   Plaintiffs the benefit of the doubt as to conflicting evidence and inferences, Plaintiffs have not

United States District Court
Northern District of California

12

made out a prima facie case of alter ego or agency.

### 2.      Cristal Arabia's Direct Contacts

Plaintiffs' sparse allegations in the SAC regarding Cristal Arabia's contacts are based solely on agency and alter ego. *See* SAC ¶ 50. The SAC does not allege any independent contacts between Cristal Arabia and the United States. *See id.* Likewise, Plaintiffs' opposition brief focuses primarily upon their contention that this Court has personal jurisdiction over Cristal Arabia based upon attribution of Millennium's contacts with the United States. Plaintiffs also argue that personal jurisdiction arises from Cristal Arabia's independent contacts with the United States.

### a.      General Jurisdiction

Plaintiffs' opposition brief asserts that this Court may exercise both general and specific jurisdiction over Cristal Arabia. *See* Pls.' Opp. at 21-24, ECF 141. At the hearing, however, Plaintiffs' counsel did not argue the existence of general jurisdiction, instead stating that "we are asking the Court to look at it through a specific jurisdiction test." Hrg. Trans. at 5:4-5, ECF 156. Because general jurisdiction is argued in Plaintiffs' brief, the Court nonetheless addresses the argument in an abundance of caution.

For purposes of general jurisdiction analysis, the Court must consider all contacts of Cristal Arabia with the United States, whether or not related to the claims asserted in this lawsuit, to determine whether those contacts are "are so continuous and systematic as to render [Cristal Arabia] essentially at home" in the United States. *Daimler*, 134 S. Ct. at 761. As discussed above, Cristal Arabia officer Samuel Alexander was stationed in Hunt Valley, Maryland, for approximately one and a half years commencing in July 2009. However, while Mr. Alexander was employed by Cristal Arabia during that time, he actually was heading Cristal Global's operations there and held the title of executive vice president of "Cristal Global." Alexander Dep. 35:4-25, 74:2-5, ECF 142-1. Thus it is unclear whether Mr. Alexander's presence in Maryland may be considered a contact of Cristal Arabia. *See Allphin v. Peter K. Fitness, LLC*, No. 13-cv-01338-BLF, 2014 WL 6997653, at *5 (N.D. Cal. Dec. 11, 2014) (where officer held positions with both foreign corporation and its domestic subsidiary, court declined to attribute officer's

United States District Court
Northern District of California

13

contacts with California to foreign corporation when it was unclear whether officer was wearing his foreign corporation "hat" rather than his domestic subsidiary "hat" at the time of the contacts).

Cristal Arabia's president, Mr. Nahas, traveled to the United States approximately twice a year. Alexander Dep. 63:24-64:3, ECF 142-1. Cristal Arabia's chief executive officer, Dr. Talal, has a house in Maine and spends approximately one day every couple of years at Millennium's Hunt Valley offices. *Id.* 65:2-11; Richard Rowe Dep. 138:4-8, ECF 142-4. However, like Mr. Alexander, Dr. Talal wears two hats in that he is both Cristal Arabia's chief executive officer and Cristal Global's chairman. Alexander Dep. 75:18-24, ECF 142-1. It is unclear which hat Dr. Talal wears when traveling to the United States.

Plaintiffs claim that several other individuals were employed by Cristal Arabia and worked out of Millennium's Hunt Valley offices, including Samir Omar, Mark Stoll, John Hall, and Robert Daniels. The evidence proffered by Plaintiffs does not establish that those individuals were employed by Cristal Arabia. Mr. Alexander testified that Mr. Omar is the internal auditor for "Cristal Global" and that he reports directly to Mr. Nahas with independence from all entities. Alexander Dep. 53:10-20. With respect to Mr. Stoll, Mr. Hall, and Mr. Daniels, the evidence cited by Plaintiffs establishes only that they reported to Cristal Arabia, not that they were employed by Cristal Arabia rather than by Millennium. *See, e.g.,* Clover Dep. 59:13-18. The Court notes that the SAC refers to Mr. Hall as "Millennium's John Hall." SAC ¶ 137.

Plaintiffs submit evidence that Cristal Arabia and Millennium share the same database to record purchases; it is not clear where the server for the database is physically located. Alexander Dep. 85:3-23.

Plaintiffs argue that this and similar evidence is sufficient to establish general jurisdiction under the holding of *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952). In *Perkins*, the president of a Philippine mining company relocated to Ohio during the Philippine islands' occupation by military forces during World War II and immediately afterward. While in Ohio, the president carried on the company's business with activities such as maintaining files, engaging in correspondence, distributing salary checks, and the like. *Id.* at 448. He also supervised the rehabilitation of the company's properties in the Philippines and otherwise ran the company as

14

best he could from Ohio. *Id.* Under those circumstances, the Supreme Court held that "it would not violate federal due process for Ohio either to take or decline jurisdiction of the corporation in this proceeding." *Id.* The facts of *Perkins* are completely different from those presented here. There is no evidence in this record that Cristal Arabia has been displaced from its corporate headquarters in Jeddah, or that Cristal Arabia's president, Mr. Nahas, is running Cristal Arabia from the United States and not from Jeddah.

Moreover, Plaintiffs' general jurisdiction argument ignores the Supreme Court's holding that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler*, 134 S. Ct. at 760. "With respect to a corporation, the place of incorporation and principal place of business are paradigm . . . bases for general jurisdiction." *Id.* (internal quotation marks, citation, and brackets omitted). "Those affiliations have the virtue of being unique – that is, each ordinarily indicates only one place – as well as easily ascertainable." *Id.* In order to find that a corporation is subject to general jurisdiction in yet another forum, the plaintiff must demonstrate not only that the corporation "engages in a substantial, continuous, and systematic course of business" – that alone is insufficient – but that the "corporation's affiliations with the state are so continuous and systematic as to render it essentially at home in the forum State." *Id.* at 761 (internal quotation marks and citation omitted). Cristal Arabia's contacts clearly do not rise to that level.

### b.      Specific Jurisdiction

At the hearing, Plaintiffs' counsel urged the Court to evaluate specific personal jurisdiction based upon Cristal Arabia's own contacts with the United States. *See* Hrg. Trans. 5:4-5, ECF 156. Courts in the Ninth Circuit employ a three-prong test when determining whether a nonresident defendant may be subject to specific personal jurisdiction in a forum:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

United States District Court
Northern District of California

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.  "The plaintiff bears the burden of satisfying the first two prongs of the test."  *Id.*  If the plaintiff succeeds in doing so, the burden shifts to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

Starting with the first prong, it is not clear whether Plaintiffs are asserting "purposeful direction" or "purposeful availment."  This may be because Plaintiffs have provided few specifics with respect Cristal Arabia's conduct.  The SAC alleges a price-fixing conspiracy involving the Domestic Defendants – DuPont, Huntsman, Kronos, and Millennium – dating back to 2002, and contains detailed allegations regarding communications between and coordinated price increases implemented by those companies.  *See* SAC ¶¶ 106-164.  Cristal Arabia is not mentioned in any of those allegations and in fact did not enter the picture until 2007 – approximately five years into the alleged conspiracy period – when it acquired Millennium.  SAC ¶ 49.  When the Court raised this point with Plaintiffs' counsel at the hearing, counsel responded, "So what we say is it's a joint and ongoing conspiracy.  That would be our position."  Hrg. Trans. 5:15-22, ECF 156.  While it might be possible to allege that a foreign corporation joined in a pre-existing conspiracy and took acts in furtherance of that conspiracy, the SAC contains no such allegations.

At the hearing, Plaintiffs' counsel asserted that Cristal Arabia "participated in the alleged TDMA, conspiracy only by virtue of purchasing a U.S. subsidiary," that is, Millennium; that Cristal Arabia routinely approves Millennium's pricing decisions; and that because those pricing decisions go to the heart of Plaintiffs' antitrust claims, the Court has specific jurisdiction over Cristal Arabia.  Hrg. Trans. 5:6-9:24.  Thus framed, Plaintiffs' theory properly is analyzed under the "purposeful direction" test.  *See In re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 743-44 (9th Cir. 2013) (applying purposeful direction test to antitrust claims based upon the alleged manipulation of market prices for natural gas in the forum states); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. CV 07-5944-SC, 2014 WL 2581525, at *6-8 (N.D. Cal. June

16

1    9, 2014) (applying purposeful direction test to antitrust claims based upon foreign corporations'

2    alleged price-fixing and sale of cathode ray tube products in the United States).[5]

3         "Purposeful direction requires that the defendant allegedly must have (1) committed an

4    intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows

5    is likely to be suffered in the forum state." *In re Western States*, 715 F.3d at 743.  None of the

6    allegations in the SAC, and none of the record evidence, suggests that Cristal Arabia committed an

7    intentional act, aimed at the United States, that caused harm in the United States.  Counsel's

8    assertion during oral argument that Cristal Arabia purchased Millennium for the *purpose* of

9    joining the conspiracy is wholly unsupported by any factual allegations in the SAC or evidence in

10   the record.  Counsel's other oral argument on this point was equally unpersuasive.  Counsel

11   argued that paragraph 6 of Mr. Livingston's reply declaration "is a big new fact" that demonstrates

12   the existence of specific jurisdiction based upon Cristal Arabia's direct contacts with the United

13   States.  Hrg. Trans. 6:18-21.  The paragraph in question reads in its entirety as follows:

14        Millennium informs Cristal of certain substantial business decisions, including
          pricing changes, as a courtesy to its corporate parent.  Cristal routinely approves
15        these decisions.  Millennium initiates and makes its own pricing decisions for
          Titanium Dioxide products.
16

17   Livingston Reply Decl. ¶ 6, ECF 144-1.  The Court engaged Plaintiffs' counsel in a colloquy

18   about that argument, stating that in the Court's view "approving pricing of Millennium is the alter

19   ego issue only."  Hrg. Trans. 7:23-8:14.  Plaintiffs' counsel took the position that Cristal Arabia's

20   approval of Millennium's pricing decisions also may be considered to be Cristal Arabia's direct

21   contacts with the United States for purposes of a specific jurisdiction analysis.  *Id.* 8:15-9:4.  Even

22   assuming that counsel is correct, evidence that Millennium routinely submits pricing decisions for

23   approval by its parent, Cristal Arabia, and that such approval routinely is given, does not suggest

24   Cristal Arabia's participation in the alleged conspiracy.  Without something more – for example,

25   allegations or evidence that Cristal Arabia's officers attended meetings or participated in

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] At the hearing, Cristal Arabia's counsel argued that the purposeful direction test applies only in
28   tort cases and thus is not applicable here because an antitrust claim is not a tort.  Hrg. Trans.
     15:20-16:14.  Given the Ninth Circuit's application of the purposeful direction test to antitrust
     claims in *In re Western States*, the Court is satisfied that the test is appropriate here.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    communications by which price increases were agreed upon, or, indeed, even *knew* that price

2    increases *were* being agreed upon – the proffered evidence suggests nothing more than a parent's

3    ordinary oversight over its subsidiary.  *See Unocal*, 248 F.3d at 926 ("a parent corporation may be

4    directly involved in the activities of its subsidiaries without incurring liability").  This case is

5    distinguishable from *In re Western States* and *CRT*, in which the defendants were alleged to have

6    participated actively in the manipulation of pricing within the forums.  *See In re Western States*,

7    715 F.3d at 743-44; *CRT*, 2014 WL 2581525, at *6-8.

8         Plaintiffs' failure to satisfy the first prong of the *Schwarzenneger* test is dispositive.

9    Plaintiffs have failed to meet their burden to make out a prima facie case of specific jurisdiction

10   over Cristal Arabia.  Accordingly, the Court GRANTS Cristal Arabia's motion to dismiss under

11   Rule 12(b)(2) for lack of personal jurisdiction.

12        **C.    Request for Jurisdictional Discovery**

13        Because Plaintiffs have failed to meet their burden of establishing a prima facie case of

14   personal jurisdiction over Cristal Arabia, their claims against Cristal Arabia are subject to

15   dismissal.  Plaintiffs request leave to take jurisdictional discovery in the event the Court is inclined

16   to grant Cristal Arabia's motion.

17        This Court has "broad discretion" to permit or deny discovery to aid in determining

18   whether it has personal jurisdiction.  *Butcher's Union Local No. 498 v. SDC Investment, Inc.*, 788

19   F.2d 535, 540 (9th Cir. 1986) (trial court has "broad discretion to permit or deny discovery");

20   *Data Disc,* 557 F.2d at 1285 n.1 ("A court may permit discovery to aid in determining whether it

21   has in personam jurisdiction.").  "Discovery should ordinarily be granted where 'pertinent facts

22   bearing on the question of jurisdiction are controverted or where a more satisfactory showing of

23   the facts is necessary.'"  *Butcher's Union*, 788 F.2d at 540 (quoting *Data Disc*, 557 F.2d at 1285

24   n.1).  However, denial of discovery "is not an abuse of discretion when it is clear that further

25   discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells*

26   *Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977).  Nor is an abuse

27   of discretion to deny a discovery request that is "based on little more than a hunch that it might

28   yield jurisdictionally relevant facts."  *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).

United States District Court
Northern District of California

Plaintiffs have not articulated what discovery they wish to take, or what they believe might be revealed by further discovery. In the direct purchaser action, Millennium produced 5,900,000 pages of documents to the plaintiffs, including all relevant email traffic between Millennium and Cristal Arabia. Decl. of Timothy Newman at ¶ 4, ECF 144-2. The plaintiffs in the direct purchaser action deposed sixteen then-current or former employees of Millennium, including every senior executive of Millennium who had pricing authority or a reporting relationship to Cristal Arabia. *Id.* Millennium agreed not to withhold documents in the direct purchaser action based upon the fact that they reflected communications with Millennium's affiliates, including Cristal Arabia. *Id.* Despite having the benefit of that discovery, the plaintiffs in the direct purchaser action were unable to muster a sufficient showing of personal jurisdiction to defeat Cristal Arabia's motion to dismiss. The evidence presented to this Court is substantially identical to the evidence presented to Judge Bennett in the Maryland action. Under these circumstances, it appears highly unlikely that further discovery would result in any useful new evidence regarding personal jurisdiction.

The Court thus DENIES Plaintiffs' request for jurisdictional discovery.

**D.      Insufficient Service of Process**

In light of its disposition of Cristal Arabia's Rule 12(b)(2) motion for lack of personal jurisdiction, the Court need not reach Cristal Arabia's Rule 12(b)(5) motion for insufficient service of process. The Court TERMINATES that motion as MOOT.

**III.    DOMESTIC DEFENDANTS' MOTION**

Domestic Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing and under Federal Rule of Evidence 12(b)(6) for failure to state a claim upon which relief may be granted. Domestic Defendants also move to strike Plaintiffs' class allegations under Federal Rule of Civil Procedure 12(f).

**A.      Article III Standing**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) raises a challenge to the Court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Article III . . . gives the federal courts jurisdiction over only cases and controversies." *Public Lands for the*

19

*People, Inc. v. United States Dep't of Agric.*, 697 F.3d 1192, 1195 (9th Cir. 2012) (internal quotation marks and citation omitted).  "The oft-cited *Lujan v. Defenders of Wildlife* case states the three requirements for Article III standing:  (1) an injury in fact that (2) is fairly traceable to the challenged conduct and (3) has some likelihood of redressability."  *Id.* at 1195-96 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  If these requirements are not satisfied, the action should be dismissed for lack of subject matter jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109-10 (1998).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (internal quotation marks and citation omitted).  The Court also may consider affidavits containing further particularized allegations of fact supportive of Article III standing.  *Id.* at 1067.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Id.* at 1068 (internal quotation marks, citation, and brackets omitted).  "*Twombly* and *Iqbal* are ill-suited to application in the constitutional standing context because in determining whether plaintiff states a claim under 12(b)(6), the court necessarily assesses the merits of plaintiff's case."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  "But the threshold question of whether plaintiff has standing (and the court has jurisdiction) is distinct from the merits of his claim."  *Id.*  "This is not to say that plaintiff may rely on a bare legal conclusion to assert injury-in-fact, or engage in an ingenious academic exercise in the conceivable to explain how defendants' actions caused his injury."  *Id.* (internal quotation marks and citation omitted).  But "the jurisdictional question of standing precedes, and does not require, analysis of the merits."  *Id.* (internal quotation marks, citation, and brackets omitted).

Domestic Defendants contend that Plaintiffs lack Article III standing because they have failed to allege an injury that is traceable to Defendants' alleged acts.  Defendants raised this argument in the last round of motion practice, but because the argument had not been fully fleshed

20

1  out in the briefing and Plaintiffs' claims were subject to dismissal on other grounds, the Court

2  declined to reach it.  *See* Order Granting Motion to Dismiss in Part, With Leave to Amend at 4

3  n.2, ECF 105.  The issue of Article III traceability being squarely presented in the current motion,

4  the Court now addresses it.

5          The SAC alleges that during the class period commencing on January 1, 2002, Defendants

6  and their co-conspirators dominated and controlled the titanium dioxide market in the United

7  States and accounted for approximately 92% of all United States consumption of titanium dioxide.

8  SAC ¶ 80.  The remaining 8% of titanium dioxide was unsuitable for and was not used in

9  Architectural Coatings.  *Id.*  Those factual allegations give rise to a reasonable inference that any

10  Architectural Coatings manufactured in the United States during the class period contained

11  titanium dioxide traceable to one of the Defendants or their co-conspirators.  The SAC alleges that

12  because of their market domination, Defendants and their co-conspirators were able to and did fix

13  and stabilize the price of titanium dioxide at artificially high noncompetitive levels throughout the

14  United States.  *Id.* ¶¶ 80, 167.  As a result, manufacturers of Architectural Coatings paid unfairly

15  high prices for titanium dioxide and, according to Plaintiffs, those overcharges "passed through

16  each level of distribution as they traveled to Plaintiffs and the Classes."  *Id.* ¶ 167.  The SAC gives

17  as an example a statement by Defendant Kronos's chief executive officer to the effect that

18  increases in the price of titanium dioxide are passed through the distribution chain but that "[t]here

19  is no question that an extra $1 for a gallon of paint is not going to destroy demand."  *Id.* ¶ 174.

20          Domestic Defendants argue that Plaintiffs cannot trace titanium dioxide through the

21  relevant distribution chains – and thus cannot meet the Article III requirement that Plaintiffs'

22  injury be traceable to Defendants' conduct – because titanium dioxide becomes completely

23  integrated into the final product.  Many decisions addressing traceability in the context of both

24  Article III and antitrust standing have focused on the physical distinctness of components.  *See,*

25  *e.g., In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2015 WL 3398199, at *12 (N.D. Cal.

26  May 26, 2015) (finding Article III standing in reliance on facts that "capacitors are discrete and

27  identifiable component parts that pass through the chain of distribution in substantially the same

28  form from defendants to consumers when purchased as part of electronic products" and that "[a]

United States District Court
Northern District of California

United States District Court
Northern District of California

1    capacitor is traceable to an entity owned and/or controlled by a defendant because it bears the

2    defendant's markings (e.g., name, logo, series)"); *In re Lithium Ion Batteries Antitrust Litig.*, No.

3    13-MD-2420 YGR, 2014 WL 4955377, at *14 (N.D. Cal. Oct. 2, 2014) (finding antitrust standing

4    in part because "the battery cells remain physically unaltered through the chain of distribution");

5    *In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 997, 1002,  (E.D. Mich. 2014) (finding

6    both Article III and antitrust standing based in part upon observation that car parts at issue

7    followed a physically traceable path through the distribution chain).  However, this Court is

8    unaware of any case holding that physical distinctness is required to demonstrate traceability.

9    Some courts have found expressly that physical distinctness is not required in order to trace.  *See,*

10   *e.g., Lorix v. Crompton Corp.*, 736 N.W.2d 619, 632 (Minn. 2007) (indirect purchaser had

11   standing to bring state law antitrust claim based upon alleged price fixing of chemicals used in the

12   manufacture of tires); *D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 492-93

13   (E.D. Penn. May 30, 2006) (indirect purchasers had standing to bring state law antitrust claims

14   based upon alleged price fixing of plastics additives contained in purchased products).  This Court

15   concludes that the fact that titanium dioxide becomes fully integrated into the final product does

16   not bar Plaintiffs' claims.

17          Having failed to persuade the Court that they could establish antitrust standing for claims

18   covering the entire consumer market for products containing titanium dioxide, Plaintiffs now

19   attempt to establish standing in the market for Architectural Coatings.  Apparently this newly

20   defined market contains thousands of products, some of which have countless formulations.

21   Plaintiffs only reveal that they have purchased one category of those products, namely, paint.

22   SAC  ¶¶ 16-44.  To support their allegations regarding traceability, Plaintiffs allege that, for

23   example, Sherwin-Williams SUPERPAINT Interior Flat Latex Wall Paint contains 17% (by

24   weight) of titanium dioxide.  SAC ¶ 170.  Although five Plaintiffs allege that they purchased

25   Sherwin-Williams paint, none alleges the purchase of this particular product.

26          In support of standing, Plaintiffs allege that titanium dioxide follows a traceable physical

27   distribution chain and that Architectural Coating manufacturers know the amount of titanium

28   dioxide contained in each product, two allegations that seem without controversy.  SAC ¶ 170.

1    Problematically, however, Plaintiffs go on to allege that "[j]ust as Titanium Dioxide can be

2    physically traced through the supply chain, so can its price be traced. . . ." SAC ¶ 172.  This

3    allegation is critical to Plaintiffs' showing of identifiable injury.  However, it is without any

4    factual support given the breadth of the defined market and the variation in the amount of titanium

5    dioxide found in the expansive category of Architectural Coating products.  Most notably,

6    Plaintiffs rely solely on the example of a single paint product, which appears to be the product

7    containing the highest concentration of titanium dioxide within the vast market alleged in the

8    SAC.  Plaintiffs go on to provide an unsupported allegation that "[r]aw materials like Titanium

9    Dioxide account for 7 to 13 percent of the cost of Architectural Coating production, and in July

10   2010, it was reported that paint costs would go up by as much as 5 percent over the rest of that

11   year due to the reduced supply and increased price of Titanium Dioxide." SAC ¶ 173.  First, the

12   conglomeration of the quantum of titanium dioxide contained in Architectural Coatings is not

13   supported by any factual pleading, and second, it seeks to sweep within its bounds products that

14   may have only a trace of titanium dioxide.  Further, the allegation itself is unclear as to the amount

15   of titanium dioxide at issue insofar as the allegation states "[r]aw materials *like* Titanium

16   Dioxide."  The Court is left to speculate what quantum of those raw materials is actually titanium

17   dioxide as opposed to some other raw material not at issue here.

18            Typically, antitrust claims based on sprawling and indefinite markets are readily dismissed

19   by the courts for lack of Article III and antitrust standing.  *In re Magnesium Oxide Antitrust Litig.*,

20   No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011), is instructive.  There the court was faced

21   with claims by indirect purchasers who bought products containing magnesium oxide, an

22   ingredient in fertilizers, animal feeds, electrical insulation, and pharmaceuticals.  Finding that the

23   indirect purchaser plaintiffs lacked Article III and antitrust standing, the court determined that

24   because the plaintiffs had failed to identify the products that they purchased, they had not

25   demonstrated that the alleged price increases were passed through the distribution chain.  The

26   court commented that the price of magnesium oxide would have a minimal foreseeable effect on

27   the price of products containing only trace amounts as opposed to products in which magnesium

28   oxide was a major ingredient.  Leave to amend was granted so that the indirect purchaser plaintiffs

United States District Court
Northern District of California

23

could allege the specific products containing magnesium oxide that they had bought and the nexus between price increases of those products and the alleged price-fixing conspiracy. *Id.* at *7. Similarly, a court in this district found problematic an indirect purchaser class who bought a wide variety of electronics products containing capacitors, "one of the most basic functional units in electronics circuits" that are contained in "virtually every electronic device we use, from toasters to cellphones." *Capacitors*, 2015 WL 3398199, at *1-2. Following a colloquy between the court and class counsel at a motion hearing, the indirect purchaser plaintiffs voluntarily dismissed their claims based upon the purchase of finished electronics products containing capacitors. *Id.* at *2.

Defendants raise an additional concern regarding Plaintiffs' intent to represent classes at different levels of the distribution chains, i.e., the Merchant Class and the Consumer Class. Defendants point out that even assuming that Plaintiffs could trace an overcharge from the manufacturer to the Merchant Class (and Defendants do not concede that Plaintiffs could), Plaintiffs have not alleged facts showing how they could quantify the amount of the overcharge paid by the Merchant Class versus the amount, if any, paid by the Consumer Class. Defendants' point is well-taken. The Court has grave reservations about Plaintiffs' ability to get any class certified in this action, let alone two separate classes that would be adverse to each other in the manner described by Defendants. Defendants argue that the issue goes beyond a class certification concern but rather implicates the more fundamental question of Article III traceability. Because the Court concludes that Plaintiffs lack Article III standing for other reasons, the Court need not address the issue of the conflict between claims asserted on behalf of the Merchant Class and those asserted on behalf of the Consumer Class. However, Plaintiffs obviously will have to address that issue at a future stage of the proceedings if this case goes forward.

After careful consideration of Plaintiffs' allegations and the SAC as a whole, the Court concludes that Plaintiffs have not established Article III standing to pursue claims arising out of the purchase of Architectural Coatings. Plaintiffs have alleged facts sufficient to make out a claim that Defendants conspired to and did artificially inflate the price of titanium dioxide, but Plaintiffs have not alleged facts showing that the resulting overcharges to manufacturers of Architectural

Coatings were passed down the thousands of distribution chains at issue to Plaintiffs.  While Plaintiffs are not required to quantify their damages for the class period in order to establish injury for Article III purposes, Plaintiffs must demonstrate that the *fact* of injury is not speculative.  *See In re Static Random Access Memory (SRAM) Antitrust Litigation*, No. 07-md-01819 CW, 2010 WL 5071694, at *8 (N.D. Cal. Dec. 7, 2010).  Were the Court concerned only with Plaintiffs' ability to quantify their damages with adequate specificity, the Court might conclude that Article III requirements have been met.  However, in this case Plaintiffs allegations do not give rise to even a reasonable inference of injury for the entire market of Architectural Coatings.

In considering whether to grant Plaintiffs another opportunity to amend, the Court has paid particular attention to Plaintiffs' allegations regarding architectural paint.  The SAC alleges that almost all Plaintiffs bought paint.[6]  SAC ¶¶ 16-44.  Plaintiffs allege specific facts regarding the titanium dioxide content of one paint product, Sherwin-Williams SUPERPAINT Interior Flat Latex Wall Paint, which is alleged to contain 17% (by weight) of titanium dioxide.  SAC ¶ 170.  Plaintiffs cite to an online website where data about the SUPERPAINT may be found.  *Id.*  Plaintiffs also allege that in 2011, analysts reported that "'TiO2 pigment accounts for 24-25% of the total raw cost to make architectural paint,' and Sherwin-Williams' CEO stated that Titanium Dioxide 'makes up most of [its] raw material costs.'"  *Id.* ¶ 174.  Those allegations suggest that Plaintiffs may be able to amend their complaint to show Article III standing for a more limited market.  If Plaintiffs do amend, they will need to set forth a precise definition of the market for architectural paint and other products in order to allege sufficient facts to support the elements of Article III standing.  The Court notes that based upon the allegations in the SAC, it is likely that Plaintiffs could successfully allege Article III standing with respect to the market for architectural paint.

Accordingly, the Court GRANTS Domestic Defendants' motion to dismiss all claims under Rule 12(b)(1) for lack of Article III standing, with leave to amend.

---

[6] The SAC alleges expressly that each of the named Plaintiffs bought paint, with the exception of Plaintiff Stockman Development Inc. dba Stockman Farm Supply.  *See* SAC ¶ 25.

25

### B.    Antitrust Standing

Given the Court's view regarding the likelihood that Plaintiffs can establish Article III standing with respect to paint, the following analysis is provided on the remaining issues addressed in Defendants' motion.

With respect to antitrust claims brought under federal statute, the court must determine "whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983). "The label 'antitrust standing' has traditionally been applied to some of the elements of this inquiry." *Id.* "Under *AGC*, courts consider (1) the nature of plaintiffs' injuries and whether plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (citing *AGC*, 459 U.S. at 536-39).

A challenge to antitrust standing properly is brought under Federal Rule of Civil Procedure 12(b)(6). *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) (analyzing *AGC* factors in the context of a Rule 12(b)(6) motion); *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (characterizing "antitrust standing" as a pleading requirement for a Sherman Act § 1 claim). A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court first addresses *AGC*'s applicability to Plaintiffs' Sherman Act § 1 claim and then addresses *AGC*'s applicability to Plaintiffs' state law antitrust claims.

### 1.    Standing to Pursue Sherman Act § 1 Claim

In Claim 4, Plaintiffs seek injunctive and equitable relief under § 16 of the Clayton Act, 15

26

U.S.C. § 26, for Defendants' alleged violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  This Court previously determined that "with respect to the Sherman Act § 1 claim, the appropriate test is '*AGC* lite.'"  Order Granting Motion to Dismiss in Part, With Leave to Amend at 9, ECF 105.  The "lite" aspect of the analysis refers to the fact that, because damages are not available under a Sherman Act § 1 claim, the fourth factor (risk of duplicative recovery) and fifth factor (complexity in apportioning damages) do not apply.  *See id.*; *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n.6 (1986) (recognizing that not all *AGC* factors apply to a claim under § 16 of the Clayton Act because "standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. MDL 2109, 09 C 7666, 2012 WL 39766, at *9 (N.D. Ill. Jan. 9, 2012) (analysis must be modified when only injunctive relief is sought because not all *AGC* factors apply).

### a.      First Factor

With respect to the first factor – the nature of the plaintiffs' injuries and whether the plaintiffs were participants in the relevant market – this Court's prior order summarized the different approaches that courts have taken to the definition of the relevant market.  *See* Order Granting Motion to Dismiss in Part, With Leave to Amend at 11-13, ECF 105.  More recently, the *Ion Batteries* decision discussed in detail the cases from this district addressing relevant market.  *See Ion Batteries*, 2014 WL 4955377, at *12-14.  Most of the decisions conclude that the first *AGC* factor is satisfied if the plaintiffs are participating in either the identical market as the price-fixed good or in a market that is "inextricably linked' to that market, for example, a market for products that incorporate the price-fixed good as a significant component.  *See id.* at 12 (summarizing cases).  Those "cases hinge on the plausibility of the markets alleged being linked in light of the nature of the components and finished products alleged."  *Id.*  One components case from this district, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig. ("DRAM II")*, 536 F. Supp. 2d 1129, 1140-41 (N.D. Cal. 2008), concluded that the first *AGC* factor is not satisfied by allegations that the plaintiffs purchased finished products that incorporate the price fixed component good.  *Id.* at 13 (discussing *DRAM II*).  *DRAM II* is an outlier that has not been adopted generally either inside or outside the district.  *See id.*

United States District Court
Northern District of California

1    This Court agrees with the majority of the courts in this district in concluding that the first

2    *AGC* factor may be satisfied by an allegation of participation in an inextricably linked market.  *Cf.*

3    *Blue Shield v. McCready*, 457 U.S. 465, 480-81 (1982) (holding that group health plan subscriber

4    had standing to bring antitrust claims based upon defendants' alleged scheme to exclude and

5    boycott clinical psychologists from receiving compensation under the plan, as subscriber was

6    within the area of the economy endangered by defendants' anticompetitive behavior).  This Court

7    previously concluded that Plaintiffs had not satisfactorily alleged an inextricably linked market

8    because they had defined the relevant market to include every product in the United States that

9    contains titanium dioxide.  Plaintiffs have revised their market definition to "Architectural

10   Coatings."  However, as discussed above in section III.A, the revised market definition is still so

11   broad that Plaintiffs could not possibly demonstrate that the market for Architectural Coatings is

12   inextricably linked to the market for titanium dioxide.

13   Domestic Defendants distinguish this case from a number of decisions finding markets to

14   be inextricably linked when the price-fixed market is for a component that may be physically

15   traced through the distribution chain of the allegedly linked market.  As Defendants point out,

16   titanium dioxide does not hold its distinct form but rather is absorbed into Architectural Coatings.

17   Defendants urge the Court to adopt a blanket prohibition against indirect purchaser suits whenever

18   the price-fixed good is a chemical component or ingredient of a finished product.  The Court

19   declines to adopt that position absent compelling precedent.  Defendants have not cited, and the

20   Court has not discovered, any such case.  As discussed above in section III.A, some courts have

21   found indirect purchasers to have standing when the alleged price-fixed product was a chemical

22   used in the manufacture of tires, *Lorix*, 736 N.W. 2d at 632, or a plastics additive used in the

23   manufacture of other products, *see D.R. Ward*, 470 F. Supp. 2d at 492-93.

24   While the Court acknowledges that demonstrating the existence of an inextricably linked

25   market might be easier when tracing a distinct, physical component through the chain of

26   distribution, the Court perceives no reason why titanium dioxide could not be traced based upon

27   an ingredient list and formula for each product at issue in the context of a sufficiently narrowly

28

United States District Court
Northern District of California

1   defined market.[7]  Based on the allegations of the SAC, it appears that architectural paint might be

2   a sufficiently narrow market to satisfy the first *AGC* factor.  However, Plaintiffs have not limited

3   the relevant market definition to paint.  The market for Architectural Coatings is simply too vast

4   and ill-defined to be considered inextricably linked to the market for titanium dioxide.

5   Consequently, the first *AGC* factor weighs against finding antitrust standing.

### b.   Second and Third Factors

7          With respect to the second and third *AGC* factors – the directness of the alleged injury and

8   the speculative nature of the alleged harm – the analysis largely overlaps with the Article III

9   analysis set forth above.  Plaintiffs allege that Defendants conspired to and did fix the price of

10  titanium dioxide at artificially high levels throughout the United States; as a result, direct

11  purchasers paid unfairly high prices for titanium dioxide; those overcharges were passed through

12  each level of distribution as titanium dioxide was incorporated into Architectural Coatings; and

13  Plaintiffs and class members paid supracompetitive prices for Architectural Coatings during the

14  class period.  SAC ¶¶ 80, 167.  As discussed above, the Court concludes that the market of

15  Architectural Coatings is so broad, and the array of products covered by that term so varied, that

16  Plaintiffs cannot plausibly assert an ability to trace the alleged overcharges through the

17  distribution chains with respect to each of the products at issue.  *See Magnesium Oxide*, 2011 WL

18  5008090, at *7 (dismissing indirect purchaser claims where plaintiffs had not specified which

19  products containing magnesium oxide they had purchased but granting leave to amend to allege

20  the specific purchased products and facts showing a nexus between increase in the price of those

21  products and the alleged price-fixing conspiracy).  Consequently, the second and third *AGC*

22  factors weigh against finding antitrust standing.  It appears likely that upon amendment, Plaintiffs

23  could allege antitrust standing by limiting the relevant market to architectural paint, but it remains

24  unclear whether Plaintiffs could successfully identify other products besides paint.

United States District Court
Northern District of California

---

[7] As the Court noted at the hearing, if one were to bake a cake using two cups of flour, the presence of flour in the cake might not be apparent viewing the finished dessert, but someone with the recipe easily could determine how much flour is in the cake.  *See* Hrg. Tr. 31:22-24, ECF 156.

United States District Court
Northern District of California

### c.       Conclusion

The Court thus concludes that the first, second, and third *AGC* factors weigh against finding antitrust standing for Plaintiffs' Sherman Act § 1 claim.  In their brief in opposition to the present motion, Plaintiffs suggest that *AGC* does not apply to their Sherman Act § 1 claim, asserting that they may seek injunctive and equitable relief based solely on a showing of "a threatened injury, not an actual one."  Pls.' Opp. at 13, ECF 135.  Even if that standard were the appropriate one, Plaintiffs have not shown a threatened injury in this case, because they have not alleged facts giving rise to a reasonable inference that the alleged overcharges paid by manufacturers of Architectural Coatings are passed down the distribution chains to Plaintiffs.

Accordingly, the Court GRANTS Domestic Defendants' motion to dismiss Plaintiffs' Sherman Act § 1 claim for lack of antitrust standing, with leave to amend.

### 2.       Standing to Pursue State Law Antitrust Claims

In Claim 1, Plaintiffs assert claims under the antitrust laws of sixteen states:  Arizona, California, District of Columbia[8], Iowa, Kansas, Michigan, Minnesota, Mississippi, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oregon, Tennessee, and Wisconsin. The parties dispute whether the *AGC* factors must be applied in determining antitrust standing to bring those state law claims.  In its prior order, this Court reviewed the different approaches adopted by courts in this district in determining the applicability of the *AGC* factors to state antitrust statutes.  *See* Order Granting Motion to Dismiss in Part, With Leave to Amend at 9-11, ECF 105.  This Court concluded that it is appropriate to apply the *AGC* factors to a repealer statute if the state legislature or any state court clearly indicates that federal law should be followed in construing the statute, but that *AGC* should not be followed based solely upon a general harmonization provision in the state statute.  *Id.*  Since issuance of that order, other courts in this district have issued thoughtful, reasoned decisions addressing the application of *AGC* to state repealer statutes.  *See, e.g., Capacitors*, 2015 WL 3398199, at *13-14; *Ion Batteries*, 2014 WL 4955377, at *7-11.  After considering those decisions, this Court finds it appropriate to revisit its

---

[8] For ease of reference, the District of Columbia is referred to as a "state" herein.

approach to *AGC*.

As noted in this Court's prior order, *DRAM I* applied the *AGC* factors broadly based upon state court decisions applying federal law and/or statutory harmonization provisions indicating that federal law applies. *DRAM I*, 516 F. Supp. 2d at 1093-95. A narrower approach was adopted in *In re Graphics Processing Units Antitrust Litig. ("GPU II")*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007), which determined that application of *AGC* is appropriate when a state's highest court has expressly endorsed *AGC*, may or may not be appropriate when *AGC* has been endorsed only by an intermediate appellate court, and is not appropriate based only upon a harmonization provision in the state antitrust statute. *Flat Panel* took a narrower approach, holding that *AGC* applies only when there is clear direction from the state's legislature or highest court. *Flat Panel*, 586 F. Supp. 2d at 1123. More recently, *Ion Batteries* took an even narrower approach, applying *AGC* only when it can be determined that the state's legislature or highest court would apply *AGC* *in the same manner* as it is applied by the federal courts. *Ion Batteries*, 2,014 WL 4955377, at *7-11 (concluding that even when a state court specifically has invoked *AGC*, the decision must be read closely to determine whether the state court has modified the application of *AGC* so that it is different from the federal approach).

After reviewing all of the available authorities, and *Illinois Brick*[9], this Court is persuaded that it should modify its application of *AGC* slightly. The repealer statutes that were passed in response to *Illinois Brick* "expressly allow[] indirect purchasers to recover money damages for antitrust violations under *state* law." *Ion Batteries*, 2014 WL 4955377, at *6 (internal quotation marks and citation omitted) (emphasis in original). Thus whether *AGC* applies to a state's antitrust statute is a question of state law. *In re Flash Memory Antitrust Litig.* 643 F. Supp. 2d 1133, 1151 (N.D. Cal. 2009). "In analyzing questions of state law, federal courts are bound by the decisions of the state's highest court" and "must follow the state intermediate appellate court decision" absent convincing evidence that the state's highest court likely would not follow it. *Id.* (internal quotation marks and citation omitted). In the absence of such guidance, a federal court

---

[9] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

1   must predict how the state's highest court would rule on the issue. *Ion Batteries*, 2014 WL

2   4955377, at *8.

3          Applying these guidelines, this Court will apply *AGC* to claims brought under state

4   antitrust laws whenever the state's legislature, highest court, or intermediate court expressly has

5   adopted *AGC*. This approach varies slightly from that articulated in *Ion Batteries*, which suggests

6   that federal courts must determine not only whether a state has adopted *AGC* but also must

7   conduct an independent inquiry to determine whether the state applies *AGC* exactly as do the

8   federal courts or whether it has been modified at all by the state. It seems to this Court that absent

9   a *caveat* in the statute itself, or in a high court or appellate court decision interpreting the statute,

10  an express adoption of *AGC* may be taken at face value.

11         However, this Court no longer finds it prudent to rely upon state trial courts to predict how

12  the state's highest court would come out on the issue. Although this Court previously concluded

13  that a state trial court would be in a better position than this Court to predict how the state's

14  highest court would rule on a particular issue, that conclusion has not been supported by further

15  research. Moreover, while this Court previously was disposed to rely upon state court decisions

16  indicating generally that federal law is consistent with or may inform interpretation of state

17  antitrust statutes, the Court finds persuasive those decisions requiring a more express adoption of

18  *AGC* before imposing federal pleading requirements on state repealer statutes. *See, e.g., Ion*

19  *Batteries*, 2014 WL 4955377, at 9.

20                    a.      **AGC Does Not Apply to Arizona, California, District of**

21                            **Columbia, Kansas, Michigan, Minnesota, Mississippi, New**

22                            **Hampshire, North Carolina, Oregon, Tennessee, and Wisconsin**

23         Applying the standards outlined above, the Court concludes that the *AGC* factors do not

24  apply to the laws of twelve of the sixteen states implicated by Claim 1. As to those twelve states,

25  listed below, the relevant authorities do not demonstrate an express adoption of *AGC* by the state's

26  legislature, the state's highest court, or the state's intermediary court. Thus while Defendants cite

27  authorities indicating that some state trial courts have applied *AGC* and that some states have

28  enacted statutes generally harmonizing state and federal antitrust law, this Court concludes that

United States District Court
Northern District of California

there is insufficient authority to suggest that the highest courts of the following states would apply

*AGC*:  Arizona, *see Bunker's Glass Co. v. Pilkington*, 75 P.3d 99, 107 (Ariz. 2003) (Arizona

Supreme Court distinguished federal approach to antitrust standing from Arizona's approach);

California, *see Aryeh*, 55 Cal. 4th at 1195 (California Supreme Court distinguished federal

antitrust law from California's law)[10]; District of Columbia, *see Peterson v. Visa USA, Inc.*, No.

03-8080, 2005 WL 1403761, at *4-6 (D.C. Super. Ct. Apr. 22, 2005) (District of Columbia trial

court applied *AGC* factors, but no adoption by higher state court); D.C. Code § 228-4515

(permitting District of Columbia courts to use federal law to guide interpretation of state antitrust

statute but no express adoption of  *AGC*); Kansas, *see Wrobel v. Avery Dennison Corp.*, No. 05-

cv-1296, 2006 WL 7130617, at *2-4 (Kan. Dist. Ct. Feb. 1, 1006) (Kansas trial court applied *AGC*

factors but no adoption by higher state court); Michigan, *see Stark v. Visa USA, Inc.*, No. 03-

055030-CZ, 2004 WL 1879003, at *2-4 (Mich. Cir. Ct. July 23, 2004) (Michigan trial court

applied *AGC* factors but no adoption by higher state court); Mich. Comp. Laws § 445.784(2)

(harmonization statute indicating that Michigan courts shall give "due deference to interpretations

given by the federal courts to comparable antitrust statutes" but no express adoption of *AGC*);

---

[10] This Court previously applied *AGC* to analysis of claims under California's Cartwright Act based upon a state appellate court decision, *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 (1995), and a Ninth Circuit decision, *Knevelbaard*, 232 F.3d at 989. *See* Order Granting Motion to Dismiss in Part, With Leave to Amend at 10, ECF 105.  In *Knevelbaard*, the Ninth Circuit simply applied *AGC* to the Cartwright Act without discussing the reasons for doing so. *Knevelbaard*, 232 F.3d at 987-91.  Thus that decision gives no indication what the California Supreme Court would do.  In *Vinci*, a state appellate court applied *AGC* based upon general observations that "the Cartwright Act has objectives identical to the federal antitrust acts," and that in the past California courts construing the Cartwright Act have looked to cases construing federal antitrust laws for guidance.  *Vinci*, 36 Cal. App. 4th at 1814 n.1.  Almost two decades later, however, the California Supreme Court clarified that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century."  *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013).  The California Supreme Court recently reiterated that statement in *In re Cipro Cases I & II*, 61 Cal. 4th 116, 142 (2015).  In light of the California Supreme Court's repeated instruction that federal antitrust law does not control interpretation of the Cartwright Act, this Court concludes that the California Supreme Court would not find the rationale set forth in *Vinci* persuasive and would not apply *AGC*.  *Accord Capacitors*, 2015 WL 3398199, at *13-14 (concluding that *AGC* does not apply to Cartwright Act); *Ion Batteries*, 2014 WL 4955377, at *10-11 (same); *cf. Samsung Electronics Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (recognizing that Cartwright Act is not coextensive with Sherman Act).

United States District Court
Northern District of California

Minnesota, *see Lorix*, 736 N.W. 2d at 632 (Minn. 2007) (Minnesota Supreme Court expressly rejected *AGC*); Mississippi (no state court decision or statute adopting *AGC*), *see Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp*, 789 F. Supp. 760, 780 (federal district court dismissed state law antitrust claims as analytically identical to federal antitrust claims that were dismissed under *AGC*, but no citation to state authority expressly adopting *AGC*); New Hampshire, *see Minuteman, LLC v. Microsoft Corp.*, 795 A. 2d 833, 839 (N.H. 2002) (New Hampshire Supreme Court held that state antitrust statute should be construed consistently with *Illinois Brick* rule but did not discuss *AGC*); North Carolina, *see Teague v. Bayer AG*, 671 S.E. 2d 550 (N.C. Ct. App. 2009) (North Carolina appellate court declined to apply *AGC*); Oregon, *see N.W. Med. Labs., Inc. v. Blue Cross & Blue Shield of Or., Inc.*, 794 P. 2d 428, 433 (Or. 1990) (stating that federal decisions addressing federal antitrust law are persuasive authority, but not expressly adopting *AGC*); Tennessee, *Spahr v. Leegin Creative Leather Products, Inc.*, No. 2:07-cv-187, 2008 WL 3914461, at *13-14 (E.D. Tenn. Aug. 20, 2008) (observing that Tennessee state law antitrust cases rely heavily on federal precedent but recognizing that the Tennessee Supreme Court has extended the reach of Tennessee state antitrust law beyond that permitted by the Supreme Court's interpretation of the Sherman Act); and Wisconsin, *see Strang v. Visa USA, Inc.*, No. 03 CV 011323, 2005 WL 1403769, at *3-5 (Wis. Cir. Ct. Feb. 8, 2005) (state trial court applied *AGC* factors but no higher state court decision adopting *AGC*).

    b.    ***AGC* Applies to Iowa, Nebraska, New Mexico, and New York**

        The Court concludes that the *AGC* factors apply to the laws of four of the sixteen states implicated by Claim 1:  Iowa, *see Southard v. Visa USA, Inc.*, 734 N.W.2d 192, 198-99 (Iowa 2007) (express adoption of *AGC* by Iowa Supreme Court); Nebraska, *see Kanne v. Visa USA, Inc.*, 723 N.W.2d 293, 297-300 (Nebraska 2006) (express adoption of *AGC* by Nebraska Supreme Court); New Mexico, *see Naas-Romero v. Visa USA, Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012) (express application of *AGC* factors by New Mexico appellate court); and New York, *see Ho v. Visa USA, Inc.*, 793 N.Y.S. 2d 8, 8-9 (N.Y. App. Div. 2005) (New York appellate court affirmance of trial court's denial of indirect purchaser standing based upon trial court's application of *AGC* factors).

United States District Court
Northern District of California

###### i.      First, Second, and Third *AGC* Factors

The analysis of the first, second, and third *AGC* factors with respect to the state antitrust statutes is identical to the analysis of those factors with respect to the Sherman Act § 1 claim, set forth in sections III.B.1.a and III.B.1.b, above.  In brief, the Court concludes that because Plaintiffs' alleged market of Architectural Coatings is so vast and ill-defined, and because Plaintiffs do not allege what specific products within that market they purchased, Plaintiffs have not alleged facts showing that the Architectural Coatings market plausibly can be considered to be inextricably linked to the titanium dioxide market, or giving rise to a plausible inference that the alleged overcharges caused by Defendants' anticompetitive conduct were passed down the distribution chains to Plaintiffs.  Thus the first, second, and third *AGC* factors weigh against finding antitrust standing.

###### ii.      Fourth and Fifth Factors

Although the fourth and fifth *AGC* factors – risk of duplicative recovery and complexity in apportioning damages – do not apply to Plaintiffs' Sherman Act § 1 claim, which seeks only injunctive and equitable relief, those factors are relevant to Plaintiffs' state law claims, which seek damages.  Plaintiffs cite several decisions holding that the referenced risk and complexity do not preclude antitrust actions in repealer states, in which the legislatures expressly have authorized indirect purchaser suits.  *See, e.g., In re Flash Memory Antitrust Litig.* 643 F. Supp. 2d 1133, 1156 (N.D. Cal. 2009) ("States . . . which have repealed *Illinois Brick* and allowed indirect purchasers to sue for antitrust violations, have necessarily made the policy decision that duplicative recovery may permissibly occur.") (internal quotation marks and citation omitted); *Lorix*, 736 N.W. 2d at 628 (same).  Those decisions do not address the aspect of Defendants' argument that is of most concern to the Court, which is not the risk of duplicate recovery or complexity of apportionment between direct and indirect purchasers, but rather the risk of duplicate recovery and complexity of apportionment between indirect purchasers at different levels in the same distribution chains.  Plaintiffs do not address that issue directly in their SAC or in their briefing, other than to allege that "Plaintiffs will seek only one recovery from Defendants and will not make duplicative claims for damages."  SAC ¶ 66, ECF 117.  That conclusory allegation is insufficient to address the

concerns articulated in the fourth and fifth *AGC* factors.  Thus those factors weigh against finding antitrust standing here.

### iii.    Conclusion

Accordingly, the Court GRANTS Domestic Defendants' motion to dismiss Plaintiffs' state law antitrust claims for lack of antitrust standing as to Iowa, Nebraska, New Mexico, and New York, with leave to amend, and otherwise DENIES Defendants' motion to dismiss Plaintiffs' state law antitrust claims for lack of antitrust standing.

### C.    Consumer Protection Statutes

In Claim 2, Plaintiffs allege that Defendants' conduct gives rise to liability under consumer protection statutes of ten states:  Arkansas, California, District of Columbia, Florida, Massachusetts, Missouri, New Mexico, New York, North Carolina, and South Carolina.  Domestic Defendants argue that Plaintiffs have failed to state a claim under those state laws.[11]

### 1.    Class Actions Under South Carolina Law

Plaintiffs assert claims under South Carolina's consumer protection law, which provides that:  "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, but not in a representative capacity, to recover actual damages."  S.C. Code § 39-5-140(a).  Defendants argue that because the state statute is limited to individual actions, Plaintiffs may not bring a class action under the statute in federal district court, citing *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

"In *Shady Grove*, the different opinions of the fractured Court took contrasting approaches to determining whether a New York statute prohibiting class actions in suits seeking penalties or

---

[11] In addressing Plaintiffs' claims brought under state consumer protection statutes and state unjust enrichment law, the Court has followed the organizational structure of Defendants' motion, which groups states together by argued grounds for dismissal.  There is some potential for confusion, because states are addressed multiple times, and Defendants' motion may be denied on some grounds but granted on others with respect to the same state.  The Court considered reorganizing its discussion to a state by state format to avoid multiple rulings as to the same state, but ultimately decided that it is more appropriate to address Defendants' arguments in the order they selected in their briefing.

statutory minimum damages precluded a federal district court sitting in diversity from entertaining a class action under Rule 23." *In re Hydroxycut Mktg. and Sales Practices Litig.*, 299 F.R.D. 648, 652 (S.D. Cal. 2014). Defendants argue that Justice Stevens' opinion controls, citing his statement that "[w]hen a State chooses to use a traditionally procedural vehicle as a means of defining the scope of substantive rights or remedies, federal courts must recognize and respect that choice." *Shady Grove*, 559 U.S. at 420. Plaintiffs contend that Justice Stevens' opinion is not controlling, citing to district court decisions relying upon other portions of *Shady Grove* in holding that Rule 23 class actions may be maintained under South Carolina's consumer protection law despite the language of the statute limiting suit to individual actions. For example, in *Ion Batteries*, the district court applied the test articulated by the Ninth Circuit in *Freund v. Nycomed Amersham*, 347 F.3d 752, 761-62 (9th Cir. 2003), to conclude that the class action bans articulated in the consumer protection statutes of South Carolina and Illinois "are procedural, not substantive, and that application of Rule 23 to them would not modify any substantive right." *Ion Batteries*, 2014 WL 4955377, at *20-21. The district court went on to hold that "Rule 23 therefore governs and the challenged claims may be asserted on a representative basis in this federal court." *Id.* That holding is consistent with several other decisions inside and outside of this district which expressly address the applicability of *Shady Grove* to the South Carolina statute at issue in this case. *See In re Hydroxycut*, 299 F.R.D. at 652; *In re Automotive Parts Antitrust Litig.*, 2013 WL 2456612, at *30; *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012). This Court finds *Ion Batteries* and the other cited decisions to be persuasive and likewise concludes that a class action may be maintained under Rule 23 notwithstanding the language of the South Carolina statute limiting suit to individual claims.

Accordingly, the Court DENIES the motion to dismiss claims under South Carolina's consumer protection laws pursuant to *Shady Grove*.

2.  **Standing under Arkansas, California, Florida, Massachusetts, Missouri, New Mexico, New York, North Carolina, and South Carolina Consumer Protection Statutes**

Domestic Defendants contend that where antitrust claims are recast as consumer protection claims, the *AGC* factors dictate standing to bring the consumer protection claims as well as the antitrust claims.  According to Defendants, "Arkansas and New York have recognized that the *AGC* factors apply with equal force to antitrust claims that are recast as consumer protection claims."  Defs.' Mot. at 14, ECF 120.  Defendants also assert that a number of other states – Florida, California, North Carolina, Massachusetts, Missouri, South Carolina, and New Mexico – have not directly applied *AGC* in the consumer protection context but have imposed causation requirements similar to the *AGC* factors.  The thrust of Defendants' argument is that in those states that apply a version of *AGC* to consumer protection claims, a failure to satisfy *AGC* as to antitrust claims likewise dooms the parallel consumer protection claims.

As discussed above, the Court has determined that only Iowa, Nebraska, New Mexico, and New York would apply *AGC* to state antitrust claims; of those states, only two overlap with the list of states that are the subject of the present argument, New Mexico and New York.  With respect to New Mexico, Defendants cite only the relevant consumer protection statute, N.M. Stat. Ann. § 57-12-10, in a footnote, without discussion.  With respect to New York, Defendants cite *DRAM II*, 536 F. Supp. 2d 1142, which does hold that *AGC* applies to consumer protection claims brought under New York consumer protection laws, but the New York case relied upon by *DRAM II* does not actually mention *AGC*.  Accordingly, the Court concludes that Defendants have not demonstrated that a failure to satisfy the *AGC* factors is fatal to consumer protection claims brought under the laws of New Mexico or New York.

Accordingly, the Court DENIES the motion to dismiss consumer protection claims brought on this ground.

3.  **Consumer-Oriented Conduct Under New York Law**

New York's consumer protection law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are

38

hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). "A § 349 claim consists of three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Boris v. Wal-Mart Stores, Inc.*, 35 F. Supp. 3d 1163, 1173 (C.D. Cal. 2014). Defendants argue that Plaintiffs' claims do not meet the "consumer-oriented" requirement because Plaintiffs allege price-fixing agreements between companies, and not conduct aimed specifically at New York consumers. This Court rejected the same argument in addressing Defendants' first motion to dismiss. Defendants acknowledge the Court's prior ruling and request that the Court take a closer look at New York state law. Defendants attach a state trial court decision addressing an indirect purchaser action brought by individuals who purchased tires against a company that sold rubber-processing chemicals to tire manufacturers. *See Sperry v. Crompton Corp.*, No. 17872/2002, slip op. at 4 (N.Y. Sup. Ct. Nov. 20, 2003), Defs.' Mot. Exh. B, ECF 120-2. In *Sperry*, the trial court concluded that the transactions between the corporations – the company that sold rubber-processing chemicals and the tire manufacturers – could not be construed as consumer oriented. *Id.* It is that portion of the decision upon which Defendants rely. However, the trial court also focused upon the absence of allegations from which it could be inferred that the defendant companies engaged in a deceptive scheme likely to mislead reasonable tire-purchasing consumers. *Id.* In the present case, Plaintiffs have alleged such a scheme. Accordingly, the Court remains unpersuaded that a claim arising out of the facts of the present case would be barred under New York law. The Court notes that other courts in this district have permitted similar claims under § 349. *See Flat Panel*, 586 F. Supp. 2d at 1128 (allegations of impact on New York consumers sufficient to state claim under § 349); *In re Graphics Processing Units Antitrust Litig. ("GPU I")*, 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) ("Antitrust-type claims have been recognized under § 349(a).").

      Defendants argue that the Merchant Class cannot assert a consumer protection claim under New York law because they are not consumers and because titanium dioxide is not a consumer product. Defendants cite a state appellate decision holding that "[i]n New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods,

services or property primarily for 'personal, family or household purposes.'" *Cruz v. NYNEX Info. Resources*, 263 A.D. 285, 289 (2000). Defendants ignore other language of the decision that New York's consumer protection statute "does not preclude its application to disputes between businesses per se," and that "[t]he threshold requirement of consumer-oriented conduct is met by a showing that the acts or practices have a broader impact on consumers at large" in that they are directed to consumers or potentially affect similarly situated consumers." *Id.* (internal quotation marks and citation omitted). This language does not clearly preclude the claims of the Merchant Class.

Accordingly, the Court DENIES the motion to dismiss the New York consumer protection claims on this basis.

### 4.    Requirement of Purchase for Personal Use Under Missouri Law

Defendants argue that Missouri's Merchandising Practices Act ("MMPA") authorizes claims only for those who purchase goods "primarily for personal, family or household purposes." Mo. Ann. St. § 407.025. Cases in this district have interpreted the statute to confer standing only upon persons who purchase property for their *own* personal, family or household purposes. *See, e.g., In re Actimmune Marketing Litig.*, No. C 08-02376-MHP, 2010 WL 3463491, at *12 (N.D. Cal. Sept. 1, 2010). This Court likewise concludes that the Merchant Class cannot maintain a claim under the MMPA.

The Court GRANTS the motion to dismiss claims on behalf of the Merchant Class under Missouri consumer protection law, without leave to amend.

### 5.    Necessity of Pleading Fraud or Deceit under Arkansas, California, District of Columbia, Florida, Missouri, and New York

Defendants argue that Plaintiffs' claims under the consumer protection statutes of Arkansas, California, District of Columbia, Florida, Missouri, and New York fail because Plaintiffs do not adequately allege fraud or deceit. Defendants' argument misses the mark for the most part, because as discussed below, only New York's consumer protection statute requires allegations of deceit – the statutes of the other states permit claims based upon "unconscionable," "unfair," or "unlawful" conduct. For the reasons discussed below, the Court concludes that

United States District Court
Northern District of California

1    Plaintiffs have alleged claims under the latter statutes, but that they have not alleged deceit

2    sufficient to state a claim under New York's statute.

3                          **a.        Arkansas**

4          Arkansas's Deceptive Trade Practices Act prohibits "unconscionable" acts as well as

5    "false, or deceptive acts" in business, commerce, or trade, and there is a split of authority whether

6    claims grounded in anticompetitive conduct may be brought under the "unconscionable" prong.

7    *See In re Lidoderm Antitrust Litig.*, --- F. Supp. 3d ----, No. 14-md-02521-WHO, 2015 WL

8    2089223, at *6- (N.D. Cal. May 5, 2015) (collecting cases).  Courts in this district have gone both

9    ways on the issue.  *Id.*  This Court is inclined to follow those cases that have permitted the claims

10   to go forward under Arkansas law given the statute's use of the broad term "unconscionable,"

11   which Arkansas state courts have construed to mean that the statute is to be interpreted liberally.

12   *See State ex rel. Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 302 (1999); *see also Ion Batteries*,

13   2014 WL 4955377, at *23 (allowing claims); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d

14   at 1156-57 (same); *but see Lidoderm*, 2015 WL 2089223, at *7 (precluding claims); *In re TFT–*

15   *LCD Antitrust Litig.*, 787 F. Supp. 2d at 1042 (precluding claims).

16                         **b.        California**

17         California's Unfair Competition Law, California Civil Code § 17200, may be grounded in

18   "unfair" or "unlawful" business practices as well as "fraudulent" business practices.  *See Davis v.*

19   *HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).  Thus even if the Court were to

20   conclude that Plaintiffs' allegations could not support a claim under the fraud prong, Plaintiffs

21   could proceed under the unfair and unlawful prongs based upon the alleged antitrust violations.

22   *See In re Processed Egg Products Antitrust Litig.*, 851 F. Supp. 2d 867, 900 (E.D. Penn. 2012)

23   (finding that § 17200 claim based upon antitrust violations need not be brought under the fraud

24   prong of § 17200 but may be brought under the unfair and unlawful prongs).

25                         **c.        District of Columbia**

26         The District of Columbia's Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et*

27   *seq.*, is designed to remedy "all improper trade practices," and several courts have permitted

28   plaintiffs to go forward under the statute for alleged antitrust violations whether or not those

United States District Court
Northern District of California

violations arose to the level of "deceptive practices."  *Flat Panel*, 586 F. Supp. 2d at 1126; *see also Eggs*, 851 F. Supp. 2d at 898-99 ("Defendants also have raised no valid arguments that an antitrust violation by itself cannot comprise an unlawful trade practice within the meaning of the DCCPPA."); *but see GPU II*, 540 F. Supp. 2d at 1100-1101 (holding that antitrust violations alone did not give rise to claims under state consumer protection statutes precluding deceptive or unconscionable conduct).  Consequently, Plaintiffs may proceed with this claim even absent allegations of fraud or deceit.

### d.     Florida

Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  Anticompetitive conduct alone may give rise to a claim under this statute; allegations of fraud are not required.  *See Eggs*, 851 F. Supp. 2d at 900.

### e.     Missouri

Missouri's Merchandising Practices Act, Mo. Ann. Stat. § 407.020, makes unlawful "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale . . . of any merchandise in trade or commerce . . . in or from the state of Missouri[.]"  Anticompetitive conduct may give rise to a claim under this statute.  *See Ion Batteries*, 2014 WL 4955377, at *19-20.

### f.     New York

As noted above, New York's consumer protection law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. Law § 349(a).  "A § 349 claim consists of three elements:  first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *Boris*, 35 F. Supp. 3d at 1173.  In section III.C.3, above, the Court addressed Defendants' argument regarding the first prong, that the challenged conduct was consumer

United States District Court
Northern District of California

oriented.  In this section, the Court addresses Defendants' argument regarding the second prong, that the alleged conduct was misleading in a material way.

Unlike the consumer protection statutes in Arkansas, California, District of Columbia, Florida, and Missouri, New York does require allegations of "deceptive" acts.  *See* N.Y. Gen. Bus. Law § 349(a); *Boris*, 35 F. Supp. 3d at 1173.  Some cases have held that an antitrust violation may form the basis of a claim under this statute, *see, e.g., Flat Panel*, 586 F. Supp. 2d at 1127-28, while others have held to the contrary, *see, e.g., Eggs*, 851 F. Supp. 2d at 908-09.  This Court agrees with *Eggs*, in which the court dismissed a § 349(a) claim after concluding that although the defendants were alleged to have made misrepresentations to conceal their price-fixing conspiracy, it was the price-fixing itself that caused the plaintiffs' injury, not the concealment of the conspiracy.  *See Eggs*, 851 F. Supp. 2d at 908-09.  Similarly, in this case, it is the price-fixing that is alleged to have caused Plaintiffs' injury – the payment of supracompetitive prices – not the misrepresentations Defendants made to cover their tracks.  Accordingly, Plaintiffs have failed to state a claim under § 349.

The Court GRANTS the motion to dismiss Plaintiffs' claims under New York's consumer protection law on this basis, with leave to amend, and DENIES the motion to dismiss Plaintiffs' claims under the consumer protection laws of Arkansas, California, District of Columbia, Florida, and Missouri on this basis.

### 6.    Price-Fixing Claims Under Arkansas Consumer Protection Law

Domestic Defendants assert that price-fixing allegations may not be raised under Arkansas consumer protection law.  As discussed above, there is a split in authority whether claims based upon anticompetitive conduct may be brought under Arkansas's Deceptive Trade Practices Act.  *See Lidoderm*, 2015 WL 2089223, at *6 (collecting cases).  This Court agrees with those cases that have permitted such claims under the "unconscionable" prong of the Arkansas statute.  *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1156-57 (permitting claims); *but see Lidoderm*, 2015 WL 2089223, at *7 (precluding claims).

Accordingly, the Court DENIES the motion to dismiss claims brought under the ADTPA.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### D.      Unjust Enrichment

In Claim 3, Plaintiffs assert unjust enrichment claims under the laws of 21 states: Arkansas, Arizona, California, District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oregon, South Carolina, Tennessee, and Wisconsin.  Domestic Defendants contend that these claims fail for a number of reasons.

With respect to jurisdictions that view unjust enrichment as a theory of recovery rather than an independent claim, Defendants argue that Plaintiffs' "parasitic" unjust enrichment claims fail with the underlying antitrust and consumer protection claims.  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011) (defining parasitic unjust enrichment claims as those based upon a separate predicate wrong such as a tort, breach of contract, or antitrust violation).  The Court agrees that to the extent an unjust enrichment claim is based wholly upon a predicate antitrust or consumer protection claim, the unjust enrichment claim falls with the predicate claim.  However, Defendants have not identified any unjust enrichment claims that are based wholly upon failed predicate antitrust or consumer protection claims.  Accordingly, this argument does not provide a basis for dismissing any particular claims at this time.

With respect to jurisdictions that view unjust enrichment as an independent claim, Defendants assert that Plaintiffs' unjust enrichment claims may not be used to end-run state antitrust and consumer protection laws, meaning that Plaintiffs may not bring unjust enrichment claims based upon the same facts that are insufficient to make out antitrust or consumer protection claims.  This argument must be evaluated on a state-by-state basis, and Defendants have not briefed the issue in any depth, presumably because of the page limits imposed by this Court. Accordingly, this argument does not provide a basis for dismissing any particular claims at this time.

Defendants also contend that Plaintiffs' unjust enrichment claims fail as to eighteen states that preclude unjust enrichment claims where the plaintiff received the benefit of the bargain; as to eight states that preclude unjust enrichment where the defendant provided consideration for benefits received; as to four states that preclude unjust enrichment claims unless the plaintiff

1    directly confers a benefit upon the defendant; and as to five states that require an absence of

2    remedy at law.  Finally, Defendants assert that the SAC fails to state a claim under South Carolina,

3    California, and New York law.  The Court addresses those categories of states in the same order as

4    Defendants' briefing.

5              **1.       Benefit of the Bargain:  Arkansas, Arizona, California, District of**

6                      **Columbia, Florida, Iowa, Massachusetts, Michigan, Minnesota,**

7                      **Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New**

8                      **York, North Carolina, Oregon, and South Carolina**

9              Domestic Defendants contend that eighteen states[12] preclude unjust enrichment claims

10   where the plaintiff received the benefit of bargain.  The vast majority of unjust enrichment cases

11   cited by Defendants arose in the context of a contractual relationship between the plaintiff and the

12   defendant.  *See Brooks v. Valley Nat'l Bank*, 548 P.2d 1166, 1171 (Ariz. 1976) (mortgage); *Frein*

13   *v. Windsor Weeping Mary LP*, 366 S.W.3d 367 (Ark. Ct. App. 2009) (lease); *Peterson v. Cellco*

14   *Partnership*, 164 Cal. App. 4th 1583 (2008) (insurance); *Smith v. Stowell*, 125 N.W. 2d 795 (Iowa

15   1964) (option agreement); *Cmty. Builders, Inc. v. Indian Motorcycle Associates, Inc.*, 692 N.E. 2d

16   964 (Mass. App. Ct. 1998) (consulting agreement); *Isom v. NE Lots LLC*, 2010 WL 143470

17   (Mich. Ct. App. Jan 14, 2010) (contract for real property); *Zinter v. Univ. of Minn.*, 799 N.W. 2d

18   243 (Minn. Ct. App. 2011) (tuition payment); *Howard v. Turnbull*, 316 S.W. 3d 431 (Mo. Ct.

19   App. 2010) (real property loan); *Washa v. Miller*, 546 N.W. 2d 813 (Neb. 1996) (attorney-client

20   relationship); *Clapp v. Goffstown Sch. Dist.*, 977 A.2d 1021 (N.H. 2009) (employment); *Arena*

21   *Res., Inc. v. Obo, Inc.*, 238 P.3d 357 (N.M. Ct. App. 2010) (operating agreement); *One Step Up,*

22   *Ltd. v. Webster Bus. Credit Corp.*, 925 N.Y.S.2d 61 (N.Y. App. Div. 2011) (letter of credit); *Britt*

23   *v. Britt*, 359 S.E.2d 467 (N.C. 1987) (oral contract, trust); *High v. Davis*, 584 P.2d 725 (Or. 1978)

24   (real property instruments).

25             Other cases cited by Defendants arose from alleged false advertising, *see Dahlgren v.*

26

27   ──────────────
     [12] Arkansas, Arizona, California, District of Columbia, Florida, Iowa, Massachusetts, Michigan,
     Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North
28   Carolina, Oregon, and South Carolina.

United States District Court
Northern District of California

*Audiovox Commc'ns Corp.*, 2012 WL 2131937 (D.C. Super. Ct. March 15, 2012) (fraud in marketing of cellular telephones); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007) (false advertising class action against drug manufacturer), the sale of a bank, *see Omnibank of Mantee v. United S. Bank*, 607 So.2d 76 (Miss. 1992), and a quantum meruit action between two dentists who shared a practice, *Johnston v. Brown*, 348 S.E.2d 391 (S.C. Ct. App. 1986).  None of the cases involved antitrust claims.

The Court is not persuaded that the blanket prohibition urged by Defendants can be extracted from the cited cases.  It is one thing to say that a party who contracts with another for a particular set of rights, and receives all of those rights for the agreed upon price, may not seek to alter the arrangement later.  But that rationale does not translate well to an indirect purchaser case in which Plaintiffs are not seeking to avoid an agreement negotiated with Defendants.

Some courts nonetheless have applied the benefit of the bargain rationale to preclude unjust enrichment claims arising out of anticompetitive conduct.  *See, e.g., In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) (buyers of digital music barred from asserting unjust enrichment claims because they received the music they purchased at the price they agreed to pay).  Other courts have rejected the benefit of the bargain argument as a basis for dismissing unjust enrichment claims asserted in the antitrust context.  *See, e.g., In re Automotive Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 894-95 (E.D. Mich. 2014) ("[W]hen stripped to its essence, a claim of unjust enrichment requires IPPs to allege sufficient facts to show that Defendants received a benefit, and under the circumstances of the case, retention of the benefit would be unjust.").

It is this Court's task to predict how each state's highest court would rule on the issue.  *See Ion Batteries*, 2014 WL 4955377, at *8.  None of the state court decisions cited by Defendants holds or even suggests that the states' highest courts would apply the benefit of the bargain rule to preclude unjust enrichment claims in antitrust cases.  Given the dearth of state law on point, and the split among the federal courts that have addressed the issue, this Court is not persuaded that the states' highest courts would adopt Defendants' position.

Accordingly, the Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims

United States District Court
Northern District of California

46

on the ground that Plaintiffs received the benefit of the bargain.

### 2. Consideration for Benefits Received:  Arizona, Florida, Kansas, Massachusetts, Missouri, New Hampshire, Tennessee, and Wisconsin

Defendants next argue that eight states[13] preclude unjust enrichment claims where the defendant provided any consideration for the benefits it received.  Most of Defendants' cases on this point involved disputes between subcontractors on the one hand and property owners or general contractors on the other.  *See Senne & Co. v. Simon Capital Ltd. Partnership*, 2007 WL 1175858 (Kan. Ct. App. Apr. 20, 2007) (precluding an unjust enrichment claim in a mechanics' lien case); *Cnty. Asphalt Paving, Co. v. Mosley Constr., Inc.*, 239 S.W.3d 704 (Mo. Ct. App. 2007) (precluding subcontractor's quantum meruit claim where property owner had paid full contract price); *Axenics, Inc. v. Turner Constr. Co.*, 62 A.3d 754 (N.H. 2013) (subcontractor's unjust enrichment claim precluded by express contract covering the same subject matter); *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (1966) (cited for the proposition that "if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher"); *Tri-State Mech., Inc. v. Northland Coll.*, 681 N.W.2d 302 (Wis Ct. App. 2004) (precluding subcontractor's unjust enrichment claim against college where college had fully paid contract price plus excess costs to general contractor).

Other cited cases arose in a variety of circumstances (although none involving alleged anticompetitive conduct).  In *A M Leasing, Ltd. v. Baker*, 786 P.2d 1045 (Ariz. Ct. App. 1990), a lessor repossessed a backhoe that the lessee had repaired at his own expense.  The lessee then sought to assert an unjust enrichment claim against the lessor for the repairs.  The court held that the lessee could not maintain such a claim because return of the backhoe in good repair was a benefit to which the lessor was entitled under the parties' agreement and for which the lessor had given full consideration.  *See id.* at 198.  In *Pereira v. Regions Bank*, 752 F.3d 1354 (11th Cir. 2014), consumers filed a class action alleging that a bank's practice of assessing a fee for cashing

---

[13] Arizona, Florida, Kansas, Massachusetts, Missouri, New Hampshire, Tennessee, and Wisconsin.

checks violated state law.  The Eleventh Circuit held that the plaintiffs' unjust enrichment claims, asserted under Florida state law, were preempted but that even if the claims were not preempted they could not be maintained because plaintiffs could not show that the bank failed to give consideration for the check-cashing fee.  *See id.* at 1358 n.6.  Finally, in *Ferola v. Allstate Life Ins. Co.*, 2007 WL 2705534 (Mass. Super. Ct. Aug. 30, 2007), the executor of an estate asserted an unjust enrichment claim to recover funds his deceased father had used to purchase an annuity from Allstate.  The court held that there was no basis for such a claim because the purchase of the annuity was governed by a contract, and the deceased had reaped the benefits of that contract.  *Id.* at *14.

Once again, the Court is not persuaded that the rule of law articulated by Defendants – here, that an unjust enrichment claim cannot be maintained where the defendant paid any consideration for benefits received – reasonably can be extracted from the cited cases.  The claims asserted in those cases are so factually distinct from the indirect purchaser claims asserted in the present action that it is difficult to see how the holdings would apply.  There is nothing in any of the cited decisions to suggest that the states' highest courts would preclude all antitrust claims based upon such a rule.  *Accord Automotive Parts*, 2014 WL 4793848, at * 20 (denying defendants' motion to dismiss unjust enrichment claims on the basis that defendants had paid consideration).

The Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims on the ground of consideration received.

### 3. Direct Benefit to Defendant:  Florida, Kansas, Michigan, and North Carolina

Defendants contend that four states[14] require that the plaintiff directly confer a benefit upon the defendant in order to maintain an unjust enrichment claim.

#### a. Florida

In the case *In re Porsche Cars North America, Inc.*, 880 F. Supp. 2d 801 (S.D. Ohio 2012),

---

[14] Florida, Kansas, Michigan, and North Carolina.

the plaintiffs sued the defendant car manufacturers for products liability and related claims, including a claim of unjust enrichment based upon the theory that Florida class members had paid the defendants more than fair market price for their vehicles such that it would be inequitable for the defendants to retain the benefit.  Relying on Florida law, the district court observed that "[u]njust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law," and held that "[i]n order to state a claim for unjust enrichment in Florida, a plaintiff must allege that he or she directly conferred a benefit on the defendants."  *Id.* at 842-43.  The court explained that "[t]he parties need not be in privity of contract in order for a plaintiff to establish that he or she conferred a direct benefit on a defendant; however, a plaintiff cannot recover for unjust enrichment in Florida when he or she purchased a product on the secondary market with no direct link to the manufacturer."  *Id.* at 843.  Based upon this authority, Plaintiffs' Florida unjust enrichment claims appear to be precluded.

The cases cited by Plaintiffs do not dictate a different result.  In *Williams v. Wells Fargo Bank, N.A.*, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011), the district court confirmed that in order to maintain an unjust enrichment claim under Florida law the plaintiff must confer a "direct benefit" upon the defendant, but held that direct *contact* was not required.  In *Williams*, the benefit conferred by the plaintiffs – insurance payments – were not paid by the plaintiffs directly to the defendants but were routed through a third party.  That holding does not help Plaintiffs here, because they did not route a payment to Defendants through third parties or otherwise confer a direct benefit upon Defendants.  In *Eggs*, the district court engaged in a lengthy discussion of Florida law, observed that a number of Florida cases require that the plaintiff directly confer a benefit upon defendants, but then concluded that other Florida cases muddied the waters as to whether a direct benefit is required.  *See Eggs*, 851 F. Supp. 2d at 929.

Having reviewed the available authorities, the Court concludes that Defendants' cases more accurately describe the state of Florida law on this point.  The Court GRANTS the motion to dismiss Plaintiffs' unjust enrichment claims brought under Florida law, without leave to amend.

### b.    Kansas

*In re Aftermarket Filters Antitrust Litig.*, 2010 WL 1416259 (N.D. Ill. Apr. 1, 2010), is an

United States District Court
Northern District of California

antitrust case in which the district court applied the laws of several states to unjust enrichment claims.  The district court held that Kansas "require[s] plaintiffs to plead that they have conferred a direct benefit on the defendant," and that as a result indirect purchasers could not make out an unjust enrichment claim.  *Id.* at *2 (alteration added).  The court observed that any benefit conferred by indirect purchasers "would be on others in the chain of distribution from whom they purchased, not on defendants."  *Id.* at *3.  *Eggs* holds to the contrary.  *See Eggs*, 851 F. Supp. 2d at 929.  The Court concludes that *Aftermarket Filters* is more consistent with Kansas law.

The Court GRANTS the motion to dismiss Plaintiffs' unjust enrichment claims brought under Kansas law, without leave to amend.

### c.  Michigan

In *Fenerjian v. Nongshim Co., Ltd.*, 2014 WL 5685562, *20 (N.D. Cal. Nov. 4, 2014), the district court held that Michigan unjust enrichment law requires "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant."  Relying on a Michigan appellate court case in which the unjust enrichment doctrine was held inapplicable due to the lack of direct contact between the indirect purchaser plaintiffs and the defendant, the district court found that the transactions between the indirect purchasers and the defendant in the case before it were "too attenuated to state an unjust enrichment claim under Michigan Law."  *Id.* at *21-22.  At least one other district court has held that under Michigan law an element of an unjust enrichment claim is that the plaintiff conferred a direct benefit on the defendant.  *See Aftermarket Filters*, 2010 WL 1416259, at *2-3.  The cases relied upon by Plaintiffs are factually distinguishable and do not persuade the Court that *Fenerjian* and *Aftermarket* are incorrect.

The Court GRANTS the motion to dismiss Plaintiffs' unjust enrichment claims brought under Michigan law, without leave to amend.

### d.  North Carolina

District courts have split as to whether North Carolina law requires that the plaintiff confer a direct benefit on the defendant in order to bring an unjust enrichment claim.  *Aftermarket Filters* answers that question in the affirmative.  *See Aftermarket Filters,* 2010 WL 1416259, at *2-3.

United States District Court
Northern District of California

1   However, *Eggs* and *Lidoderm* reach the opposition conclusion, holding that under North Carolina

2   law it is not required that the plaintiff confer a direct benefit upon the defendant.  *See Lidoderm*,

3   2015 WL 2089223, at *17; *Eggs*, 851 F. Supp. 2d at 932.  This Court concludes *Lidoderm* and

4   *Eggs* are more consistent with North Carolina state court decisions.

5       The Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims brought

6   under North Carolina law.

7           **4.      Absence of Remedy at Law:  Arizona, Florida, Massachusetts,**

8                      **Minnesota, and Tennessee**

9       Defendants argue that five states[15] bar unjust enrichment claims where there is an adequate

10  remedy at law.  Plaintiffs do not dispute that the laws of the states in question provide for an

11  unjust enrichment recovery only when there is no available remedy at law.  However, Plaintiffs

12  argue that they may allege unjust enrichment claims in the alternative to claims giving rise to legal

13  remedies.  This Court agrees.  *See* Fed. R. Civ. P. 8(a)(3) (expressly providing that a plaintiff may

14  demand "relief in the alternative or different types of relief"); *In re Automotive Parts Antitrust*

15  *Litig.*, 50 F. Supp. 3d at 867 (collecting cases).

16      The Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims for failure to

17  allege the absence of a remedy at law.

18          **5.      South Carolina, California, and New York**

19      Finally, Defendants assert that Plaintiffs fail to state a claim for unjust enrichment under

20  South Carolina, California, and New York law.

21               **a.      South Carolina**

22      Defendants cite *Pitts v. Jackson Nat. Life Ins. Co.*, 574 S.E.2d 502, 511-12 (2002), for the

23  proposition that in South Carolina a plaintiff cannot maintain an unjust enrichment claim unless

24  the defendant owes the plaintiff a duty.  That case did not involve antitrust claims and the unjust

25  enrichment claim was premised on the existence of a legal duty.  *Id.*  Other cases expressly

26  addressing unjust enrichment in the antitrust context hold that "[t]here is no requirement to allege

27

28  ──────────────
    [15] Arizona, Florida, Massachusetts, Minnesota, and Tennessee.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the existence of a duty" in order to maintain an unjust enrichment claim in South Carolina.  *In re:*

2   *Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1026 (2014).

3   　　The Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims under South

4   Carolina law on this basis.

5   　　　　　　　　　　**b.**　　**California**

6   　　Defendants seek dismissal of Plaintiffs' unjust enrichment claims under California law on

7   the ground that California does not recognize such a claim.  This Court recently addressed the

8   issue of pleading unjust enrichment:

> [T]he Ninth Circuit recently spoke on this issue:  "in California, there is not a
> standalone cause of action for 'unjust enrichment,' which is synonymous with
> 'restitution.'"  *Astiana*, 2015 WL 1600205, at *7.  However, because restitution is a
> recognized "theory underlying a claim that a defendant has been unjustly conferred
> a benefit 'through mistake, fraud, coercion, or request,'" *id.* (quoting 55 Cal. Jur.
> 3d Restitution § 2), the remedy for which is "typically sought in a quasi-contract
> cause of action," *id.*, "a court may 'construe the cause of action [for unjust
> enrichment] as a quasi-contract claim seeking restitution,'" *id.* (quoting *Rutherford*
> *Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014)).  Moreover,
> that an unjust enrichment claim may be "nonsensical because it was duplicative of
> or superfluous to" a plaintiff's other claims is not grounds for dismiss[al].

15  *Romero v. Flowers Bakeries, LLC*, 2015 WL 2125004, at *9 (N.D. Cal. May 6, 2015).

16  　　Accordingly, the Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims

17  under California law.

18  　　　　　　　　　　**c.**　　**New York**

19  　　Finally, Defendants argue that Plaintiffs' unjust enrichment claims are too attenuated under

20  New York law, citing *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007).  In *Sperry*,

21  a tire buyer brought indirect purchaser claims against producers and sellers of rubber-processing

22  chemicals.  In discussing the plaintiff's unjust enrichment claim under New York law, the court

23  held that a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,

24  but that "the connection between the purchaser of tires and the producers of chemicals used in the

25  rubber-making process is simply too attenuated to support such a claim."  *Id.* at *215-16.

26  　　In response, Plaintiffs cite *In re: Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982

27  (E.D. Mich. 2014), in which the district court concluded that *Sperry* did not require dismissal of

28  the unjust enrichment claims before it.  In *Automotive Parts*, automobile buyers brought indirect

purchaser claims against the manufacturers and sellers of fuel senders, a component of the

purchased automobiles, based upon allegations of price-fixing.  The district court concluded that

*Sperry* did not preclude the indirect purchasers' unjust enrichment claims because the relationship

between the indirect purchasers and the defendant in *Sperry* was more attenuated than the

relationship between the indirect purchasers and the defendants in the case before it.  *Id.* at 1024.

Based upon the allegations in the SAC, the Court cannot conclude that the relationship between

Plaintiffs and Defendants is so attenuated as to preclude an unjust enrichment claim under New

York law.

The Court DENIES the motion to dismiss Plaintiffs' unjust enrichment claims under New

York law on this basis.

### E.    Statute of Limitations

Plaintiffs' claims are subject to limitations periods ranging from three to six years.  Those

limitations periods are set forth in Exhibit D to Domestic Defendants' motion.  Plaintiffs' brief

does not dispute the limitations periods set forth in Defendants' Exhibit D.  Plaintiffs filed this

action on March 15, 2013.  Thus absent allegations demonstrating delayed accrual of their claims

or tolling of the applicable limitations periods, it appears on the face of the SAC that all of

Plaintiffs' claims pre-dating March 15, 2007 are time-barred (six-year limitations period), and a

good portion of their claims pre-dating March 15, 2009 and March 15, 2010 are time-barred (four-

year and three-year limitations periods, respectively).

Plaintiffs allege that the limitations periods were tolled under the doctrine of fraudulent

concealment.  With respect to the federal Sherman Act claim, the limitations period "may be tolled

if the defendant fraudulently concealed the existence of a cause of action in such a way that the

plaintiff, acting as a reasonable person, did not know of its existence."  *Hexcel Corp. v. Ineos

Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).  "The plaintiff carries the burden of pleading

and proving fraudulent concealment; it must plead facts showing that the defendant affirmatively

misled it, and that the plaintiff had neither actual nor constructive knowledge of the facts giving

rise to its claim despite its diligence in trying to uncover those facts."  *Id.* (internal quotation

marks, citation, and brackets omitted).  "A fraudulent concealment defense requires a showing

United States District Court
Northern District of California

1   both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action,

2   and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." *Id.*

3   (internal quotation marks and citation omitted).

4       "If a defendant proves that the plaintiff had actual or constructive knowledge of the facts

5   giving rise to the claim, the doctrine of fraudulent concealment does not apply." *Id.* "The plaintiff

6   is deemed to have had constructive knowledge if it had enough information to warrant an

7   investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Id.*

8   (internal quotation marks and citation omitted). "It is enough that the plaintiff should have been

9   alerted to facts that, following duly diligent inquiry, could have advised it of its claim." *Id.*

10   (internal quotation marks and citation omitted).

11       With respect to Plaintiffs' state law claims, "[f]ederal courts addressing state law claims

12   must apply state law statutes of limitation and state law applies to the question of tolling state

13   claims." *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Financial Corp.*, 878

14   F. Supp. 2d 1009, 1015 (2011). The parties have not briefed application of state law to the issue

15   of fraudulent concealment, although they have provided appendices summarizing the relevant law

16   for each state. *See* Defs.' Mot. Exh. D, ECF 120-4; Pls.' Opp. Exh. C, ECF 135-3. All of the

17   states apply some variant of the federal law articulated above. For the reasons discussed below,

18   the Court concludes that under even the most lenient of approaches to equitable tolling, Plaintiffs

19   have not alleged a plausible date upon which they became aware of facts giving rise to their

20   claims.

21       Plaintiffs previously alleged that they were not aware of the facts giving rise to their claims

22   until July 2010 when the direct purchasers publicly announced that they were passing along

23   Defendants' price increases to their customers. At the hearing on Defendants' earlier motion to

24   dismiss, the Court expressed reservations regarding the adequacy of Plaintiffs' fraudulent

25   concealment allegations, and Plaintiffs' counsel requested and was granted leave to amend those

26   allegations without further discussion.

27       The SAC now alleges that Plaintiffs were not aware of the facts giving rise to their claims

28   until *August 28, 2012*, when Judge Bennett granted class certification in the direct purchaser action

United States District Court
Northern District of California

in Maryland.  SAC ¶ 183.  The SAC sets forth various facts about Defendants' alleged conspiracy and concealment of the conspiracy.  *Id.* ¶¶ 195-209.  While those allegations certainly do suggest that Defendants took steps to keep their alleged price-fixing conspiracy a secret, the alleged discovery date of August 2012 is wholly implausible.  The SAC alleges that "Judge Bennett's order conferred judicial legitimacy for the first time on the allegations made against Defendants in that case."  *Id.* ¶ 184.  However, "judicial legitimacy" is not the touchstone for application of the fraudulent concealment doctrine.  Plaintiffs must allege facts showing that they did not have enough information to put them on inquiry notice with respect to their claims.  Plaintiffs in the direct purchaser action had sufficient information about the alleged conspiracy and price-fixing to file their action February 2010, more than three years before the indirect purchasers followed suit.  Plaintiffs' own allegations discuss public statements that appear sufficient to put them on inquiry notice, for example, the 2011 statement of Kronos's chief executive officer that its customers pass along higher titanium dioxide prices, causing "an extra $1 for a gallon of paint."  SAC ¶ 174.

Plaintiffs may be able to allege a different date upon which they discovered the facts giving rise to their claims.  Plaintiffs already have had at least two opportunities to allege fraudulent concealment, the last time in the face of the Court's expressed reservations regarding their fraudulent concealment theory.   However, given that leave to amend is granted as to other aspects of the pleading, Plaintiffs will be granted another opportunity to allege facts sufficient to show fraudulent concealment.  The Court directs Plaintiffs' attention to a recent case from this district addressing the pleading requirements for fraudulent concealment, *In re Animation Workers Antitrust Litig.*, 14-CV-04062-LHK, 2015 WL 1522368 (N.D. Cal. April 3, 2015).

The Court GRANTS Defendants' motion to dismiss Plaintiffs' claims arising outside the applicable limitations periods, with leave to amend.

### F.     Class Allegations

Domestic Defendants move to strike Plaintiffs' class allegations under Federal Rule of Civil Procedure 12(f).  "There is a split in this District as to whether a motion to strike class action allegations may be entertained at the motion to dismiss stage."  *Ogala v. Chevron Corp.*, No. 14-cv-173-SC, 2014 WL 4145408, at * (N.D. Cal. Aug. 21, 2014) (collecting cases).  Even courts that

have been willing to entertain such a motion early in the proceedings "have applied a very strict standard to motions to strike class allegations on the pleadings." *Id.* "Only if the court is convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed may the allegations be stricken. *Id.* (internal quotation marks and citation omitted).

Defendants contend that the named Plaintiffs and their counsel do not satisfy the adequacy requirements under Federal Rule of Civil Procedure 23(a)(4), which provides that a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Defendants point out that there appears to be an inherent conflict among the putative Merchant Class and Consumer Class, because they occupy different levels of the same distribution chains. A larger recovery for one necessarily will result in a smaller recovery for the other. The same class counsel represents both classes.

At the hearing, the Court indicated its inclination to defer the issue of adequacy to the class certification stage, but it permitted counsel to offer brief oral argument on the motion. *See* Hrg. Tr. 45:3-47:25. The Court has reviewed the parties' briefing and the relevant case law, and remains convinced that it would be premature to address the issue at the pleading stage.

Accordingly, the Court DENIES the motion to strike class allegations without prejudice to raising the arguments presented in that motion at a later stage of the proceedings.

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1)   Cristal Arabia's motion to dismiss for lack of personal jurisdiction is GRANTED;

(2)   Cristal Arabia's motion to dismiss for insufficient service of process is TERMINATED AS MOOT;

(3)   Plaintiffs' request to take jurisdictional discovery is DENIED;

(4)   Domestic Defendants' motion to dismiss for lack of Article III standing is GRANTED, WITH LEAVE TO AMEND;

(5)   Domestic Defendants' motion to dismiss for failure to state a claim is GRANTED IN PART AND DENIED IN PART as follows:

United States District Court
Northern District of California

56

1     (a)    As to Claim 1 (state antitrust laws), the motion is GRANTED WITH

2            LEAVE TO AMEND as to claims brought under the laws of Iowa,

3            Nebraska, New Mexico, and New York for lack of antitrust standing and

4            otherwise is DENIED;

5     (b)    As to Claim 2 (state consumer protection laws), the motion is GRANTED

6            WITHOUT LEAVE TO AMEND as to Merchant Class claims under

7            Missouri Law; is GRANTED WITH LEAVE TO AMEND as to all claims

8            under New York law; and otherwise is DENIED;

9     (c)    As to Claim 3 (state unjust enrichment laws), the motion is GRANTED

10           WITHOUT LEAVE TO AMEND as to all claims under Florida, Kansas,

11           and Kentucky law; and otherwise is DENIED;

12    (d)    As to Claim 4 (Sherman Act § 1), the motion is GRANTED WITH LEAVE

13           TO AMEND for lack of antitrust standing;

14    (e)    As to all claims, the motion is GRANTED WITH LEAVE TO AMEND as

15           to claims arising outside the applicable statutes of limitation;

16  (6)   Domestic Defendants' motion to strike class allegations is DENIED; and

17  (7)   Any amended pleading shall be filed on or before September 15, 2015.

19  Dated: August 11, 2015

20                                   _____
                                     BETH LABSON FREEMAN
21                                   United States District Judge

57