1   Ben F. Pierce Gore (SBN 128515)
    PRATT & ASSOCIATES
2   1871 The Alameda, Suite 425
    San Jose, California 95126
3   Telephone:  (408) 369-0800
    Facsimile:   (408) 369-0752
4   pgore@prattattorneys.com

5   *Attorney for Plaintiffs and the Putative Class*

6   (Additional counsel listed on signature page)

7                   **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
8                      **SAN FRANCISCO DIVISION**

9   JAN HARRISON; LEE RANALLI;
    MORGAN TANNER; SPENCER
10  HATHAWAY; TODD TURLEY; DEBBIE
    HALE; KELI ANNO; JOHN
11  ZULLOCHRISTOPHER KUON-TSEN LEE;
    JIM BUCKINGHAM; TANDA SAXTON;
12  JOHN WOZNIAK; JEROME SHERMAN;
    BEVERLY JENKINS; DAVID PETERSEN;
13  TOM STEVER; BRIAN BAWOL;            No. 5:13-cv-01180-BLF
    RANSOME FOOSE; and, STACY
14  FRANKLIN.                           **THIRD AMENDED**
                                        **CLASS ACTION COMPLAINT**
15               Plaintiffs,

16  v.

17  E.I. DUPONT DE NEMOURS AND
    COMPANY; HUNTSMAN
18  INTERNATIONAL, LLC; KRONOS
    WORLDWIDE, INC.; and, MILLENNIUM
19  INORGANIC CHEMICALS, INC.

20               Defendants.

21

22

23

24

1

## TABLE OF CONTENTS

2    I.    INTRODUCTION ................................................................................................1

3    II.   JURISDICTION AND VENUE .........................................................................4

4    III.  PARTIES .............................................................................................................6

5          A.    PLAINTIFFS ...........................................................................................6

6          B.    DEFENDANTS ......................................................................................12

7    IV.   AGENTS AND CO-CONSPIRATORS ..........................................................13

     V.    CLASS ACTION ALLEGATIONS ................................................................15

8    VI.   TRADE AND COMMERCE ...........................................................................18

9    VII.  FACTUAL ALLEGATIONS ...........................................................................19

10         A.    BACKGROUND REGARDING TITANIUM DIOXIDE ...................................19

11         B.    THE TITANIUM DIOXIDE INDUSTRY.......................................................21

12         C.    DEFENDANTS' UNLAWFUL TITANIUM DIOXIDE PRICE FIXING CONSPIRACY ........25

13               1.    Industry Conditions Prior to 2002 .........................................29

14               2.    A Paradigm Shift in Industry Behavior..................................30

15                     a.   2002 Price Increases ..................................................33

16                     b.   2003 Price Increases ..................................................35

17                     c.   2004 Price Increases ..................................................36

18                     d.   2005 Price Increases ..................................................37

19                     e.   2006 Price Increases ..................................................40

20                     f.   2007 Price Increases ..................................................40

21                     g.   2008 Price Increases ..................................................41

22                     h.   2009 Price Increases ..................................................46

23                     i.   2010 Price Increases ..................................................48

     VIII. PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY .......52
24

IX.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF
        LIMITATIONS.........................................................................................59

        A.      THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS
                DID NOT AND COULD NOT DISCOVER THE CLAIMS. ...........................................59

        B.      FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS.................61

X.      CLAIMS FOR RELIEF ...........................................................................69

        FIRST CLAIM FOR RELIEF ........................................................................69

        SECOND CLAIM FOR RELIEF ....................................................................84

        THIRD CLAIM FOR RELIEF.......................................................................97

        FOURTH CLAIM FOR RELIEF ..................................................................105

PRAYER FOR RELIEF .....................................................................................108

JURY DEMAND .............................................................................................109

Come now Plaintiffs Jan Harrison, Lee Ranalli, Morgan Tanner, Spencer Hathaway, Todd Turley, Debbie Hale, Keli Anno, John Zullo, Christopher Kuon-Tsen Lee, Jim Buckingham, Tanda Saxton, John Wozniak, Jerome Sherman, Beverly Jenkins, David Petersen, Tom Stever, Ransome Foose, Brian Bawol, and Stacy Franklin (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, and for their Third Amended Class Action Complaint ("Complaint"), state as follows:

## I.  INTRODUCTION

1.     This class action lawsuit alleges price fixing in Titanium Dioxide, a principal ingredient in Architectural Paint.[1]   Although Titanium Dioxide is an ingredient in many products, the only product at issue in this case is Architectural Paint.

2.     Plaintiffs are indirect purchasers of Titanium Dioxide who purchased Titanium Dioxide in Architectural Paint.   Defendants E.I. DuPont De Nemours and Company

---

[1] Architectural Paint refers to a subset of architectural coatings, defined as: "pigmented liquid, liquefiable, or mastic composition designed for application to a substrate in a thin layer which is converted to an opaque solid film after application. [Paint is] used for protection, decoration, or identification, or to serve some functional purpose such as the filling or concealing of surface irregularities, the modification of light and heat radiation characteristics etc." *See, e.g., http://www.hamiltonnw.com/TechBullFinishing02.asp* (citing *Federation of Societies for Coating Technology*) (last visited Sept. 28, 2015). The other principal category of architectural coatings are "coatings," distinguishable from Architectural Paint in that coatings are not opaque when dried. *See*, *id.*

Opacity is achieved through pigments including Titanium Dioxide. "Because [these] coatings are applied in thin layers, a relatively high amount of pigment must be used to achieve hiding." *See* Manuel Jesús Gázquez1, *A Review of the Production Cycle of Titanium Dioxide Pigment*, 5 MATERIALS SCIENCES AND APPLICATIONS, 441-458 (2014), *available at* http://www.scirp.org/journal/msahttp://dx.doi.org/10.4236/msa.2014.57048.     Therefore, Architectural Paint, which is defined by its opacity and requires relatively high levels of pigments, will include relatively high levels of Titanium Dioxide. Titanium Dioxide "is a non-color pigment that is used in all chromatic paint." Ed Barlow, *Paint Pigments and the Global Economy*, PAINT & COATINGS INDUSTRY (October, 2013). Primers, or undercoats, also fall within the category of Architectural Paint because they are opaque.

("DuPont"); Huntsman International, LLC ("Huntsman"); Kronos Worldwide, Inc. ("Kronos"); and Millennium Inorganic Chemicals, Inc. ("Millennium") (collectively "Defendants") and their co-conspirators are the dominant suppliers of Titanium Dioxide in the United States. Defendants dominate the United States marketplace for this product, a dry chemical powder, which is used in coatings such as Architectural Paint as well as cosmetics, plastics, and paper industries.  All or virtually all sales of Titanium Dioxide in the United States for production of Architectural Paint during the Class Period (defined below) were made by Defendants. Defendants earn billions in revenues from these Titanium Dioxide sales.

3.    On September 13, 2004, Bob Lee, Chief Executive Officer and Deputy General Counsel and Director of Corporate Development for Millennium, met with Tom Keenan, the President of Huntsman, and Mahomed Maiter, its Vice President, in Baltimore, Maryland.  The next day, Millennium's Gary Cianfichi sent an e-mail to colleagues, stating, "now that we have competition on board for the Oct 1 price increase announcement, please relook at your agents['] commissions."  Based on this and other evidence detailed below, Plaintiffs allege that Defendants and other unnamed co-conspirators intentionally conspired and agreed to manipulate, fix, raise, maintain, and stabilize prices at which Titanium Dioxide is sold in the United States.  The alleged conspiracy was hatched and implemented in the United States and elsewhere for the purpose of collusively restraining competition, resulting in the unconscionable, unfair, and deceptive overcharging of Plaintiffs.

4.    Defendants' unlawful conspiracy was initiated, developed, maintained, and facilitated by a course of anticompetitive conduct, including information exchanges, verbal and tacit agreements, price signaling, secret meetings, and communications between Defendants for the purpose of artificially inflating the price of Titanium Dioxide and allocating shares of the

United States market.   In secret discussions and elsewhere, Defendants exchanged commercially sensitive and proprietary information relating to the sales, production, supply, inventory, marketing, and pricing of Titanium Dioxide, as well as the raw materials necessary to manufacture Titanium Dioxide itself.   In order to perpetuate this unlawful conspiracy, Defendants and their co-conspirators engaged in fraudulent and deceptive anticompetitive behavior to hide and conceal their behavior from Plaintiffs and others.

5.      As a result of Defendants' fraudulent, deceptive, unconscionable, unfair, and anticompetitive behavior, the United States marketplace for Titanium Dioxide was controlled and manipulated while prices for Titanium Dioxide were artificially inflated.   Because Plaintiffs paid a price for Architectural Paint containing Titanium Dioxide that was higher than what would be paid in a competitive marketplace, each suffered economic damages as a result of Defendants' wrongdoing.

6.      Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of residents of jurisdictions which proscribe the Defendants' unlawful conduct, as described in this Complaint.   These jurisdictions include Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oregon, and Tennessee.

7.      Plaintiffs bring this lawsuit individually, and on behalf of all persons and business entities who, during the period from and including January 1, 2002 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period"), indirectly purchased Architectural Paint containing Titanium Dioxide in the United States indirectly from one or more of the named Defendants, their agents, and/or co-conspirators.

1   Plaintiffs seek recovery of actual and/or compensatory damages and to enjoin Defendants and

2   their co-conspirators from engaging in their unlawful and anticompetitive behavior.

3   **II.       JURISDICTION AND VENUE**

4          8.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26)

5   to secure equitable and injunctive relief against Defendants for violating Section 1 of the

6   Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages

7   pursuant to state antitrust, unfair competition, and consumer protection laws and seek to obtain

8   restitution, recover damages, and secure other relief against Defendants for violation of those

9   state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under

10  federal and state law.

11         9.      This Court has jurisdiction over the subject matter of this action pursuant to

12  Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),

13  and 28 U.S.C. §§ 1332(d) and 1367 in that: (i) this is a class action in which the matter or

14  controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which

15  some members of the proposed Classes are citizens of a state different from the Defendants;

16  and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal

17  claims under Article III of the United States Constitution.

18         10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15

19  U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events

20  giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected

21  interstate trade and commerce discussed below has been carried out in this District, and

22  Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are

23  found or transact business in this District.

24

11.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Titanium Dioxide throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and, (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

12.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anticompetitive effects upon interstate commerce within the United States.

13.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

14.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain, and/or stabilize prices; rig bids; and allocate the market and customers in the United States for Titanium Dioxide, which conspiracy unreasonably restrained trade and adversely affected the market for Titanium Dioxide.

15.     Defendants' conspiracy and wrongdoing described herein adversely affected Plaintiffs in the United States.

## III.     PARTIES

### A.     Plaintiffs

16.     Plaintiff Jan Harrison ("Harrison") is a California resident who, during the Class Period, purchased for personal use Architectural Paint, including but not limited to Sherwin Williams Architectural Paints, containing Titanium Dioxide manufactured by one or more of the Defendants. For example, Plaintiff Harrison purchased Glidden Premium Interior Egg Base Architectural Paint, containing 20-30 percent Titanium Dioxide by weight. Plaintiff Harrison has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

17.     Plaintiff Lee Ranalli ("Ranalli") is an Arizona resident who, during the Class Period, purchased for personal use Architectural Paint containing Titanium Dioxide manufactured by one or more of the Defendants.  For example, Plaintiff Ranalli purchased Dunn-Edwards Evershield Exterior Architectural Paint.[2] Plaintiff Ranalli has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

18.     Plaintiff Morgan Tanner ("Tanner") is an Arkansas resident who, during the Class Period, purchased for personal use Architectural Paint, including but not limited to PPG Industries Architectural Paints, containing Titanium Dioxide manufactured by one or more of the Defendants. For example, Plaintiff Tanner purchased PPG Speedhide Eggshell

---

[2] Dunn-Edwards' MSDS do not disclose the Titanium Dioxide content as it is subsumed within a larger category of "pigments." On information and belief, discovery from the manufacturer will reveal the Titanium Dioxide content of their paint.

1 Architectural Paint containing 10-25 percent Titanium Dioxide by weight. Plaintiff Tanner has

2 suffered overcharge loss due to unjustified increases in the price of these products, as a result

3 of the conspiracy described in this Complaint.

4       19.    Plaintiff Spencer Hathaway ("Hathaway") is a District of Columbia resident

5 who, during the Class Period, purchased for personal use paint and/or other Architectural

6 Paints, including but not limited to interior paints, containing Titanium Dioxide manufactured

7 by one or more of the Defendants at Duron Paints.  For example, Plaintiff Hathaway purchased

8 Interior Latex Arizona White Architectural Paint containing approximately 10-30 percent

9 Titanium Dioxide by weight.  Plaintiff Hathaway has suffered overcharge loss due to

10 unjustified increases in the price of these products, as a result of the conspiracy described in

11 this Complaint.

12       20.    Plaintiff Todd Turley ("Turley") is a Florida resident who, during the Class

13 Period, purchased for personal use Architectural Paint, including but not limited to Rust-Oleum

14 and Glidden Architectural Paints, containing Titanium Dioxide manufactured by one or more

15 of the Defendants. For example, Plaintiff Turley purchased Behr Premium Low Luster Enamel

16 Porch and Patio Floor Architectural Paint, containing 10-30 percent Titanium Dioxide by

17 weight.  Plaintiff Turley has suffered overcharge loss due to unjustified increases in the price of

18 these products, as a result of the conspiracy described in this Complaint.

19       21.    Plaintiff Debbie Hale ("Hale") is an Iowa resident who, during the Class Period,

20 purchased for personal use Architectural Paint, including but not limited to Behr, Valspar, and

21 Sherwin Williams Architectural Paints, containing Titanium Dioxide manufactured by one or

22 more of the Defendants.  For example, Plaintiff Hale purchased Valspar Ultra Interior Flat

23 Base B Architectural Paint containing 5-10 percent Titanium Dioxide by weight. Plaintiff Hale

24

1  has suffered overcharge loss due to unjustified increases in the price of these products, as a

2  result of the conspiracy described in this Complaint.

3      22.    Plaintiff Keli Anno ("Anno") is a Kansas resident who, during the Class Period,

4  purchased for personal use Architectural Paint, including but not limited to PPG Industries and

5  Behr Architectural Paints, containing Titanium Dioxide manufactured by one or more of the

6  Defendants at Home Depot in Olathe, Kansas. Plaintiff Anno has suffered overcharge loss due

7  to unjustified increases in the price of these products, as a result of the conspiracy described in

8  this Complaint.

9      23.    Plaintiff John Zullo ("Zullo") is a Massachusetts resident who, during the Class

10  Period, purchased for personal use Architectural Paint, including but not limited to Benjamin

11  Moore & Co. and Behr Architectural Paints, containing Titanium Dioxide manufactured by

12  one or more of the Defendants.  For example, Plaintiff Zullo purchased Benjamin Moore Class

13  Premium Interior Eggshell Finish Architectural Paint containing approximately 25 percent

14  Titanium Dioxide by weight.[3] Plaintiff Zullo has suffered overcharge loss due to unjustified

15  increases in the price of these products, as a result of the conspiracy described in this

16  Complaint.

17      24.    Plaintiff Christopher Kuon-Tsen Lee ("Lee") is a Michigan resident who, during

18  the Class Period, purchased for personal use Architectural Paint, including but not limited to

19  Sherwin Williams and Behr Architectural Paints, containing Titanium Dioxide manufactured

20  by one or more of the Defendants, at Home Depot located in Detroit, Michigan.  For example,

21

22  [3] Benjamin Moore MSDSs list a maximum percent of Titanium Dioxide by weight. Discovery

23  will reveal the exact composition of each Benjamin Moore Architectural Paint.

24

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                    Page 8 of 117

1   Plaintiff Lee purchased Kilz II Primer containing approximately 5-10 percent Titanium

2   Dioxide by weight.  Plaintiff Lee has suffered overcharge loss due to unjustified increases in

3   the price of these products, as a result of the conspiracy described in this Complaint.

4        25.    Plaintiff Jim Buckingham ("Buckingham") is a Minnesota resident who, during

5   the Class Period, purchased for personal use Architectural Paint, including but not limited to

6   Sherwin Williams and Hirshfield's Architectural Paint, containing Titanium Dioxide

7   manufactured by one or more of the Defendants.  Plaintiff Buckingham has suffered

8   overcharge loss due to unjustified increases in the price of these products, as a result of the

9   conspiracy described in this Complaint.

10       26.    Plaintiff Tanda Saxton ("Saxton") is a Mississippi resident who, during the

11  Class Period, purchased for personal use Architectural Paint, including but not limited to

12  interior Architectural Paints, containing Titanium Dioxide manufactured by one or more of the

13  Defendants.  For example, Plaintiff Saxton purchased Do-It-Best Exterior Pastel Base

14  Architectural Paint containing 20-25 percent Titanium Dioxide by weight. Plaintiff Saxton has

15  suffered overcharge loss due to unjustified increases in the price of these products, as a result

16  of the conspiracy described in this Complaint.

17       27.    Plaintiff John Wozniak ("Wozniak") is a Missouri resident who, during the

18  Class Period, purchased for personal use Architectural Paint, including but not limited to Behr

19  Architectural Paints, containing Titanium Dioxide manufactured by one or more of the

20  Defendants.  Plaintiff Wozniak has suffered overcharge loss due to unjustified increases in the

21  price of these products, as a result of the conspiracy described in this Complaint.

22       28.    Plaintiff Jerome Sherman ("Sherman") is a Nebraska resident who, during

23  Class Period, purchased for personal use Architectural Paint containing Titanium Dioxide

24

1   manufactured by one or more of the Defendants.  Plaintiff Sherman has suffered overcharge

2   loss due to unjustified increases in the price of these products, as a result of the conspiracy

3   described in this Complaint.

4          29.    Plaintiff Beverly Jenkins ("Jenkins") is a New Hampshire resident who, during

5   the Class Period, purchased for personal use Architectural Paint, including but not limited to

6   Behr and Benjamin Moore Architectural Paints, containing Titanium Dioxide manufactured by

7   one or more of the Defendants at Ace Hardware in Goffstown, New Hampshire. Plaintiff

8   Jenkins has suffered overcharge loss due to unjustified increases in the price of these products,

9   as a result of the conspiracy described in this Complaint.

10         30.    Plaintiff Tom Stever ("Stever") is a New Mexico resident who, during the Class

11  Period, purchased for personal use Architectural Paint, including but not limited to Dunn-

12  Edwards Architectural Paints, containing Titanium Dioxide manufactured by one or more of

13  the Defendants.  For example, Plaintiff Stever purchased Dunn-Edwards Interior Low Sheen

14  Paint.[4]  Plaintiff Stever has suffered overcharge loss due to unjustified increases in the price of

15  these products, as a result of the conspiracy described in this Complaint.

16         31.    Plaintiff David Petersen ("Petersen") is a New York resident who, during the

17  Class Period, purchased for personal use Architectural Paint, including but not limited to

18  Benjamin Moore Architectural Paints, containing Titanium Dioxide manufactured by one or

19  more of the Defendants.  For example, Plaintiff Petersen purchased Benjamin Moore Regal

20  Classic  Premium  Interior  Matte  Finish  Pastel  Base  Architectural  Paint  containing

21

22

23  _____
    [4] See footnote 2, *supra*.

24

approximately 20 percent Titanium Dioxide by weight.[5] Plaintiff Petersen has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

32.     Plaintiff Ransome Foose ("Foose") is a North Carolina resident who, during the Class Period, purchased for personal use Architectural Paint, including but not limited to Cabot Architectural Paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  For example, Plaintiff Foose purchased Olympic All in One Interior Flat Enamel Architectural Paint containing 10-25 percent Titanium Dioxide by weight.  Plaintiff Foose has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

33.     Plaintiff Brian Bawol ("Bawol") is an Oregon resident who, during the Class Period, purchased for personal use Architectural Paint, including but not limited to Miller Architectural Paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  For example, Plaintiff Bawol purchased Miller Devine Delicate Wall White Base Architectural Paint containing 15-20 percent Titanium Dioxide by weight. Plaintiff Bawol has suffered overcharge loss due to unjustified increases in the price of these products, as a result of the conspiracy described in this Complaint.

34.     Plaintiff Stacy Franklin ("Franklin") is a Tennessee resident who, during the Class Period, purchased for personal use Architectural Paints, including but not limited to PPG Industries, Farrell Calhoun, and Sherwin Williams Architectural Paints, containing Titanium Dioxide manufactured by one or more of the Defendants.  For example, Plaintiff Franklin

---

[5] See footnote 3, *supra*.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)

1  purchased Pittsburgh Paint Hi-Hide Eggshell Light Base Architectural Paint containing 10-30

2  percent Titanium Dioxide by weight. Plaintiff Franklin has suffered overcharge loss due to

3  unjustified increases in the price of these Architectural Paints, as a result of the conspiracy

4  described in this Complaint.

5  **B.     Defendants**

6  35.    Defendant DuPont is a Delaware corporation with its principal place of business

7  in Wilmington, Delaware.  During the Class Period, DuPont manufactured and sold Titanium

8  Dioxide, which was indirectly purchased in the United States and elsewhere through DuPont or

9  through DuPont's predecessors, affiliates, and/or subsidiaries.  DuPont is the largest producer

10 and supplier of Titanium Dioxide in the world, and it owns and controls approximately half of

11 the Titanium Dioxide production capacity in North America.  DuPont has U.S. manufacturing

12 plants in Delaware, Florida, Mississippi, and Tennessee.  DuPont receives billions of dollars in

13 revenues from the production and sale of Titanium Dioxide used in various products marketed

14 and sold throughout the United States directly and through the Internet. These products were

15 purchased by the Plaintiffs and members of the Classes (defined below) within all fifty (50)

16 states.

17 36.    Defendant Huntsman is a Delaware limited liability company with its principal

18 place of business in Salt Lake City, Utah.  During the relevant times alleged herein, Huntsman

19 manufactured and sold Titanium Dioxide in the United States, which was indirectly purchased

20 in the United States, through Huntsman or through Huntsman's predecessors, affiliates, and/or

21 subsidiaries, including Tioxide Americas, Inc., an indirect subsidiary of Huntsman and a direct

22 subsidiary of Tioxide Group (a UK company), which is wholly-owned by Huntsman.

23 Huntsman is the fourth largest Titanium Dioxide global producer and has annual sales in the

24 billions of dollars.

37.     Defendant Kronos (formerly known as Kronos, Inc.) is a Delaware corporation with its principal executive offices in Dallas, Texas and its principal North American sales, marketing, and technical offices in Cranbury, New Jersey.  Kronos and Huntsman (through a subsidiary, Huntsman Holding, LLC) jointly operate (50/50) a Titanium Dioxide manufacturing venture, Louisiana Pigment Company, L.P. (LPC), in Lake Charles, Louisiana.  During the relevant time periods alleged herein, Kronos manufactured and sold Titanium Dioxide, which was indirectly purchased in the United States through Kronos or through its predecessors, affiliates, and/or subsidiaries.  Kronos is the fifth largest global producer of Titanium Dioxide and has net sales over a billion dollars.

38.     Defendant Millennium is a Delaware corporation with its principal place of business in Hunt Valley, Maryland.  During the relevant time periods alleged herein, Millennium manufactured and sold Titanium Dioxide, which was indirectly purchased in the United States.  Prior to its acquisition by Cristal in 2007, Millennium comprised the Titanium Dioxide business of Lyondell Chemical Company.  During the relevant times alleged herein, Millennium operated plants in Ashtabula, Ohio and Baltimore, Maryland.

## IV.    AGENTS AND CO-CONSPIRATORS

39.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

40.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of some of which are presently unknown to Plaintiffs, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

41. Alleged co-conspirator Lyondell Chemical Company ("Lyondell") is a Delaware corporation with its principal place of business in Houston, Texas. During the relevant time periods alleged herein, Lyondell manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including a wholly-owned subsidiary that is the predecessor of Defendant Millennium. Lyondell acquired its Titanium Dioxide business as part of its acquisition of Millennium Chemicals, Inc. in 2004. In 2005, Lyondell was the second-largest global producer of Titanium Dioxide and earned over a billion dollars in revenue. Lyondell sold its Titanium Dioxide business (the predecessor of Millennium) to Cristal in 2007. In January 2009, Lyondell and numerous affiliates filed voluntary bankruptcy petitions to restructure under Chapter 11 of the Bankruptcy Code.

42. Alleged co-conspirator Tronox Inc. ("Tronox") is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. During the relevant time periods alleged herein, Tronox manufactured and sold Titanium Dioxide to indirect purchasers in the United States through itself or through its predecessors, affiliates and/or subsidiaries. Tronox is the world's third largest producer of Titanium Dioxide. In 2006, Tronox earned hundreds of millions of dollars in net sales of Titanium Dioxide in the United States. It owns plants in Hamilton, Mississippi and Savannah, Georgia. Prior to becoming a publicly traded company in November 2005, Tronox was a wholly owned subsidiary of Kerr-McGee Corporation and was acquired by Anadarko Petroleum Corporation in 2006. In January 2009, Tronox and certain of its subsidiaries filed voluntary petitions to restructure under Chapter 11 of the United States Bankruptcy Code.

43.     Alleged co-conspirator International Business Management Associates, Inc. ("IBMA") is a Delaware corporation, and its principal place of business is believed to be in Plainsboro, New Jersey.  Alleged co-conspirator James R. Fisher is the President and Chief Executive Officer of IBMA and held this role at all relevant times.  IBMA is Mr. Fisher's alter ego.  Mr. Fisher has been a consultant to the Titanium Dioxide industry for many years, including before and during the relevant time period alleged herein.  Prior to working as a consultant to the industry, he was employed by Defendant Kronos.  Mr. Fisher was a main actor and perpetuator of the sharing of nonpublic, commercially sensitive information concerning Titanium Dioxide between and among Defendants and their co-conspirators. He has also been an agent and co-conspirator of one or more Defendants.

44.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

45.     Defendants are liable for unlawful acts performed in furtherance of the alleged anticompetitive price-fixing conspiracy by companies acquired through mergers and acquisitions.

## V.     CLASS ACTION ALLEGATIONS

46.     Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following defined class (the "Nationwide Class"):

> All persons who purchased Architectural Paint containing, in some form, Titanium Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, during the Class Period.

47.     Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Damages Class"):

> All persons who resided in the Damages States[6] and purchased Architectural Paint for personal use and not for resale containing, in some form, Titanium Dioxide manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, during the Class Period.

48.     The Nationwide Class and the Damages Classes are referred to herein as the "Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, any judicial officer presiding over this matter and his or her staff, and persons who purchased Titanium Dioxide directly.

49.     Plaintiffs believe the approximate size of the Classes to be extremely numerous and so geographically dispersed throughout the United States that joinder of all class members is impracticable.

50.     Plaintiffs' state law claims are typical of the claims of the Classes and arise from the same anticompetitive conspiracy and unlawful conduct engaged in by Defendants and co-conspirators as alleged herein.  The relief sought by the Plaintiffs is common to the Classes.

---

[6] The Plaintiff States are those listed in the First and Second Claims for Relief: Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oregon, and Tennessee.

51.     Numerous questions of fact or law arise from Defendants' and their co-conspirators' anticompetitive conduct that are common to the Classes, including but not limited to:

(a)     Whether Defendants and their co-conspirators combined or conspired to manipulate, raise, maintain, or stabilize prices of Titanium Dioxide sold in the United States;

(b)     Whether Defendants and their co-conspirators shared nonpublic, proprietary information, allocated markets and customers, restricted the supply and output of Titanium Dioxide sold in the United States and/or committed unfair or anticompetitive conduct in furtherance of the alleged price-fixing conspiracy;

(c)     Whether Defendants and their co-conspirators engaged in unfair, false, deceptive or unconscionable behavior;

(d)     Whether Defendants and their co-conspirators conduct resulted in Titanium Dioxide's being sold at an artificially high and noncompetitive prices;

(e)     Whether Defendants and their co-conspirators were unjustly enriched by the sale of Titanium Dioxide at artificially high and non-competitive levels;

(f)     Whether Plaintiffs and Classes were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; and

(g)     Whether Plaintiffs and the Nationwide Class are entitled to nationwide injunctive relief.

52.     The questions of fact or law common to the Classes are overarching and predominate as a threshold matter over any individual questions affecting members of the Classes.

53.     Plaintiffs will fairly and adequately represent the interests of the Classes and have no interests that conflict with or are antagonistic to the Classes.  Plaintiffs have retained counsel who are competent and experienced in antitrust law, class actions, and complex litigation.

54.     Defendants have acted in ways that cause similar injury to the Classes as a whole, thereby making final injunctive relief appropriate with respect to the Classes.

55.      A class action is procedurally superior to any alternatives for adjudicating the claims of Plaintiffs and members of the Classes.  The claims of the members of the Classes can be consolidated into one lawsuit to decide the predominating issue of liability.  Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple lawsuits over the same common issues of fact and liability and the risk of inconsistent decisions establishing varying standards of conduct for Defendants.  Maintenance of the lawsuit as a class action will promote judicial economy, efficiency, and fairness to all parties involved.

## VI.     TRADE AND COMMERCE

56.     During the relevant time periods alleged in this Complaint, the Defendants and co-conspirators engaged in anticompetitive and unlawful conduct and control of the Titanium Dioxide market affecting trade and commerce throughout the fifty (50) states, including this judicial district.

## VII.    FACTUAL ALLEGATIONS

### A.    Background Regarding Titanium Dioxide

57.    Titanium Dioxide is a dry chemical powder that is primarily used as a white pigment.  It is the world's most widely used pigment for whiteness, brightness, and masking of colors in Architectural Paints purchased by Plaintiffs and members of the Classes.  Titanium Dioxide is consumed in 170 countries and is one of the most important inorganic chemicals used in the production of goods.  Titanium Dioxide is considered very valuable in markets such as the United States, and its use in consumer goods increases the quality of life for consumers.

58.    Titanium Dioxide traps and reflects visible light better than almost any known substance.  The majority (approximately 55 percent) of Titanium Dioxide is consumed in the United States in the Architectural Paint and coatings industries.   It is nonflammable and nontoxic and has replaced lead compounds in residential Architectural Paints.  Although the primary function of Titanium Dioxide is to whiten or brighten Architectural Paint, paper, and plastic, the chemical is also used in synthetic fiber production and to make inks, pharmaceutical coatings, toothpaste, sunscreen, cosmetics, food, rubber, ceramic, and other products.

59.    There are no viable white pigment competitive substitutes for Titanium Dioxide in consumer products.  Because Titanium Dioxide's masking or opacifying ability is very unique, there is no technical substitute for the product.  Titanium Dioxide also has great resistance to other chemicals and ultraviolet degradation and has very good heat stability.  There are no competitive white pigment substitutes.  Even though Titanium Dioxide's artificially inflated and supra-competitive prices are manipulated and unconscionably high, competitors have difficulty entering into and competing in the consumer goods market.  Thus,

1  Plaintiffs and members of the Classes have no alternative but to pay the unfairly fixed and

2  maintained prices set by Defendants.

3        60.     Titanium is the ninth most abundant element in the Earth's crust.  It is typically

4  found along with iron in a mineral oxide called ilmenite and also in a less common ore called

5  rutile.  The majority of titanium production is used to make Titanium Dioxide.  The Titanium

6  Dioxide manufactured for commercial use is derived from the mining of ilmenite and rutile.

7  Manufacturers typically sell Titanium Dioxide in powder form after mining it and separating it

8  from titanium ore.

9        61.     Titanium Dioxide is manufactured using two different processes, sulphate and

10  chloride, which create two crystal forms, rutile and anatase.  The sulphate process uses

11  concentrated sulfuric acid to extract Titanium Dioxide from ilmenite or titanium slag.  The

12  chloride process uses petroleum coke to convert rutile to titanium tetrachloride, which is then

13  converted into Titanium Dioxide through contact with superheated oxygen or air.

14        62.     Most Titanium Dioxide plants utilize the chloride manufacturing process

15  because, among other advantages, it generates less waste.  Defendants and their co-conspirators

16  operate most of the chloride process plants in the world.  Although both the sulphate and

17  chloride processes create the rutile crystal form of Titanium Dioxide, only the sulphate process

18  produces the anatase form, which is less durable than rutile.  Anatase is preferred in food, drug

19  and cosmetic products.  The rutile form of Titanium Dioxide fulfills more than 80 percent of

20  the world's requirements for Titanium Dioxide.  After Tronox's predecessor, Kerr-McGee,

21  closed its sulphate process plant in 2004, only the chloride process has been used to produce

22  Titanium Dioxide in the United States.

23

24

63.     Titanium Dioxide is a homogeneous commodity chemical that is sold in rutile and anatase grades worldwide.  Titanium Dioxide grades feature degrees of brightness and whiteness, and most are made by adjusting the size of the Titanium Dioxide particles.  Most grades are sold in fine powder form, but a few are sold in other forms, including ultrafine powder, water slurry (aqueous solutions), and a coarse, nonpigmentary form (such as for use in glass and ceramic manufacturing).

64.     Titanium Dioxide can be hazardous, and labeling of products containing Titanium Dioxide is mandated under Federal and State regulatory regimes.  Architectural Paints often have labeling requirements disclosing their Titanium Dioxide content, sometimes called material safety data sheets ("MSDS").

**B.     The Titanium Dioxide Industry.**

65.     Grades of Titanium Dioxide supplied by one producer are readily substituted for grades of Titanium Dioxide supplied by other producers.  Accordingly, buyers make purchase decisions based largely, if not entirely, on price, which made it easier for Defendants and their co-conspirators to reach agreement on prices and to monitor each other's compliance with the agreements.

66.     All Defendants make and sell rutile grades of Titanium Dioxide, which comprise more than 80 percent of Titanium Dioxide sales, and which are sold primarily to United States customers in the paint, coatings, and plastic industries.  All Defendants except for DuPont make and sell anatase grades.  The rutile crystalline form of Titanium Dioxide has a higher refractive index and is more durable than anatase.  Generally speaking, rutile grades are preferred for outdoor uses by customers in the coatings and plastics industries (the largest end-use applications for Titanium Dioxide), whereas anatase grades are preferred by customers in the food, drug, and cosmetic industries.  Both rutile and anatase grades are sold to fine paper

1   and paperboard customers in the paper industry for use as a filler and in coatings.

2   Approximately 90 to 95 percent of Titanium Dioxide annual sales are made to customers in the

3   coatings, plastics, and paper industries, and all Defendants sell grades of Titanium Dioxide to

4   customers in these industries.

5         67.   During the relevant times alleged herein, Defendants and their co-conspirators

6   dominated and controlled the Titanium Dioxide market in the United States.   Defendants and

7   their co-conspirators control 100 percent of the United States' Titanium Dioxide capacity and

8   65.5 percent of all imports.[7]   Thus, Defendants account for approximately 92 percent of all

9   United States consumption of Titanium Dioxide.   The remaining eight percent is unsuitable for

10   and not used in the production of Architectural Paints.   Because of this market domination,

11   Defendants and their co-conspirators are able to engage in unfair and anticompetitive behavior,

12   overcharging consumers of paints, cosmetics, and plastics in the United States.

13         68.   The Titanium Dioxide industry has high barriers to entry.   For example, a new

14   "greenfield" one-hundred kilotons-per-year plant has been estimated to cost approximately

15   $450 to $500 million and require a three- to five-year lead time to build.   Defendants also have

16   cost advantages and proprietary technologies that effectively deter new entrants.   Such barriers

17   are conducive to a conspiracy because they protect existing suppliers from competition and

18   maintain the high concentration of the Titanium Dioxide industry.

19         69.   Titanium Dioxide producers, including Defendants, face similar costs.   Because

20   Defendants face similar costs, their pricing preferences tend to be aligned.   This alignment and

21   ---
[7] The largest non-defendant source of Titanium Dioxide in the United States is from China.
22   However, Chinese imports of Titanium Dioxide are not used in the production of Architectural
Paint because of the low quality of the Chinese product.   In fact, Chinese manufacturers
23   actually imports rutile-based Titanium Dioxide from the United States and other countries to be
used in Architectural Paint because of the low quality of the domestic Titanium Dioxide.

24

unity of interest make it much easier for them to agree to and defend an agreement on price increases, thus manipulating the Titanium Dioxide market capacity and control of supply.  The manipulation of the production and supply further creates the opportunity for an unlawful uniform conspiracy to artificially inflate the price charged for Titanium Dioxide, which is passed on to purchasers of products containing Titanium Dioxide such as Architectural Paint.

70.     In and around 2005, allegedly to reduce the costs of importing Titanium Dioxide manufactured abroad into North America, Huntsman purportedly reduced its sales (and, presumably, its market share) in North America.  Nevertheless, Defendants' domestic and global market shares remained relatively stable during the relevant times alleged herein.  For example, even though DuPont's Titanium Dioxide plant in DeLisle, Mississippi was shut down by Hurricane Katrina in August 2005 and did not even begin a phased-in production until January 2006, DuPont's resulting market share decline in 2005 was recovered in 2006, even in the midst of price increases and increasing demand for Titanium Dioxide in the United States. Indeed, sales volumes in DuPont's Coatings and Color Technologies segment (of which Titanium Dioxide sales are a part) declined only three percent from 2004 to 2005, while sales revenues were up three percent.

71.     Because Titanium Dioxide is an essential (non-substitutable) element in the production of consumer goods, demand for the product is inelastic:  *i.e.*, the loss in sales volume from a Titanium Dioxide price increase is small relative to the magnitude of the price increase itself.

72.     The Titanium Dioxide industry in the United States presents strong characteristics favoring creation of an unlawful pricing cartel.  The industry is highly concentrated with the vast majority of the world's capacity concentrated in the few Defendants

and involves the sale of a homogenous commodity product, for which there is inelastic demand.   Couple this inelastic demand with the industry's high barriers to entry, and the concomitant opportunity to collude, cooperate, and conspire regarding the pricing for Titanium Dioxide supply, and output is particularly favorable.   This is especially true given that the vast majority of the world's capacity for production of Titanium Dioxide is concentrated in these few Defendants.   During the Class Period, "the overall market share remained relatively stable, with DuPont's share hovering around 30 percent, Huntsman's around 10 percent, Kronos's between 16 and 20 percent, and Millennium's around 20 percent."   Indeed, Defendants have exploited this opportunity, adversely affecting Plaintiffs and members of the Classes.

73.     Titanium Dioxide market characteristics that indicate collusive behavior include very similar, quickly followed, and obviously coordinated price increase announcements; the existence of joint venture agreements among cartel members; and static or declining demand, which encourages those in collusion to coordinate supply restraint and/or reduction and prevent downward price competition.   Moreover, many of these factors make it easier for each Defendant to monitor one another's compliance with an agreement to artificially inflate or stabilize prices, putting each at a higher risk of retaliatory action and enforcement from those who choose not to disrupt the unlawful agreement and restraint of trade.

74.     Industries like the Titanium Dioxide industry, with few sellers facing similar costs, low substitutability, competition primarily based on price, and high barriers to entry, are particularly susceptible to price collusion.   Succinctly stated, the Titanium Dioxide industry bore, in 2002, all of the characteristics of a price-fixing cartel waiting to happen.   This set the stage for an unlawful conspiracy to manipulate, fix, maintain, and stabilize the price of Titanium Dioxide, which began to impact industry pricing in January 2002.

1

## C.     Defendants' Unlawful Titanium Dioxide Price Fixing Conspiracy

2        75.    Defendants' joint ventures, transactions, trade association activity, use of

3   common consultants, deals, and agreements afforded them opportunities to discuss pricing,

4   capacity, cost, customer, and other nonpublic, commercially sensitive issues, which they

5   utilized.  Defendants engaged in coordinated pricing activity as early as January 2002 and

6   thereafter in furtherance of their unlawful, ongoing conspiracy.  In the absence of such an

7   overriding price-raising and/or price-stabilization agreement and understanding among

8   Defendants, it would have been contrary to the independent economic self-interest of each

9   Defendant to allow its competitors access to information about each other's pricing, supply,

10  capacity, utilization, and output..

11       76.    Defendants and their affiliates produce and sell raw materials to each other.  For

12  example, Defendants Kronos, Millennium, and their affiliates sell raw materials, such as

13  ilmenite ore, to other Titanium Dioxide producers.  In 2007, Millennium purchased Titanium

14  Dioxide from DuPont for $0.88 per pound, while the lowest price paid by any other purchaser

15  at that time was $0.09 higher.  Defendants also engage in other business transactions with each

16  other, including sales of Titanium Dioxide between Defendants (as opposed to selling the

17  product to customers of another Defendant or co-conspirator).

18       77.    Defendants Huntsman and Kronos' joint Titanium Dioxide manufacturing

19  venture, LPC, facilitated the conspiracy by giving the two competitors opportunities to collude.

20  For example, Huntsman agreed to reduce inventory in 2002 following the release of a monthly

21  report by LPC indicating that it reduced production as a result of the partners' wishes due to

22  high stocks.  Kronos's and DuPont's cross-license patents to make certain Titanium Dioxide

23  grades are also examples of opportunities to collude and conspire.

24

78.    Defendants swapped Titanium Dioxide with each other, sold Titanium Dioxide to each other (including at discounts off of "market price"), sold ore and other raw materials to each other, swapped raw materials with each other, occasionally considered purchasing each other, and—to borrow a word that one senior executive coined in an email to his high-level colleagues at Cristal/Millennium—engaged in "co-opertition."

79.    The mutually beneficial nature of the business relations between Defendants provided not only the opportunity to conspire but also a financial incentive to do so.  The more that Defendants came to deal with and rely on each other, the more incented they were to maintain market stability, to agree on and support price increases, and to avoid competing on price for the business of each other's customers.  Defendants' meetings and communications, which occurred during the relevant times alleged herein and are detailed below, fostered cooperation, eliminated competition, and permitted the unlawful price-fixing conspiracy.

80.    Defendants' conspiracy to overcharge Plaintiffs and members of the Classes was monitored and policed by communications not only among Defendants themselves, but also between Defendants and industry consultants, customers, and others, as well as through public sources like *Chemical Week*, the *Chemical Market Reporter* (now ICIS), and Defendants' websites.  For example, in advance of the effective date of a price increase, Defendants routinely sent price increase announcement letters to customers being served by other producers, conditioning the market to accept a price increase by the effective date.  This conduct maximized the transparency in the market of Defendants' collective willingness to increase prices and discouraged price competition or "cheating" on the price increase.  After having reached an unlawful agreement or understanding as alleged herein, Defendants used

1   consultants, customers, and others as conduits to confirm intended pricing and other actions

2   with each other.

3         81.     During the Class Period, when Defendants met and spoke with each other, they

4   were always in the process of trying to increase Titanium Dioxide prices.  Indeed, the facts

5   reveal that Defendants and co-conspirators regularly and routinely met and spoke with each

6   other *before* price increase announcements, *during* the period of time after an industry increase

7   had been announced but before it became effective, and *after* the effective dates of price

8   increases, when Defendants and co-conspirators were in the process of implementing the

9   increases for all of their customer accounts.

10        82.     Like their other business meetings, trade association functions provided

11  Defendants with the opportunity to discuss prices and support for price increases, as well as

12  capacity and cost issues. Defendants engaged in such private discussions with each other at

13  dinner meetings before and during trade association and other business meetings.  For example,

14  Defendants are all members of the American Chemistry Council's Titanium Dioxide Panel.

15  Although the timing and frequency of the meetings of the Panel are not fixed, annual American

16  Chemistry Council meetings are held in June at The Greenbrier in White Sulfur Springs, West

17  Virginia, and these were attended by Defendants' top executives.   Defendants are also

18  members of the Titanium Dioxide Stewardship Council, which was formed as a U.S. industry

19  trade group ostensibly focusing on safety, health, and environmental issues.  Defendants also

20  met and spoke with each other at bi-annual (odd year) IntertechPira Titanium Dioxide

21  conferences and at bi-annual (even year) meetings and exhibitions of the Industrial Minerals

22  International Congress, annual meetings of the U.S.-based National Paint and Coatings

23  Association, and other associations related to their industry and customers.    Finally,

24

Defendants are all members of the Titanium Dioxide Manufacturers Association (TDMA), which conducts annual and other meetings and is associated with the European Chemical Industry Council (CEFIC).    Eighty-eight percent of price increase announcements by Defendants came within thirty days of their attendance at TDMA General Council meetings.

83.    Defendants' contacts also fostered industry discipline in maintaining and effectively allocating customer positions and market shares.   The numerous meetings and contacts (both bi-lateral and multi-lateral) between Defendants and co-conspirators typically coincided with simultaneous industry price increase announcements.

84.    In addition to prices, costs, and customers, Defendants also discussed capacity issues.   Their discussions helped them reach consensus on the need to restrain Titanium Dioxide capacity expansion, which restraint they knew would help stabilize prices and support price increases despite industry overcapacity.   Defendants monitored each other's capacity plans, including plant closures, "debottleneckings," and "brownfield" capacity expansion through the improvement of production efficiencies at existing facilities.

85.    Defendants were generally aware of each other's inventory levels and operating rates.   Defendants understood that industry expansion needed to occur in a "disciplined" way, *i.e.*, in a manner that sought to eliminate—or at least minimize—the potentially negative pricing impact of capacity expansion.   At times during the Class Period, Defendants wanted the industry to appear to be "tight" on product (regardless of whether demand was weak or strong), so that industry overcapacity did not cause prices to decline like it did in the mid-1990s.

86.    Defendants' discussions about capacity issues had their intended effect.   None of the capacity increase announcements made during the Class Period, including increases planned by DuPont to cover the industry's annual growth, decreased prices.   For example,

within weeks after DuPont's announcement of its intent to build an enormous plant in China, Defendants announced price increases in North America and worldwide.  These price increases were a success.

### 1.   *Industry Conditions Prior to 2002*

87.    During the 1990s, on account of factors including vigorous price competition, global overcapacity, and customer consolidation, Titanium Dioxide prices trended downward, with the profitability of Titanium Dioxide manufacturers reaching an all-time low in 1996. Bayer and Rhone-Poulenc left the industry, selling their Titanium Dioxide businesses to Kerr-McGee (Tronox's predecessor) and Millennium, respectively.

88.    Imperial Chemical Industries' Titanium Dioxide business also went up for sale, and it was eventually sold to Huntsman in 1999 for $2.8 billion. Although industry consolidation and other factors helped industry prices and margins improve by the year 2000 from their 1996 lows, poor economic conditions (*e.g.*, those following the events of September 11, 2001), declining demand, and increased global customer purchasing power severely eroded prices in 2001.

89.    Demand in 2001 decreased to the point that Defendant Millennium idled one of its U.S. plants effective September 1, 2001, informing customers that they would not be impacted because other plants could still supply them.  By the end of 2001, average U.S. prices of Titanium Dioxide purportedly had reached their lowest level in current dollars since 1991.

90.    For example, according to a chart within Huntsman's Marketing Strategy for 2001-2006 (dated August 2001), the "real" price of Titanium Dioxide per ton, in "Real 2000 US$," was approximately $3,200 in 1991, but only $1,900 in 2000: a 41-percent decline.  As a Millennium strategy report dated in April 2003 put it, over the previous decade, the "maturing" Titanium Dioxide industry's "profitability ha[d] declined[,] driven by overcapacity and a

decline in real prices (negative 3.4-percent CAGR)."  Similarly, in April 1999, Kerr-McGee's Senior Vice President, Peter Woodward, gave the keynote address at an Intertech Titanium Dioxide conference in Padova, Italy, stating in part: "[T]his industry has been giving up price during most of the decade. This trend of declining prices moved faster than the industry's ability to control its costs."

91.     Overcapacity and decreasing prices led to a "restructuring" of the industry in the 1990s.  Rhone Poulenc sold its Titanium Dioxide business to Millennium, Bayer "sold 80% [of its] European business to Kerr-McGee," and ICI sold its "Tioxide" Titanium Dioxide business to Huntsman, which then entered the industry at that time.  KMG's Woodward even warned Intertech conference attendees in Padova of his belief that, "Tioxide, without DuPont ownership, would be a negative factor on price."

### 2.     *A Paradigm Shift in Industry Behavior*

92.     As a result of abysmal industry conditions in 2001, Defendants were motivated to reach, and did reach, an agreement or understanding to act together to increase prices and improve margins in the industry.  Millennium, for example, created a presentation entitled "Strategic Planning Presentation" that included a slide titled "TiO2 Industry Trends" for the September 2001 meeting of TDMA.  One such "Trend" was "[p]ossibly more discipline on pricing and capacity."

93.     Prior to 2002, DuPont was not a member of TDMA.  That was corrected at the TDMA General Committee meeting on January 24, 2002, in Saariselka, Finland when TDMA's existing members agreed to change its rules and expand its already-limited membership to include the world's largest producer and price leader, DuPont.  DuPont's "associate membership" in the TDMA, however, was conditioned on its agreement to participate in a new Global Statistics Program (GSP). The GSP would involve monthly

reporting by its members of the previous month's sales production and inventory figures and consolidation by CEFIC of that information into a report e-mailed back to TDMA members. Finally, TDMA's members agreed to a one-time exchange of historical data for the years 2000 through 2002.  This allowed TDMA's members to estimate their own market shares and their ostensible competitors' shares, inventories, and production on a virtually real-time basis.

94.     Millennium's David Vercollone encouraged creation of the GSP, writing to his Millennium colleagues on April 17, 2002 that the program was  "an important effort for us to get the industry to make more informed decisions" and "the best opportunity we have in structuring industry data for all our collective needs."   Vercollone's uses of the terms "we," "our," and "collective" suggest benefits to all Defendants and their co-conspirators rather than simply Millennium.

95.     James Fisher, a well-known consultant in the Titanium Dioxide industry and the President and Chief Executive Officer of International Business Management Associates, Inc., also "recommended that pigment producers "more carefully monitor trends in end-use sectors and trends in demand for end-use products" in an editorial he wrote for a pigment industry newsletter called "TiO2 Worldwide Update" during this time frame.  Fisher also advised all Defendants that it was "critical for producers to have accurate information about their success in the market as well as knowing share positions of their competitors for sales as well as for inventory levels."  Fisher would act as a conduit for Defendants throughout their conspiracy.

96.     The details of these information exchanges were finalized and agreed upon at TDMA's September 2002 meeting and became operational in October 2002.  Defendants and their co-conspirators treated the information as being highly confidential and instructed any

1    person that was given access not share it with any other parties, including other employees of

2    their companies.

3            97.    Once DuPont joined TDMA and members began contributing to the Global

4    Statistics Program, Defendants' and their co-conspirators' behavior in the market immediately

5    changed.   Beginning in or around early 2002, increases were announced and implemented

6    despite flat demand, decreasing raw material costs, and excess capacity in the industry.

7    Defendants' cooperative conduct and achieving of consensus not to resist price increases

8    caused customers, including Plaintiffs and members of the Classes, to pay higher prices for

9    Titanium Dioxide during the Class Period than they would have paid in a competitive market.

10           98.    Defendant DuPont, the world's largest supplier of Titanium Dioxide, which had

11   the largest U.S. and world Titanium Dioxide market share, usually led industry price increases

12   during the Class Period.  Defendants routinely matched the amount and typically the effective

13   date of each other's price increase announcements during the Class Period.  Defendants also

14   usually justified price increases on the same grounds, whether in written announcements or in

15   discussions with customers.

16           99.    It is logical to assume that prior to these price increases, Defendants

17   communicated with each other directly (bi-laterally and/or multi-laterally) and indirectly (such

18   as through industry analysts, consultants, or others) and reached an understanding or agreement

19   to support increases in industry prices.  Defendants' price-fixing agreement or understanding

20   was reached in secret, so Plaintiffs do not presently know the precise circumstances

21   surrounding its formation.  However, the facts indicate that this understanding or agreement

22   was maintained and fostered throughout the Class Period by means of other communications,

23

24

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                                    Page 32 of 117

1  which led to numerous additional price increases and relatively stable customer positions and

2  market shares.  Defendants' communications were conducted surreptitiously.

3        **a.   2002 Price Increases**

4    100.   On January 7, 2002, Dave Young of DuPont emailed his colleagues regarding

5  alternative price increase announcement strategies.  He wrote that an announcement on

6  "January 24, effective February 15" – as opposed to  the alternative  of "February 4, effective

7  March 1" – "could give our competitors a change [sic] to announce 'differently' on March 1."

8  DuPont was admitted to TDMA only a few weeks later.

9    101.   Less than a week after TDMA's January 2002 meeting in Finland and in spite of

10  flat demand, decreasing raw material costs, and excess capacity in the industry, Defendants and

11  their co-conspirators announced similar price increases worldwide, including a $0.05 per

12  pound increase in the United States, to be effective March 1, 2002.   This immediately

13  preceded the seasonal demand peak period of April to June and the annual Industrial Minerals

14  International Congress Exhibition held in Paris, France in April 2002.   At the time this

15  exhibition was held in Paris, Defendants were still in the process of increasing prices to their

16  customers globally, in part because the largest customers typically buy Titanium Dioxide under

17  contracts that contain price protection clauses, which defer the effective date of an increase

18  until several months after the increase announcement.   The first known increases of the

19  Titanium Dioxide cartel were successful.

20    102.   After Defendants' announcements of the early 2002 price increases, but several

21  weeks before their effective date of March 1, 2002, a chemical and oil industry news service

22  published an article on February 11, 2002 entitled "Ti02 Producers Seek Large Price Increases

23  As Profitability Hovers Near Break-Even Point."   The article noted that support for the

24  worldwide increases "appears unanimous" and it predicted further increases if demand

THIRD AMENDED CLASS ACTION COMPLAINT

1  recovered in the next few months.  The article quoted an industry analyst, James Fisher of

2  IBMA, as stating, "Every producer is hurting. They all need to get prices up."  The article

3  continued, "Producers concede that buyers may question the increases because of last year's

4  falloff in demand, but they stress that the increases are necessary to rebuild margins."  The

5  article also quoted high-level executives from Defendants DuPont (Ian Edwards, Global

6  Marketing Director for Titanium Dioxide), Millennium (Bruce Zwicker, Vice President of the

7  Global Coatings Business), and Huntsman (Stuart Heyes, Vice President of NAFTA Sales),

8  commenting on industry prices, margins, consumption, and demand.

9       103.   In May 2002, Joe Maas of Kronos stated in an e-mail to Fisher "that he had

10  heard Huntsman announced a price increase of '150$/mt???!!!'"   "It sounds weird to me,"

11  wrote Maas, "[c]an you confirm anything from your lofty position??"

12       104.   On June 7, 2002, several days before DuPont's June 11, 2002 price increase

13  announcement Connie Hubbard, DuPont's Competitive Intelligence Manager, spoke with

14  Fisher.  A week later, she made a note in DuPont's "Competitive Intelligence" database that

15  Fisher had called her to confirm that Huntsman had announced a "$150/T increase" in North

16  America.  Hubbard wrote that "[a]s this call came before the DuPont announcement, [she] told

17  [Fisher] that [she] had not seen any press release or announcement on Huntsman (or DuPont)

18  and asked him his source."

19       105.   In July 2002, shortly after the communications between Hubbard and Fisher,

20  Defendants announced price increases worldwide again.    DuPont led the charge with a price

21  increase of $0.06, to be effective on July 1, 2002. Millennium and Kronos followed suit three

22  days later, Huntsman announced an identical price increase two weeks later, and Tronox joined

23

24

1    in effective August 1, 2002.  A few months later, in and around September 2002, a U.S. price

2    increase of $0.04 per pound for other grades sold to the paper industry was announced.

3                                **b.  2003 Price Increases**

4            106.    Defendants also increased prices in 2003 despite a decline in global demand and

5    85 percent industry capacity utilization.  Kronos, DuPont, and Huntsman led a $0.06 per pound

6    price increase announcement in January 2003, which Tronox followed two weeks later.  Then

7    DuPont led a second $0.06 per pound increase in September 2003, which the remaining

8    Defendants followed within 20 days.  In all, the North American annual average price per ton

9    of Titanium Dioxide (including cost of goods, insurance, and freight) increased by 4 percent

10   from 2002 to 2003, going from $1,753 to $1,830, .

11           107.    In the midst of the January and February 2003 price increase announcements, a

12   Titanium Dioxide conference was held in Miami, Florida.  It was attended by Defendants and

13   their co-conspirators, who, it is believed and alleged, discussed and came to price agreements

14   at or around the same time.  DuPont's Global Business Director (Ian Edwards, who gave the

15   keynote address), as well as a former Vice President of Defendant Millennium (Bruce

16   Zwicker), who told conference attendees to expect further price increases.  Mr. Edwards's

17   speech, entitled "TiO2 - Graceful Maturation of Spirited Rejuvenation" included slides that

18   stated, among other things, "Cost is a beautiful thing to have as an advantage - but is of limited

19   benefit if it's all given away."  Mr. Edwards later told another DuPont executive that his goal

20   was "to stress the need for the TiO2 industry to get its financial house in order" and that

21   "verbally at the conference [he] was more direct."  His speech coincided with the February

22   2003 price increase announcements described above.

23           108.    On July 31, 2003, Gary Cianfichi of Millennium sent an e-mail to his colleagues

24   John Hall and Rick Rowe to report that Millennium had decided to "stop our US TiO2

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)

1  statistics reporting to the [Department of Commerce]" in order "not to telegraph a possible US

2  TiO2 inventory buildup by us and others."   More tellingly though, Mr. Cianfichi ended the e-

3  mail, "PS – John – also note that Bob asked me to talk to Fisher to ask him to do a little job for

4  us – ascertain relative TiO2 inventory levels for some of our key competitors. A little task but

5  I'll speak to Jim this week on this."

### c.   2004 Price Increases

7         109.     Defendants announced price increases four times in 2004, though DuPont was

8  not always the leader (as it was in 2002 and 2003).  There was a U.S. price increase of $0.05

9  per pound for all grades effective March 15, 2004; a U.S. increase of $0.04 per pound for all

10  grades effective June 15, 2004 (Millennium, DuPont, Tronox, Huntsman) or July 1, 2004

11  (Kronos); a price increase of $0.03 to $0.07 per pound, depending on grade, effective October

12  1, 2004; and a $0.06 per pound increase for all grades effective January 1, 2005.  Overall, the

13  North American annual average price per ton of Titanium Dioxide increased by 5 percent

14  (from $1,830 to $1,921) from 2003 to 2004.

15         110.     Again, Defendants and their co-conspirators had ample opportunities to

16  conspire and agree to the increases.   At an Industrial Minerals International Congress

17  conference in Barcelona, Spain held in the last few days of March 2004, a Senior Vice

18  President of Huntsman gave a presentation about Titanium Dioxide industry prices and price

19  dynamics.  It was a timely speech because Defendants were in the process of increasing prices,

20  described above, to customers, and Defendants and their co-conspirators in attendance at the

21  conference were able to discuss and come to price agreements at or around the same time.

22         111.     On August 25, 2004, Millennium's European sales director Tim Edwards sent

23  an email to Gary Cianfichi instructing that the October 1 announcement date was "a bit early"

24

1  and that an announcement on November 1 would give "others [a] chance to get on their

2  horses."

3       112.    Millennium's Chief Executive Officer Bob Lee, Millennium's Deputy General

4  Counsel and Director of Corporate Development, Huntsman's President Tom Keenan, and

5  Huntsman Vice President Mahomed Maiter met in Baltimore, Maryland on September 13,

6  2004.  The next day, Millennium's Cianfichi sent an e-mail to colleagues, stating "**now that**

7  **we have competition on board for the Oct 1 price increase announcement**, please relook at

8  your agents['] commissions."

9       113.    In addition, Defendants were able to monitor each other's conduct both in the

10  United States and worldwide beginning in May 2004  through  their support of, and data

11  contributions to, TZ Minerals International's (TZMI) *TiO2 Review*, a publication that, during

12  the relevant time period alleged herein, provided Defendants with detailed production, pricing,

13  capacity, raw material, and other information and statistics.  The July 2004 issue of this

14  publication included an article on industry price dynamics written by Robert Louw, Senior

15  Vice President of Huntsman.  (Upon leaving Huntsman, Mr. Louw joined TZ Minerals

16  International as its senior global pigment advisor in or around April 2005.)  That article

17  provided that the "decision to reduce **capacity by both Huntsman and Millennium will**

18  **possibly impact on future price levels."** Indeed, it did, as the industry announced price

19  increases shortly thereafter to be effective in October 2004.

20              **d.  2005 Price Increases**

21       114.    In an article dated February 28, 2005, after the 2004 Fourth Quarter

22  price increases, an industry analyst was reported to say that he "expects 75-85 percent of

23  the increase to get implemented by the end of [the first quarter of 2005]" and that he "expects

24  benchmark pricing in the U.S. to be around $1 per pound once the increase goes through."

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                   Page 37 of 117

That prediction proved correct as Defendants and their co-conspirators increased prices four times in 2005.  DuPont announced a $0.05 per pound increase for all grades effective April 1, 2005, which was in addition to the $0.06 increase that it had announced in December 2004. There were also U.S. price increases of $0.04 per pound for all grades, effective July 1, 2005 and for $0.06 per pound, effective October 1, 2005.   Notably, DuPont's September 2005 announcement (effective in October) was followed by Tronox within a mere seven hours and Kronos within eight hours.  Defendant Millennium's Jim Clover sent an e-mail that evening to Gary Cianfichi and others at Millennium, commenting that their competitors' announcements were "too much fun to ignore."  Millennium and Huntsman announced price increases the next day.  In sum, the North American annual average price per ton of Titanium Dioxide increased by 13 percent (from $1,921 to $2,169) from 2004 to 2005 alone.

115.   As in past years, Defendants and their co-conspirators attended a conference in 2005, where they were able to meet and discuss price increases that would be announced within a few weeks. In March 2005, a Titanium Dioxide conference was held in Cannes, France.  It was attended by Defendants, including Vice Presidents from Lyondell and DuPont (Sam Severance), who gave keynote presentations.  Fisher later wrote, in an expert report for unrelated litigation, that pigment producers at the conference "discussed the need to take advantage of tight market conditions to improve pricing."  He further stated that Defendant Millennium's John Hall "noted in his presentation that the industry should avoid responding to increased demand with 'over-investment in capacity' as had happened in the past," suggesting Defendants and their co-conspirators shared pricing information with Fisher as well as each other.

116.   As described below, Defendants had previously increased prices, effective in January 2005.  Kronos's Henry Basson telephoned Millennium's Cianfichi and told him that Kronos was "significantly oversold in Europe" and had "no inventory" and that Kerr-McGee was also "oversold" in Europe.  Cianfichi then launched an industry price increase and also announced worldwide price increases within weeks of this conference in March 2005 that became effective April 1, 2005. Indeed, around this time, Defendants were announcing price increases every quarter.

117.   At an investor conference in September 2005, Lyondell, which owned Millennium and had an estimated 19 percent of North American capacity at the time, made a presentation noting that there were minimal announced Titanium Dioxide industry capacity additions.  The same presentation included a chart that showed annual industry operating rates and overcapacity.  According to the chart, the industry operating rate averaged approximately 87 percent in the 2002 to 2005 period, a time when Defendants were announcing price increases nearly every quarter.

118.   After Hurricane Katrina shut down DuPont's DeLisle Plant, Tronox's Vice President of Investor Relations Robert Gibney wrote an e-mail to his colleagues advising "that DuPont would not be 'aggressively pursuing their lost share and will be diligent in bringing the volume back to the market.'"   In addition, financial firm JP Morgan reported that the head of DuPont's coating division stated that DuPont would "bring DeLisle up gradually and NOT flood the market with product."

119.   Even when industry leader DuPont announced in November 2005 that it had an agreement with Chinese officials to build a massive 200,000 metric-ton-per-year Titanium Dioxide plant in China, Defendants were still able to increase prices, both in 2005 and in

1  subsequent years, and even at times when demand and consumption were declining in the face

2  of poor economic conditions (*e.g.*, as in 2007-2008).  An industry analyst was quoted as saying

3  in November 2005 that DuPont's new capacity would have no problem being absorbed by the

4  market when it eventually came online because pigments would remain "tight" in the future.

5  <center>**e.   2006 Price Increases**</center>

6      120.   Defendants again increased prices in 2006.  For example, Defendants and their

7  co-conspirators announced a $0.05 per pound increase for all grades in North America,

8  effective January 1, 2006.  This increase was in addition to the October 1, 2005 increase.  An

9  Industrial Minerals International Congress Exhibition was held in San Francisco, California

10  from March 26-29, 2006.  Defendants, who likely attended the Exhibition, were in the process

11  of trying to increase prices at this time.  Indeed, there was a U.S. price increase of $0.04 per

12  pound for all grades effective June 15, 2006 (DuPont) and July 1, 2006 (Millennium, Tronox,

13  and Kronos).  Even though global industry capacity increased from approximately 4 million

14  tons to 5.3 million tons from 2005 to 2006 and industry operating rates were approximately 87

15  percent in 2006, the North American annual average price per ton of Titanium Dioxide

16  increased from approximately $2,169 to $2,273 from 2005 to 2006, an increase of 5 percent.

17  <center>**f.   2007 Price Increases**</center>

18      121.   Defendants sought price increases for all grades worldwide in 2007, despite

19  weak demand for Titanium Dioxide in some regions due to declining economic conditions and

20  overcapacity in the market.  In the U.S., Defendants and their co-conspirators announced a

21  $0.05 per pound increase effective July 1, 2007 and a $0.06 per pound increase effective

22  October 15, 2007 (or October 17, 2007 in the case of Huntsman).  The increases were for all

23  grades.  The announcements followed a February 2007 Intertech Titanium Dioxide conference

24  in Fort Lauderdale, Florida where it is believed and alleged that Defendants in attendance,

1   including Vice Presidents from Lyondell and DuPont, were able to meet and discuss said price

2   increases.

3           122.    On July 9, 2007, Defendant Millennium's Michael Card e-mailed his colleagues

4   complaining that "Millennium's market share was 20 percent in the year to date, while the

5   company's historical share was 21 percent" and asserting that "[w]e should have this extra

6   share—customers have been and want to buy this from us.  Competitors will let us have this."

7   However, Millennium's Jim Clover made a handwritten notation reading, "Don't steal Dup

8   tonnes" in November 2007.

9           123.    Connie Hubbard of DuPont again spoke with Fisher in the summer of 2007 and

10  drafted an entry in DuPont's Competitive Intelligence database noting that Fisher told her,

11  regarding "pricing," that he was "[v]ery confident that Tronox, Kronos, and Huntsman will

12  follow."

13          124.    In December 2007, Millennium's John Hall e-mailed his colleague Jim Clover

14  and others at Millennium regarding the need to "improve price."   Hall responded that

15  Millennium should "[b]e disciplined, keep [its] volume, do not take others." Hall explained at a

16  later deposition that he meant "do not take others" and was referring to the volume of titanium

17  dioxide sales of Millennium's competitors.

18                          **g.   2008 Price Increases**

19          125.    2008 was a banner year for Defendants and their co-conspirators.   They

20  announced price increases worldwide for all grades in 2008 on several occasions and also

21  implemented "energy surcharges" for the first time.

22          126.    On January 7, 2008, DuPont first announced a $0.06 per pound price increase

23  for all grades sold in North America, effective January 15, 2008, stating that the increase was

24  in addition to the $0.06 per pound increase previously announced that was effective October

15, 2007.  On the same day, an article published in an industry publication quoted a Titanium Dioxide industry analyst and consultant as stating that Titanium Dioxide prices and margins were expected to increase in 2008.

127.    Tronox's CEO was quoted in the same article as stating: "Although supply and demand fundamentals support increased prices, since 2004 the Ti02 industry has been largely unsuccessful in its efforts to offset rising costs of various inputs, from energy to process chemicals, through increased prices."   This statement was false and misleading because industry "supply and demand fundamentals" rarely, if ever, explained and supported increased prices during the 2004-2007 time period and because Defendants were at times able to offset increased costs during this period and improve their margins.   There was also overcapacity in the industry and flat or weak demand at times during this period, yet, in an uneconomic move, prices were still increased.  This statement "was also false and misleading in that it justified increased prices as being based solely on 'supply and demand fundamentals,'" which did not justify an increase, rather than on Defendants' carefully coordinated and sustained campaign to increase industry prices worldwide.

128.    An Industrial Minerals International Congress Exhibition was held in Athens, Greece from March 30 - April 2, 2008.  Defendants, who were in the process of increasing prices at this time, were registered to attend and are believed and alleged to have attended. Shortly thereafter on May 23, 2008, Defendant Kronos announced a $0.05 per pound increase for all grades sold in North America to be effective June 15, 2008, as well as a $0.03 per pound "energy related surcharge" effective June 9, that would be added to all North American invoices for the sale of all Titanium Dioxide products.   Kronos stated that the surcharge

1  "represents further implementation of previously announced North American price increases."

2  This was the first time that an "energy surcharge" was announced in the industry.

3      129.    On Monday, June 2, 2008, DuPont announced that it would increase prices for

4  all grades in all regions, telling customers that they "can expect the rapid implementation of

5  previously announced price increases, additional increases and, in some areas, energy-related

6  surcharges."  That same day, DuPont announced a North American price increase of $0.05 per

7  pound, effective June 15, 2008, for all grades, stating that this increase was in addition to the

8  two $0.06 per pound increases in late 2007 and early 2008, which were still "in the process of

9  being implemented."  On June 3, 2008, DuPont announced an "energy cost related surcharge"

10  of $0.04 per pound, effective July 1, 2008, for grades of Titanium Dioxide sold in North

11  America to the paper and board industry.  DuPont cited the dramatically increased cost of

12  crude oil as an example of an energy cost increase that necessitated the surcharge.

13      130.    On June 3, 2008, Tronox announced global price increases, stating in its press

14  release that "prices for all TRONOX® titanium dioxide (Ti02) grades sold worldwide will

15  increase by up to 8 percent by July 1."  On the same day, June 3, 2008, the Vice President and

16  General Manager of DuPont Titanium Technologies was quoted in a PRNewswire article as

17  saying "We expect to increase the global pricing structure by as much as 8 percent in coming

18  weeks."  On June 4, 2008, Millennium and Tronox announced a $0.05 per pound price increase

19  in North America for all grades.   Tronox's increase was effective June 15, 2008 and

20  Millennium's increase was effective July 1, 2008.

21      131.    Also on June 4, 2008, Huntsman announced "energy related surcharges,"

22  including a surcharge of $75 per metric ton for "all sales of imported product into North

23  America."  On June 6, 2008, Huntsman announced price increases throughout the world, and

24

1    on June 9, 2008, Huntsman matched the other Defendants in announcing a North American

2    price increase of $0.05 per pound effective July 1, 2008.

3         132.    On June 12, 2008, Millennium announced that it would apply "raw material

4    surcharges" to Titanium Dioxide grades sold into the North American paper market of either

5    $0.04 per pound (for Tiona RCS-P grades) or $0.09 per pound (for sulfate anatase grades).

6         133.    On June 23, 2008, only three weeks after its June 2, 2008 price increase,

7    DuPont announced another price increase, this time for $0.06 per pound for all grades sold in

8    North America, effective July 1, 2008.  This increase was in addition to all previous increases

9    and the paper industry surcharge announced earlier in June.

10        134.    On June 25, 2008, both Kronos and Tronox matched DuPont's $0.06 per pound

11   increase for all grades sold in North America, effective July 1, 2008.   The Tronox

12   announcement stated that the "increase is in addition to the price increases announced in

13   October 2007, January 2008 and on June 4, 2008, and is the next step toward partially

14   offsetting the extraordinary increases in freight, energy, and other input costs that the Ti02

15   industry has absorbed over the last two years."   Kronos also announced another $0.03 per

16   pound energy surcharge to be added to all North American invoices, effective July 15, 2008,

17   which would be in addition to the surcharge that became effective on June 9, 2008.

18        135.    On June 27, 2008, Defendant Huntsman matched DuPont's second increase

19   ($0.06 per pound for all grades in North America effective July 1) and also announced another

20   energy surcharge ($0.03 per pound in North America effective August 1).  These increases

21   were in addition to all previously announced price increases as well as the June 4, 2008

22   surcharge.

23

24

136.    On June 30, 2008, Defendant Millennium joined DuPont and the other Defendants and their co-conspirators, announcing a $0.06 per pound price increase for all grades sold in North America, effective July 1, 2008, which was in addition to its previously announced price increases in North America.

137.    On August 1, 2008, Defendant DuPont announced another energy surcharge, this time for $0.06 per pound on all sales of the Titanium Dioxide grades that it sold to the North American paper and board industry, specifically its Ti-Pure® RPS Vantage® grades. Unconscionably, Millennium and Tronox matched DuPont's surcharge increase.

138.    On August 19, 2008, Huntsman announced a $0.05 per pound increase on ten Titanium Dioxide grades sold in North America, effective September 1, 2008, or as contracts allowed.

139.    On September 2, 2008, DuPont announced a North American price increase, effective that same day, of $0.08 per pound for all Ti-Pure® Titanium Dioxide grades.  Kronos and Tronox matched this increase the next day on September 3, 2008.  Millennium joined it on September 4, 2008, and Huntsman joined it on September 5, 2008.  The Huntsman increase announcement did not clarify whether this increase (which was for all grades) was in addition to the $0.05 per pound price increase for ten grades that it had announced several weeks earlier on August 19, 2008.

140.    The September 2008 price increases were misleadingly justified by DuPont, Millennium, and Huntsman because of cost increases, even though oil prices had fallen far below the record highs that they had reached earlier in the year.  Defendants' 2007-2008 price increases and energy surcharges also occurred in spite of declining demand in the United States for Titanium Dioxide due to recessionary economic conditions, including declining

1   demand in the paint and construction industries.   Titanium Dioxide demand generally had

2   decreased almost 20 percent from 2000-2008 and more than 25 percent from 2004-2008.

3       141.   In short, over the course of approximately 14 weeks, from late May 2008

4   to early September 2008, Defendants and their co-conspirators uniformly announced three

5   separate Titanium Dioxide price increases and at least two energy surcharges, in spite

6   of declining demand.   The prices of ilmenite and rutile titanium ore, key raw materials

7   for making Titanium Dioxide, also decreased from 2007-2008, further showing a disconnect

8   between the 2008 price increases and their purported justification.

9       142.   On December 4, 2008, Defendant Kronos's Joe Maas e-mailed his colleagues

10   about Kronos's November 2008 sales, complaining that the company's sales volume "was the

11   lowest November volume since 1998 and the worst sales volume month since December

12   2003!" However, Maas went on to write that the "good news" was that Kronos's "average

13   price worldwide increase[d] by 17 US$/MT and we have now realized since May a total

14   average price increase of 205 US$/MT."   Maas concluded, "It appears that we and our

15   competitors are prepared to reduce production rather than chase phantom volume."

16                           **h.  2009 Price Increases**

17       143.   In March 2009, Richard C. Olson, vice president and general manager of

18   Defendant DuPont's Titanium Technologies gave the key note address at IntertechPera's

19   Titanium Dioxide 2009 conference.   According to DuPont's website, Mr. Olson "said during

20   the economic downturn the titanium dioxide industry must operate more cautiously, keeping

21   inventory at levels only sufficient to satisfy customer requirements, scrutinizing all capital

22   expenditures and avoiding investment in new capacity without some certainty of a reasonable

23   return."   Representatives from Millennium also presented at this conference, and it is believed

24

1   and alleged that Defendants and their co-conspirators were able to meet and discuss price

2   increases at or around the same time.

3       144.    Following IntertechPera's 2009 conference, Defendant DuPont announced a

4   price increase on May 15, Millennium announced on May 20, Kronos announced on July 10,

5   Huntsman announced on July 15, and Tronox announced on July 17, with each party's increase

6   to take effect on August 1, 2009.  Defendants DuPont, Millennium, and Huntsman each

7   increased their prices by $0.02 per pound while Defendant Kronos and co-conspirator Tronox

8   increased their prices by $0.03 per pound.

9       145.    TZMI hosted another minerals conference in October 2009.  David Robb, then

10   Managing Director of Iluka Resources (an Australian mineral company), stated in his opening

11   address, "Industry participants who seek temporary advantage or cash flow through lowering

12   prices in the face of weak demand are confining themselves and their industry to a long and

13   painful recovery process.  Of course, we recognize that individual companies will act in what

14   they believe is their own interest, but often that just produces short term gain and long term

15   pain."  It is believed and alleged that DuPont and Millennium were both in attendance and that

16   Defendants and their co-conspirators were able to meet and discuss price increases at or around

17   the same time.

18       146.    On December 2, 2009, Kronos's Maas e-mailed a file entitled "R&D Org

19   Chart" to Fisher on December 2, 2009 and warned Fisher, "[P]lease do not copy it verbatum

20   [sic] and screw up a few facts so it does not look like too much inside info."  Defendants

21   Kronos and Millennium and co-conspirator Tronox simultaneously announced a price increase

22   of $0.06 per pound one week later, effective January 1, 2010.  Huntsman followed suit with an

23   immediate $0.06 per pound increase on January 14, 2010.

24

### i.   2010 Price Increases

147.   Defendants and their co-conspirators followed up on the January 2010 price increase with a second $0.05 per pound increase, effective April 1, 2010.  DuPont led this increase on February 24, and Kronos, Huntsman, Tronox, and Millennium followed on March 3, 9, 10, and 12 respectively.

148.   The 20th Industrial Minerals International Congress & Exhibition was held later in March 2010.  It is believed and alleged that DuPont and Millennium were in attendance and that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time.   One month after the conference convened, Defendants and their conspirators announced a third 2010 price increase of $0.08 per pound, effective June 1, 2010. DuPont again led the charge on April 30, and Millennium, Kronos, Huntsman, and Tronox followed on May 3, 5, 6 and 17 respectively.

149.   TMZI held its Annual Asia in Focus Congress in Hong Kong from November 3 to 5, 2010.  A DuPont representative spoke at the conference, and it is believed and alleged that Defendants and co-conspirators in attendance were able to meet and discuss price increases at or around the same time.   One week later, Huntsman announced a $0.08 per pound increase. Kronos, Millennium, Tronox, and DuPont followed with $0.10 per pound price increase announcements on November 15, 24, and 30 and December 3, respectively.

150.   During the Class Period, price increase announcements for sales in the United States or North America were typically in cents per pound for all grades of Titanium Dioxide sold to all customers for all end-use applications, effective on a particular date.  Prices in the United States tended to set a benchmark for prices in other regions worldwide.  Price increases in one region were used by Defendants to justify price increases in other regions.  Indeed, industry price increases often occurred worldwide in that regional price increases were

1  announced simultaneously or within a month or two of each other.  For example, North

2  American price increases typically occurred within a month or two of announcements of price

3  increases in Europe, Asia and other regions.  Some of the coordinated price increase

4  announcements of the Defendants and their co-conspirators during the Class Period are listed

5  by effective date in the following table:

6  **Examples of Certain U.S. Titanium Dioxide**
**Industry Price Increase Announcements by**
7  **Effective Date in Cent Per Pound**

| Effective Date | DuPont | Millennium | Kronos | Tronox | Huntsman |
|---|---|---|---|---|---|
| | | | | | |
| 03/2002 | $0.05 | $0.05 | $0.03 | $0.05 | $0.05 |
| 07/2002 | $0.06 | $0.06 | $0.03 | | |
| 08/2002 | | | | $0.06 | |
| 10/2002 | $0.04 | $0.04 | | | |
| 02/2003 | $0.06 | $0.06 | | $0.06 | |
| 10/2003 | $0.06 | $0.06 | $0.03 | $0.06 | |
| 03/2004 | $0.05 | $0.05 | $0.05 | | |
| 04/2004 | | | | | $0.05 |
| 06/2004 | $0.04 | $0.04 | | $0.04 | $0.04 |
| 07/2004 | | | $0.04 | | |
| 10/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 01/2005 | $0.06 | $0.06 | $0.06 | | |
| 04/2005 | $0.05 | $0.07 | $0.05 | $0.05 | |
| 07/2005 | $0.04 | $0.04 | $0.04 | $0.04 | |
| 10/2005 | $0.06 | $0.06 | $0.06 | | $0.06 |
| 01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 06/2006 | $0.04 | | | | |
| 07/2006 | | $0.04 | $0.04 | $0.04 | |
| 08/2006 | | | | | $0.04 |
| 10/2006 | $0.04 | | | | |
| 07/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 10/2007 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 11/2007 | | $0.06 | | | |
| 01/2008 | | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/2008 | $0.05 | | $0.05 | $0.05 | |
| 07/2008 | $0.06 | $0.05 | $0.06 | $0.06 | $0.05 |
| 08/2008 | | | | | $0.06 |
| 09/2008 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |

| 01/2009 | $0.04 | | | | |
|---|---|---|---|---|---|
| 06/2009 | | | $0.04 | | |
| 08/2009 | $0.02 | $0.02, $0.03 | $0.03 | $0.02 | $0.02, $0.03 |
| 10/2009 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 01/2010 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 04/2010 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 06/2010 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 09/2010 | | $0.08 | | $0.08 | $0.08 |
| 10/2010 | $0.08 | | $0.08 | $0.08 | |
| 01/2011 | $0.10 | $0.10 | $0.10 | $0.10 | $0.08 |
| 04/2011 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| 06/2011 | $0.10 | $0.10 | | $0.10 | $0.20 |
| 07/2011 | $0.25 | $0.25 | $0.35 | $0.25 | $0.15 |
| 08/2011 | $0.10 | | $0.10 | | |
| 09/2011 | $0.32 | $0.10 | $0.10 | $0.10 | $0.10 |
| 10/2011 | | | $0.25 | | |
| 11/2011 | $0.15 | $0.15 | | $0.15 | $0.15 |

Sources: Defendants' press releases; 2002-2008 *Chemical Market Reporter*, *Chemical Week*, and other industry news articles.

151.    All these acts indicate that Defendants were acting pursuant to, and confirming by their acts, an agreement or understanding to fix, raise, maintain, and stabilize Titanium Dioxide prices during the Class Period.  Pursuant to the alleged conspiracy, Defendants and their co-conspirators engaged in deceptive behavior including secret discussions about industry pricing, capacity, costs, and customers, and conspired and agreed to support industry price increase announcements.  It is clear that Defendants had achieved a consensus that if they attempted to take significant business or market share from one another on the basis of price (*e.g.*, by "attacking" or trying to "steal" another Defendant's customer with a low-price offer), they risked retaliation from that producer and the potential peril of their own customer accounts, not only in the United States but also around the world, and that they acted to reinforce that consensus.  For example, Defendant Huntsman was careful not to appear to compete aggressively for the business of a DuPont customer, lest its own customer accounts

then be subject to retaliation from DuPont.  Plaintiffs allege that such conduct was not limited to Huntsman but was also practiced by the other Defendants, pursuant to and consistent with an understanding or agreement among DuPont, Millennium, Kronos, Huntsman, and their co-conspirators to keep customer positions and industry prices stable.    Price increase announcements were routinely supported in the industry during the Class Period, and this consistent conduct in light of Defendants' considerable contacts with each other also gives further support to the allegation that an anticompetitive understanding or agreement existed among Defendants during the Class Period.

152.    The conspiracy among Defendants was successful in increasing prices during the Class Period even when industry overcapacity and weak demand existed.  For example, in November 2007, Defendant Millennium announced that it was closing a Titanium Dioxide plant in France, in part due to industry overcapacity.    As discussed above, Defendants announced worldwide price increases in 2007 and in 2008.  Unlike in the 1990s, when market forces caused industry overcapacity to generate lower prices and poor industry margins, Defendants' conspiracy managed to prevent overcapacity from appreciably impacting prices during the Class Period.

153.    Defendants' price increases during the Class Period had their intended effect, and the alleged conspiracy has been profitable for Defendants.  For example, the average annual price per ton of Titanium Dioxide in North America increased from approximately $1,753 in 2002 to $2,273 in 2006, an increase of 30 percent.  Defendants Huntsman and Kronos dramatically increased their operating income and margins between 2002 and 2003. Even after discounting the $142 million in insurance proceeds that Defendant DuPont received for damages to its Mississippi plant from Hurricane Katrina in 2005, DuPont's operating

1  income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide

2  business) increased approximately 45 percent from 2002 to 2007.  In addition, in 2008 and in

3  spite of declining demand for Titanium Dioxide and recessionary economic conditions in the

4  United States and elsewhere, the global Titanium Dioxide industry earned over $1 billion in

5  pre-tax operating income.  Industry leader and Defendant DuPont achieved approximately half

6  of that amount.

7  **VIII.   PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY**

8         154.    Defendants' combination and conspiracy has had the following effects, among

9  others:

10        (a)     Price competition in the sale of Titanium Dioxide by Defendants and their co-

11  conspirators has been restrained, suppressed, and eliminated throughout the United States;

12        (b)     Prices for Titanium Dioxide sold by Defendants and their co-conspirators have

13  been unfairly raised, fixed, maintained, and stabilized at artificially high and

14  noncompetitive levels throughout the United States; and

15        (c)     Defendants charged purchasers of Titanium Dioxide artificially inflated, fixed,

16  and stabilized prices for such Titanium Dioxide;

17        (d)     Architectural Paint manufacturers paid an unfairly high price for Titanium

18  Dioxide, which they passed on to Plaintiffs and the Classes;

19        (e)     Defendants' overcharges passed through each level of distribution as they

20  traveled to Plaintiffs and the Classes;

21        (f)     All persons and entities purchasing Architectural Paint containing Titanium

22  Dioxide paid Defendants' artificially inflated prices, during the Class Period, as a result of

23  the Defendants' conspiracy and have been deprived of free and open competition.

24

155.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Architectural Paint containing Titanium Dioxide as a result of Defendants' conspiracy.

156.    The market for Titanium Dioxide and the market for Architectural Paint are inextricably linked and intertwined.  Architectural Paint manufacturers consume approximately 41 percent of all Titanium Dioxide.  Moreover, there are no viable white pigment competitive substitutes for Titanium Dioxide in the Architectural Paint industry.

157.    Titanium Dioxide follows a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes.   It goes through a single transformation when manufacturers incorporate it into their Architectural Paint and is a substantial part of those products.  Architectural Paints manufacturers know what percentage of their products is comprised of Titanium Dioxide, and they disclose that percentage on their Material Safety Data Sheets.    The chain of distribution from Defendants to Plaintiffs is short. Titanium Dioxide is sold directly to manufacturers of Architectural Paint such as Sherwin-Williams, who then incorporate it into and sell Architectural Paint either directly to consumers, such as Plaintiffs and members of the Classes, through company-owned stores or indirectly through retailers.

158.    Just as Titanium Dioxide can be physically traced through the supply chain, so can its price be traced to show that changes in the prices paid by direct purchasers of Titanium Dioxide affect prices paid by indirect purchasers of products containing Titanium Dioxide. The below chart demonstrates that there is a relationship between the price of Titanium Dioxide and the price of producing Architectural Paint.

1
2
3
4
5
6
7
8
9
10
11



Price of Titanium Dioxide vs. Paint and Coatings Manufacuring

Source: U. S. Bureau of Labor Statistics    Notes: TiO2 NAICS- 32513011,  Paint and Coating NAICS- 325510

12    159.    Titanium Dioxide is the costliest component of Architectural Paint such that the

13   retail price of the product is determined in substantial part by the cost of the Titanium Dioxide.

14   According to the CEH Report, titanium dioxide is 50 percent of the cost of Architectural Paint

15   raw materials for "flat coatings" and 33 percent for "high gloss coatings."

16    160.    Because of the significance of Titanium Dioxide as an input, Architectural Paint

17   producers are not able to absorb fluctuations in the cost of Titanium Dioxide.    As a result,

18   increases in the price of Titanium Dioxide caused increases in the prices of Architectural Paint

19   containing Titanium Dioxide during the Class Period.

20    161.    The Architectural Paint market has many characteristics that economic theory

21   indicates will lead to a near 100 percent pass-through rate on cartel-imposed cost increases.[8]

22

23   _____
     [8] Incidence theory, by likening taxes to cartel-imposed price inflation, describes why this is so.
     *See* John Cirace, *Apportioning Damages between Direct and Indirect Purchasers in*

24

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                           Page 54 of 117

1    For example, economic theory indicates that in markets that are competitive, where individual

2    prices are not negotiated, and where resellers do not provide significant value-added services,

3    pass-through rates will approach 100 percent; that is, the end-consumer will ultimately pay

4    Defendants' inflated Titanium Dioxide prices.

5         162.    Empirical observation confirms this conclusion.  According to a 2012 article,

6    the reason for the price increases "all across the spectrum of brands, quality and price points" is

7    due to increases in Titanium Dioxide because "when the cost of that material goes up, so goes

8    the price of paint."[9]   A 2011 article explained that increased Titanium Dioxide prices resulted

9    in higher wholesale and retail prices for paint in the United States.[10]

10        163.    In July 2010, it was reported that Architectural Paint costs would go up by as

11   much as five percent over the rest of that year due to the reduced supply and increased price of

12   Titanium Dioxide.  In November 2011, the cost of Architectural Paints continued to rise.

13   "Chief executives from US paint and coatings manufacturers Sherwin-Williams and PPG

14   Industries . . . reported frustration about price hikes coming from their customers.  The

15   companies [we]re passing on their own price increases in response to continuous rising costs of

16   titanium dioxide."

17

18

---

19   *consolidated Antitrust Suits: ARC America Unravels the Illinois Brick Rule*, 35-2 VILLANOVA L.
     REV., 311-317 (1990).  Incidence theory involves determining if a tax imposed at a particular

20   level of a distribution channel can be passed through to indirect purchasers along the
     distribution channel and ultimately to consumers.  For additional discussion of incidence theory

21   as it pertains to price increases passed through to indirect purchasers, Pindyck, Robert S. and
     Rubinfeld, Daniel L., MICROECONOMICS (6th ed.2005) 326-328.

22   [9] http://www.integralcolor.com/behind-the-increasing-cost-of-Architectural Paint/
     [10] James Hagerty, "Pricing Brightens for Architectural Paint Makers, The Wall Street Journal

23   April 23, 2011 available at
     http://www.wsj.com/articles/SB100014240527487\039070045762791634868528

24

164.    Analysts reported in 2011 that "TiO$_2$ pigment accounts for 24-25% of the total raw cost to make architectural paint," and Sherwin-Williams' CEO stated that Titanium Dioxide "makes up most of [its] raw material costs."  Further, Kronos CEO Steve Watson admitted, while on an earnings call in November 2011, that its customers pass along the higher Titanium Dioxide prices, and he advised investors, "There is no question that an extra $1 for a gallon of Architectural Paint is not going to destroy demand . . . . I feel our customer base understands and would prefer a higher price than a lack of availability."  That same year, Sherwin-Williams announced an eight- to nine-percent increase in prices for Architectural Paints.    *See*   http://www.icis.com/resources/news/2011/11/14/9507731/inorganics-us-paint-companies- frustrated-by-continuous-tio2-price-hikes/ (last visited Oct. 14, 2014).

165.    The inflated prices of Titanium Dioxide in Architectural Paint resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and members of the Classes by manufacturers.  Those overcharges have unjustly enriched Defendants.

166.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Titanium Dioxide and, as a direct and foreseeable result, the price of Architectural Paints containing Titanium Dioxide.

167.    Kronos admits that Titanium Dioxide price increases led to "an extra $1 for a gallon of paint."  Even without such direct evidence, economists have also developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis – called a regression analysis – is commonly used in the real

1   world and in litigation to determine the impact of a price increase on one cost in a product or

2   service that is an assemblage of costs.

3        168.    The precise amount of the overcharge affecting the price of Architectural Paints

4   containing Titanium Dioxide can be measured and quantified.   Commonly used and well

5   accepted economic models can be used to measure the amount of the supracompetitive charge

6   passed through the chain of distribution.   Thus, the economic harm to Plaintiffs and members

7   of the Classes can be quantified.

8        169.    As in cases related to securities where the price effects of the Defendants'

9   conduct can be traced, but the individual plaintiffs suffered different damage depending on

10  their purchase and sale prices, the length of time they held the instrument, or the particular

11  instrument at issue, here, well accepted methods can be used to ensure appropriate

12  apportionment of damages. For example, a matrix detailing the level of Titanium Dioxide in

13  various products (or categories of products) would allow a tailored recovery based on the

14  amount of Titanium Dioxide purchased by Plaintiffs and the members of the Classes.

15  Alternatively, after determining how much of the Defendants' illegal overcharge has been

16  passed on to Plaintiffs and the members of the Classes, a pro rata formula by Titanium Dioxide

17  content of the purchased product could be used to apportion recovery.

18       170.    Class wide damages can be found by multiplying the direct purchaser

19  overcharge by percent of the overcharge that gets passed through to end-consumers and

20  multiplied by the percent of the commerce within the Damages States. Though the dollar

21  amount of the damages per gallon of Architectural Paint will be higher for high-Titanium

22  Dioxide paints compared to low-Titanium Dioxide paints, this can be accounted for in a

23  formulaic manner when apportioning the class-wide damages to Damages Class Members.

24

Specifically, damages to an individual can be found by taking pounds of Titanium Dioxide per gallon of Architectural Paint multiplied by gallons of Architectural Paint purchased  multiplied by price per pound of Titanium Dioxide (found in defendants' transactional data) multiplied by the overcharge percentage and multiplied by the pass-through rate.

171.    Discovery will reveal sufficient information concerning Titanium Dioxide content of Architectural Paint (sufficient to determine content by product), Defendants' cartel-imposed overcharge, and the rate of pass-through, such that the overcharge incurred by purchasers of Architectural Paint will be demonstrable.

172.    By reason of Defendants' illegal, unfair, and anticompetitive conduct, Plaintiffs and the members of the Classes have sustained injury to their businesses and/or property, having paid higher prices for Architectural Paints containing Titanium Dioxide than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and they have, as a result, suffered damages in an amount presently undetermined. Specifically, and by way of example, Plaintiffs and the members of the Classes have suffered overcharge loss during the Class Period due to unjustified increases in the price of Architectural Paint containing Titanium Dioxide, as a result of the conspiracy described in this Complaint.

173.    Plaintiffs and the members of the Classes have suffered an antitrust injury of the type that the various state antitrust laws invoked by this Complaint were meant to punish and prevent, and Plaintiffs' and Class Members' damages are measurable.

174.    Plaintiffs have standing, and have suffered damage, in the states where they reside and/or operate, compensable by indirect purchaser laws, and they and members of the

Classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy and unlawful and unfair trade practices.

## IX.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.   The Statute of Limitations Did Not Begin To Run Because Plaintiffs Did Not And Could Not Discover The Claims.

175.   Plaintiffs repeat and reallege the allegations set forth above.

176.   Plaintiffs have been diligent in the pursuit of this action.   Consumers of Architectural Paint are unlikely to examine, or be aware of, what materials are included in, and therefore inexorably tied with the price of, Architectural Paint.

177.   Plaintiffs' and Class Members' purchases of Architectural Paint are inconstant, rendering it difficult to track price changes. Because of the relationship between the supracompetitive price of Titanium Dioxide and the retail price of Architectural Paint (*i.e.* masked by the existence of other price inputs), no consumer could detect or would have reason to suspect that a conspiracy was the source of price increases.  Under controlling precedent, the applicable statutes of limitations did not begin to run against Plaintiffs and members of the Classes until shortly after August 28, 2012 when a class of direct purchasers of Titanium Dioxide was certified by Judge Richard D. Bennett in a separate but related lawsuit brought in the District of Maryland ("Direct Purchaser Litigation").  *See In Re: Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, Memorandum Opinion (Dkt. 337).

178.   Judge Bennett's order conferred judicial legitimacy for the first time on the allegations made against Defendants in that case, accepting as credible nearly all of the findings by direct purchasers' economics expert, Dr. Russell Lamb.  He "f[ound] credible Dr. Lamb's conclusions that the Defendants implemented multiple nearly simultaneous price increases throughout the class period, and those price increases can be used to prove

coordinated pricing." *Id*. at 21.  In addition, the court accepted "as established" the "general conclusions that the market for TiO2 is a highly concentrated one," and it "credit[ed] Dr. Lamb's conclusion that $TiO_2$ is a commodity-like product and that competition among produces is based primarily on price."  *Id*. at 23, 25.  Finally, Judge Bennett accepted Dr. Lamb's findings of declining demand and excess capacity after describing his determination "that prices for $TiO_2$ did not fall as economic theory predicts."  *Id*. at 26.

179.   Judge Bennett also found credible Dr. Lamb's findings regarding how Defendants' anticompetitive conduct had common impact on and damaged the direct purchasers, holding that "Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry."  *Id*. at 33.  Dr. Lamb's analysis concluded "that, as a result of the cartel, prices for TiO2 were more than seven percent higher during the Class."  *Id*. at 32-33.  This informed Plaintiffs for the first time that Architectural Paint manufacturers in the United States were damaged, as a whole, by Defendants' anticompetitive conduct.

180.   Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the very earliest, August 28, 2012, when Judge Bennett entered his class certification order.  Until that time, Plaintiffs did not have access to Dr. Lamb's report or the evidence he relied on, nor did they have any way to determine the legitimacy of the direct purchasers' allegations against Defendants.

181.   Plaintiffs and the members of the Classes had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint until the entry of Judge Bennett's class certification opinion.

182.    Prior to the August 2012 certification of a direct purchaser class, facts were not available to Plaintiffs and the members of the Classes that revealed sufficient information to suggest that Plaintiffs had a claim against the Defendants.  Plaintiffs and the members of the Classes did not have facts or information concerning Defendants' dealings with each other or with direct purchasers of Titanium Dioxide, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged in this Complaint.

183.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statute of Limitations.[11]**

184.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted in this Complaint by Plaintiffs and the Classes. Plaintiffs and members of the Classes did not know, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy and unlawful combination alleged herein until, at the earliest, the August 28, 2012 entry of Judge Bennett's class certification opinion.

185.    Because Defendants' agreements, understandings, and conspiracies were kept secret and not known to Plaintiffs before Judge Bennett's August 2012 class certification ruling, Plaintiffs and members of the Classes were unaware before that time of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive

---

[11] Plaintiffs plead fraudulent concealment for the purposes of preserving this argument for appeal.

1  prices throughout the United States for Architectural Paints containing Titanium Dioxide

2  during the Class Period.

3       186.    The affirmative acts of Defendants alleged in this Complaint, including acts in

4  furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

5  precluded detection.

6       187.    By its very nature, Defendants' and their co-conspirators' alleged price-fixing

7  conspiracy was inherently self-concealing.  Defendants met and communicated in secret and

8  agreed to keep the facts about their collusive conduct from being discovered by any member of

9  the public or by the Architectural Paints manufacturers and other direct purchasers with whom

10  they did business.  Plaintiffs thus had neither actual nor constructive knowledge of the facts

11  constituting their claims for relief despite diligence in trying to discover the pertinent facts.

12       188.    Plaintiffs and members of the Classes, ordinary consumers, did not discover,

13  and could not have discovered through the exercise of reasonable diligence, that Defendants

14  and their co-conspirators were violating the antitrust laws at an earlier date because of the

15  deceptive practices and techniques of secrecy employed by Defendants and their co-

16  conspirators to avoid detection of, and fraudulently conceal, their conduct.

17       189.    The conspiracy as herein alleged was fraudulently concealed by Defendants by

18  various means and methods.   Defendants and their co-conspirators are alleged to have

19  affirmatively concealed their conspiracy by meeting secretly to discuss Titanium Dioxide

20  prices, customers and markets; by agreeing among themselves at meetings and in

21  communications not to discuss publicly, or otherwise reveal, the nature and substance of the

22  acts and communications in furtherance of their illegal scheme; by deceptively giving false and

23  pretextual reasons for price increases, and by describing Titanium Dioxide pricing falsely as

24

being the result of competitive factors rather than collusion; and by wrongfully and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection.  If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators.

190.    As alleged above, in 2002, after years of declining prices, the price of Titanium Dioxide began to increase.  The price increases and "surcharges" implemented by Defendants and their co-conspirators during the Class Period tended to be based on a need to improve margins, justify future investment, offset increased  costs, and/or meet allegedly increased demand at a time of tight supply.  The justifications offered by Defendants and their co-conspirators for their price increases were false, pretextual, and/or misleading and operated to conceal the conspiracy.  In fact, price increases were the result of collusive conduct among Defendants and their co-conspirators, which was undisclosed at the time of the increases.  To the extent there was any truth in the explanations offered by Defendants for their numerous price increases during the Class Period, the explanations were nevertheless misleading because of Defendants' conspiracy, which was kept secret from the public.

191.    For example, in early 2002, when industry prices had hit bottom and Titanium Dioxide producers were desperate to increase prices, they offered a variety of justifications for price increases.  Huntsman's Vice President of NAFTA sales was quoted in an article as saying that "recent pricing has been insufficient to justify investments in major new capacity, which will be needed by 2003 to 2004, leading to a tight market at that time."  But this was false and misleading because new capacity was in fact not needed.  Huntsman and other producers, who

1   successfully increased prices in between 2002 and 2005, actually shut down some capacity

2   during the 2003-2004 period.

3       192.    Indeed, a lack of new capacity was used at times to justify price

4   increases during the Class Period, even though Defendants and their co-conspirators often had

5   more than enough capacity (and inventory) on hand to supply global markets.  For example,

6   Huntsman and Millennium decreased capacity at certain plants in 2004, and shortly after the

7   October 2007 price increase, Defendant Millennium closed a plant in France citing "the

8   overcapacity of titanium dioxide in the world market," among other reasons.

9       193.    Often during the Class Period, Defendants justified the need for price increases

10  due to poor or otherwise "unacceptable" industry margins even though the Titanium Dioxide

11  business of DuPont and other Defendants earned hundreds of millions of dollars in profits

12  annually.  For example, in August 2007, DuPont informed customers (even customers who

13  were being supplied by other Defendants) that price increases were justified in part because

14  industry profitability had declined, even though DuPont's operating income for its Coatings &

15  Color Technologies segment (which includes its Titanium Dioxide business) increased

16  approximately 45 percent from 2002 to 2007.  Also, in 2008, a year in which the paint and

17  plastics industries (which account for approximately 80 percent of Titanium Dioxide

18  consumption) were beleaguered by recession, DuPont, the industry leader, earned over $500

19  million in pre-tax operating income from global Titanium Dioxide sales.

20      194.    In addition, when DuPont led an industry price increase in September 2008, its

21  price increase announcement contained various justifications for the increase from its Global

22  Business Director, Ian Edwards.  The justifications included not only the existence of higher

23  raw material, energy and transportation costs (which plagued a vast number of industries in

24

2008), but also the purported fact that "Demand for Ti02 remains strong." This was false and misleading, as demand for Titanium Dioxide was declining in 2008, particularly given recessionary economic conditions in the paint, construction, paper and plastic industries. In fact, demand for Titanium Dioxide had been declining for years. For example, the market volume of Titanium Dioxide sold in the U.S. declined over 25 percent between 2004 and 2007.

195.    Although Defendants' price increase announcements during the Class Period often did not contain justifications for price increases (such justifications were typically given to customers orally), the announcements nevertheless constituted implicit statements that the price increases in question were legitimate and were the result of competitive market forces. Customers also were often told that price increases were needed because raw material costs were increasing and industry margins were being adversely impacted.

196.    For example, after Defendants announced price increases to be effective on October 1, 2004, an article published in Paint and Coatings Industry magazine on October 1, 2004 stated: "DuPont said the price increases are the result of rising raw-material costs, economic expansions that are driving 'very strong global Ti02 demand,' high capacity rates, and 'reinvestment economics for capital funding to support industry growth.'" Similar statements were issued by other suppliers.

197.    Huntsman said the price hikes "reflect both strong global market demand and the significant impact of raw material, energy and freight cost increases." These statements were false and misleading because (1) capacity was not "high"—the industry operating rate averaged approximately 87 percent in the 2002-2004 period and (2) ore costs, which are a substantial part of the raw material costs of manufacturing Titanium Dioxide, were either decreasing (ilmenite ore) or stable (rutile ore) during the 2002-2004 period.

198.    Defendants' and co-conspirators also actively hid the existence of the GSP from the public:

(a)    Millennium's Cianfichi stressed that the GSP was confidential and advised that any references made to the public regarding market details should be described as "[Millennium] estimates and never as CEFIC data"

(b)    Kronos's Basson reminded colleagues that "[a]ny TDMA statistics that are shared with you or any specifics which you may share with your co-workers, should UNDER NO CIRCUMSTANCES BE DIVULGED TO ANY THIRD PARTIES"

199.    Other examples of Defendants' fraudulent concealment include the following:

(a)    Defendants had countless non-public meetings and communications with each other of which Plaintiffs were not aware, and Defendants also operated a secret statistics program. TDMA also held a number of multi-lateral meetings for which there are no minutes or notes.   The TDMA's "General Committee" or "GC," typically met in person three times a year, and included representatives from Millennium, Huntsman, Kronos and Tronox.  Through their representatives, these companies and DuPont also attended annual GSP meetings, usually every January.

(b)    Defendants and their co-conspirators destroyed potential evidence of collusion. As the Titanium Dixoide market was becoming more "uncertain" in 2000—and the Defendants were trying to get customers to accept an industry price increase— Millennium's Bruce Zwicker spoke with Jim Fisher in September 2000 about Kronos. According to an email sent by Zwicker to Cianfichi and other colleagues dated in September 2000, Zwicker learned from Fisher that Kronos was in the process of creating a grade of Titanium Dioxide for sales to paint customers that could compete as a "clone" of

Dupont's widely-sold paint grade, R-706. Zwicker concluded the email with the instruction: "Please delete email."

(c)     Fisher testified in a deposition that he never saved e-mail, even after being instructed by direct purchasers' counsel to preserve documents.  He further destroyed handwritten notes reflecting knowledge of his conversations with industry personnel.  The only notes that remain reflect knowledge of future pricing moved by Defendants.

(d)     In a telephone conversation with a financial consulting firm, Jim Fisher explained that the 60 "published production capacities" of the pigment producers are "far below the real ones," and that DuPont, Millennium, and Kerr-McGee had a total of "350,000 tons of unused capacity."

(e)     Defendants used a "strategy" of providing pretextual explanations for price increases, telling customers that supply was "tight" (despite the existence of secret "unused" or excess capacity) in order to "demand a good price."

(f)     In 2004, Millennium's Cianfichi told customers through a Coatings World article that inventories were low in order to justify a price increase, but he told his staff that inventory was "too high" in North America.

(g)     In 2008, DuPont raised prices in the U.S. and stated in its Customer Communication Plan that "Global demand for TiO2 is expected to . . . increase[,]" whereas an internal DuPont email stated: "The market for TiO2 is more than well supplied, and demand unfortunately [is] very weak in the U.S."

(h)     In 2009, a Kronos executive emailed his colleagues about using "plant curtailments" to "scare the hell out of customers about the impending shortage" in order to raise prices.

1    200.    Defendants' customers, including Plaintiffs and members of the Classes, were

2    thus conditioned by experience in dealing with Defendants in what they believed to be a

3    competitive industry to expect price increases from time to time.  Plaintiffs and members of the

4    Classes were lulled into believing that price increases were the normal result of competitive

5    market forces rather than the product of collusive, unlawful efforts.  Indeed, as alleged herein,

6    Defendants and their co-conspirators made statements in the media in support of price

7    increases that were presumed to be true and were designed to convince members of the Classes

8    to pay purportedly legitimate price increases. Plaintiffs are informed and believe, and thereon

9    allege, that Defendants' reasons for the price increases of Titanium Dioxide during the Class

10   Period were materially false and/or misleading and were made, at least in part, in order to

11   conceal Defendants' anticompetitive scheme as alleged in this Complaint.

12   201.    Judge Bennett found an adequate basis to defeat Defendants' motion for

13   summary judgment based on the statute of limitations in the Direct Purchaser Litigation, citing

14   evidence "suggesting that the Defendants attempted to minimize the appearance of collusion"

15   and "indicating that the Defendants gave inaccurate information to customers in order to justify

16   their price increase."  Direct Purchaser Litigation, Memorandum Opinion at 59-60 (Dkt. 498).

17   202.    The affirmative acts of Defendants alleged herein, including acts in furtherance

18   of the conspiracy, were wrongfully concealed and carried out in a manner that precluded

19   detection.

20   203.    Because Defendants' agreements, understandings, and conspiracies were both

21   self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs

22   and members of the Classes had no knowledge of the alleged conspiracy or of any factors or

23   information that would have caused a reasonably diligent person to investigate whether a

24

conspiracy existed.  Plaintiffs were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices throughout the United States for Architectural Paints containing Titanium Dioxide during the Class Period.

204.   For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until August 28, 2012.

## X.   CLAIMS FOR RELIEF

<div align="center">

**FIRST CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(On Behalf of Plaintiffs and the Damages Classes)**

</div>

205.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

206.   From as early as January 2002 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Titanium Dioxide in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below

207.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetetive levels the price for Titanium Dioxide and to allocate customers for Titanium Dioxide in the United States.

208.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)   Participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Titanium Dioxide at certain levels, and otherwise fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Titanium Dioxide sold in the United States;

(b)     Allocating customers and markets for Titanium Dioxide in the United States in furtherance of their agreements; and

(c)     Participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

209.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and the allocate customers with respect to Titanium Dioxide.

210.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

211.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*   Accordingly, Consumers and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

212.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Titanium Dioxide at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Titanium Dioxide.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above

and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Titanium Dioxide; and (2) Allocating among themselves the production of Titanium Dioxide.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California:  (1) Price competition in the sale of Titanium Dioxide has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Architectural Paints containing Titanium Dioxide from entities who purchased the chemical from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Architectural Paints containing Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

213.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

the District of Columbia; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Consumers and members of the Damages Class, who resided in the District of Columbia and/or purchased Architectural Paints containing Titanium Dioxide in the District of Columbia, were deprived of free and open competition, in the District of Columbia; and (4) Consumers and members of the Damages Class, who resided in the District of Columbia and/or purchased Architectural Paints containing Titanium Dioxide in the District of Columbia, paid supracompetitive, artificially inflated prices in the District of Columbia for Architectural Paints containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Consumers and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-45601, *et seq.*

214.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

1   artificially high levels throughout Iowa; (3) Consumers and members of the Damages Class

2   were deprived of free and open competition; and (4) Consumers and members of the

3   Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints

4   containing Titanium Dioxide.

5        (b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa

6   commerce.

7        (c)     As a direct and proximate result of Defendants' unlawful conduct, Consumers

8   and members of the Damages Class have been injured in their business and property and

9   are threatened with further injury.

10        (d)     By reason of the foregoing, Defendants have entered into agreements in restraint

11   of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Consumers and members

12   of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

13        215.     Defendants have entered into an unlawful agreement in restraint of trade in

14   violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

15        (a)     Defendants' combinations or conspiracies had the following effects:   (1)

16   Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

17   Kansas; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

18   artificially high levels throughout Kansas; (3) Consumers and members of the Damages

19   Class were deprived of free and open competition; and (4) Consumers and members of the

20   Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints

21   containing Titanium Dioxide.

22        (b)     During the Class Period, Defendants' illegal conduct substantially affected

23   Kansas commerce.

24

1    (c)    As a direct and proximate result of Defendants' unlawful conduct, Consumers

2    and members of the Damages Class have been injured in their business and property and

3    are threatened with further injury.

4    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

5    of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Consumers and

6    members of the Damages Class seek all forms of relief available under Kansas Stat. Ann.

7    §§ 50-101, *et seq.*

8    216.    Defendants have entered into an unlawful agreement in restraint of trade in

9    violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

10    (a)    Defendants' combinations or conspiracies had the following effects:    (1)

11    Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

12    Michigan; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

13    artificially high levels throughout Michigan; (3) Consumers and members of the Damages

14    Class were deprived of free and open competition; and (4) Consumers and members of the

15    Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints

16    containing Titanium Dioxide.

17    (b)    During the Class Period, Defendants' illegal conduct substantially affected

18    Michigan commerce.

19    (c)    As a direct and proximate result of Defendants' unlawful conduct, Consumers

20    and members of the Damages Class have been injured in their business and property and

21    are threatened with further injury.

22    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

23    of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*   Accordingly,

24

Consumers and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

217.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(b)   During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*   Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

218.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:    (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased Architectural Paints containing Titanium Dioxide in Mississippi were deprived of free and open competition in Mississippi; and (4) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased Architectural Paints containing Titanium Dioxide in Mississippi paid supracompetitive, artificially inflated prices in Mississippi for Architectural Paints containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

219.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:    (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

Nebraska; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*   Accordingly, Consumers and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Consumers and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

221.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Consumers and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:   (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New York; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class who resided in New York and/or purchased Architectural Paints containing Titanium Dioxide in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Damages Class who resided in New York paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide when they purchased, in New York, Architectural Paints containing Titanium Dioxide or purchased, in New York, Architectural Paints containing Titanium Dioxide that were otherwise of lower quality than would have been absent the conspirators' illegal acts, or were unable to purchase Architectural Paints containing Titanium Dioxide that they would have otherwise purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

223.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased Architectural Paints containing Titanium Dioxide were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased Architectural Paints containing Titanium Dioxide in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for Architectural Paints containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

1    (c)    By reason of the foregoing, Defendants have entered into agreements in restraint

2 of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs

3 and members of the Damages Class seek all relief available under North Carolina Gen.

4 Stat. §§ 75-1, *et seq.*

5    224.    Defendants have entered into an unlawful agreement in restraint of trade in

6 violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

7    (a)    Defendants' combinations or conspiracies had the following effects: (1)

8 Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout

9 Oregon; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

10 artificially high levels throughout Oregon; (3) Consumers and members of the Damages

11 Class were deprived of free and open competition; and (4) Consumers and members of the

12 Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints

13 containing Titanium Dioxide.

14    (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

15 Oregon commerce.

16    (c)    As a direct and proximate result of Defendants' unlawful conduct, Consumers

17 and members of the Damages Class have been injured in their business and property and

18 are threatened with further injury.

19    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

20 of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly,

21 Consumers and members of the Damages Class seek all relief available under Oregon

22 Revised Statutes §§ 646.705, *et seq.*

23

24

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:    (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class who resided in Tennessee and/or purchased Architectural Paints containing Titanium Dioxide in Tennessee were deprived of free and open competition in Tennessee; and (4) Plaintiffs and members of the Damages Class who resided in Tennessee and/or purchased Architectural Paints containing Titanium Dioxide in Tennessee paid supracompetitive, artificially inflated prices in Tennessee for Architectural Paints containing Titanium Dioxide.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

226.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Damages Class have paid

1   more for Architectural Paints containing Titanium Dioxide than they otherwise would have

2   paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust

3   laws of the above states were designed to prevent and flows from that which makes

4   Defendants' conduct unlawful.

5       227.    In addition, Defendants have profited significantly from the aforesaid

6   conspiracy.   Defendants' profits derived from their anticompetitive conduct come at the

7   expense and detriment of the Plaintiffs and members of the Damages Class.

8       228.    Accordingly, Plaintiffs and the members of the Damages Class in each of the

9   above jurisdictions seek damages (including statutory damages where applicable), to be trebled

10  or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

11  including reasonable attorneys' fees, to the extent permitted by the above state laws.

12                          **SECOND CLAIM FOR RELIEF**
                       **Violation of State Consumer Protection Statutes**
13                     **(On Behalf of Plaintiffs and the Damages Classes)**

14      229.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

15  every allegation set forth in the preceding paragraphs of this Complaint.

16      230.    Defendants knowingly engaged in unlawful, unfair competition or unfair,

17  unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer

18  protection and unfair competition statutes listed below.

19      231.    Defendants have knowingly entered into an unlawful agreement in restraint of

20  trade in violation of the Arkansas Code Annotated, § 4-88-101.

21      (a)     Defendants knowingly agreed to, and did in fact, act in restraint of trade or

22          commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and

23          artificially inflated levels, the prices at which Architectural Paints containing Titanium

24

Dioxide were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Consumers and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Consumers and members of the Damages Class seek all relief available under that statute.

232.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged in this Complaint violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Architectural Paints containing Titanium Dioxide in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)       Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout California; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class who resided in California and/or purchased Architectural Paints containing Titanium Dioxide in California were deprived of free and open competition in California; and (4) Plaintiffs and members of the Damages Class who resided in California and/or purchased Architectural Paints containing Titanium Dioxide in California paid supracompetitive, artificially inflated prices in California for Architectural Paints containing Titanium Dioxide.

(h)       Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)       Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j)       The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(k)       The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially inflated prices for Architectural Paints containing Titanium Dioxide.  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

1      (l)      The conduct of Defendants as alleged in this Complaint violates Section 17200

2  of the California Business and Professions Code.

3      (m)    As alleged in this Complaint, Defendants and their co-conspirators have been

4  unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

5  competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to

6  equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

7  compensation, and benefits that may have been obtained by Defendants as a result of such

8  business practices, pursuant to the California Business and Professions Code, Sections

9  17203 and 17204.

10      233.    Defendants have engaged in unfair competition or unlawful, unfair,

11  unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-

12  3901, *et seq.*

13      (a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by

14  affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels,

15  the prices at which Titanium Dioxide was sold, distributed, or obtained in the District of

16  Columbia.

17      (b)     The foregoing conduct constituted "unlawful trade practices" within the

18  meaning of D.C. Code § 28-3904.

19      (c)     During the Class Period, Defendants' illegal conduct substantially affected

20  District of Columbia commerce and consumers.

21      (d)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide

22  price competition was restrained, suppressed, and eliminated throughout the District of

23  Columbia; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at

24

artificially high levels throughout the District of Columbia; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(e)     As a direct and proximate result of Defendants' conduct, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Consumers and members of the Damages Class seek all relief available under that statute.

234.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Florida; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

1    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

2    members of the Damages Class have been injured in their business and property and are

3    threatened with further injury.

4    (d)    Defendants have engaged in unfair competition or unlawful, unfair, or deceptive

5    acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs

6    and members of the Damages Class seek all relief available under that statute.

7    235.    Defendants have engaged in unfair competition or unlawful, unfair,

8    unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch.

9    93A, § 1, *et seq.*

10    (a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

11    affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated

12    levels, the prices at which Titanium Dioxide was sold, distributed, or obtained in

13    Massachusetts and took efforts to conceal their agreements from Consumers and members

14    of the Damages Class.

15    (b)    The aforementioned conduct on the part of the Defendants constituted "unfair

16    methods of competition and unfair or deceptive acts or practices in the conduct of any trade

17    or commerce," in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2, 11.

18    (c)    Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide

19    price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2)

20    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high

21    levels throughout Massachusetts; (3) Consumers and members of the Damages Class were

22    deprived of free and open competition; and (4) Consumers and members of the Damages

23

24

1   Class paid supracompetitive, artificially inflated prices for Architectural Paints containing

2   Titanium Dioxide.

3        (d)     During the Class Period, Defendants' illegal conduct substantially affected

4   Massachusetts commerce and consumers.

5        (e)     As a direct and proximate result of the unlawful conduct of the Defendants,

6   Consumers and members of the Damages Class have been injured in their business and

7   property and are threatened with further injury.

8        (f)     Defendants have engaged in unfair competition or unfair or deceptive acts or

9   practices in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2,11 and, accordingly,

10  Consumers and members of the Damages Class seek all relief available under that statute.

11       236.    Defendants have engaged in unfair competition or unlawful, unfair,

12  unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising

13  Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

14       (a)     Defendants engaged in the conduct described in this Complaint in connection

15  with the sale of Architectural Paints containing Titanium Dioxide in a market that includes

16  Missouri.

17       (b)     During the Class Period, Defendants' illegal conduct substantially affected

18  Missouri commerce and consumers.

19       (c)     Defendants agreed to, and in fact did, fix, control, and/or maintain at artificial

20  and non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or

21  obtained in Missouri, which conduct constituted unfair practices in that it was unlawful

22  under federal and state law, violated public policy, was unethical, oppressive, and

23

24

unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Titanium Dioxide.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Architectural Paints containing Titanium Dioxide.

(e)      Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(f)      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(g)      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(h)      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment,

suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

237.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at a non-competitive and artificially inflated levels, the price at which Titanium Dioxide was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Consumers and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices" in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, and as set forth in N.M.S.A. § 57-12-2E, resulted in a gross disparity between the value received by Consumers and members of the Damages Class and the prices paid by them for Architectural Paints containing Titanium Dioxide.

(c)    Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Consumers and members of the Damages Class were deprived of free and open competition; and (4) Consumers and members of the Damages Class paid supracompetitive, artificially inflated prices for Architectural Paints containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Consumers and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Consumers and members of the Damages Class seek all relief available under that statute.

238.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and members of the Damages Class, to believe that the Architectural Paints containing Titanium Dioxide they had purchased had been sold at a legal, competitive price, when they had in fact been sold at a collusively obtained and inflated price, that passed on to them the artificially inflated price of Titanium Dioxide.

(c)     The conduct of the Defendants described in this Complaint constituted consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large,

1    and harmed the public interest of New York State in an honest marketplace in which

2    economic activity is conducted in a competitive manner.

3        (d)    Defendants' unlawful conduct had the following effects:  (1) Titanium Dioxide

4    price competition was restrained, suppressed, and eliminated throughout New York; (2)

5    Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high

6    levels throughout New York; (3) Plaintiffs and members of the Damages Class who reside

7    in and/or made purchases of Architectural Paints containing Titanium Dioxide in New

8    York were deprived of free and open competition and subject to Defendants' deceptive

9    practices in New York; and (4) Plaintiffs and members of the Damages Class who reside in

10   and/or made purchases of Architectural Paints containing Titanium Dioxide in New York

11   paid supracompetitive, artificially inflated prices in New York for Architectural Paints

12   containing Titanium Dioxide, and were subjected to Defendants' deceptive practice in New

13   York.

14       (e)    During the Class Period, Defendants' illegal conduct substantially affected New

15   York commerce and consumers.

16       (f)    During the Class Period, each of the Defendants named in this Complaint

17   directly, or indirectly and through affiliates they dominated and controlled, manufactured,

18   sold, and/or distributed Titanium Dioxide in New York.

19       (g)    Plaintiffs and members of the Damages Class seek all relief available pursuant

20   to N.Y. Gen. Bus. Law § 349(h).

21       239.    Defendants have engaged in unfair competition or unfair, unconscionable, or

22   deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

23

24

(a)     Defendants agreed to, and did in fat, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which Titanium Dioxide was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described in this Complaint constituted consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers in North Carolina or Architectural Paints containing Titanium Dioxide:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class who reside in North Carolina and/or purchased Architectural Paints containing Titanium Dioxide in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased Architectural Paints containing Titanium Dioxide in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for Architectural Paints containing Titanium Dioxide.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(e)     During the Class Period, each of the Defendants named in this  Complaint, directly, or indirectly and through affiliated they dominated and controlled, manufactured, sold, and/or distributed Titanium Dioxide in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Damages Classes)**

240.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

241.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Arkansas by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Consumers and members of the Damages Class have conferred a benefit on Defendants.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

(c)     Defendants received something of value – Defendants' ill-gotten profits from illegally inflated prices of Titanium Dioxide – to which they were not entitled and which they must restore.

(d)     Defendants engaged in conduct and acts, with the requisite intent, and under the circumstances, to make their receipt of profits from unlawfully inflated prices for Titanium Dioxide compensable, as equity and good conscience dictate they may not retain. Defendants are at fault for their gains.

242.    As a result of their unlawful conduct described above, Defendants have and will continued to be unjustly enriched in violation of the common law of Arizona by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have been enriched from their unlawful acts.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of Damages Class for Architectural Paints containing Titanium Dioxide.

(c)     Consumers and members of the Damages Class have been impoverished as a result of Defendants' conspiracy.

(d)     There is a connection between the Defendants' enrichment and the impoverishment of the Consumers and members of the Damages Class because both were fundamentally caused by Defendants' wrongful and unlawful acts and the benefit flowed from Consumers and members of the Damages Class to Defendants.

(e)     There is no justification for the Defendants' enrichment and the impoverishment of the Consumers and members of the Damages Class.

243.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of California by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and members of Damages Class have conferred a benefit on Defendants.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide.

244.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of the District of Columbia by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Damages Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

245.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Iowa by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants were cognizant of and appreciated the benefit conferred on them by Consumers and members of the Damages Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Damages Class.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                                                    Page 99 of 117

(c)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

246.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Massachusetts by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful acts at the expense of Consumers and members of the Damages Class.

(b)     Consumers and members of the Damages Class were not compensated for the benefit they conferred on Defendants.

(c)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

247.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Minnesota by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and the members of the Damages Class conferred a benefit on the Defendants through their payment of unlawfully inflated prices for Architectural Paints containing Titanium Dioxide.

(b)     Defendants were cognizant of and appreciated the benefit conferred on them by Plaintiffs and the members of the Damages Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(c)     Defendants have benefitted from their unlawful acts by accepting and retaining the benefit conferred by Plaintiffs and the members of the Damages Class.

(d)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide without payment to the Plaintiffs and the members of the Damages Class.

248.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Mississippi by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and the members of the Damages Class have conferred a benefit upon Defendants as a result of mistakes of fact concerning the pricing of Titanium.

(b)     Defendants have benefitted from their unlawful acts by accepting and retaining the benefit conferred by Plaintiffs and the members of the Damages Class.

(c)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide.

249.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Missouri by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants were cognizant of and appreciated the benefit conferred on them by Plaintiffs and the members of the Damages Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)     Defendants were enriched at the expense of the Plaintiffs and the members of the Damages Class.

(c)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Damages Class.

(d)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide.

250.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Nebraska by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Damages Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

251.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of New Hampshire by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Damages Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

252.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of New Mexico by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have knowingly benefitted from their unlawful acts by accepting the benefit conferred by Consumers and members of the Damages Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

253.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of New York by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted and been enriched from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Damages Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide.

(c)     Defendants' ill-gotten gains were at the expense of Plaintiffs and members of the Damages Class through their payment of unlawfully inflated prices for Architectural Paints containing Titanium Dioxide.

(d)     It is against equity and good conscience to permit Defendants to retain their ill-gotten profits.

254.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of North Carolina by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Plaintiffs and the members of the Damages Class have conferred a measurable benefit on the Defendants in the form of paying unlawfully inflated prices for Architectural Paints containing Titanium Dioxide.

(b)     Defendants, with conscious knowledge, have benefitted from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Damages Class.

(c)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide.

(d)     Plaintiffs and the members of the Damages Class did not confer the benefit of ill-gotten profits on Defendants gratuitously or officiously, but rather as a result of, and through, Defendants' unlawful conspiracy.

255.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Oregon by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)     Defendants have benefitted from their unlawful by accepting the benefit conferred by Consumers and members of the Damages Class.

(b)     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Consumers and members of the Damages Class for Architectural Paints containing Titanium Dioxide.

256.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched in violation of the common law of Tennessee by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

(a)    Defendants were cognizant of, appreciated, and desired the benefit conferred on them by Plaintiffs and the members of the Damages Class through their receipt of ill-gotten profits as a result of unlawfully inflated prices for Titanium Dioxide.

(b)    Defendants have benefitted from their unlawful acts by accepting the benefit conferred by Plaintiffs and the members of the Damages Class.

(c)    It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs or the members of the Damages Class for Architectural Paints containing Titanium Dioxide.

257.    Plaintiffs and the members of the classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

258.    Pursuit of any remedies against the entities from which Plaintiffs and members of the Damages Class purchased products containing Titanium Dioxide subject to Defendants' conspiracy would have been futile, given that those entities did not take part in Defendants' conspiracy.

**FOURTH CLAIM FOR RELIEF**
**Injunctive and Equitable Relief**
**(On Behalf of Plaintiffs and the Nationwide Class)**

259.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

260.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

261.    At least as early as January 2002, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Titanium Dioxide, thereby creating anticompetitive effects.

262.    The anticompetitive acts were intentionally directed at the United States market for Titanium Dioxide and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Titanium Dioxide throughout the United States.

263.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Titanium Dioxide.

264.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Titanium Dioxide have been harmed by being forced to pay inflated, supracompetitive prices for Titanium Dioxide.

265.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Titanium Dioxide has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c)     Prices for Architectural Paints purchased by Plaintiffs and the members of the Nationwide Class containing Titanium Dioxide manufactured by Defendants and their co--conspirators were inflated; and

(d)     Plaintiffs and members of the Nationwide Class who purchased Architectural Paints containing Titanium Dioxide indirectly from Defendants have been deprived of the benefits of free and open competition.

266.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Titanium Dioxide than they would have paid and will pay in the absence of the conspiracy.

267.     Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Titanium Dioxide.

268.     Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Titanium Dioxide.

269.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

270.   There being no injunction in force preventing repetition of Defendants' conspiratorial conduct, Plaintiffs will face possible future antitrust injury unless this Court enjoins the conduct and all improper information exchanges that facilitated it.  Thus, Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing them from repeating the violations alleged herein.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(a)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.   The unlawful conduct, contract, conspiracy, or combination alleged in this Complaint be adjudged and decreed:

(a)   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth in this Complaint; and

(b)   Acts of unjust enrichment by Defendants as set forth in this Complaint.

C.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under applicable laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

1    D.    Plaintiffs and the members of the Damages Class recover damages, to the

2    maximum extent allowed by applicable laws, in the form of restitution and/or disgorgement of

3    profits unlawfully gained from them;

4    E.    Defendants, their affiliates, successors, transferees, assignees, and other officers,

5    directors, partners, agents, and employees thereof, and all other persons acting or claiming to

6    act on their behalf or in concert with them, be permanently enjoined and restrained from in any

7    manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination

8    alleged herein, or from entering into any other contract, conspiracy, or combination having a

9    similar purpose or effect, and from adopting or following any practice, plan, program, or

10   device having a similar purpose or effect;

11   F.    Plaintiffs and the members of the Damages Class are awarded restitution,

12   including disgorgement of profits Defendants obtained as a result of their acts of unfair

13   competition and acts of unjust enrichment;

14   G.    Plaintiffs and the members of the Damages Class be awarded pre- and post-

15   judgment interest as provided by law, and that such interest be awarded at the highest legal rate

16   from and after the date of service of this Complaint;

17   H.    Plaintiffs and the members of the Classes recover their costs of suit, including

18   reasonable attorneys' fees, as provided by law; and

19   I.    Plaintiffs and members of the Classes have such other and further relief as the

20   case may require and the Court may deem just and proper.

21                                    **JURY DEMAND**

22   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

23   Procedure, of all issues so triable.

24   Dated: September, 29, 2015                     Respectfully submitted,

Third Amended Class Action Complaint
Case No. 13-cv-01180 (BLF)                                      Page 109 of 117

1

2

PRATT & ASSOCIATES

*/s/ Ben F. Pierce Gore*

3    Ben F. Pierce Gore (SBN 128515)
1871 The Alameda, Suite 425

4    San Jose, California 95126
Telephone:   (408) 369-0800

5    Facsimile:    (408) 369-0752
pgore@prattattorneys.com

6

7    Don Barrett (admitted *pro hac vice*)     Jonathan W. Cuneo (admitted *pro hac vice*)
Barrett Law Group, P.A.     Joel Davidow (*pro hac vice* to be filed)

8    P.O. Box 927     Katherine Van Dyck (admitted *pro hac vice*)
404 Court Square     Victoria Romanenko (admitted *pro hac vice*)

9    Lexington, MS 39095     Cuneo Gilbert & LaDuca LLP
Telephone: (662) 834-2488     507 C Street, N.E.

10   dbarrett@barrettlawgroup.com     Washington, DC 20002
Telephone:     (202) 789-3960

11   Charles F. Barrett  (admitted *pro hac vice*)   Facsimile:      (202) 789-1813
Charles Barrett, P.C.     jonc@cuneolaw.com

12   6518 Highway 100, Suite 210     joel@cuneolaw.com
Nashville, TN 37205     kvandyck@cuneolaw.com

13   Telephone:   (615) 515-3393     vicky@cuneolaw.com
Facsimile:    (615) 515-3395

14   Email: charles@cfbfirm.com

15   Thomas P. Thrash (admitted *pro hac vice*)   Dewitt Lovelace
Marcus N. Bozeman     Lovelace & Associates, P.A.

16   Thrash Law Firm, P.A.     12870 US Hwy 98 West, Ste. 200
1101 Garland Street     Miramar Beach, FL 32550

17   Little Rock, AR 72201     Telephone: (850) 837-6020
Telephone: (501) 374-1058     dml@lovelacelaw.com

18   tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

19

Shawn M. Raiter     Phillip Duncan

20   Larson • King, LLP     Richard Quintus
2800 Wells Fargo Place     Duncan Firm, P.A.

21   30 East Seventh Street     900 S. Shackleford, Suite 725
St. Paul, MN 55101     Little Rock, AR 72211

22   Telephone: (651) 312-6500     Telephone: (501) 228-7600
sraiter@larsonking.com     phillip@duncanfirm.com

23             richard@duncanfirm.com

Gerard V. Mantese

24

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-01180 (BLF)                

1 | Mantese Honigman Rossman &
Williamson, P.C.
2 | 1361 E. Big Beaver Road
Troy, Michigan 48083
3 | Telephone:     (248) 457-9200
Facsimile:     (248) 457-9201
4 | gmantese@manteselaw.com                    *Attorneys for Plaintiffs and the Putative Class*